IN THE
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON
STATE OF LOUISIANA

STATE EX REL. Rigoberto Funes
        Petitioner
            DOCKET NO. 08-5641

VERSUS
            FILED_____

BURL CAIN, WARDEN
LA. STATE PENITENTIARY
        Respondent
            Deputy Clerk

## PETITION AND ORDER FOR
## WRIT OF HABEAS CORPUS AD TESTIFICANDUM

MAY IT PLEASE THE COURT:

Petitioner, Rigoberto Funes, in proper person, respectfully request this Honorable Court to order the Respondent Warden to produce petitioner for an Evidentiary Hearing, pursuant to Louisiana Code of Criminal Procedure, *Article 930.4* for the following reasons to wit:

I.

That, said petitioner, Rigoberto Funes # 571875 , is incarcerated in the Louisiana State Penitentiary, at Angola, Louisiana.

II.

That petitioner, therefore, desires that a Writ of Habeas Corpus Ad Testificandum be issued and directed to Burl Cain, Warden at the Louisiana State Penitentiary, Angola, LA, to produce the person of Rigoberto Funes, # 571875 , petitioner for an evidentiary hearing to be held at the 24TH Judicial District Court, Parish of Jefferson, State of Louisiana, on this _____ day of _____, 2013, at ____ o'clock ____ .m.

WHEREFORE, premises considered, petitioner prays that a Writ of Habeas Corpus Ad Testificandum be issued herein as hereinafter set forth so that the petitioner, Rigoberto Funes # 571875 , may be present to present witnesses and testify at the hearing set in the above entitled cause.

RESPECTFULLY SUBMITTED:

x *Rigoberto Funes*
Rigoberto Funes # 571875
Main Prison, Spruce-4
LA. STATE PENITENTIARY
ANGOLA, LA 70712

IN THE
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON
STATE OF LOUISIANA

STATE EX REL. Rigoberto Funes                    DOCKET NO. 08-5641
                    Petitioner

VERSUS                                           FILED _____

BURL CAIN, WARDEN                                _____
LA. STATE PENITENTIARY                           Deputy Clerk
                    Respondent

## ORDER

IT IS ORDERED that a Writ of Habeas Corpus Ad Testificandum be issued on the foregoing

petition and be directed to Burl Cain, Warden, Louisiana State Penitentiary, Angola, Louisiana, to

produce the person, Rigoberto Funes # 571875 , for an Evidentiary Hearing to be held at the

24TH Judicial District Court, Parish of Jefferson, Gretna, La., State of Louisiana, on this_____ day

of_____, 2013, at the time of_____ o'clock _____.m.

Thus done and signed in the 24TH Judicial District Court, Parish of Jefferson, Gretna, La, on

this ___ day of_____, 2013.


                                             _____
                                             DISTRICT COURT JUDGE


Please Serve:

Rigoberto Funes # 571875
Main Prison, Spruce-4
La. State Penitentiary
Angola, LA 70712

173

# Appendix #12

Order denying Petitioner's Post-conviction Request for Admissions
because the judge erroneously believes that Requests for Admissions
could only be had in civil suits, denial of appointment of counsel,
denial of request for evidentiary hearing, denial of request for Writ of
Habeas Corpus Ad testificandum, and denial and/or erroneous barring
of multiple claims. **PLEASE? COMPARE THIS ORDER WITH
THE "EXPLANATORY CONTENTS" OF APPENDIX #1.**

**RECEIVED**

SEP-2-3-2013

Legal Programs Department

TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON
STATE OF LOUISIANA

**RECEIVED**

SEP #0 2013

NO. 08-5641

STATE OF LOUISIANA

DIVISION "O"

VERSUS

RIGOBERTO FUNES

FILED: 9-13-13

**DEPUTY CLERK**

*M* **ORDER**

This matter comes before the court on the petitioner's **APPLICATION FOR POST-CONVICTION RELIEF, STAMPED AS FILED JUNE 6, 2013, STATE'S REPLY, STAMPED AS FILED AUGUST 12, 2013, PETITIONER'S TRAVERSAL, STAMPED AS FILED SEPTEMBER 10, 2013, and PETITIONER'S RE-URGED MOTION FOR APPOINTMENT OF COUNSEL AND EVIDENTIARY HEARING  ALSO  PETITIONER REQUESTS  DISCOVERY  AND AUTHENTICATION  OF  DOCUMENTS : SECURED  THROUGH  DISCOVERY REQUEST FOR ADMISSIONS RELATIVE TO PLAINTIFF'S REQUEST FOR PCR RELIEF, and PETITION AND ORDER FOR WRIT OF HABEAS CORPUS AD TESTIFICANDUM, STAMPED AS FILED SEPTEMBER 10, 2013.**

On July 29, 2010, the petitioner was convicted of counts #1, #3, and #4, LSA-R.S. 14:30.1, relative to second degree murder. On August 5, 2010, the court sentenced him on each count to life imprisonment at hard labor. His convictions were affirmed on appeal. *State v. Funes*, 11-120 (La. App. 5 Cir. 12/28/11) 88 So.3d 490; writ denied, 2012-290 (La. 5/25/12) 90 So.3d 408.

Petitioner filed an application for post-conviction relief, alleging the following claims:

1.  Parish of East Jefferson, through its public assistance offices, has been violating the National Votes Rights Act, which in turn had a direct impact of the composition of the jury, and whether or not this is a form of jury fixing, violating due process and equal protection.

2.  Deferral of ineffective assistance of counsel claim from direct appeal to post-conviction relief constitutes cause mandating appointment of counsel.

3.  Right to fair trial was violated during jury selection (*Batson* and *Strickland* violations).

4.  Trial court violated petitioner's due process and right to fair trial in failing to instruct or sequester jury when it retired during recess and breaks during trial.

5.  Trial court committed reversible error in making erroneous and misleading comments on responsive verdicts.

6.  Prosecutorial misconduct occurred when
    a.  Prosecutor improperly vouched for credibility of state witness.
    b.  Failed to correct perjured testimony in violation right to a fair trial.

7.  (skipped by petitioner)

8.  Ineffective assistance of counsel at trial when counsel failed to seek quashing of grand jury indictment on grounds of violation of the National Voter Registration Act of 1993. The jury panel for grand and petit jury were both quashable.

9.  Ineffective assistance of counsel by not securing rebuttal experts for defense.

10. Independent claim of "Grand Jury and Trial Jury discrimination". (This is a new fact previously not known to petitioner, meets the exception of 930.4 and 930.8(a)(1). (This claim shows a need for experts.)

11. Trial court violated petitioner's due process rights to a fair trial in failing to instruct or sequester the jury when it retired during recess and breaks during trial.

12. (Petitioner lists # 11 twice.) Conflict of interest against the entirety of the Jefferson Parish Indigent Defender Board for covering up the fact that

they were well aware of the systemic ineffective assistance being provided for the reasons set out in the "assessment of trial level defense services in Louisiana 40 years after Gideon."

## PROCEDURAL OBJECTIONS FOR
## APPLICATION FOR POST-CONVICTION RELIEF

The court finds **claims #1 and #10**, both pertaining to the jury venire, and **claim #12,** pertaining to the conflict of interest, procedurally barred from review. As the state surmises in it's response, the petitioner's application fails to state a claim cognizable on an application for post-conviction relief. As LSA-C.C.P. Art. 930.3 provides,

> *If the petitioner is in custody after sentence for conviction for an offense, relief shall be granted only on the following grounds:*
> *(1) The conviction was obtained in violation of the constitution of the United States or the state of Louisiana;*
> *(2) The court exceeded its jurisdiction;*
> *(3) The conviction or sentence subjected him to double jeopardy;*
> *(4) The limitations on the institution of prosecution had expired;*
> *(5) The statute creating the offense for which he was convicted and sentenced is unconstitutional; or*
> *(6) The conviction or sentence constitute the ex post facto application of law in violation of the constitution of the United States or the state of Louisiana.*
> *(7) The results of DNA testing performed pursuant to an application granted under Article 926.1 proves by clear and convincing evidence that the petitioner is factually innocent of the crime for which he was convicted.*

Thus, as these claims are not cognizable for review, and claims # 1, 10, and 12 will be denied.

As to **claim #2** pertaining to appointment of counsel, this claim is not cognizable in post-conviction relief and will be dismissed. (The court addresses petitioner's Motion for Appointment of Counsel in this order.)

The court finds **claims #4 and #11**, both pertaining to jury sequestration, **claim #5,** pertaining to jury instructions, and **claim #6a,** pertaining to prosecutor's comments vouching for credibility in closing arguments, are barred from review. If the application raises a claim the petitioner knew about, but inexcusably failed to raise prior to conviction, the court may deny relief. LSA-C.Cr.P. art. 930.4(B). Additionally, if the application alleges a claim that was raised at trial, but was inexcusably not pursued on appeal, the court may deny relief. LSA-C.Cr.P. art. 930.4(C). The petitioner's claims should be barred because they could have been, but were not, raised at trial or on appeal. Under LSA-C.Cr.P. art. 930.4, such claims should be denied.

Additionally, the court finds that under *State ex rel, Rice v. State*, 749 So.2d 650 (La. 1999), Petitioner's proper use of the Uniform Application satisfies the requirement of LSA-C.Cr.P. art. 930.4(F). Petitioner's failure to explain the reasons for not previously raising these claims. The court finds these claims are procedurally barred from judicial review.

The court concludes that the State's objections are valid and constitute bars to relief. As the State surmises in its response, these claims not valid or reviewable in accordance with LSA-C.Cr.P. 930.3.

Under LSA-C.Cr.P. art. 928, an application may be dismissed without an answer if the application fails to allege a claim which, if established, would entitle petitioner to relief. As to the above mentioned claims, petitioner has not alleged a claim valid claim reviewable in accordance with LSA- C.Cr.P. art. 930.3 or 930.4.

## APPOINTMENT OF COUNSEL, EVIDENTIARY HEARING ADMISSIONS

As to petitioner's request for appointment of counsel, petitioner is not entitled to court appointed counsel at this time. LSA-C.Cr.P. art. 930.7 states, "If petitioner is indigent and alleges a claim which, if established, would entitle him to relief, the court may appoint counsel." The court does not find that petitioner is entitled to court appointed counsel at this time.

The court also finds that petitioner is not entitled to an evidentiary hearing. Under LSA-C.Cr.P. art. 929, if the court determines that the factual and legal issues can be resolved based upon the application and answer, and supporting documents, the court may grant or deny relief without further proceedings. Based on the procedures set forth in the post-conviction statutes, the petitioner is not entitled to an evidentiary hearing at this time, and the court sees no reason

175

for the petitioner to be produced in court at this time, and so his petition for a writ of habeas ad testificandum is denied.

As to petitioner's pleading entitled, "Request for Admissions relative to Plaintiff's Request for PCR Relief," petitioner is not entitled to any admissions as this is not a civil filing/lawsuit, but rather an application for post-conviction relief. As such, this pleading is not cognizable in post-conviction proceedings and will be denied.

Finally, the court confirms that petitioner was not convicted of aggravated incest or any sexual offenses in this case, and the court's order of July 22, 2013 merely contains a typographical error mentioning "aggravated incest".

Accordingly,

IT IS ORDERED BY THE COURT that claims # 1, #2, #4, #5, #6a, #10, #11 and #12 of petitioner's application for post-conviction relief are procedurally barred and are hereby **DENIED.**

IT IS FURTHER ORDERED BY THE COURT that the State file an answer within thirty (30) days on the merits of claims #3, #6b, #7, #8, and #9.

IT IS FURTHER ORDERED BY THE COURT that petitioner's pleading entitled, "Request for Admissions relative to Plaintiff's Request for PCR Relief" be and is hereby **DENIED.**

IT IS FURTHER ORDERED BY THE COURT that petitioner's request for appointment of counsel be and is hereby **DENIED.**

IT IS FURTHER ORDERED BY THE COURT that petitioner's request for an evidentiary hearing of counsel be and is hereby **DENIED.**

IT IS FURTHER ORDERED BY THE COURT that petitioner's Petition and Order for Writ of Habeas Corpus Ad Testificandum be and is hereby **DENIED.**

Gretna, Louisiana, this 13th day of September 20 13

_____
J U D G E

PLEASE SERVE:

PETITIONER: Rigoberto Funes, DOC # 571875, Louisiana State Penitentiary, Angola, LA 70712

Terry Boudreux, District Attorney's Office, 200 Derbigny St., Gretna, LA 70053

Matthew Caplan, District Attorney's Office, 200 Derbigny St., Gretna, LA 70053

4TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON

# Appendix #13

Traversal to the State's **Procedural Objections** to petitioner's request for Post Conviction Relief, (filed 9/3/13

IN THE
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON
STATE OF LOUISIANA


DOCKET NO: 08-5541


Rigoberto Funes
                    Petitioner

VERSUS

BURL CAIN, WARDEN
L.A. STATE PENITENTIARY
                    Respondent


(All exhibits in State v. Isaiah Doyle, 05-05262, 24th JDC, are adopted in full here by their original identification in that case as the relate to the violation of the NVRA of 1993)


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRAVERSAL OF THE STATE'S PROCEDURAL OBJECTIONS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


**ALERT!!!:** "THE JUDGE'S ORDER OF JULY 22, 2013,
WRONGFULLY ALLEGED THAT PETITIONER WAS
CHARGED WITH AGGRAVATED INCEST. PETITIONER HAS NEVER
HAD A SEX CHARGE, PETITIONER WAS CHARGED
WITH HOMICIDE, THERE WAS NOTHING SEXUAL IN THIS CASE.


RESPECTFULLY SUBMITTED:


_Rigoberto Funes_
Rigoberto Funes #571875
MAIN PRISON, Spruce-4
L.A. STATE PENITENTIARY
ANGOLA, LA 70712

178

IN THE
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON
STATE OF LOUISIANA

STATE EX REL. Rigoberto Funes                    DOCKET NO. 08-5641
       Petitioner

VERSUS                                           FILED _____

BURL CAIN, WARDEN
LA. STATE PENITENTIARY                           _____
       Respondent                       Deputy Clerk

## MEMORANDUM OF LAW
## TRAVERSING THE ARGUMENTS OPPOSING RELIEF
## AND SUGGESTION THE IMPOSITION OF PROCEDURAL DEFAULT

**ALERT!!!:** "THE JUDGE'S ORDER OF JULY 22, 2013, WRONGFULLY ALLEGED THAT PETITIONER WAS CHARGED WITH AGGRAVATED INCEST. PETITIONER **HAS NEVER HAD A SEX CHARGE**, PETITIONER WAS CHARGED WITH HOMICIDE, THERE WAS NOTHING SEXUAL IN THIS CASE.

MAY IT PLEASE THE COURT:

NOW INTO COURT comes, Rigoberto Funes, who avers and maintains that all Officials acting in relation to this matter are first bound by their Official Oaths of Office executed pursuant *Article X. § 30* of the *Louisiana Constitution of 1974*. Conforming to that Oath requires the granting of petitioner's application for post-conviction relief.

Petitioner maintains that the issues presented in his Application for PCR and his Memorandum in Support, entitle petitioner to the nullification of all proceedings subsequent to the violation of the *NVRA of 1993*. Further, an evidentiary hearing is warranted with the appointment of counsel as required by *La.C.Cr.P. Art. 930.7(B)*. At such a hearing, a record will be established to support that petitioner is entitled to the relief sought. Petitioner herein shows that **"all" of the State's procedural objections are worthy of dismissal** due to ineffective assistance of counsel and conflict-of-interest laden representation.

## PROCEDURAL DEFAULT PURSUANT POST CONVICTION PROCEDURES

At first glance, the state's procedural objections appear to be valid. However, petitioner negates this appearance by urging that the entire framework of his case from start to end has been unconstitutionally impacted by the State's deliberate violation of the *NVRA of 1993*, resulting in "jury fixing" of the Grand and Petit Jury. Petitioner, contends that the state's procedural objections

to this/these claims where counsel failed to either "contemporaneously object" or file" Motion to Quash" are wholly meritless in the wake of the "cause" advanced for the procedural default.

The instant petitioner directs this Honorable Court's attention to the "cause" of his procedural default. Counsel did not file a motion to quash the grand jury nor the trial jury because, she/he, as a member of the Jefferson Parish Indigent defender Board suffered from a conflict-of-interest. This, constitutes an external factor which injected "cause" for the procedural default to be embedded in the defense camp without petitioner's knowledge nor disclosure from counsel.

Petitioner avers that both his trial and appellate counsel suffered from inter-related conflicts-of-interest.

(1) Trial counsel had an interest in not filing systemic ineffectiveness against his office nor an objection to his own failure to file proper and timely pre-trial motions to quash the Grand and Petit Jury's impaneled for violating of the *NVRA of 1993*. Therefore, counsel prejudiced his client by not preserving the issue for review on direct appeal where petitioner still had a right-to-counsel.

(2) Because the direct appeal is a stage where petitioner still has the right to counsel, Appellate counsel is a part of a system which "systemically" provides ineffective-assistance of counsel at the appellate level. Appellate counsel had a coveted interest in not pointing out to the appellate court, trial counsel's ineffective-assistance for the failure to file pre-trial motions to quash. This is so because, (appellate counsel) too had been ineffective in countless cases for never having pointed out the ineffective-assistance of trial counsel(s) for not filing pre-trial motions to quash indictments on the grounds of intentional violations of the *NVRA of 1993*, thereby tainting the jury pools for the Grand and Petit juries (juries which should have been quashed due to the taint).

(3) Further, because appellate counsel is an integral part of the systemic by-passing of these "structural error" claims and ineffective assistance at the appellate level, appellate counsel had an interest in not pointing out that, as individuals and as a collective body, the Attorney's of the Louisiana Appellate Project had been by-passing legitimate ineffective-assistance of counsel claims against Indigent Defender Board Attorneys as individuals and as a collective (in thousands of cases). The Indigent Defender Board has "never filed pre-motions to quash the grand or petit juries despite all the elements and evidence to prove those as viable claim since the public discovery of the systemic excluding of a distinctive class of people from becoming registered voters to be included in the state jury pools because of their, disability, race, economic or social status, and other identifiers set out in the *NVRA of 1993*."

Mr. Funes' makes a substantial showing that delay in filing these claims were not his fault, but rather the result of ineffective and conflict-laden counsel. Counsels who were appointed to him by the Court from the Jefferson Parish IDB Office and the Appellate Project. Petitioner presently lacks the ability to investigatehis claim; he lacks the academic capability to comprehend post conviction

statutes[1], procedures, and case law. He is totally dependant upon others. Presently, just as before PCR proceedings were instituted., petitioner is suffering from (A "constructive denial [2]," which constitutes a "structural defect" in the collateral review process as was true in the pre-trial, trial and post-trial proceedings. That claim falls under a continuation of the appellate process with respect to the claim of trial counsel ineffective assistance of counsel. Further, as the state exposes in all of its procedural objections, petitioner is only at risk of procedural default because without counsel he lacks the expertise and access to the other meaningful tools by which to make his initial application for post-conviction relief claim of ineffective assistance a competent one without the aid of counsel. Having counsel on one's first appeal has become a matter of right, and a claim of ineffective assistance of trial counsel in the first collateral review is deemed a continuation of the direct appeal process as explained in *Martinez v. Ryan* and *Trevino v. Thaler*.[3]

The state's request for dismissal of several of petitioner's claims under the holdings in *Francis v. Henderson*, 425 U.S. 536 (1976), must fail. A dismissal under *Francis* or any other

___

[1]

Petitioner has never had his intellectual capability assessed through an individual interview by one or more psychologists nor has he ever been administered a verbal intelligence and reading comprehension test. Also, he has never been administered the Law School Admission Test (LSAT) to compare his ability to those of students starting out in the field of law. Also, there has been no personality testing in order to get an estimate of his current emotional and mental well-being, gauging whether his capacity to perform the task he faced (filing a competent post-conviction), was negatively affected by depression or any other debilitating mental illness.

[2]

In post conviction proceedings, the most critical reason which justifies the help of a lawyer are: The need for factual investigation. Since the vast majority of post-conviction issues are based on facts that are not in the record, the most critical aspect of any case will be the required factual investigation. Regardless of how educated the individual, or how long he has to prepare, this task is simply impossible for the prisoner to perform from the Louisiana State Penitentiary.

[3]

Also, it is necessary to note that some years ago, the Law Libraries throughout D.O.C. had Westlaw online, due to a accidental firewall breach, some inmates accessed some information not appreciated by the department. Since that time all inmate have been made to suffer in their access to current material in their efforts to continue the litigation of their cases. The inmates are given access to Westlaw through a quarterly update system. As a matter of routine, this system is rarely if ever, up-to-date with cases decided upon within the last ninety (90) days. As a general rule, the system is six to 12 months behind and the opposition (state) has up to the moment access. This too contributes to the reality of why: Requiring a prisoner to litigate post-conviction without appointing counsel is a fundamental denial. Long before anyone close to cut back on prisoner access to courts, some courts had expressed the opinion that even a complete library would not provide the inmate with much chance of success: "In this court's view, access to the fullest law library anywhere is a useless and meaningless gesture in terms of the great mass of prisoners. The bulk and complexity [of the legal issues] have grown to such an extent that even experienced lawyers cannot function efficiently today without the support of special [research] tools . . . . To expect untrained laymen to work with entirely unfamiliar books whose contents they cannot understand, may be worthy of Lewis Carroll, but hardly satisfies the substance of the constitutional duty of [access to courts]. Access to full law libraries makes about as much sense as furnishing medical services through books like: "Brain Surgery Self Taught", or "How to remove your own Appendix", along with scalpels, drills, hemostats, sponges and sutures." *Falzerano v. Collier*, 535 F.Supp. 800, 803 (D.N.J. 1982)

reason advanced by the state on any claim is inapplicable to the fact specific circumstances of this case. To excuse Funes' failure to timely challenge the composition of the grand and petit jury pools at this late day, the "cause" and "prejudice" requirements of *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976), must be satisfied. The state maintains, by their urgency of procedural bars, that Funes has neither demonstrated "cause" nor "prejudice". This contention is belittled by the record as petitioner sufficiently raised and argued counsel's pre-trial ineffectiveness at trial and post-trial ineffectiveness. Collectively, these deficiencies constitute a "structural denial of counsel."

Here, Funes has argued his claims, both as independent and inter-related substantive issues. Funes's arguments encompass:

(1) the State of Louisiana engaged in [jury pool-fixing] for both the Grand and Petit juries through non-compliance with the *NVRA of 1993*.

(2) Trial counsel was systemically ineffective

(3) Counsel was actively engaged in a conflict-of-interest during Funes' representation as he was actively concealing from his client the systemic-ineffectiveness of the public defenders office set forth in "An Assessment of Trial-Level Indigent Defender Services in Louisiana 40 Years after Gideon."

(4) Counsel effectively engaged in an "active" and "systemic-conflict-of-interest" which caused counsel to be ineffective in not filing a motion to quash for both the Grand Jury and the Petit Jury, when counsel had reasonable access to the information which reflected discriminatory practices were in place through the violation of the *NVRA or 1993* and other means.

(5) The reason for the refusal to lodge any of these credible challenges to the systemic exclusion of those who are handicapped, minorities, and/or reliant upon public assistance is the systemic-ineffectiveness set in place by the design and operation of the Indigent Defender System.

(6) The Indigent Defender Board(s) is/are working in collusion with the District Attorney's Office to allow the clients of the IDB office to be subjected to unconstitutionally tainted and discriminately composed Grand and Petit Jury pools during the Indictment and trial process.

At the outset of this argument and for the sake of clarity, unlike *Deloch*, this petitioner did/does not speak the English language, and was given an interpreter for all proceedings. This fact goes to the truth of petitioner having been completely reliant upon the expertise and guiding hand of counsel.

In advancing procedural bars, the state chose several lines of defense. The procedural bar of counsel's failure to file a "Pre-trial Motion to Quash", or "failure to raise a contemporaneous objection" are extinguishable. However, the procedural bars invoked by the state are not immune from defeat. To overcome procedural default, petitioner need only establish "cause" for the procedural default. Also, because procedural bars are only applicable when the

state/defendant/respondent proves that the applicability of the procedural bar did not derive from a corrupted process or internal-scheme specifically designed or structured to deprive a party litigant of a protected right (right to effective counsel and/or conflict-free counsel) by fraud, silence, and or misrepresentation.

Although the state argues that counsel's failure to file a pre-trial motion to quash waived petitioner's equal protection claim against the State of Louisiana for "fixing" the composition of the criminal jury pools for the Grand and Petit jury through non-compliance with the mandates of the *NVRA of 1993*. Petitioner avers that the state is correct only to the extent that counsel failed in his obligation to file the requisite pre-trial motion. However, as a victim of counsel's failures, petitioner's assessment wholly contrasts that assessment with his own. What counsel failure to file the pre-trial motion does is, it establishes that counsel was not acting as counsel envisioned by the *Sixth Amendment*. The state's contention is thus self-defeated in assailing against petitioner. The state's argument only goes to support petitioner's claim of counsel's ineffective assistance deriving from counsel's conflicting-interest.

## CAUSE AND THE EQUITABLE TOLLING ISSUE

The State of Louisiana, in its desire to preserve the unconstitutional practice of depriving the poor, handicapped and un-educated from becoming members of the jury pools throughout the State of Louisiana seeks to prevent the adjudication of petitioner's claims.. This practice has prevented otherwise qualified persons from becoming registered voters. Petitioner avers that the following will show the self-exterminating nature of the procedural defaults raised by the State of Louisiana.

1.) Who is responsible for supplying the *Sixth Amendment's* standard of effective assistance of counsel for the poor 40+ years after *Gideon*, when a person is charged with a crime inside the borders of Jefferson Parish? *Answer: The State of Louisiana.*

2.) Does this State have obligation to comply with the *National Voter's Rights Act of 1993? Answer: Yes.*

3.) Is it true that the IDB Office of Jefferson Parish has never questioned the unconstitutional practices deriving from the State's Violation of the *NVRA of 1993? Answer: Yes.*

Considering the honest answers to these questions, the statute of limitations to filing a "Pre-trial Motion to Quash the Grand and Petit Juries is not a "jurisdictional bar" and as such, it is subject to equitable tolling. "The doctrine of equitable tolling preserves a plaintiff's claim when strict application of the statute of limitations would be inequitable." The doctrine applies principally where the plaintiff is actively misled by the defendant (in this case his attorney) about the cause of action or

is prevented in some extraordinary way from asserting the rights. *United States v. Patterson*, 211 F.3d 927, 930 (5th Cir. 2000). The ineffectiveness and hidden conflicts of counsel sealed his lips on these crucial matters, thereby, depriving petitioner of his only opportunity to timely challenge these unconstitutional practices.

Here these considerations are paramount because the arguments advanced herein have never been properly advanced in the prior cases which ended in adverse decisions. Petitioner's litigation does not suffer from the error of those litigants. Consequently, this case must be construed from it's own factual circumstances and the court is free from limitation of prior decisions wherein the same issue was advanced, but, advanced without any effort to meet the "cause" and "prejudice" requirement of *Francis*. Petitioner herein suffered the extra-ordinary preventive measures of his own defense counsel from urging these claims in a timely manner. **Petitioner, a Non-English speaking alien**, was completely subjected to the inclinations and whims of his defense counsel who was appointed and paid by the IDB office for the Parish of Jefferson.

## WHAT HAS THE JEFFERSON PARISH DISTRICT ATTORNEY'S OFFICE CONCEDED TO IN THIS LITIGATION?

Though the State argues that claim #1 fails to state a claim upon which relief can be granted, this contention is refuted in the state's own pleading. The State has not only found but also cited cases where this exact same issue was brought forth, if this was not an issue wherein relief could be granted, the state could not cite *Francis* nor *Davis*.

Petitioner avers that, if the State of Louisiana wishes to maintain its procedural default defense against petitioner's claim(s) of "the fixing of the Grand and Petit Jury so as to exclude those who were handicapped, minorities and/or dependent upon public assistance," then it likewise certifies this claim to be re-raised before the federal judiciary in habeas proceedings under it's sub-title of and inclusive argument that, this(the procedural defaults) occurred as a result of counsel's systemic ineffectiveness for not filing the pre-trial motion to quash.

**The price of maintaining the state' assertion of procedural default is the following** admission:

> Defendant's counsel from the Jefferson Parish IDB Office had an available and known opportunity to quash the instant indictment for the State's violation of the NVRA of 1993, likewise the Petit Jury could have been quashed for the same reason. The IDB Office knew or reasonably should have known these jury pools to be tainted by the discriminatory jury-pool-fixing-scheme, yet, by-passed urging the challenge in every case they have handled.

In urging procedural default against petitioner's claims, the State of Louisiana effectively advances petitioner's argument that counsel was ineffective and this ineffectiveness constitutes the "cause" for petitioner's subsequent default. Because of the conflict-of-interest, the IDB counsel rendered aid to petitioner's adversary and provided them a better opportunity to *indict* and *convict*. Through the "understood" and "unspoken agreement" between the Jefferson Parish District Attorney's Office and the Jefferson Parish IDB to: *Never file challenges to the unconstitutional jury pool composition nor selection processes, petitioner could only receive systemic-ineffective-assistance.*

## EFFECT OF THE STATES REFUSAL TO WITHDRAW THE PROCEDURAL DEFAULT RAISED AGAINST PETITIONER'S CLAIMS.

Should the State of Louisiana elect not to withdraw its procedural objections to the claims raised in petitioner's application for post-conviction relief and the Memorandum in Support, petitioner re-invokes his request for an evidentiary hearing and an opportunity to depose under oath, the entire staff of the IDB Office. Petitioner furthers that, he wishes to lodge public records request for the IDB Office and archived records of the Jefferson Parish IDB Office covering the expanse from 1994 to 2013, with respect to all clients who have been subject to either a Grand Jury Indictments and/or Petit Jury Trials. Further, petitioner aims to fully effectuate and prosecute his request for all the persons he listed as material-witnesses to this cause to come forth and testify under oath as to the reality of and the effects of the State of Louisiana violating the *National Voter's Rights Act of 1993*. These witnesses will specifically address how the State of Louisiana's non-compliance with the *NVRA of 1993* has negated the legality of the jury pool compositions in Jefferson Parish and through out the State of Louisiana. Also, the State should be mindful that the cases of *Deloch, Francis, and Davis* are not interchangeable with this case, as not one of those litigants raised the claim(s) of ineffective-assistance of counsel nor conflict-of-interest against the counsel representing them at the time of the procedural default. Here these claims are raised as independent substantive claims and they are also raised as inter-related claims.

As a matter of systemic reality, the Louisiana System of providing legal representation for indigents in the Parish of Jefferson is unconstitutional before the *6th Amendment of the United States* Constitution.

## THE STANDING AGREEMENT JEFFERSON PARISH DISTRICT ATTORNEY'S OFFICE AND THE JEFFERSON PARISH IDB SYSTEM WHICH ULTIMATELY BEGETS SYSTEMIC-CONFLICTS-OF-INTEREST

Petitioner avers through the art of deduction, the following is both true and evident. There exists and unwritten and unspoken of agreement which includes but is not limited to:

A.) No IDB Counsel will file pre-trial Motions to Quash the Grand or Petit Juries will be filed with respect to the State's Violation of the *NVRA of 1993*.

B.) No IDB Counsel will file any pleadings against himself/herself nor the Jefferson Parish IDB Office for promoting and/or preserving the systemic-unconstitutional Ineffective-Assistance of Counsel as set forth in, but not limited to, "An Assessment of Trial-Level Defense Services in Louisiana 40 years after Gideon," as published in 2004, nor which has become reality to the date of this filing in 2013.

Standing alone, these two agreements are depriving citizens of the honest and constitutionally required services of the Jefferson Parish IDB Office. These hidden agreements make the preservation of the *6th Amendment* and the compliance therewith impossible. Petitioner bears the burden of proving or disproving, through the actions or inactions of the Jefferson Parish IDB Office that this understood contract exists. In proving this strategically arranged and systemic ineffective assistance of counsel so as to warrant the finding of "cause" for the procedural default, the following facts are offered.

A.) Since the State of Louisiana's deliberate and systemic violation of the *NVRA of 1993*, was exposed in *Ferrand v. Schedler*, the Jefferson Parish IDB Office has not made any pre-trial motions to quash the Grand Jury and/or Petit Jury on the grounds of the jury pools being "fixed" by the state's refusal to comply with the *NVRA of 1993*, despite the issue being a viable and sustainable one.

B.) The Jefferson Parish IDB Office has not filed a single claim of systemic-ineffective assistance of counsel against the IDB as a whole. They are prevented from filing the claim because it is a conflict-of-interest to do so. It would be politically incorrect, socially deplorable, economically devastating and/or would likely cost their employment with the Jefferson Parish IDB. So, it is through the silence of the Jefferson Parish IBD, the Jefferson Parish District Attorney's Office is given a decisive advantage over any person in that parish as a part of a systemic reality and the extreme budgetary constraints of the Jefferson Parish IDB Office. Ultimately and realistically, this serves to deprive those charged with a crime in this parish of the *Sixth Amendment* Right to Counsel and *Fourteenth Amendment* Right, to Due Process and Equal Protection of the Law.

Given these truths, the only reasonable conclusion is evident, petitioner has been deprived of his *Sixth Amendment* right to counsel, his right to conflict-free counsel, and his right to a Grand and Petit Jury free from systemic-exclusion of handicapped, minorities and, those dependent upon public assistance.

## RELEVANT ATTACHMENTS WHICH WEIGH ON THIS COURT'S DECISION

(1.) Request for Post-Conviction Application-related "Admissions of Fact"

(2.) Request for Post-Conviction Application-related "Discovery"

(3.) Request Post-Conviction Application-related "Authentication of Documents request" for all documents acquired through discovery.

Case 2:14-cv-01342-JCZ-KWR   Document 1-1   Filed 06/05/14   Page 17 of 319

(4.)   Request for subpoena of out-of-state witnesses

(5.)   Request that the Jefferson Parish Public Defenders involved in this case submit to the subpoena powers of this Honorable Court to give testimony on the following issues which bear upon the court's decision:

     (a)   When did they become aware of the existence of the *NVRA of 1993*?

     (b)   In how many cases have they filed a motion to quash, and/or sought relief based upon the State of Louisiana's violation of the *NVRA of 1993*?

     (c)   In how many cases have the Jefferson Parish IPD filed pleadings alleging systemic ineffective assistance of counsel by their office as a result under-funding and but not limited to the findings set out in the **An Assessment of Trial-Level Indigent Defender Services in Louisiana 40 years after Gideon**?

Given that, as a matter of "routine" and "standard" operation, the Jefferson Parish IDB System effectively renders aid to the Jefferson Parish District Attorney's Office in their efforts to convict those charged with crimes in this parish, by effectively by-passing opportunities to file sustainable challenges (via Motion to Quash) against the Jefferson Parish practice of "fixing" the eligible pools of Grand and Petit Jurors, this conflict-of-interest overcomes any/ all procedural bars proffered.

Petitioner aims to call expert witnesses who are Defense Attorneys, the Authors of "An Assessment of Trial-Level Indigent Defender Services in Louisiana 40 Years after Gideon," members of the Louisiana Appellate Project; and members of the Spangenberg Group who made the first study of the Louisiana Indigent Defender System (proposal presented to Sam Salton, James Boren, and Nina Maples, September 11, 1990), and its subsequent results. Petitioner further invokes his right to call/summons/subpoena out-of-state witnesses for the purposes of fully developing the record relative to the claims raised through these pleadings.

## PETITIONER MAINTAINS THAT PRO SE PLEADINGS ARE TO BE HELD TO LESS STRINGENT STANDARDS THAN FORMAL PLEADINGS DRAFTED BY LAWYERS

The law, as it is presently exists, does not hold a pro se prisoner to the high standards in which attorneys are held to. Further, the pro se prisoner is to be given the benefit of any favorable doubts regarding his pleading, because he may suffer from an inability to articulate what is really wrong in his case. Most importantly, this is how the United States Supreme Court addressed the issue in *Haines v Kerner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972):

"A pro se complaint, "however inartfully **pleaded**," **must be held to "less stringent standards** than formal pleadings drafted by lawyers" and **can only be dismissed for failure to state a claim if it appears "**

"**beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.**'" Id., at 520-52, 92 S.Ct. at 596, quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Petitioner thus avers that pursuant the decision in *Haines v. Kerner*, the Court is confounded from accepting and applying the procedural bar of failure to state a claim, because the claim is a cognizable one before both State and Federal Courts.

Under this settled-principle of law, this Honorable Court is duty-bound to permit the development of the underlying facts of this case. Petitioner, hereby invokes his right to be held to a less stringent standard which provides that his pleading "can only be dismissed for failure to state a claim if it appears 'beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief'." Plaintiff contends that precedent of the United States Supreme Court regard pro se pleadings is binding.

## "PREJUDICE COMPONENT" FOR COUNSEL NOT SUBMITTING A CHALLENGE TO THE UNCONSTITUTIONAL GRAND AN PETIT JURY "FIXING" PROCEDURAL IN PLACE

The petitioner has established the "**cause**" requirement of *Francis v. Henderson*, 425 U.S. 536 (1976), and *Davis*, in the arguments presented above, hereinafter, the petitioner quotes the legal authority for the purposes of showing that he meets the "prejudice requirement" and a result of IDB Counsel's failure to challenge the jury-pool-fixing-scheme.

In the case of *Winters v. Cook*, 489 F.2d 174 (C.A.5 (Miss.) 1973), the U.S. Fifth Circuit addressed the issue of waiver by counsel:

> "Waiver by counsel-- As the court below found on clear record evidence, Winters attorney fully considered the possibility of raising constitutional objections to the racial composition of the grand jury, but rejected that course of action in favor of a plea of guilty. By such plea his client was assured of receiving the prosecution's recommendation of a life sentence with parole after serving ten years), thus avoiding what counsel reasonably considered was the distinct possibility of the death sentence. Counsel testified that the threat of his urging these constitutional objections to the jury selection procedures was the 'pry pole' that he used in getting the state to allow the defendant to enter a guilty plea. In his opinion as an experienced criminal attorney this procedure utilized the unlawful condition in the most effective way. 'Even the most skillful trial tacticians should be hard pressed to fault counsel's considered and conscientious strategy to waive this option in return for practical assurance that his client would not be executed. Where as here, a competent attorney who is well-versed in the defense of murder charges deliberately refrains from making a known constitutional objection to the composition of a grand or petit jury for strategic purposes, there has been a deliberate by-pass and waiver under *Fay v. Noia*, 372 U.S. 3912, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963)." (This Footnote is very important)[*]

---

[*] The same rationale set forth in *Winters v. Cook*, applies to all the state's claims, and in order to avoid redundancy, petitioner applies his contention of ineffective assistance of counsel

The prejudice suffered by petitioner Funes is summed up intelligently by the excerpt from the aforementioned court opinion. The attorney in that case used the "threat of his urging these constitutional objections to the jury selection procedures" as the "pry pole" "that he used in getting the state to allow the defendant to enter a guilty plea." This ( a constitutional attack against the unconstitutional composition of the Grand and petit jury pool, along with other necessitated verbal objections) is what IBD counsel in this case never considered, nor used despite the fact that this tactic has been available since 1973, and all the evidence to prove the claim was clearly ascertainable by counsel and available to counsel pre-trial. Even the State of Louisiana through the Parish of Jefferson, District Attorney, specified this fact in its procedural objection when they wrote:

"....and the petitioner in this case was as capable of learning these facts as was petitioner in that case." Id. at page -5 of 8- (state's procedural objections)"

Simply put, the state avers that the non-English speaking petitioner should have either known of this violation or should have learned this violation from a source other than counsel. If this is true of petitioner, how much more is this true of IDB counsel? When confronted with a similar question in *Hollis v. Davis*, 941 F.2d 1471 (C.A. 11 (Ala.) 1991), the court wrote extensively upon the premise which is likewise application here. In *Hollis* the Court wrote:

"But Mr. Hollis challenge involves the systematic exclusion of blacks from the pool from which grand and petit juries were chosen. This right could hardly have been better established by 1959, and any competent attorney practicing criminal defense in Alabama at the time should have known of it." Id. at 1477-78

"If Mr. Jinks did not assert this right because he was unaware of it, his representation was not "within the range of competence demanded of attorneys in criminal cases." *Strickland v. Washington*, 466 U.S. at 687, 104 S.Ct. at 2064 (quoting *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970)). A Justice of the Alabama Supreme Court noted in 1963 that "it is beyond the realm of speculation that any active lawyer, practicing law and residing in Montgomery, could fail to know that the question of the exclusion of Negroes from the juries in Montgomery County has been raised in recent years,... [I]t is inconceivable that any qualified and active local attorney would not know of the raising of the question,..." *Ex Parte Aaron*, 275 Ala. 377, 379 155 So.2d 334, cert. Denied, 375 U.S. 989, 84

coupled with the conflicting-interests maintained by counsel during all proceeding are what caused the lapses which the state now urges as lapses warranting the application of procedural default. Petitioner contends the District attorney enjoins him in proving the prejudice prong of ineffectiveness as counsel's failure are still rendering aid to the prosecution at this late hour. Counsels pre-trial and trial ineffectiveness is the state's sole basis for launching a procedural default assault against petitioner's claim of suffering constitutional deprivations.

"True enough, the Deloch case and this case is similar as to the primary claim raised, but Sidney Deloch, did not raise the independent substantive claims(s) of ineffective assistance of counsel nor conflict-of-interest. An for that reason, his claim failure, he (Deloch) never sought beyond *930.8(A)(2)* to establish the cause and prejudice components required by *French v. Henderson* nor *Davis v. United States*. And for the sake of clarity, *La.C.Cr.P. Art. 930.8(A)(1)* was not nor truly could it be a consideration here as petitioner's application for post-conviction relief is both timely and his very first.

S.Ct. 177, 11 L.Ed.2d 126 (1963) (Merrill, J., concurring ). Bullock County borders Montgomery County to the southeast. This ineffective assistance establishes cause for the procedural default."

In the rationale above we see the same principles at work in that case are also present and at work in this case. Likewise, it is: [beyond the realm of speculation that any active lawyer, practicing law and residing in Louisiana, could fail to know that the question of the exclusion of Negroes from the juries as a historical and present fact has been raised in recent years.... [I]t is inconceivable that any qualified and active local attorney would not know of the raising of the question.] Because of recent challenges aiming at the unconstitutionality of the Louisiana Grand Jury System and Petit Jury System, it should be common knowledge to the Jefferson Parish IBD Office to at least file a motion to quash, thereby, preserving the claim for later review if necessary and preventing future prejudice to the client's by having frustrated their ability to raise the challenge at a later date because counsel failed to file the requisite pre-trial motion to quash.

In recent years there has been *State v. Kenneth Dilosa*, 848 So.2d 546 (2003), *Campbell v. Louisiana*, 118 S.Ct. 1419 (1998), *State v. Rick Langley*, 711 So.2d 651 (1998), and *Deloch v. Whitley*, 684 So.2d 349 (1996), therefore, IDB counsel could not argue that he was unaware of his obligations with respect to this issue. Historically, cases like *Eubanks v. Louisiana* (1958); *Pierre v. Louisiana* (1939) are just two (2) cases that counsel should have at least been casually acquainted with. Further, there have been cases where litigants have argued, albeit improperly, that they were entitled to the presumption of prejudice when their trial counsel failed to file the required Pre-trial Motion to Quash. *Francis v. Henderson* required that the cause and prejudice provision be met as done herein.

## HARM DONE AND DEPRIVATION OF CONSTITUTIONAL RIGHT NOT HARMLESS AS THE IS NO GUARANTEE THAT A NEW "LEGALLY CONSTITUTED GRAND JURY WOULD HAVE RE-INDICTED OR EITHER RE-INDICTED FOR THE SOME GRADE OF OFFENSE (STRUCTURAL ERROR)

In the instant case, the state may try to argue "harmless error" because a new grand jury would have simply re-indicted petitioner. As a starting point, systemic and unconstitutional exclusion of minorities or readily identifiable group is "structural error" requiring automatic reversal and not amenable to "harmless error" analysis. See *Arizona v. Fulminate* and *Vasquez v. Hillary*.

Now, the magnitude and the scope of the jury-pool-fixing scheme set in place by non-compliance with the *National Voter Registration Act*, was sufficient to bring a halt to any efforts to immediately re-indict petitioner. How is that so? The State of Louisiana would have been obligated

to bring the State of Louisiana into conformity with the *NVRA of 1993*, until then, any subsequent Grand Jury Pool would have suffered the same unconstitutional taint. The repair of the unconstitutional Jury Pool System could not have been achieved right away, because the Secretary of State Tom Schedler was asked to remedy the matter, and when he refused, actions were taken and presently both he and the State of Louisiana are being sued in two (2) civil suits. So quick reparation of the system could have been quite time consuming. The aforementioned suits are what brought this constitutional rights deprivation to petition's attention. At present those civil cases are *Ferrand v. Schedler* and *U.S. v. Louisiana* as set out in the PCR Application and Memorandum in Support.

With respect to the time period that it may have or perhaps would take to compose a constitutionally acceptable trial and petit jury, the petitioner speedy trial rights would have been implicated and this too could have been a consideration used by IDB counsel in any effort to use the possible of securing a deal on behalf of his client or as was the case in *Winters v. Cooks*, 489 F.2d 174 (C.A. 5 (Miss.) 1973).

As a settled issue, a *Batson* violation is <u>structural error</u> for which prejudice is generally presumed. As the Court explained in *Powers v. Ohio*, 499 U.S. 400, 11 S.Ct. 1364, 113 L.Ed. L.Ed.2d 411 (1991):

> The jury acts as vital check against the wrongful exercise of power by the State and its prosecutors. The intrusion of racial discrimination into the jury selection process damages bot the fact and the perception of this guarantee. Jury selection is the primary means by which the court may enforce a defendant's rights to be tried by a jury free from ethnic, racial, or political prejudice, or predisposition about the defendants culpability. Active discrimination by a prosecutor during this process condones violation of the United States Constitution within the very institution entrusted with its enforcement, and so invites cynicism respecting the jury's neutrality and its obligation to adhere to the law. The cynicism may be aggravated if race is implicated in the trial ...

> ...

> The purpose of the jury system is to impress upon the criminal defendant and the community as a whole that a verdict of conviction or acquittal is given in accordance with law by persons who are fair. The verdict will not be accepted or understood in these terms if the jury is chosen by unlawful means at the outset. *Id.* at 411-13, 111 S.Ct. 1364 (citation and in internal quotation marks omitted)

Overall, there is a reasonable probability that had counsel objected and filed a motion to quash both the Grand and Petit juries, Funes would have succeeded in proving that the prosecutor was benefiting from the jury-pool-fixing-scheme executed through the State's Non-compliance with the *NVRA of 1993*. This is sufficient to undermine confidence in the outcome of the trial because Grand and trial Jury discrimination is structural error. See *Arizona v. Fulminante*, 499 U.S. 279, 309, 111

S.Ct. 1246, 113 L.Ed.2d 302 (1991)(noting the structural defects in the constitution of the trial

mechanism "defy analysis by 'harmless-error' standards").

## PROPOSITION TO THE DISTRICT ATTORNEY'S OFFICE

As a result of the procedural objections urged by the Jefferson Parish District Attorney's

Office, the following questions are posed to them:

1.) When did the District Attorney's Office not the statistical under-representation of black and other minorities in their jury pools for the Grand and Petit Jury?

2.) When did the Jefferson Parish realize that their Jury Pools were unconstitutionally composed for the state's Non-compliance with the *NVRA of 1993*?

3.) Where any other methods in place which aided the Jefferson Parish District Attorney's office in facilitating the under-representation of minorities, handicapped and the impoverished?

4.) How many indictments where secured while any of the above practices were in place?

5.) How many criminal trials proceeded to verdict with the above practices where in effect?

6.) Is the District Attorney's Office for the Parish bound by *Art. X, § 30, of the Louisiana Constitution of 1974*, which provides for the taking of an Oath of Office to uphold the *Constitution of the United States*, the *Louisiana Constitution of 1974*, and the laws of the State of Louisiana?

7.) Is this Oath of Office violated when the District Attorney's Office knowingly uses unconstitutionally constituted grand juries in order to secure illegal indictments?

8.) Is this Oath of Office violated when the District Attorney's Office knowingly uses illegally unconstitutionally constituted petit juries in order to secure illegal convictions?

## TRANSCRIPTS LAW AND ARGUMENT

Petitioner, Rigoberto Funes, has been constructively, actively and continuously denied his right

to adequate and meaningful appeal review by way of "**STATE CREATED IMPEDIMENT,**"

resulting from the appointment of ineffective and conflict-laden defense counsel from the

Jefferson Parish IDB. This is of no fault of Funes as he has utilized due diligence to no avail. Funes

urges that all portions of the record are of "extreme importance" and his ability to review the complete

record will enable him to have meaningful appeals prepared on his behalf, should more appeals be

needed. Constitutional Violation contained in the missing or un-transcribed portions of the transcript,

pose an impediment to have a thorough appellate review.   The continued failure to produce the

complete and entire transcript will preclude Funes from enjoying equal protection of the law, if other

indigent appellants are freely given their complete record, then Funes is entitled to the same treatment

as a anyone else before the Courts of law.

In the instant case, Funes' direct appeal was meaningless and amounted to sham litigation that only served to cause further injury to Funes. From inception, Funes was systemically denied the basic and fundamental right to counsel, whereas counsel's failure to object to preserve critical portions of the transcript for review is simply another ancillary problem deriving from the systemic ineffectiveness.

With less than the complete record, appeal counsel could be nothing short of ineffective, as failure to designate all constitutional violations/errors contained in the complete transcript precludes the raising of those violations later in the proceedings, and this is highly prejudicial to the accused.

The *Louisiana Constitution of 1974, Article 1, Section 19* provides that "the review under an appeal of right from a felony conviction [accorded by *Art 5, § 5 (D) (2)* ] shall be based upon a complete record of all evidence upon which a judgement is based." *State V. Robinson*, 387 So.2d 1143 (La. 1980).

The United States Supreme Court has also recognized the right to a complete transcript of the trial proceedings, particularly when (as here) counsel on appeal was not counsel at trial. *Hardy v. United States*, supra, while the outer limits of that principle are not clear, there can be no doubt that the state must provide an indigent defendant with a transcript of prior proceeding when that transcript is needed for an effective defense or appeal. *Britt v. North Carolina*, 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971).

The right to counsel at trial is different from the right of counsel on appeal. The purpose of *Louisiana Constitution of 1974* and *Codal article (C.Cr.P. art. 843)* requirement of recording all proceedings in felony cases is to make it possible for a party to support assignments of error on appellate review. When a portion of the trial has not been recorded, a party cannot perfect assignments of error which occurred during that portion of the trial, and the appellate court cannot review any such errors pursuant to *La.C.Cr.P. 920* in order to ensure that the trial was properly conducted. *State v. Ford*, 338 So.2d 107 (La. 1976).

In the instant case, the trial court has failed to produce significant portions of the trial record which may have aided the petitioner in winning a reversal of his conviction on appeal. Petitioner's appellate counsel, again who was not trial counsel, failed to make a diligent effort to obtain pertinent portions of the record.

As a result of counsel's failure to obtain the records requested and granted, counsel abandoned the proper appeal of claims discoverable therein, that further established the "substantive" and

"constructive" denial of petitioner's rights. Counsel's inaction on behalf on his client only served to further aid the prosecution, cover trial counsel's ineffectiveness in furtherance of unfair acts designed to fundamentally impugn the rights of the accused.

There is a requirement that the Court Reporter record verbatim all proceedings in criminal cases held in open court, such is mandatory and is not to be overridden by Local Practice, *28 U.S.C.A § 753 (b). Court Reporter Act.*

Where defendant is represented by same attorney at trial and on appeal, court reporter's failure to record verbatim all proceedings in criminal case held in open court requires reversal only if defendant can show that failure to record and preserve specific portion of trial proceedings visits hardship upon him and prejudices his appeal; however, where defendant is represented by new counsel on appeal, all that need be shown is substantial and significant omission in transcript. *28 U.S.C.A. §§ 753, 753 (b).*

Petitioner asserts that the very first preliminary hearing in this matter and the imposition of sentence, there exists constitutional violations not objected to as a result of divided loyalty of counsel.

Without the entire record to review, there exists the possibility that petitioner will constructively be denied an opportunity to establish to what extent his constitutional rights were violated and denied an opportunity to point to the specific instances where rights were compromised by his counsel. Also, with the complete record, petitioner can specify all errors that appellate counsel should have briefed had been effective.

## CONCLUSION

Wherefore, for the "cause" and "prejudice" shown as to all the lapses in counsel's representation deriving from systemic ineffectiveness and conflict-of-interest laden representation, petitioner prays that the State of Louisiana, all Procedural objections perfected through the Jefferson Parish District Attorney's Office, to claims 1, 4, 5, 6a, 10, 11, and 12 be dismissed.

Respectfully Submitted By:

*Rigoberto Funes*
Rigoberto Funes # 571375
MAIN PRISON, Spruce-4
LA. STATE PENITENTIARY
ANGOLA, LOUISIANA 70712

## CERTIFICATE OF SERVICE

I, Rigoberto Funes, hereby certify that I have forwarded a copy of the above Traversal to the State's Procedural Objections to the Clerk of Court and District Attorney's Office for the Parish of Jefferson 200 Derbingy Street, Gretna, La. 70053, on this 3rd day of September 2013.

*Rigoberto Funes*
Rigoberto Funes

## AFFIDAVIT

Wherefore after being duly question and making stipulations to the satisfaction on the undersigned, one, Rigoberto Funes, did appear before me and swear that to the best of his limited knowledge and understanding of the law, the facts and allegations contained herein are true to the best of his knowledge and belief. Thereafter, this document was tendered to the hands of a Prison Official on this _____ day of August, 2013.

Notary of Other Person duly Commissioned to
Accept a legal and Binding Oath

9-3-13

Ex-Officio Notary
Dept. of Public Safety & Corrections/LSP

# Appendix #14

Order of the trial court dated 7/22/13 denying access to transcripts

RECEIVED

AUG 05 2013

TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON
STATE OF LOUISIANA

DIVISION

NO. 08-5641

STATE OF LOUISIANA

VERSUS

RIGOBERTO FIUNES

FILED: 1-22-13

DEPUTY CLERK

## ORDER

This matter comes before the court on the petitioner's APPLICATION FOR POST-CONVICTION RELIEF, AND MEMORANDUM OF LAW AND ARGUMENT IN SUPPORT OF APPLICATION FOR POST CONVICTION RELIEF AND REQUEST FOR AN EVIDENTIARY HEARING, STAMPED AS FILED JUNE 5, 2013.

On July 29, 2010, the petitioner was convicted of counts #1, #3, and #4, LSA-R.S. 14:30.1, relative to second degree murder, aggravated incest.  On August 5, 2010, the court sentenced him on each count to life imprisonment at hard labor. His conviction was affirmed on appeal. State v. Fiunes, 11-120 (La. App. 5 Cir. 12/28/11) 88 So.3d 520, writ denied, 2012-290 (La. 5/25/12) 90 So.3d 408.

Petitioner now files an application for post-conviction relief alleging the following claims:

1.  Parish of East Jefferson, through its public assistance offices, has been violating the National Voters Rights Act, which in turn had a direct impact of the composition of the jury, and whether or not this is a form of jury-fixing, violating due process and equal protection.

2.  Deferral of ineffective assistance o counsel claim from direct appeal to post-conviction relief constitutes cause mandating appointment of counsel.

3.  Right to fair trial was violated during jury selection (Batson and Strickland violations).

4.  Trial court violated petitioner's due process and right to fair trial in failing to instruct or sequester jury when it retired during recess and breaks during trial.

5.  Trial court committed reversible error in making erroneous and misleading comments on responsive verdicts.

6.  Prosecutorial misconduct occurred when
    a.  Prosecutor improperly vouched for credibility of state witness.
    b.  Failed to correct perjured testimony in violation right to a fair trial.

7.  (skipped by petitioner)

8.  Ineffective assistance of counsel at trial when counsel failed to seek quashing of grand jury indictment on grounds of violation of the National Voter Registration Act of 1993. The jury panel for grand and petit jury were both quashable.

9.  Ineffective assistance of counsel by not securing rebuttal experts for defense.

10. Independent claim of "Grand Jury and Trial Jury discrimination" , this is a new fact previously not known to petitioner meets the exception of 930.4 and 930.8(a)(1). (This claim shows a need for experts.)

11. Trial court violated petitioner's due process rights to a fair trial in failing to instruct or sequester the jury when it retired during recess and breaks during trial.

12. (Petitioner lists # 11 twice.) Conflict of Interest against the entirety of the Jefferson Parish Indigent Defender Board for covering up the fact that a

197

they were well aware of the systemic ineffective assistance being provided ... for the reasons set out in the "assessment of indigent defense services in Louisiana 40 years after Gideon."

Post-conviction relief law requires that if an application alleges a claim which, if proven, would entitle petitioner to relief, the court shall order the district attorney to file any procedural objections, or an answer on the merits if there are no procedural objections, within 30 days. La.C.Cr.P. art. 927. A district court may grant a summary disposition on an application for post-conviction relief only after the required answer by the State has been filed. La.C.Cr.P. art. 929.

For these reasons, it is the order of this court that the State file a response raising whatever procedural objections it may have, or if no procedural objections, an answer on the merits to petitioner's allegations.

Petitioner also requests a complete copy of trial transcripts. He is not entitled to a free copy of transcripts without a showing a particularized need.

It is well-settled that indigent prisoners must demonstrate particularized need for court documents/transcripts before receiving copies free of charge. Particularized need is more than a mere statement that he wishes to comb the record for errors or a general statement that a right has been violated. This challenge must not be mere harmless error, but must be an error of constitutional proportions. *State ex rel. Payton v. Thiel*, 315 So.2d 40 (La. 1975).

There are limited exceptions to the requirement of showing particularized need. Thus, indigent prisoners must be provided with free transcripts of guilty plea colloquies, copies of bill of information or grand jury indictment, copies of court minutes for various portions of their trials, copies of transcripts of evidentiary hearings held on applications for post-conviction relief, and copies of documents committing them to custody. *State ex rel. Simmons v. State*, 647 So.2d 1094 (La. 12/16/94.)

In *State ex rel. Bernard v. Criminal Dist. Court Section J.*, 653 So.2d 1174, 94-2247 (La. 4/28/95), the Supreme Court of Louisiana held that an indigent inmate cannot make a showing of particularized need absent a properly filed application for post-conviction relief which sets forth the specific claims of constitutional errors which required the requested documentation for support. The Louisiana Supreme Court specifically stated,

This Court's jurisprudence requires lower courts to provide indigent inmates with copies of certain types of documents as of right. *State ex rel. Simmons v. State*, 93-0175 (La. 12/16/94), 647 So.2d 1094. As to all other documents, an indigent inmate has the constitutional right to free copies only in those instances in which he shows that denial of the request will deprive him of an "adequate opportunity to present [his] claims fairly." *United States v. MacCollom*, 426 U.S. 317, 324, 96 S.Ct. 2086, 2091 41 L.Ed.2d 666 (1976) (quoting *Ross v. Moffitt*, 417 U.S. 600, 616, 94 S.Ct. 2437, 2447, 41 L.Ed.2d 341 (1974)). Meeting that constitutional threshold requires a showing of what this Court has called "particularized need."

For the inmate requesting documents in anticipation of a collateral attack on his conviction, adequate opportunity to present his claims requires first and foremost meaningful access to the post-conviction procedures provided by the legislature in La.C.Cr.P. art. 924 et seq. That access does not require the state to underwrite the inmate's efforts to overturn his conviction and sentence by providing him generally with documents "to comb the record for errors." *State ex rel. Payton v. Thiel*, 315 So.2d 40 (La.1975). If an inmate has identified specific constitutional errors in the proceedings leading to his conviction and sentence, as required by La.C.Cr.P. art. 930.3, he may also "specify[ ] with reasonable particularity the factual basis for such relief," and thereby meet the initial requirements set forth in La.C.Cr.P. art. 926 for filing his application and invoking the post conviction articles. An inmate therefore cannot make a showing of particularized need absent a properly filed application for post conviction relief which sets out specific claims of constitutional errors requiring the requested documentation for support. See *Payton, supra; State v. Drozd*, 116 Ariz. 330, 569 P.2d 272, 274 (Ct.App.1977) ("[d]ue process and equal protection surely do not require the providing of transcripts to make petitioner aware in the first instance of events or occurrences which constitute grounds for collateral attack"). *Cf. Cubbin v. State*, 695 P.2d 156, 159 (Wyo.1985) ("a petition for post-conviction relief must be on file and the district court must determine that the petition has merit" before an inmate will receive free copies of transcripts); *Reed v. State*, 310 Ark. 651, 840 S.W.2d 155, 166 (1992) (free copies of "material on file" available to inmate only when he "demonstrates some

compelling need for specific documentary evidence to support an allegation contained in a petition for post conviction relief."

Id. at 1175 (Emphasis added).

In the instant case, petitioner was present for all proceedings and cannot raise at this time any arguments of constitutional proportions without transcripts. The court notes that petitioner presents claims of constitutional violations in his application for post conviction relief. However, he fails to designate which portions of the transcript are necessary to support his constitutional errors, and does not recount any specific incidents where constitutional errors may have occurred. He is not entitled to the entire trial record free of charge.

Accordingly,

IT IS ORDERED BY THE COURT that the State file a response within thirty (30) days raising whatever procedural objections it may have, or if no procedural objections, an answer within thirty (30) days on the merits.

IT IS FURTHER ORDERED BY THE COURT that petitioner's request for transcripts is hereby **DENIED**.

Gretna, Louisiana, this _22nd_ day of _July_ 20__

_____
JUDGE

PLEASE SERVE:

DEFENDANT: Rigoberto Funes # 571878
La State Penitentiary
Main Prison, Spruce 4
Angola, La. 70712

Terry Boudreux, District Attorney's Office, 200 Derbigny St., Gretna, LA 70053

# Appendix #15

Exhibit "D" of petitioner's Post Conviction - A Copy of a letter
signed in the handwriting of former La. Supreme Court Justice,
Pascal F. Calogero, date December 11, 1990, where the
Constitutionality of the Louisiana Indigent Defense System was
being called into question. (Attached thereto is a proposal for the
Spangenburg Group to undertake a Study of Louisiana's indigent
Defender System) It was noted then by Mr. Bob Spangenburg, that
"This system of funding indigent defense is unlike any other in the
United States.

Exhibit U

# Supreme Court
### STATE OF LOUISIANA
### New Orleans

CHIEF JUSTICE
   PASCAL F. CALOGERO, JR.
ASSOCIATE JUSTICES
   WALTER F. MARCUS, JR.
   JAMES L. DENNIS
   JACK CROZIER WATSON
   HARRY T. LEMMON
   LUTHER F. COLE
   PIKE HALL, JR.

301 LOYOLA AVE.
TELEPHONE 504/568-5705

December 11, 1990

Honorable Donald G. Kelly        SEE ATTACHED LIST.
Senator, State of Louisiana
Post Office Box 756
Natchitoches, LA 71457

Dear Senator Kelly:

     Much concern has been voiced recently regarding the
state of Louisiana's indigent defense system. To that end, the
Court has decided to appoint a committee of the Judicial
Council whose function would entail studying all facets of
Louisiana's indigent defense system. On behalf of the Court, I
would like to invite you to participate as a member of this
committee. The committee will be composed of a number of
judges, indigent defender and district attorney
representatives, a state senator, and a state representative.

     One important aspect of the committee's duties will be
to receive and study a comprehensive report of Louisiana's
indigent defense system to be prepared by a qualified
professional approved by the American Bar Association.
Subsequent to receipt and review of this study, it is hoped the
committee might present the Judicial Council with
recommendations for improvements in Louisiana's indigent
defense system.

     Although a firm date for the next Judicial Council
meeting has not been set, it is anticipated the meeting will
take place in mid-March, 1991. Hopefully, the committee will
be in a position to make recommendations to the Judicial
Council prior to this meeting. The Council would then consider
recommending legislation for the 1991 legislative session.

     I have designated Sam Dalton as chairman of the
committee. Mr. Dalton's address and phone number are:

         2001 Jefferson Highway
         Jefferson, LA 70121
         (504) 835-4289

201

Letter to Honorable Donald G. Kelly
December 11, 1990

Page 2

Please contact Mr. Dalton and Timothy Averill, Deputy Judicial
Administrator of the Louisiana Supreme Court, by facsimile
response, if possible, concerning your willingness to serve.
Mr. Dalton's FAX number is (504) 835-4302; Mr. Averill's FAX
number at the Louisiana Supreme Court Clerk of Court's office
is (504) 568-2846. I anticipate Mr. Dalton will be contacting
you shortly after the makeup of the committee has been
finalized concerning an initial meeting date.

Thanking you in advance for your consideration of this
important matter, and with kindest regards, I remain

Very truly yours,

Pascal F. Calogero, Jr.

PFCJr/jg
3828G/3834G

bcc:   Hugh M. Collins, Ph.D.
       Samuel S. Dalton

Mr. John F. LaVe
Attorney at Law
Post Office Box 1602
Lake Charles, Louisiana  70602 Mr. LaVern Mr. John F. LaVern

Ms. Jean M. Faria _Jean called 12/12/90 accepted_
Attorney at Law
333 St. Louis Street
Baton Rouge, Louisiana  70802 Ms. Faria Ms. Jean M. Faria

Mr. Paul J. Carmouche
District Attorney
First Judicial District Court
Courthouse
Shreveport, LA  71101 Mr. Carmouche Mr. Paul Carmouche

Mr. Doug Moreau
District Attorney
Nineteenth Judicial District Court
Courthouse
Baton Rouge, Louisiana  70801 Mr. Moreau Mr. Doug Moreau

Mr. Don R. Burkett
District Attorney
Eleventh Judicial District Court
Courthouse
400 South Capitol Street
Many, LA  71449 Mr. Burkett Mr. Don R. Burkett

Honorable Robert J. Burns
Judge, Twenty-Fourth Judicial District Court
New Gretna Courthouse
Gretna, Louisiana  70053 Judge Burns Honorable Robert J. Burns

Honorable Paul J. deMahy
Judge, Sixteenth Judicial District Court
Post Office Box 7
St. Martinville, Louisiana  70582 Judge deMahy Honorable Paul
J. deMahy

Mr. Bruce M. Bolin
Attorney at Law
Post Office Box 740
Minden, Louisiana  71055 Mr. Bolin Mr. Bruce M. Bolin

Honorable Donald G. Kelly
Senator, State of Louisiana
Post Office Box 756
Natchitoches, LA  71457 Senator Kelly Honorable Donald G. Kelly

Honorable Ralph R. Miller
Representative, State of Louisiana
Post Office Box 190
Norco, LA  70079-0190 Representative Miller Honorable Ralph R.
Miller

Mr. John M. Mamoulides
District Attorney, Jefferson Parish
Courthouse
Gretna, Louisiana 70053 Mr. Mamoulides Mr. John M. Mamoulides_

Honorable Jerome M. Winsberg
Judge, Criminal District Court, Orleans Parish
2700 Tulane Avenue
New Orleans, Louisiana 70119 Judge Winsberg Honorable Jerome M. Winsberg_

Mr. Jerry L. Jones
Attorney at Law
1011 South Grand Street
Monroe, Louisiana 71210 Mr. Jones Mr. Jerry L. Jones_

Mr. Edward J. Lopez
Attorney at Law
149 West Landry
Opelousas, Louisiana 70570 Mr. Lopez Mr. Edward J. Lopez_

Mr. William J. O'Hara, III
Attorney at Law
300 Lafayette, Suite 100
New Orleans, Louisiana 70130 Mr. O'Hara Mr. William J. O'Hara, III_

Ms. Brenda Brown
Attorney at Law
13081 New Hampshire Street
New Orleans, Louisiana 70129 Ms. Brown Ms. Brenda Brown

# T H E    S P A N G E N B E R G    G R O U P

Robert L. Spangenberg
President

Patricia A. Smith
Vice President

William J. Rose
Senior Associate

Amy Salomon,
Senior Associate

Elizabeth Dewsley
Senior Associate

Marya E. Beeman
Research Assistant

of Counsel
Prof. Richard J. Wilson

<u>MEMORANDUM</u>

TO:        Sam Dalton
           James Boren
           Nina Maples

FROM:      Bob Spangenberg

DATE:      September 11, 1990

RE:        Proposed Louisiana Study

          You will find enclosed a draft of a proposal that we spoke
about at our New Orleans meeting.  I would be interested in your
comments and suggestions.  I hope to see you in Baton Rouge on
Saturday.

RLS/jm
Encl.

## PROPOSAL TO EVALUATE LOUISIANA'S INDIGENT DEFENSE SYSTEM

### Indigent Defense in Louisiana - Statutory Background

As specified in LSA-R.S 15:144, Louisiana's current system for providing legal services to indigents accused of crimes is overseen by indigent defender boards (IDBs) that must be established in each of the state's judicial districts. There are currently 40 judicial districts encompassing 64 parishes throughout the state. Each IDB is required by statute to maintain a current panel of volunteer attorneys to provide representation to indigents. As set out under LSA-R.S. 15:145, each indigent defender board is vested with the authority to select the method by which it establishes a particular indigent defense program. Thus, throughout the state, there is a mixture of court-appointed, public defender, and contract systems for providing counsel to indigents.

Louisiana's judicial district indigent defender system is funded entirely by assessments charged to defendants in criminal cases. As specified in LSA-R.S. 15:146, each IDB is responsible for administering the indigent defense fund for its judicial district. Until recently, assessments ranged from $4.50 to $17.50 per case.

In 1990, House Bill 592 (The IDB Funding Bill) was introduced to the state legislature in order to increase the level of funding provided for indigent defense services throughout the state. The bill passed, and as of September 8, 1990, the minimum assessment charged for all criminal cases was raised to $17.50. As specified in the modified L.S.A. 15:146(B), districts are authorized to increase this minimum assessment to not more than $25 upon resolution by a 2/3 vote of the district board, and the concurrence of the chairman of the board.

This system for funding indigent defense services is unlike any other in the United States. Louisiana's is the only system that operates solely on funds drawn from criminal violation assessments. It does not receive any additional support from

1

either state or local (i.e., county) resources. This makes it one of the most underfunded systems in the country.

## The Need for a Comprehensive Look at Louisiana's Indigent Defense System

At the same time work was being done on the IDB Funding Bill, the Louisiana Senate Judiciary "C" Committee recommended that a study be conducted to determine how best to fund the system if the districts were to receive the additional revenue. In response to this suggestion, Sam Dalton, chairman of the 24th Judicial District's Indigent Defender Board, arranged for Robert Spangenberg, president of The Spangenberg Group, to meet with representatives from indigent defender boards, private attorneys and representatives of the Louisiana Criminal Defense Lawyer's Association throughout the state to discuss the possibility of undertaking a study of the Louisiana indigent defense system. The Spangenberg Group is recognized as the nation's leading expert on the study of indigent defense systems. The Group has conducted research and provided technical assistance to organizations and agencies interested in indigent defense in virtually every state in the nation.

It is clear that in order to effectively improve the delivery of services to indigents accused of crime, there must first be a better understanding of the current system in Louisiana. There is a substantial lack of overall statewide information. Currently, there is no statewide process for collecting important program data from each judicial district on an annual basis. Before recommendations on strengthening indigent defense services can be made, accurate documentation of basic information, such as district-by-district expenditure and caseload, must be made available.

Thus, The Spangenberg Group proposes to undertake a study of Louisiana's indigent defense system that will identify for each of the 40 Judicial Districts:

2

o   What is the district's type of indigent defense system?
    Public defender, assigned counsel, contract, a combination of
    these?  Are there multi-parish districts in which more than
    one system is used?

o   How precisely are volunteer attorneys appointed to cases?
    What are the policies and procedures for attorneys to collect
    compensation for work on assigned cases from district to
    district?

o   What were the total expenditures in the past year? What have
    been the trends in expenditure and funding in the past five
    years?

o   What were the caseload totals of each district in the past
    year?

## Methodology

To gather this information, we will design a mail
questionnaire to send to representatives from each of the 40
indigent defender boards.  Questionnaires will also be prepared for
individuals working in, or familiar with the basic individual
defense system in each district to gather descriptive information
about the current system and to obtain subjective opinions about
the strengths and weaknesses of the current system and
recommendations for improvements.

A questionnaire will be developed for each program or programs
providing indigent defense services in every judicial district in
the state.   This questionnaire will be designed to gather
statistical and program data on present operations.  These data
will include caseload, costs, number and type of program personnel
and the particular courts and types of cases for which they are
responsible.   The questionnaire will be designed to reflect the
differences between public defender, contract and assigned counsel
programs.   Information will be collected through a series of
questions on such issues as the timing of the entry of counsel

3

caseload levels, continuity of representation, representation in co-defendant cases, investigatory and expert witness services, training, and recordkeeping. Emphasis will be placed upon the current compensation of private attorneys and the availability of funds for necessary expenses as well as the salary structure for the various staff members of each public defender's office. By way of example, if the judicial district is served by a private bar assigned counsel system, we would gather specific information on the number of court appointments by type of case (felony, misdemeanor, juvenile, mental health, appeals, etc.), the method for selecting court-appointed attorneys, the qualifications for appointment, the fee arrangements for court-appointed counsel, the specific requirements for expense of court-appointed counsel such as investigatory expenses, expert witnesses, travel, etc., and any special requirements for the appointment in serious felony cases, particularly those involving death penalty cases.

If the judicial district has a public defender program, the questionnaire will request information on the specific courts served by the program, the number of full-time and part-time staff by type of personnel, the caseload by type of case, informal or formal caseload standards, salary of all staff and availability of support services such as investigators, expert witnesses and secretaries. We would also obtain information on current indigency standards, screening methods, the entry point of representation, the system for assigning cases in the office, conflicts policy, trial rate, available training and expenditure data for the past five years. We would also obtain information on perceived problems in the system and recommendations for improvement.

These questionnaires will be administered by mail and will be designed to collect statistical and descriptive data only and will not attempt to assess the objective quality of representation.

Once we have obtained the results from the mail surveys, we will tabulate the results and be able to describe the indigent defense system district by district and provide aggregate statewide

4

data.

We will then provide a comparison of the Louisiana indigent defense system with similar systems in the country. Specifically, we will compare expenditure, caseload and system type data with a number of other states nationally.

We will also describe the various methods used throughout the country to fund indigent defense systems. This information should prove to be extremely valuable to the Louisiana legislature in having, for the first time, reliable statewide data, to be able to compare these data with other states and to review a large number of funding options currently employed in other states.

Finally, based upon the Louisiana study and our extensive experience in other states, we would provide a series of recommendations for improvement in the indigent defense system in Louisiana with a series of alternative options. All of these requirements would be contained in a written final report.

Based upon a number of similar prior studies that we have conducted, it is our estimate that the total cost would be approximately $25,000 and that the study would take approximately four months to complete.

## Prior Experience of The Spangenberg Group in the Area of Indigent Defense Delivery

The Spangenberg Group was formed in September 1985 to conduct research and provide technical assistance primarily in the area of indigent defense services. In the past ten years, The Spangenberg Group's principal staff members have conducted various types of research at the state, local, and national levels. Specific projects have included national baseline surveys of indigent criminal defense services; evaluations of state and county indigent defense programs; and studies of resource allocation, indigency standards, cost recovery and recoupment efforts, caseload/workload measurement, appellate services, support staff and indigent defense services in capital cases. In addition, the staff has produced a

5

210

number of nationally recognized publications on such topics as cost containment through eligibility standards and cost recovery, maximization of public defender resources, national baseline data on indigent defense and a manual for training attorneys in indigent defense delivery.

The three senior members of The Spangenberg Group have over 20 years of cumulative experience and have developed a national reputation as a group of objective and knowledgeable professionals committed to the goal of improving indigent defense services in the most cost efficient manner.  Over the past ten years, staff members have visited virtually every state in connection with research or the delivery of technical assistance.  The Group has worked extensively on issues relating to public defenders, ad hoc assigned counsel, coordinated assigned counsel and contract defense programs.  For the past five years, The Spangenberg Group has been under contract with the American Bar Association's Bar Information Program which provides expertise and technical assistance to state and local jurisdictions concerned about indigent defense delivery. In this capacity, we have provided technical assistance in 42 states and on-site work in 30 states.

Of particular importance to the proposed study in Louisiana is the work we have conducted over the years at the state level. Some of these studies are outlined as follows:

o    In 1988-89, under contract with the Office of the
     Administrator for the Courts in the state of Washington, The
     Spangenberg Group conducted a statewide survey of indigent
     defense services in Washington.  Working closely with the
     legislative Indigent Defense Task Force, we provided an
     analysis of existing programs including caseload and cost data
     and formulated alternative indigent defense models with
     projected cost estimates for the Task Force's consideration.

o    In 1990, also under contract with the Office of the
     Administrator for the Courts in Washington, The Spangenberg
     Group conducted a thorough review of the cost of appellate
     defense service in Washington, comparing the state's system
     with appellate systems used in other jurisdictions.  Based on
     conclusions of this research, The Spangenberg Group made
     recommendations to the Washington state legislature concerning

6

the design of possible alternative systems. The project also included a thorough review and recommendations concerning the feasibility of establishing a program of cost recovery for appointed counsel services at the appellate level.

o   Under contract with the Oklahoma State Bar, The Spangenberg Group in 1988 conducted a statewide study of the indigent defense system in Oklahoma by gathering data in each of the 77 counties in the state.   The final report analyzed the available data and recommended necessary changes in the system on a statewide basis.

o   Under contract with the South Carolina Bar in 1988, The Spangenberg Group assisted the Bar in conducting a statewide study of the indigent defense system in the state with funds provided by the State Justice Institute. The study identified weaknesses in South Carolina's indigent defense system and recommended the actions necessary to implement improvements for the system statewide.

o   The Spangenberg Group in 1988-89, at the request of the Indigent Defense Services Division of the Oregon Judicial Department, conducted a study of the state's criminal defense delivery system.   The research included an extensive mail survey of public defenders, contract counsel, private assigned counsel, judges and prosecutors as well as field work in counties throughout the state.   A series of recommendations was provided for overall improvement in the system.

o   Members of The Spangenberg Group have been working with the Virginia State Bar, the Virginia Legislature and the Virginia State Court Administrator's Office for over five years to improve the state's indigent defense system and to increase the compensation for the private bar, which is among the lowest in the country.   In 1984-85, under contract with the State Bar Foundation, Group members collected data on the current cost of the system and suggested areas for further study.   Since 1985, under the ABA's Bar Information Program, staff members have provided technical assistance to the Joint Subcommittees of the Virginia General Assembly, studying methods of improving the overall system and possibly expanding the public defender program.   We have produced an extensive report which compares the cost of Virginia's system to other similar states and provides comparative cost estimates for each type of indigent defense system in the state. resulted in an increase in the compensation for private appointed counsel.

o   Under contract with the Ohio State Public Defender Commission, The Spangenberg Group conducted an assessment of misdemeanor representation in the Municipal and County Courts of Ohio. The research involved a comprehensive mail questionnaire

7

addressed to judges, probation officers, district attorneys, and defense attorneys in each court; a program questionnaire addressed to the primary criminal defense providers in each county; and extensive on-site work in a sample of counties throughout the state.

o   The Spangenberg Group is currently conducting an assessment of the existing system of providing indigent criminal defense in the state of Ohio, under contract with the Ohio State Bar Association.

o   For the ABA Bar Information Program, we have conducted several statewide assessments in connection with efforts to improve existing programs:

—   In New Mexico, on behalf of the New Mexico Public Defender Department, we conducted an assessment of the overall program, including current caseload requirements in support of a substantial increase in state funding for the next legislative year. This effort proved to be successful.

—   In Missouri, we worked closely with the Missouri State Bar Special Committee on the Representation of Indigent Criminal Defendants. The purposes of the Special Committee were to establish a Post-Conviction Capital Resource Center and substantially improve the funding for the Missouri State Public Defender System. Both efforts were successful.

—   In Alabama, at the request of the Chief Justice of the Alabama Supreme Court and the Administrator of Courts, Group members prepared a comprehensive review of the indigent defense system. The emphasis in this study was on the continuing problem of cost-effectiveness and adequate funding. We are currently working with a joint Task Force created by the Supreme Court and the State Bar in efforts to improve the overall system statewide.

—   In Indiana, Group members reviewed the fiscal impact of proposed legislation to create a state commission to oversee local county programs and provide some state funding for those local programs meeting state standards. This effort has proven to be partially successful to date.

—   In Iowa, Group staff worked with the State Court Administrator's Office and Legislature to prepare plans for state takeover of the funding of the state's indigent defense system on July 1, 1987.

8

In Maine, Spangenberg Group staff assisted a special commission created by the State Bar to assess Maine's state-funded, ad hoc assigned counsel system. In particular, staff collaborated with the State Court Administrator's Office to provide an analysis of court expenditure data for assigned counsel, county by county, for a three-year period.

— In Michigan, Group staff provided technical assistance to a special State Bar Task Force on Assigned Counsel Standards. We assisted in the development of program standards for defense counsel for indigents and in the drafting of legislation for a state funded defense system, which would provide state oversight with the option to choose a program type in a mixed system.

— In Tennessee, Group staff provided data in support of efforts by the Tennessee Association of Criminal Defense Attorneys to obtain compensation for assigned counsel in misdemeanor cases and to improve the fees paid to appointed attorneys in all types of cases.

o  In 1985, members of our group participated with the National Legal Aid and Defender Association (NLADA) in a statewide assessment of the private bar component (bar advocate program) of the Massachusetts Public Counsel Services Committee. This program contracts with local bar associations to provide all of the misdemeanor representation in Massachusetts' 14 counties.

o  Under contract with the Office of Criminal Justice Programs, Division of Public Safety, Executive Office of the Governor, State of South Carolina, Group members in 1982-83 performed a statewide assessment of the state's county-based system for indigent defense. On-site assessments were conducted in nine of the 16 judicial districts and a mail survey was fielded in each of the counties in the state. The final report outlined a series of recommendations for reform in the system, both for the short and the long term. This initial effort was followed by an extensive cost analysis of the additional funds required to implement each of our recommendations.

o  Group members also conducted a review of the state funded ad hoc assigned counsel system in the state of West Virginia. This review resulted, with our assistance, in the drafting of legislation to create a statewide/mixed defender system. This system was implemented in 1982.

9

# Appendix #16

Exhibit "C" of petitioner's Post Conviction - A Copy of the National
Legal Aid & Defender Association, Evaluation - **"An Assessment of
Trial-Level Indigent Defense Services in Louisiana 40 Years After
Gideon."** (Quoting the Executive Summary at page iii: "In direct
violation of state and federal constitutions, Louisiana government (both
state and local) has constructed a disparate system that fosters systemic
ineffective assistance of counsel due primarily to inadequate funding
and lack of independence from undue political influence."

215

# IN DEFENSE OF PUBLIC ACCESS TO JUSTICE

EVALUATION

## An Assessment of Trial-Level Indigent Defense Services in Louisiana 40 Years after *Gideon*



RESEARCHED AND WRITTEN

NATIONAL
LEGAL AID
DEFENDE
ASSOCIATIC

COMMISSIONED



# IN DEFENSE OF PUBLIC ACCESS TO JUSTICE

## AN ASSESSMENT
## OF TRIAL-LEVEL INDIGENT DEFENSE SERVICES IN LOUISIANA
## 40 YEARS AFTER *GIDEON*

*March 2004*

Researched & Written by:
*The National Legal Aid & Defender Association*
1140 Connecticut Avenue, NW, Suite 900
Washington, DC 20036

Commissioned by:
*The National Association of Criminal Defense Lawyers*
1150 18th Street, NW, Suite 950
Washington, DC 20036

## Executive Summary

A commitment to justice for all is the cornerstone of the American social contract and our democratic system. We entrust our government with the administration of a judicial system that guarantees equal justice before the law -- assuring victims, the accused and the general public that resulting verdicts are fair, correct, swift and final. In *Gideon v. Wainwright*, 372 U.S. 335 (1963), the United States Supreme Court concluded that that the right to counsel for those unable to afford one is a fundamental part of due process and determined that state government is responsible for providing an appropriate public defense system that honors this basic right. In accordance with its obligations under *Gideon*, the 1974 Louisiana Constitution directs the legislature to "provide for a uniform system for securing and compensating qualified counsel for indigents."

In direct violation of the state and federal constitutions, Louisiana government (both state and local) has constructed a disparate system that fosters systemic ineffective assistance of counsel due primarily to inadequate funding and a lack of independence from undue political interference. These two main systemic deficiencies produce numerous ancillary problems including a lack of oversight, training and supervision of those entrusted with the defense of the poor. When combined with the crushing caseloads public defenders are forced to carry, these factors prevent the state from securing justice for all, protecting the peace, and promoting the general welfare of its people.

The evidence to support this conclusion is detailed in this National Legal Aid & Defender Association (NLADA) report commissioned for the National Association of Criminal Defense Lawyers (NACDL). The introduction (Chapter I, pages 1-9) looks at Louisiana's long history of systemic deficiencies in guaranteeing the right to counsel to the poor and details current opportunities to correct those problems, including the creation of a legislatively mandated Blue Ribbon Task Force on Indigent Defense (Task Force). In anticipation of the convening of the Task Force, NLADA conducted site work after preliminary research revealed major failures on the part of government to ensure equal access to justice to the poor. In developing the standards-based assessment methodology employed in this report, NLADA looked at the macro-level -- i.e. the general problems facing all Judicial Districts – as well as the specific problems manifested at the micro-level in one rural jurisdiction [The 12th Judicial District (Avoyelles Parish)]. Chapter II (pages 10-18) serves as an overview of how the indigent defense system in the state is intended to function.

In 2002, The American Bar Association adopted the *Ten Principles of a Public Defense Delivery System*, a set of standards which constitute the fundamental criteria to be met for a public defense delivery system to deliver effective and efficient, high quality, ethical, conflict-free representation to accused persons who cannot afford to hire an attorney. The substantial failing of the system to meet these standards, as documented in Chapters III (pages 19-29) and Chapters IV (pages 30-56), calls into question the ability of the entire criminal court system to dispense justice accurately and fairly, as detailed in the reports main findings:

iv     IN DEFENSE OF PUBLIC ACCESS TO JUSTICE

| Finding: | Supporting Documentation: |
|---|---|
| 1. *In direct violation of its constitutional obligations under Gideon and ABA Principle #2, the State of Louisiana fails to adequately fund indigent defense services. This results in a disparate funding system that fosters ineffective assistance of counsel in the parishes.* | Louisiana is the only state to attempt to fund the majority of indigent defense services through court surcharges. Funding indigent defense through such court costs has proven to be unreliable because there is no correlation between the ability of a jurisdiction to raise revenues and the resources required to provide adequate defense services to those unable to hire an attorney. Additionally, the policies and practices of other policy-makers can have a deleterious effect on the primary revenue stream for public defense services. |
| 2. *In violation of ABA Principle 1, Louisiana's indigent defense system lacks independence from undue political interference.* | By vesting the District Court judiciary with the authority to appoint the members of the local indigent defense boards (IDB), Louisiana Revised Statutes, Title 15 §144 is in direct violation of this ABA principle. In Avoyelles Parish, the judiciary has appointed an IDB that has not allowed for qualified continuity of administration of the system. |
| 3. *In violation of ABA Principle 8, the failure to ensure adequate funding and independence of the indigent defense system has led to the prevalence of flat fee contract systems in those districts with poor revenue streams in an attempt to save money. Flat-fee contracts are universally rejected by all national standards because they create a monetary conflict between the defense provider and the client.* | An IDB in a judicial district in which the need for public defense services is greater than can be afforded through court costs must look for cost savings to stay afloat. There are only two ways to cut costs related to indigent defense: either reduce the number of cases coming into the system or cut spending on salaries and case-related expenses. Since public defenders do not control their own caseload (it is dictated by the prosecution and courts), IDBs across the state have turned to low-bid, flat fee contract systems in which an attorney takes all of the indigent defense cases in a jurisdiction for a fixed fee. Flat-fee contracts create a financial disincentive for the attorney to provide adequate representation since the attorney must pay for all case-related services (investigation, expert witnesses, etc.). |
| 4. *In violation of ABA Principle 5, the failure to adequately fund and ensure the independence of the indigent defense system results in attorneys handling caseloads far in excess of national standards. The crushing caseloads exist despite the fact that indigent defendants in misdemeanor cases are being denied attorneys without a proper waiver of their right to counsel.* | One Avoyelles Parish contract attorney handles the workload equivalency of 6.3 full-time attorneys while only working part-time. Assuming a 1,387 hour work year, clients facing felony charges are afforded, on average, approximately two hours a piece of this attorney's time *including those charged with capital offenses*. First hand courtroom observations showed that clients were not afford counsel in some misdemeanor cases without an informed waiver of counsel. |
| 5. *In violation of ABA Principle 6, the failure to adequately fund and ensure independence of the indigent defense system results in attorneys being assigned cases that they are not qualified to handle.* | The Avoyelles Parish IDB recently hired an attorney with no trial-level experience to handle all juvenile and misdemeanor cases. In doing so, the lives of poor people have become a "practice" forum for the recent law school graduate to learn through the process of "sink or swim." At-risk juveniles require special attention from public defenders if there is hope to change behavior and prevent escalating behavioral problems that increase the risk that they will eventually be brought into the adult criminal justice system in later years. |
| 6. *In violation of ABA Principles 3 and 7, the failure to ensure adequate funding and independence of the indigent defense system undermines the timeliness of appointment of attorney and results in a lack of continuity of representation. Both erode clients' right to a speedy trial.* | In Avoyelles Parish, the first attorney assigned to a felony case does nothing substantial prior to arraignment and has no responsibility for the case post-arraignment. Thus, nothing that would help the client (investigation, psychiatric exams, drug-treatment placement) occurs until his second attorney receives the case. This is usually on the eve of preliminary hearings or pre-trial settlement conferences — several months later. Louisiana's speedy trial rules have proven ineffective to overcome this dynamic. Under Louisiana Statutes, a defense lawyer must stipulate on the record that he or she is prepared to go to trial when filing a speedy trial motion. Since they are effectively just beginning the case, the lawyer cannot do so and often waives the right to a speedy trial. |

| Finding: | Supporting Documentation: |
|---|---|
| 7. *In violation of ABA Principle 9, the failure to ensure adequate funding and independence of the indigent defense system results in a systemic failure to provide comprehensive training.* | Training should be a continual facet of a public defender agency. Skills need to be refined and expanded, and knowledge needs to be updated as laws change and practices in related fields, such as forensics, evolve. Thus, on-going training is always critical, but even more so where, as in Avoyelles Parish, experienced attorneys never received any initial "New Attorney" training and may need to re-learn skills or unlearn bad practices. There simply is no training. |
| 8. *In violation of ABA Principle 10, the failure to ensure adequate funding and independence of the indigent defense system results in a lack of accountability for attorney performance and systemic ineffective assistance of counsel.* | Because the IDB members in Avoyelles Parish do not have the knowledge or training to enable them to oversee any aspect of the delivery of indigent defense services in the Parish, the method of delivery, caseloads, quality of representation, etc., is left to the discretion of the contract public defenders. The NLADA site team noticed many troublesome practices of the defense attorneys, including one attorney's practice of standing 15 feet away from the defendant during guilty pleas. This attorney was at times laughing with court staff during the proceeding in which his clients were forced to advocate on their own behalf. |
| 9. *In violation of ABA Principle 4, the failure to ensure adequate funding and independence of the indigent defense system results in the continual abridgement of indigent defense clients' right to confidentiality.* | Substantive conversations on felony cases between clients and attorneys in Avoyelles Parish were conducted in the open courtroom audible to the courtroom audience and staff. The Avoyelles Parish Sheriff owns and operates the jail phone system and we were told that it cost $5.00 to place a collect call from the jail plus long distance rates for the entirety of the conversation. This policy has forced the contract lawyers to set a policy that no collect calls from the jail be accepted due to the financial limitations of their contracts. |
| 10. *In violation of ABA Principle 8, the failure to ensure adequate funding and independence of the indigent defense system results in the lack of resource parity between the prosecution and defense in Louisiana.* | On average, Louisiana prosecutors outspent their indigent defense counterparts by nearly 3 to 1. This does not take into account the amount of investigative resources provided at no cost to the prosecution by police, sheriffs, or FBI but which the indigent defense system must pay for directly. At the close of 2002, Louisiana district attorneys collectively had over $38 million in unused revenue in reserve accounts. |

In 1993, the Louisiana Supreme Court found in *State v. Peart*, 621 So.2d 780 (La. 1993), that there was a "general pattern...of chronic underfunding of indigent defense programs in most areas of the state." The Court subsequently ordered the creation of a state assistance board to help improve the quality of indigent defense. As demonstrated in Chapters III and IV, that reform effort has failed. Chapter V (pages 57-63) analyzes what went wrong with the post-*Peart* reform. The chapter concludes that the Louisiana Indigent Defense Assistance Board (LIDAB) has failed to improve the quality of trial-level indigent defense services for four main reasons: since its inception it has been essentially flat-funded despite increased responsibilities; participation in the District Assistance Fund (DAF) program is not dependent on compliance with state standards; LIDAB is not a regulatory commission empowered to verify the uniformity and accuracy of reported statistics; and, the DAF funding matrix is fundamentally flawed in assessing need. Moreover, NLADA and NACDL conclude that the district assistance fund model can never work in a funding system that is reliant on court costs as the primary revenue stream.

Nationally, public defenders not only serve the general population by providing representation services in specific criminal cases, but also by challenging the questionable practices of the other governmental agencies that do not serve the interests of justice. Chapter VI (pages 64-66) underscores the need for an adequate indigent

defense system in relation to Louisiana's correctional practices. In the 1970's the state began housing state prisoners in local jails. The extremely low wages paid to most local jail workers allows the parish jails to realize profits by housing state inmates. At the close of 2002, over $310 million was sitting unspent in Sheriff reserve accounts, or enough money to fully fund indigent defense services at its current low rate for 10 years.

In an effort to spur economic development through increased corrections jobs, the Avoyelles Parish Sheriff used the state-sponsored windfall as justification to expand the number of local jail beds. A problem now exists because the Sheriff enforces a work release program in which prison labor is offered to non-profit organizations (churches, hospitals, graveyards) and governmental agencies at costs well below minimum wage. Considering the relatively small size of the Parish and the relatively large numbers of prisoners, the expansion of the prison work force perversely reduces opportunities for people of little or no economic resources who are then led to consider crime as a means of supporting themselves. There should be an adequate indigent defense system looking out for the interest of the public, challenging the premise that the economic fortunes of Avoyelles Parish is tied to keeping the parish jails at maximum capacity.

The right to counsel is one of the only checks afforded to those of modest means against an unjust intrusion by the state upon their life and liberty. Without adequate defense services ensuring a fair day in court, the social fabric of our democratic way of life begins to erode. The report concludes (Chapter VII, page 67) that Louisiana fails to meet its federal obligations under *Gideon*. In violation of Louisiana's own Constitution, the indigent defense system is not "uniform" among the parishes, does not "secure qualified counsel," and does not provide counsel to the poor "at each stage of the proceeding."

viii    IN DEFENSE OF PUBLIC ACCESS TO JUSTICE

of Indigent Defense Services in Louisiana .................................... 58

Finding #11: On the Failure of the Louisiana Indigent Defense Assistance Board's
(LIDAB) District Assistance Fund (DAF) ...................................... 58
    A Closer Look at Indigent Defense Services in Indiana ..................... 58
    11.1: On LIDAB's Flat-Funding & Expanded Responsibilities ............... 59
    11.2: On the Lack of Compliance with State Standards ................... 60
    11.3: On the Lack of Verification of Reported Statistics ............... 61
    11.4: On the Failure of DAF to Adequately Measure Need ................ 62
    11.5: On the Failure of the Indiana DAF Model in Louisiana ............ 62
    Finding #12: On the Failure of Up-Front Application Fees ............... 64

VI.    The Louisiana Correctional System & The Importance of Indigent
    Defense Reform ........................................................... 65

VII.  Conclusion ............................................................. 68

Appendix A: Louisiana State Bar Association's *Gideon* Resolution ........... 69

Appendix B: Louisiana House Resolution 151 *i* ............................. 73

Appendix C: Louisiana Senate Resolution 112 .............................. 77

Appendix D: The American Bar Association's
    *Ten Principles of a Public Defense Delivery System* ................. 81

Appendix E: Letter from 12th Judicial District Judge Bennett to NLADA ... 86

Appendix F: Analysis of LIDAB's District Assistance Fund Matrix .......... 88

Appendix G: NLADA's Model Contract for Public Defender Services ........ 90

Appendix H: Four-Year Analysis of Indigent Defense Board
    Revenues & Expenditures ............................................. 111

Appendix I: National Indigency Screening Procedures ..................... 115

Appendix J: ACCD Ethics Opinion on Workload ........................... 118

Appendix K: Analysis of District Attorney Revenue & Expenditures ........ 127

Appendix L: Analysis of Sheriff Revenue & Expenditures ................. 128

## Table of Contents

I.   Introduction .................................................. 1

    The Constitutional Right to Counsel in Criminal Cases ...................... 1
    The Louisiana Constitution & the Commitment to Equal Justice .............. 1
    Louisiana's History of Systemic Deficiencies in the Delivery of the Right to
    Counsel ................................................................. 2
    Current Opportunities to Address the Continuing Inadequacy of Louisiana's
    Indigent Defense Services in the 10th Anniversary of *State v. Peart* ............ 3
    The Current Study ...................................................... 5
    Methodology ........................................................... 7
    Acknowledgements ..................................................... 9

II.   Indigent Defense Services in Louisiana:
    State & Local Structure and Funding ................................... 10

    Local Government Structure ............................................ 10
    Trial-Level Criminal Court Structure ................................... 11
    Local Indigent Defense Structure ...................................... 12
    Local Indigent Defense Funding ....................................... 13
    Statewide Indigent Defense Structure .................................. 14
    Statewide Indigent Defense Funding ................................... 16
    Indigent Defense in the 12th Judicial District .......................... 17

III.   Primary Findings: The Inadequate Funding & Lack of Independence
    of Louisiana's Indigent Defense System ............................... 19

    Overall Finding ....................................................... 19
    Finding #1: On Inadequate Funding ................................... 20
        1.1: On the Primacy of Court Costs on Indigent Defense Revenue Streams ... 20
        1.2: On the Unreliability of Court Costs on Revenue Streams ............. 22
        1.3: On the Impact of Non- Defender Policy-Makers on Revenue Streams ...... 24
        1.4: On the Unreliability of Recoupment on Revenue Streams .............. 25
    Finding #2: On the Lack of Independence ............................... 27

IV.   Ancillary Findings: The Effect of Inadequate Funding & Lack of
    Independence on the Delivery of Indigent Defense Services ............. 30

    Finding #3: On Flat-Fee Contracting ................................... 30
    Finding #4: On Public Defender Workload .............................. 32
    Finding #5: On Attorney Qualifications ................................. 42
    Finding #6: On Timeliness of Appointment & Continuity of Representation ...... 43
    Finding #7: On Training ............................................... 46
    Finding #8: On Performance & Accountability .......................... 47
    Finding #9: On Client Confidentiality .................................. 50
    Finding #10: On Public Defender & Prosecution Resource Parity .......... 51
    Summary of Chapters III & IV .......................................... 56

V.   An Analysis of the Failure of Post-*Peart* Reform to Improve the Quality

IN DEFENSE OF PUBLIC ACCESS TO JUSTICE      1

Chapter I
Introduction

*****

*"The poor quality of indigent defense is largely ignored by the public and by policy-makers. After all, it's about people accused of crime who are presumed guilty. They're poor people, often unattractive, inarticulate, with no apparent constituency and no voice in public policy...."*

*"As one maritime lawyer commented to me, even a cargo claim over soggy bags of coffee beans gets a better defense than a person capitally charged in Louisiana...."*

*- Judge Helen "Ginger" Berrigan, United States District Court*
*Eastern District of Louisiana, October 31, 2003*[1]

*****

*The Constitutional Right to Counsel in Criminal Cases*

As manifested in the Pledge of Allegiance, a commitment to justice for all is the cornerstone of the American social contract and our democratic system. We entrust our government with the administration of a judicial system that guarantees equal justice before the law -- assuring victims, the accused and the general public that resulting verdicts are fair, correct, swift and final.

In *Gideon v. Wainwright*, 372 U.S. 335 (1963), the United States Supreme Court concluded that "reason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him." Declaring it an "obvious truth" that "lawyers in criminal courts are necessities, not luxuries," the Court ruled that states must provide counsel to indigent defendants in felony cases. That mandate has been consistently extended to any case that may result in a potential loss of liberty.[2]

*The Louisiana Constitution & the Commitment to Equal Justice*

The right to counsel in criminal cases is also enshrined in the Louisiana State Constitution. Section 1 states that there are only three legitimate ends of government: to secure justice for all, to preserve peace, and to protect the rights and promote the happiness and general welfare of the people. In enumerating these rights, Section 13 states that any person who is indigent and has been arrested or detained in connection with the investigation or commission of any offense, has a right to court appointed

---

[1] For full text of speech, please see: www.criminaljustice.org/public.nsf/newsreleases/2003mn032?opendocument.

[2] *Gideon* established the right to counsel for felony trials. Subsequent cases extend that right to: direct appeals - *Douglas v. California*, 372 U.S. 353 (1963); custodial interrogation - *Miranda v. Arizona*, 384 U.S. 436 (1966); juvenile proceedings resulting in confinement - *In Re Gault*, 387 U.S. 1 (1967); critical stages of preliminary hearings - *Coleman v. Alabama*, 399 U.S. 1 (1970); misdemeanors involving possible imprisonment - *Argersinger v. Hamlin*, 407 U.S. 25 (1972); and misdemeanors involving a suspended sentence - *Shelton v. Alabama*, 535 U.S. 654 (2002).

counsel "at each stage of the proceedings." Accordingly, the legislature is directed to "provide for a uniform system for securing and compensating qualified counsel for indigents."[3]

*Louisiana's History of Systemic Deficiencies in the Delivery of the Right to Counsel*

Since the U.S. Supreme Court in *Gideon v. Wainwright* ordered the states to provide indigent defense services, Louisiana has funded the right to counsel primarily through court costs collected on state, local or municipal violations. Research conducted in Louisiana over the past thirty years consistently indicates that such a funding structure threatens the integrity of the state's system of justice.[4]

In 1993, in *State v. Peart*, 621 So.2d 780 (La. 1993), the Louisiana Supreme Court found that there was a "general pattern…of chronic underfunding of indigent defense programs in most areas of the state." The Supreme Court called upon the legislature to enact indigent defense reform or the Court "may find it necessary to employ the more intrusive and specific measures it has thus far avoided to ensure that indigent defendants receive reasonably effective assistance of counsel."[5]

Shortly thereafter, the Supreme Court took action, creating the first statewide indigent defense commission. In 1994, the Louisiana Supreme Court established the Louisiana Indigent Defense Board (LIDB) by court rule. LIDB was responsible for promulgating and enforcing indigent defense qualification and performance guidelines throughout the state. On January 1, 1998, LIDB was transformed into the Louisiana Indigent Defense Assistance Board (LIDAB).[6] Among other responsibilities, LIDAB

---

[3]   Louisiana Constitution, Article 1§13, available at:
      www.legis.state.la.us/lsrs/tsrs.asp?lawbody=CONST&title=1&section=13.

[4]   Though research has been conducted by various study groups, some of whom were only studying indigent defense tangentially and some of whom were authorized by governmental agencies to study the right to counsel specifically, and though the research was conducted at various times, all unanimously concluded that the indigent defense funding system fails to uphold the intent of the *Gideon* decision and should be changed. See: The Institute for Judicial Administration, *A Study of the Louisiana Court System*, 1972 ("A flexible state-funded public defender system should be instituted, which would include a number of full-time regional public defenders who could be moved to assist any court." p. 114); The American Judicature Society, *American Judicature Society, Modernizing Louisiana's Courts of Limited Jurisdiction*, 1973 ("Louisiana should establish a statewide system of public defender offices…to assure that indigent defendants are afforded their constitutional right to counsel" p. 138); American University Criminal Courts Technical Assistance Project, *An Evaluation of Indigent Criminal Defense Services in Louisiana and a Proposal for a Statewide Public Defender System*, 1974 ("Even if the Indigent Defender Boards were substantially funded, they could not meet the demands (for the right to counsel) on a statewide basis."); The State of Louisiana Supreme Court Judicial Counsel's Statewide IDB Commission, *Study of the Indigent Defender System in Louisiana*, 1992, prepared by The Spangenberg Group ("The indigent defense funding in Louisiana is hopelessly under funded in virtually every judicial district in the state" p. 38); The American Bar Association, Juvenile Justice Center, *The Children Left Behind: An Assessment of Access to Counsel & Quality of Representation in Delinquency Proceedings in Louisiana*, 2001 ("Recommendation 1: Increase the resources available to support representation in delinquency proceedings" p. 93); and, The American Bar Association, Juvenile Justice Center, *The Children Left Behind: A Review of the Status of Defense for Louisiana's Children & Youth in Delinquency Proceedings – Summary Update*, 2002 ("The lack of adequate funding is a pervasive and dire reality of the entire indigent defense system in Louisiana" p. 16).

[5]   *State v. Peart*, 621 So.2d 791 (La. 1993). The inadequacy of the available local funding streams to generate enough revenue to ensure competent representation resulted in public defender Rick Tessier of the New Orleans Indigent Defender Program filing a motion in District Court stating that he was unable to provided effective representation to his indigent defense clients due to the combination of a lack of resources and overwhelming caseloads. The hearings on the case showed Mr. Tessier carried caseloads far in excess of national standards, and had little or no funds for experts or investigatory resources, among other things. Based on the overwhelming factual evidence, the district judge found the New Orleans indigent defense system to be unconstitutional.

[6]   LIDAB is governed under La. Revised Statutes, Chapter XV § 151.

awards "District Assistance Fund (DAF)" grants to local judicial districts that strive toward complying with the LIDAB standards. Although the immediate attainment of LIDAB standards is not a mandatory requirement for participation in the financial assistance program, there is a requirement that the local indigent defense administration assent to the standards as goals to be immediately worked toward and to be achieved over time. [7]

*Current Opportunities to Address the Continuing Inadequacy of Louisiana's Indigent Defense Services in the 10th Anniversary of* State v. Peart

The year 2003 marked the 10th anniversary of the *Peart* decision and the beginning of state involvement in the delivery of indigent defense services. [8] Despite reform efforts, significant challenges remain in protecting the right to counsel for both adults and juveniles. [9]

In 1967, the U. S. Supreme Court held in *In Re Gault* that juveniles have the same right to counsel as adults. The standard of representation outlined in *Gault* has been established over the intervening decades in 19 volumes of Juvenile Justice Standards promulgated by the American Bar Association Institute of Judicial Administration. [10] On February 27, 2003, the U.S. Department of Justice informed then Louisiana Governor M.J. "Mike" Foster, Jr., of its on-going investigation into whether juveniles with cognitive impairments are waiving their right to counsel in delinquency proceedings in violation of the U.S. Constitution and federal laws. [11]

Three months later, the Louisiana State Bar Association passed a resolution in honor of the 40th anniversary of the *Gideon* decision that called into question the current adequacy of adult indigent defense services in the state. [12] The resolution proclaimed,

---

[7] *Louisiana Standard on Indigent Defense*, Chapter 1, Standards Relating to the Performance of Indigent Defense Systems: "Purpose and Scope of Standard – These standards provide recommended and aspirational guidelines for the consideration and use of district indigent defender boards in providing quality services to their indigent clients. The immediate attainment of these standards by a district indigent defender board is not a mandatory requirement for participation in the financial assistance programs of the Louisiana Indigent Defender Board. However, a district indigent defender board's assent to these standards, as goals to be immediately worked toward and to be achieved over time, is a requirement for such participation."

[8] The state of Louisiana did make a contribution of $10,000 to local judicial district indigent defense boards in 1973 pursuant to Louisiana Revised Statute Chapter XV §146(2)c. Though the statute has never been repealed, the state has never again contributed such funding to the local level. Thus, the post-*Peart* LIDB and LIDAB district assistance funds were the beginning of a small portion of indigent defense services.

[9] In addition to the issues delineated in this section, NLADA notes that there is a significant number of *Peart* petitions being litigated across the state, including: *State v. Donald Ray Clifton*, Criminal Docket No. 265,106, currently pending in the 9th Judicial District Court, Parish of Rapides, State of Louisiana; *State v. Dolores Mechelle Jones*, Criminal Docket No. 265,106, currently pending in the 9th Judicial District Court, Parish of Rapides, State of Louisiana; *State v. Marklin Scalisi*, Criminal Docket No. 270,297, currently pending in the 9th Judicial District Court, Parish of Rapides, State of Louisiana; and, *State v. Adrian Citizen*, Criminal Docket No. 22,815-02, 14th Judicial District Court, Parish of Calcasieu, State of Louisiana.

[10] See key provisions relating to juvenile defense, indexed in the U.S. Department of Justice, *Compendium of Standards for Indigent Defense Systems*, Volume V at www.ojp.usdoj.gov/indigentdefense/compendium/.

[11] The U.S. Department of Justice investigation is being conducted pursuant to the Violent Crime Control & Law Enforcement Act, 42, U.S.C. § 14141.

[12] See Appendix A (page 69) for LSBA resolution.

4      IN DEFENSE OF PUBLIC ACCESS TO JUSTICE

"State government has created a system in which the loss of one's liberty may be more dependent on a person's income level and the jurisdiction in which the crime is alleged to have happened than on the factual merits of the case." Besides the potential harm to individual defendants, the LSBA resolution also noted that the funding and structure of indigent defense services produces systemic inefficiencies and wastes limited taxpayer resources throughout other components of the criminal justice system.[13] And whereas one of the principle missions of LSBA is to "assure access to and aid in the administration of justice," the resolution urged all three branches of Louisiana state government to establish a "Blue Ribbon Commission to develop a strategic plan for indigent defense system reform and set a timetable for implementation."

On the heels of the LSBA resolution, the Louisiana House of Representatives passed a concurrent resolution during the close of the 2003 regular session. Mirroring much of the LSBA resolution, House Resolution 151 calls upon the state to rededicate itself to the "promise of equal justice for all, regardless of income" by establishing a Louisiana Task Force on Indigent Defense Services (Task Force).[14] The Louisiana Senate soon joined the call for reform, offering their own resolution to create a blue ribbon task force to "study the system in Louisiana of providing legal representation to indigent persons who are charged with violations of criminal laws" and present findings and recommendations for legislative change.[15] The composition of the Task Force in Senate Resolution 112 reflects the importance with which the Legislature views the job at hand. Besides having all three branches of state government represented, the Senate resolution includes business leaders, deans of the four law schools, religious leaders, and people from social services and legal services backgrounds.[16] The Task Force is set to convene and begin its work in the early part of 2004.

---

[13] "...[T]he lack of [indigent defense] resources has effectively barred Public Defenders from providing counsel at the early stages of the prosecution, resulting in overcrowding in local jails due to the large scale detention of accused persons prior to their indictment and creating serious problems for Parish government and local Sheriffs." *Supra* note 12.

[14] The resolution was introduced by a bipartisan, geographically-diverse group of Representatives: L. Jackson (D – District 2), Alario (D. – District 83), K. Carter (D. – District 93), Cazayoux (D. – District 18), Gallot (D. – District 11), Green (D. District 87), Hunter (D. – District 17), M. Jackson (D. – District 61), LaFleur (D. – District 38), Landrieu (D – District 89), Martiny (R. – District 79), Murray (D. – District 96), Richmond (D. – District 101) and Townsend (D. – District 22). See Appendix B (page 73) for text of HR 151.

[15] Senate Resolution 112 was introduced by Senator C. Jones (D. – District 34). See Appendix C (page 77) for text of SR 112.

[16] The Task Force is composed of 31 members or their designees: The Chief Justice of the Louisiana Supreme Court; the President of the Conference of Court of Appeals Judges; President of the Louisiana District Judges Association; President of the Louisiana Council of Juvenile and Family Court Judges; President of the Louisiana City Court Judges Association; President of the Council for a Better Louisiana; Executive Director of the Louisiana Interchurch Conference; President of the Louisiana AFL-CIO; President of the Louisiana Association of Business and Industry; the Deans of the four Law Centers in Louisiana; the Governor of Louisiana; the Louisiana Commissioner of Administration; President of the Louisiana Public Defender Association; President of the Louisiana Criminal Defense Lawyers Association; President of the Louisiana State Bar Association; Director of the Louisiana State Law Institute; President of the Louisiana Legal Services Corporation; President of the Louisiana Chapter of the Louis A. Martinet Society; President of the Louisiana Association of Women Attorneys; Secretary of the Louisiana Department of Social Services, President of the Louisiana Senate; Speaker of the Louisiana House of Representatives; Chairman of the Louisiana Senate Committee on Finance; Chairman of the Louisiana House Committee on Appropriations; and, Chairman of the Senate Committee on Judiciary C and the House Committee on Administration of Criminal Justice.

*The Current Study*

In the summer of 2002, the National Legal Aid & Defender Association (NLADA),[17] the National Association of Criminal Defense Lawyers (NACDL),[18] and the American Bar Association's Standing Committee on Legal Aid & Indigent Defendants (ABA/SCLAID)[19] were all contacted by various constituencies within Louisiana regarding their concerns about the adequacy of indigent defense services in the state. NLADA and NACDL staff subsequently met with and/or held discussions with state legislators, members of the Louisiana Public Defender Association (LPDA),[20] the Louisiana Indigent Defense Assistance Board (LIDAB);[21] the Louisiana Association of Criminal Defense Lawyers (LACDL),[22] and others, to assess the serious Constitutional concerns raised regarding the right to counsel in the state.

In April 2003, staff from all three national organizations testified at the State Capitol before LIDAB to report on their preliminary findings. NLADA staff began the testimony by establishing the organization's recognized leadership in the promulgation of national indigent defense standards and gave an overview of Louisiana's indigent defense system from a national perspective.[23] ABA/SCLAID staff presented the *Ten Principles of*

[17] The National Legal Aid and Defender Association (NLADA) is a national, non-profit membership association dedicated to quality legal representation for people of insufficient means. Created in 1911, NLADA has been a leader in supporting equal justice for over ninety years. NLADA currently supports a number of initiatives, including the American Council of Chief Defenders (ACCD), a leadership forum that brings together the top defender executives nationwide, and the National Defender Leadership Institute (NDLI), an innovative training project to support current managers and develop future leaders. NLADA is a recognized leader in the promulgation of indigent defense standards and the mechanisms for evaluating a jurisdiction's compliance against them. For more information please see: www.nlada.org.

[18] The National Association of Criminal Defense Lawyers (NACDL) is the preeminent organization in the United States advancing the mission of the nation's criminal defense lawyers to ensure justice and due process for persons accused of crime or other misconduct. A professional bar association founded in 1958, NACDL's more than 10,000 direct members -- and 79 state and local affiliate organizations with another 28,000 members -- include private criminal defense lawyers, public defenders, active U.S. military defense counsel, law professors and judges committed to preserving fairness within America's criminal justice system. For more information please see: www.nacdl.org.

[19] Since 1920, the American Bar Association's Standing Committee on Legal Aid and Indigent Defendants has advocated for and assisted in providing legal services to indigent persons. SCLAID is active in improving state systems for providing defense services to indigent persons charged with crime. Moreover, it provides technical assistance on the systemic improvement of indigent defense systems to state and national policy-makers, bar associations and the judiciary. *Overview of ABA Activities, January 2003.* For more information please see: www.abanet.org.

[20] David J. Carroll, Director of Research & Evaluations for the Defender Legal Services Division of NLADA attended the LPDA meeting on February 7, 2003 in St. Francisville, Louisiana.

[21] Mr. Carroll met with Mr. Ed Greenlee, Executive Director of LIDAB, Ms. Marsha Oliver, LIDAB Staff Attorney, and Mr. Jim Looney, Director of the Louisiana Appellate Project at the February LPDA meeting. Mr. Greenlee was also present at an LACDL meeting that NACDL and NLADA representatives attended in New Orleans on February 20, 2003. NLADA and NACDL representatives testified at a LIDAB hearing on April 8, 2003.

[22] NLADA, ABA/SCLAID and NACDL staff met with LACDL in New Orleans on February 20, 2003.

[23] Mr. Carroll represented NLADA at the hearing. The following is a list of NLADA indigent defense standards: The Ten Principles of a Public Defense Delivery System (adopted by the ABA, 2002); Defender Training and Development Standards (NLADA, 1997); Performance Guidelines for Criminal Defense Representation (NLADA, 1995); Indigent Defense Caseloads and Common Sense: An Update (NLADA, 1994); Standards for the Administration of Assigned Counsel Systems (NLADA, 1989); Standard for the Appointment and Performance of Counsel in Death Penalty Cases (NLADA, 1988; ABA, 1989);Guidelines for Negotiating and Awarding Contracts for Criminal Defense Services (NLADA, 1984; ABA, 1985); Standards and Evaluation Design for Appellate Defender Offices (NLADA, 1980); Evaluation Design for Public Defender Offices (NLADA, 1977; and Guidelines for Legal Defense Systems in the

*a Public Defense Delivery System (Ten Principles)*, a set of standards which "constitute the fundamental criteria to be met for a public defense delivery system to deliver effective and efficient, high quality, ethical, conflict-free representation to accused persons who cannot afford to hire an attorney."[24] As presented, the purpose of the *Ten Principles* is to distill the existing voluminous national standards for indigent defense systems down to their most basic elements, in a succinct form that busy officials and policymakers can readily review and apply. The NLADA representative then discussed the state's substantial noncompliance with the ABA and NLADA standards. The NACDL representative[25] testified that numerous jurisdictions have been sued for failure to provide adequate defense services to the poor, and that Louisiana is vulnerable to similar litigation.[26]

Based on this initial assessment, NACDL and NLADA proposed further investigation and first-hand courtroom observations of indigent defense practices, including conducting interviews with criminal justice representatives and collecting statistical data in a Louisiana Parish prior to the convening of the Task Force.[27]

NLADA developed a work plan for a limited study of indigent defense services in Louisiana. Because previous indigent defense studies have examined more populous jurisdictions in Louisiana,[28] we chose to focus the current study on a rural Parish to understand how public defense services are provided in non-urban jurisdictions. NACDL secured local and national funding[29] to conduct this study. NACDL administered the project while NLADA conducted the fieldwork and wrote the report.

Avoyelles Parish was selected for the site visit based upon background research concerning its population size, economic profile, its status as the sole Parish in the Judicial District, and availability of interviewees. Avoyelles is a rural parish covering

---

United States (National Study Commission on Defense Services, U.S. Department of Justice, 1976). Such standards were gathered into the first-ever National Compendium of Standards for Indigent Defense Systems by the U.S. Department of Justice, with NLADA assistance, in 2000. www.ojp.usdoj.gov/indigentdefense/compendium/.

[24] The *Ten Principles of a Public Defense System* is based on a paper by James Neuhard, State Appellate Defender of Michigan and former NLADA President and H. Scott Wallace, NLADA Director of Defender Legal Services, which was published in December 2000 in the *Compendium of Standards for Indigent Defense Systems* (www.ojp.usdoj.gov/indigentdefense/compendium/). The *Ten Principles* is available at: www.abanet.org/legalservices/downloads/sclaid/indigentdefense/tenprinciplesbooklet.pdf and is attached as Appendix D (page 81) of this report. Ms. Shubhangi Deoras, Assistant Counsel for ABA/SCLAID presented the *Ten Principles* at the hearing.

[25] Ms. Kathryn Jones, Indigent Defense Counsel participated on behalf of NACDL.

[26] See minutes from the LIDAB meeting, Louisiana Senate Committee Room 1, Baton Rogue, April 8, 2003. http://www.lidab.com/Minutes/2003/4-8-03.htm

[27] For a variety of reasons to be detailed in this report, Louisiana has a dearth of objective indigent defense data and statistics.

[28] See: Kurth, Michael M., Ph.D. and Daryl V. Burckel, DBA & CPA, *Defending the Indigent in Southwest Louisiana*, July 2003; The Spangenberg Group, *The Orleans Indigent Defender Program: An Overview*, February 1997; The American Bar Association, Bar Information Program, *A Study of the Operation of the Indigent Defense System in the 19th Judicial District, East Baton Rogue, Louisiana*, prepared by The Spangenberg Group, October 1992.

[29] Funding sources include: The American Bar Association's Gideon Initiative, National Association of Criminal Defense Lawyers, and Louisiana Association of Criminal Defense Lawyers. A grant from the Open Society Institute allows NLADA to conduct field research and evaluations at reduced daily rates.

832 square miles in central Louisiana.[30]  Ranked by population, Avoyelles Parish is the 29th most populated of the 64 parishes. People of African descent comprise 29.5% of the population of Avoyelles (total population: 41,458). Median household income in Avoyelles Parish is $23,851, which is 26.8% lower than the state median ($32,566) and 43.2% below the national median ($41,999).  The per capita income is $12,146, and 25.9% of the population lives below the national poverty level (6.3% higher than the state average, which is 7.2% higher than the national average).  When poverty levels are this high, our experience has been that the vast majority of defendants in criminal cases qualify for indigent defense services.  Additionally, nearly 21% of Avoyelles Parish residents speak a language other than English as their primary tongue and slightly less than 60% of people over 25 years of age finished high school.  Such statistics usually indicate that more attorney time is needed to explain, or have an interpreter explain, all information to a defendant so that (s)he can make an informed decision about a criminal case, including any collateral consequences of pleading guilty.

*Methodology*

Recognizing that effective public policy depends upon the effective implementation and enforcement of said policy, NLADA has played a leadership role in both the development of national standards for public defense systems and processes for evaluating a jurisdiction's compliance with them.  The concept of using standards to address quality concerns is not unique to the field of indigent defense. In fact, the strong pressures of favoritism, partisanship, and/or profits on public officials underscore the need for standards to assure the fundamental quality in all facets of government. For instance, realizing that standards are necessary to both compare bids equitably and to assure quality products, policy-makers long ago ceased taking the lowest bid to build a hospital, school or a bridge and required winning contractors to meet minimum quality standards of safety.

With proper evaluation procedures, standards help to assure professionals' compliance with national norms of quality in areas where the government policy-makers themselves may lack expertise. In the field of indigent defense, standards-based assessments have become the recognized norm for guaranteeing the adequacy of criminal defense services provided to the poor.[31]  NLADA standards-based assessments utilize a modified version of the Pieczenik Evaluation Design for Public Defender Offices, which has been used since 1976 by NLADA and other organizations, such as the National Defender Institute and the Criminal Courts Technical Assistance Project of the American University Justice Programs Office. The design incorporates reviewing budgetary, caseload and organizational information from a jurisdiction in addition to a site visit.

The current NLADA site assessment methodology employs the national standards as an objective measurement of an individual organization's mechanisms for effectuating key requirements of an indigent defense system including: independence, accountability, training, supervision, effective management, fiscal controls, competent representation,

---

[30] The background data on Avoyelles Parish in this paragraph was obtained from the U.S. Census Bureau. For more information please see: www.census.gov.

[31] For instance, see: NLADA, *Indigent Defense Services in Venango County (Franklin), Pennsylvania*, March 2002; NLADA, *Evaluation of the Public Defender Office: Clark County (Las Vegas), Nevada*, March 2003, available at: www.nlada.org/Defender/Defender_Evaluation; and, NLADA, *A Pilot assessment of the Office of the Public Defender for Santa Clara County, California (San Jose)*, December 2003.

8     IN DEFENSE OF PUBLIC ACCESS TO JUSTICE

and workload.   In developing a standards-based assessment methodology for the Louisiana site visit, NLADA decided to look first at the macro-level – i.e. the general problems facing all Judicial Districts – before exploring the specific problems manifested at the micro-level in the 12th Judicial District.

NLADA put together a site-visit team of professional researchers and leading public defense practitioners from the American Counsel of Chief Defenders to conduct in-court observations and interviews with defense providers and other key players in the local criminal justice system; including a District Judge, the District Attorney, the Sheriff, the local Indigent Defense Board, and others. On-site work was conducted on September 15-17[th], 2003. The four-person research team consisted of David J. Carroll,[32] Robert Boruchowitz,[33] Fern Laethem[34] and Phyllis Subin.[35]

---

[32] David Carroll joined NLADA as Director of Research and Development in January 2002. Since joining NLADA, Mr. Carroll co-authored a report on indigent defense services in Venango County, Pennsylvania, led an on-site assessment of the public defender office in Clark County (Las Vegas), Nevada, provided consultation services for the Maryland State Public Defender, and co-authored a report for the U.S. Department of Justice on the Implementation and Impact of Indigent Defense Standards. For five and a half years, Mr. Carroll worked as a Senior Research Associate & Business Manager for the Spangenberg Group (TSG). TSG is a national and international research and consulting firm specializing in criminal justice reform. Since 1985, TSG has been the research arm of the American Bar Association on indigent defense issues.

Mr. Carroll directed numerous projects on behalf of TSG, including: a jail-planning study for Pierce County (Tacoma) Washington; a study of indigent defense cost recovery efforts in Jefferson and Fayette Counties, Kentucky (Louisville and Lexington); a statewide assessment of West Virginia's Public Defender Services; and principal analysis on a statewide public defender, court and prosecutor case-weighting study in Tennessee. He provided analysis and re-design of the New York Legal Aid Society's Criminal Defense Division and Criminal Appeals Bureau's case management information systems. Mr. Carroll also was chosen to provide on-site technical assistance to statewide Task Forces in Illinois, Nevada, Alabama, and Vermont under the auspices of the American Bar Association and the U.S. Department of Justice, Bureau of Justice Assistance.

[33] Robert Boruchowitz has been the Executive Director of The Defender Association, a private, non-profit public defender agency providing representation to indigent defendants in King County (Seattle), WA since 1978. In that capacity, Mr. Boruchowitz administers an office of approximately 130 staff, including 90 lawyers and a budget of approximately $9.8 million. He co-counseled the first King County "sexual predator" commitment jury trial (1991), and appeal in state supreme court (1991-1993), and remand to superior court (1993-1994). He also argued the case before the U.S. Supreme Court (*Selig v. Young*, 531 U.S. 250 (2001)). As President of the Washington Defender Association, Mr. Boruchowitz oversees a statewide membership organization representing more than 700 lawyers and staff representing indigent people accused of crimes. He co-authored NLADA's Model Indigent Defense Contract. In 2003, he was awarded a Soros Fellowship to study the denial of counsel in misdemeanor and juvenile cases in the United States.

[34] Fern Laethem began her legal career as a Deputy District Attorney in Sacramento, California and was later appointed as an Assistant U.S. Attorney for the Eastern District of California. In 1981 she opened a solo criminal defense practice that she maintained until 1989 when California Governor George Deukmejian appointed her as the State Public Defender of California to oversee direct appeals in capital cases statewide. Governor Pete Wilson reappointed her for two more terms. Ms. Laethem retired as State Public Defender in 1999 and accepted a position with Sacramento County as the Executive Director of Sacramento County Conflict Criminal Defenders.

Ms. Laethem has served as a member of the California Committee of Bar Examiners, the California Judicial Council Appellate Standing Advisory Committee and the California Council on Criminal Justice. Ms. Laethem participated as a trainer in NLADA Defender Manager training for many years and is a consultant to contract public defender programs in other jurisdictions.   She was recently appointed by the California senate to serve on the California Commission on Special Education.

[35] Phyllis Subin completed two gubernatorial appointment terms as the Chief Public Defender for the State of New Mexico in 2003. In that capacity, she was the leader of New Mexico's largest statewide law firm, the New Mexico Public Defender Department, which had a budget of over $30 million and which employed 320 staff members (160 attorneys) with over 100 contract attorneys. At the time of her first appointment, Ms. Subin was an Assistant Professor at the University of New Mexico School of Law and the director of the Criminal Defense Clinic. She has a long history in the teaching and training of law students and public defender attorneys. Following years as a trial and appellate public defender, Ms. Subin was the first Director of Training and Recruitment at the Defender Association of Philadelphia (PA), a large county public defender system, where she developed and taught a nationally recognized training program for lawyers and law interns.

*Acknowledgements*

Many individuals contributed to this study. First and foremost, NLADA wishes to thank the members of the Avoyelles Parish community who took time out of their busy schedules to meet with us. We are particularly indebted to District Judge William J. Bennett for allowing us unrestricted access to his courtroom and helping us to secure interviews with other criminal justice practitioners.[36] District Attorney Charles A. Riddle, III, provided on-going insights into courtroom activities as they occurred. The district attorney showed compassion for victims and defendants alike and treated all people in the courtroom with dignity. In separate interviews, the District Attorney told us of his concerns about due process and allowed NLADA to review his database for available indigent defense data. It is rare for a prosecutor to be as candid and reflective on indigent defense issues as Mr. Riddle. The Chair of the 12th Judicial District Indigent Defense Board (IDB), Retired Colonel Charles Jones, provided us with contact information, helped schedule interviews, provided us with access to IDB financial records and always responded to our requests for more information in a professional manner.

Other Louisianans provided NLADA with critical data and observations. Mr. Ed Greenlee, Director of LIDAB, shared with us key funding data and walked us through the state funding schematic. Mr. Paul Marx of the Louisiana Public Defenders Association invited NLADA to address an association meeting. This in turn gave NLADA a much broader understanding of the issues defenders face on a daily basis throughout the state and helped us put the Avoyelles Parish findings into a statewide context. Representatives of the Louisiana Association of Criminal Defense Lawyers assisted us with understanding many of the unique aspects of criminal defense practice in the state. Mr. George Steimel, a managing partner of a governmental affairs consulting firm, is especially recognized for helping us collect statewide data from numerous sources and providing a local contact for us with state government representatives.

Finally, NLADA would like to thank Ms. Kathryn Jones and Ms. Catherine Vanchiere Beane, the former and current NACDL indigent defense counsel. Ms. Jones tirelessly conducted the preliminary investigations into the adequacy of indigent defense services in the state, coordinated the meetings of the concerned Louisianans and secured funding for the study. Ms. Beane continued to uphold the high standard set by Ms. Jones and provided NLADA with timely critiques and advice. Though the report's findings are NLADA's alone, the oversight and guidance provided by NACDL proved to be insightful, challenging and beneficial to the final report.

---

Ms. Subin served as chair of NLADA's Defender Trainer's Section, was instrumental in writing and developing NLADA's national Training and Development standards and assisted in the creation of NLADA's Defender Advocacy Institute. Ms. Subin has consulted privately for a number of indigent defense programs, including the Kentucky Department of Advocacy.

[36] See Appendix E (page 86) for Judge Bennett's letter to NLADA (August 18, 2003).

Chapter II
Indigent Defense Services in Louisiana:
State & Local Structure and Funding

Before evaluating the adequacy of public defense services in Avoyelles Parish, it is important to present an overview of how the indigent defense system in the state is intended to function. Given Louisiana's complex structure of local government, a brief overview of local government is required first.

*Local Government Structure*

Every parish in Louisiana has a locally elected governing board known as a "police jury."[37] With the ratification of the 1974 Louisiana Constitution, parishes were empowered with broad home rule authority reversing the traditional concept of local government as a "creature of the state" possessing only delegated authority.[38] Because of the importance of local control of government, the State Constitution and Louisiana Revised Statutes do not designate how a police jury should organize to discharge its functions.[39] Article IV §5 of the State Constitution allows for the establishment of home rule authority to be adopted through a majority vote in an election. In those parishes with no home rule charter, the Constitution specifically grants the power to the electorate to grant to the police jury whatever legal power necessary to perform any requisite function.[40]

Despite this broad power and authority of local government, police juries have little control over the criminal justice expenditures they administer. State law sets the salaries of sheriffs, clerks of court, and district attorneys at certain minimum levels, though funding of these costs is the responsibility of local government. Therefore, though local control of government is a defining trait of Louisiana, police juries do not exercise as much power over criminal justice matters as their counterparts in many other states.

Moreover, police juries in all parishes have one common characteristic that poses a significant separation of powers issue at the local level, namely:

The police jury system vests both legislative and administrative functions in the same persons. The jury performs the legislative functions of enacting ordinances, establishing programs and setting policy. It also is an administrative body in that it is involved in preparing the budget, hiring and firing personnel, spending funds, negotiating contracts and in general, directing the activities under its supervision.[41]

Serving as both the legislative and administrative function, the police jury form of government does not permit for a strong local chief executive officer, like an administrative

---

[37] In this regard, Louisiana is unlike every other state in the nation where the political subdivisions are known as counties. At the time of Louisiana's inclusion in the United States, the state did have 12 counties. The geographic size of these counties proved too difficult to administer effectively and the counties were divided into 19 parishes that mirrored many of the 21 ecclesiastical parishes established in 1762. See: http://www.lpgov.org/facts.htm

[38] Id.

[39] Id.

[40] This is the model used in Avoyelles Parish.

[41] *Supra* note 37.

secretary or county manager. The result of this form of local government is that, in most parishes, the Sheriff is the elected official that maintains the most local control over government functions.

*Trial-Level Criminal Court Structure*

Crime is a significant problem for any policy-maker in the nation, whether at the state, federal or local level. Louisiana's crime rates are among the highest in the country. For example, Louisiana ranks 22nd of the 50 states in population. In 2000, Louisiana had a total Crime Index of 5,422.8 reported incidents per 100,000 persons, ranking the state as having the fourth highest total Crime Index of the 50 states. For violent crime, Louisiana had a reported incident rate of 681.1 per 100,000 people. This ranked the state as having the 7th highest occurrence for violent crime among the states. In the same year, Louisiana had 12.5 murders per 100,000 people, ranking the state as having the highest murder rate in the country.[42]

The result is that the Louisiana court system is stretched to its limits simply to process the growing number of people entering the state's criminal justice system each year.[43] Despite having 41 judicial districts covering the 64 local parishes, the Louisiana court system is not unified. Courts of limited jurisdiction are known alternatively as "City Court," "Municipal Court," or "Parish Court," and have criminal jurisdiction over violations of parish and city ordinances.[44] These courts also have primary jurisdiction over all juvenile and family matters in those jurisdictions where no separate "Family and Juvenile Court" exists. There are two city courts in Avoyelles Parish (in the cities of Marksville and Bunkie). Significantly, there is no Family and Juvenile Court in the 12th Judicial District, leaving the two City Courts to perform the critical function of dispensing justice in delinquency proceedings.[45]

"District Courts" comprise the second level of the judiciary. City Court and District Court have concurrent jurisdiction over misdemeanor cases, while District Courts

---

[42] To complete the picture, Louisiana's robbery rate was 168.5 ranking the state 8th highest for robbery. The state also had 466.6 aggravated assaults for every 100,000 people, the 6th highest among the states. For crimes against property, the state had a reported incident rate of 4,741.7 per 100,000 people, which ranked as the 5th highest. Louisiana has the 4th highest burglary rate in the nation. Larceny-theft was reported 3,229.9 times per 100,000 people in Louisiana, which is the 7th highest among the states. Vehicle Theft occurred 475.9 times per 100,000 people, the 10th highest among the states. All statistics are for the year 2000. (http://www.disastercenter.com/crime/lacrime.htm).

[43] In 2002, there were 531,858 criminal and traffic cases processed in Louisiana's District Courts, an increase of nearly 10.5% over 1999's total (481,347). The Supreme Court of Louisiana, *Annual Report 2002 of the Judicial Council of the Supreme Court*, 2003, available at: www.lasc.org/press_room/annual_reports/reports/2002stats.pdf

[44] There are also entities known as "Mayor's Courts" or "Traffic Courts" with no criminal jurisdiction, except that Justices of the Peace serve as committing magistrates and for the issuance of peace bonds (i.e. an affidavit that a person has threatened or is about to commit a specified breach of the peace; if there is a finding of a sufficient threat, a magistrate can issue a summons or warrant).

[45] NLADA focused our research on adult representation, in part because of the extensive research that has already been done on the major problems with juvenile defense throughout the state. Nevertheless, it is not possible to completely separate adult and juvenile representation. In most instances in the state, the attorneys that are asked to represent juveniles in delinquency proceedings are the same ones handling adults in criminal cases. As a result, workload concerns, inadequate training, and other aspects of adult representation directly impact the quality of representation afforded to children. For more information on Louisiana's juvenile justice system, please visit the American Bar Association, Juvenile Justice Center website (www.abanet.org/crimjust/juvjus/home.html) and The Juvenile Justice Project of Louisiana (www.jjpl.org).

exclusively oversee all felony cases. By statute, the 12th Judicial District has two elected District Judges. These judges also hear appeals arising from the lower courts.

*Local Indigent Defense Structure*

Louisiana Revised Statutes require each judicial district to form an indigent defender board (IDB).[46] Across the state, IDBs vary in size -- but must have at least three members and no more than seven. The Avoyelles Parish IDB has four members. IDB members are selected by the district court from nominees provided by each bar association within the judicial district.[47] In the event no nominations are submitted by the bar association, a majority of the district court judges select the entire board. The board must reflect the racial and gender makeup of the judicial district involved.

Each district board is required to select one of the following procedures or any combination thereof for providing counsel for indigent defendants:[48]

1.    *Assigned Counsel System* -- Appointment by the court from a list provided by IDB of volunteer attorneys licensed to practice law in the state. In the event of an inadequate number of volunteer attorneys, appointment shall be from a list provided by IDB of non-volunteer attorneys.[49] All appointments are supposed to be on a successive, rotational basis.

2.    *Contract System* -- IDB may enter into a contract or contracts, on such terms and conditions as it deems "advisable" with one or more attorneys licensed to practice law in the state and residing in the judicial district to provide counsel for indigent defendants.

3.    *Public Defender* -- IDB may employ a chief indigent defender and such assistants and supporting staff, as it deems necessary. The chief indigent defender is to be appointed for a period of three years and may not be a member of the board. IDB sets the salaries of the chief indigent defender, and all assistants and supporting personnel.

Ten parishes have created full-time public defender programs. The majority of the other parishes provide services through contracts with individual attorneys or a consortium of lawyers; at least two parishes use an assigned counsel system.

*Local Indigent Defense Funding*

---

[46] La. Revised Statutes, Title XV § 144.

[47] Elected officials, district attorneys, their employees, including assistant district attorneys, or prosecutors in any court shall not be permitted to serve on the district board. *Supra* note 46.

[48] La. Revised Statutes, Title XV § 145.

[49] Each district board is required to maintain a current panel of volunteer attorneys licensed to practice law in the state and must additionally maintain a current panel of non-volunteer attorneys under the age of fifty-five licensed to practice law in Louisiana and residing in the judicial district. The panel of non-volunteer attorneys shall not include any attorney who has been licensed to practice in Louisiana for thirty or more years. *Supra* note 48.

Case 2:14-cv-01342-JCZ-KWR   Document 1-1   Filed 06/05/14   Page 66 of 319

Each IDB is charged with administering the local indigent defense fund.[50] Though each IDB may accept, receive, and use public or private grants, a review of each judicial district's financial audit reveals that it is rare that any IDB receives private grants.[51] Instead, funding for each IDB is garnered primarily through court costs and recoupment of costs from indigent defendants collected in the local judicial district.

Every court of original criminal jurisdiction[52] must remit to their local dedicated IDB account the monies collected on all state, local or municipal violations in which a defendant is convicted after a trial, enters a plea of guilty or nolo contendere, or forfeits bond on a monthly basis. The local IDB fee must be at least $17.50, though it can be increased to $35.00 by a majority vote of the judges of the courts of original jurisdiction.[53] Commonly referred to as "recoupment," the court can order a defendant to pay for part of the cost of representation to the extent that a person is able to do so without causing undue financial hardship.[54]

The largest amount of the revenue has been traditionally garnered from assessing fees on traffic violations, under the assumption that those cases deal with offenders who can most afford to pay costs and fees. In Avoyelles Parish, the Office of the Sheriff is empowered as the tax and fee collection authority. In that role, the Sheriff is responsible for both the collection and dissemination of funds to the local IDB. Revenues that are not expended during the course of the year can be kept at the local level. No revenue garnered through court costs or recoupment revert back to a state or local general fund — essentially leaving cash reserves to be expended at some future time. The IDB accounts may accrue interest on unexpended monies, another source of revenue at the local level.

Although Louisiana Revised Statutes, Title XV §304 states that Parishes are responsible for all witness expenses upon approval of the District Court Judge overseeing the case, the statute was amended to make clear that nothing in the section "shall be construed to make parishes or the City of New Orleans responsible for the expenses associated with the costs, expert fees, or attorney fees of a defendant in a criminal

---

[50] Indigent Defender Boards are governed under La. Revised Statutes, Title XV § 145.

[51] NLADA requested, received and reviewed the financial audits of every IDB for the years 1999-2002 through the Louisiana Office of the Legislative Auditor. All statewide financial analyses in this report are based on the review of these audits. NLADA also requested and received an electronic copy of the 12th Judicial District IDB's financial bookkeeping system. The IDB in Avoyelles Parish use Intuit "Quickbooks"®. When possible, NLADA crosschecked state financial audits on the local software program. The Avoyelles Parish IDB did not receive any grant funding. Interviews with IDB members revealed that no grants were sought.

[52] Except in the town of Jonesville, in the city of Plaquemine, and in mayors' courts in municipalities having a population of less than five thousand.

[53] To participate in LIDAB's district assistance program, the fee must be at least $25. In the 12th Judicial District the fee is $25. It is important to note that much of the criminal justice system receives similar funding from fees. Again the amount and number of agencies receiving criminal court fees varies between Parishes. In Avoyelles Parish the following agencies receive fees: the Sheriff ($17.50); Clerk of Courts ($7.50); District Attorney ($10.00-$20.00 depending on severity); The Louisiana Commission on Law Enforcement ($6.00); District Court ($10.00); CMIS Judicial Administrator ($2.00); Police Jury ($2.50); Coroner ($10.00); Central Louisiana Criminal Detention ($7.50); The 12th Judicial District Juvenile Detention Center ($2.00); and, the North Louisiana Criminalistics Lab ($10.00-$50.00 depending on severity). In total, criminal defendants can be assessed as much as $135.00 in court fees. List of fees obtained from the Office of Sheriff William O. Belt – 12th Judicial Disbursement Schedule (Last revised on April 2, 2001).

[54] The court may order payment in installments, or in any manner that it believes reasonable and compatible with the defendant's financial ability. In courtroom observations conducted in Avoyelles Parish, defendants were routinely being assessed a flat $125 fee to cover the cost of their representation.

proceeding." As a result, police juries are not required to provide *any monetary assistance to their IDB.*

In 2003, the Louisiana Legislature enacted a bill allowing for another source of income at the local level. · All defendants seeking the right to counsel must pay a $40 application fee to be screened to determine indigency. The fee may be waived in cases in which paying the fee would produce undue hardship, though the bill also allows for the fee to be assessed at sentencing, or final disposition of the case, if there is a failure to pay upfront.

*State Indigent Defense Structure*

The Louisiana Indigent Defense Assistance Board (LIDAB) is an Executive Branch Board of the State of Louisiana charged with: improving the criminal justice system and the quality of criminal defense services provided to individuals through a community-based delivery system; ensuring equal justice for all citizens without regard to race, color, religion, age, sex, national origin, political affiliation or disability; guaranteeing the respect for personal rights of individuals charged with criminal or delinquent acts; and upholding the highest ethical standards of the legal profession.[55]

LIDAB is governed by a nine-member board, all of whom must be attorneys with at least five years experience practicing in the state. No individual may be recommended, appointed, or serve on the board if he is an elected official, or employed by a law enforcement agency, or an office having any prosecutorial authority, or employed full-time by a court. The Governor has three appointments (including the chair), and the President of the Senate and the Speaker of the House each have three appointments. The Louisiana Association of Criminal Defense Lawyers, The Louisiana Public Defender's Association, and The Louisiana Trial Lawyers Association each have one ex-officio appointment.

The mission of LIDAB is to coordinate and improve the indigent defense system through education, specialized training, technical assistance, sound financial and administrative guidelines, case assistance and managed resource allocation. To accomplish this, LIDAB has expanded its services over the years to include the following:

1. *The Louisiana Appellate Project (LAP)* provides appellate services for indigent defendants in all felony appeals arising in those districts in which the indigent defender board has contracted with the LAP to supplement its staff with these services.

2. *The Capital Appeals Project (CAP)* is a separate section of the Louisiana Appellate Project. The attorneys handle only direct capital appeals to the Supreme Court of Louisiana and Writ Applications to the United States Supreme Court.

3. *The Capital Post-Conviction Project of Louisiana (CPCPL)* was created by LIDAB in response to a state statutory mandate to provide post-conviction

---

[55] The LIDAB mission is available at www.lidab.org. This resource was also used for information on LIDAB's expanded services to follow.

representation for persons sentenced to death. CPCPL provides assistance to those sentenced after the effective date of the legislation (1999), or unrepresented at the time.

4. *Regional Capital Conflict Panels (RCCP)* were created to handle conflict-of-interest cases in those districts that have a staffed public defender office (thereby creating a conflict in multiple-defendant capital cases). RCCP provides attorneys, a fact investigator and a penalty phase investigator in every case they accept.[56] Extraordinary expenses, such as psychiatrists, forensic experts and the like are not provided by LIDAB and must be funded through the local IDB or other sources.

5. *Juvenile Justice Project of Louisiana (JJPL)* is the leader in juvenile justice reform in the state. Though LIDAB does not account for JJPL's entire funding,[57] they do provide money for the representation in juvenile delinquency appeals and modification hearings.

The LIDAB program that most directly impacts indigent defense services at the trial level is the "District Assistance Fund (DAF)" program. Each year, grants are awarded to local judicial districts to offset the cost of the right to counsel in trial level cases in which the right applies. Under rules adopted by LIDAB, participation in the DAF program is dependent on the local IDB's working toward the implementation of LIDAB promulgated standards.[58] LIDAB standards mirror many of the national NLADA and ABA standards, and include:

1. Standards relating to the performance of the indigent defense system (whether public defender, assigned counsel or contract);
2. Standards relating to the early notification, assignment, and continues representation of indigent clients;
3. Standards relating to the performance of counsel providing representation to indigent defendants;
4. Standards relating to the provision of counsel to indigent persons accused of capital crimes;
5. Standards relating to the provision of counsel to indigent persons accused of non-capital crimes;
6. Standards relating to conflict of interests in the representation of indigent persons;
7. Standards relating to compensation of staff, contract and appointed counsel involved in indigent defense; and,

---

[56] RCCP is also appointed in conflict situations in parishes that have contract systems. The reason for this is that many parishes in Louisiana do not have a sufficient number of capital certified attorneys to handle multi-defendant capital cases.

[57] JJPL is supported through monies from the Southern Poverty Law Center.

[58] *Louisiana Standard on Indigent Defense,* Chapter 1, Standards Relating to the Performance of Indigent Defense Systems. *Supra* note 7.

8.  Standards relating to workload for counsel providing defense services to indigent defendants.[59]

Despite the requirement to work toward the implementation of standards, LIDAB is not a regulatory commission with powers to compel local jurisdictions to comply with its standards. As such, there is no ombudsperson at LIDAB to verify that progress is being made toward the goal of systemic improvement through the use of standards. Instead, each IDB applying for assistance must provide the following information to LIDAB no later than July 31st of each year:

1.  A copy of the previous year's audit report or financial statement;
2.  The total number of felony cases opened during the prior year;
3.  The balance in the IDB account at the start of the prior year;
4.  Total revenue collected during the same year;
5.  Total expenditures; and,
6.  The balance of the IDB account at the close of the year.

Based on this information, LIDAB uses a complex matrix to determine need. Parish IDBs that have more money in their dedicated accounts than they expended on indigent defense services in the previous year are precluded from receiving DAF funds. The available DAF funding is divided among all of the other applying parishes based on the number of reported felony cases, number of reported felony trials, and level of revenue in the IDB bank account at the close of the year – though the single most important factor in the matrix is "reported felony cases."[60]

*Statewide Indigent Defense Funding*

Significantly, the expansion of LIDAB responsibilities to include appellate and post-conviction capital programs was not matched with additional state funding. As such, the total dollars available for the DAF assistance to districts has decreased over the past decade. As recently as 1999, $3.5 million dollars were disseminated to local parishes through the DAF program. In fiscal year 2003, that total had decreased by more than 16% (down to slightly more than $2.9 million).[61]

---

[59] LIDAB standards are available on their website at: www.lidab.com/standards.htm.

[60] A more detailed assessment of the LIDAB DAF matrix, including examples to illustrate the required mathematical calculations, is included as Appendix F (page 88).

[61] In fiscal year 2003, 38% of LIDAB's total expenditure was spent on the DAF program (or $2,935,096 of $7,692,466). The balance was spent accordingly: LAP ($975,000, or 13%); CAP ($400,000, or 5%); RCCP & CPCPL ($2,718,224, or 35%); and JJPL ($320,980, or 4%). The remaining $343,166 (4%) was expended on LIDAB administration, though a portion of this includes resources for interns in other LIDAB supported programs.

*Indigent Defense in the 12th Judicial District*

In 2002, the Avoyelles Parish IDB elected to change the structure of their indigent defense delivery system from a public defender system to a contract system.[62] Upon changing structure, three attorneys were contracted to provide services to all of the eligible indigent defense clients assigned to them by the court, on a rotational basis, for a single flat-fee. In July 2003, the IDB entered into a fourth contract. This fourth attorney is now paid to handle all misdemeanor and juvenile cases (including dependency proceedings) assigned to him by the courts, and all arraignment proceedings in felony cases, while the original three attorneys handle those felony cases surviving arraignment. Because of budget concerns, the three original attorneys accepted a pay cut in order to bring on the fourth attorney.

In direct violation of ABA Principle #8 and LIDAB Standard 1-3.2, there are no formal written indigent defense contracts in Avoyelles Parish.[63] All of the attorneys work part-time and are allowed to have private practices, both civil and criminal. Originally paid $37,000 annually, the three post-arraignment felony attorneys are now each paid $31,000 per year. The new attorney is compensated at $19,200 per year. Because of the flat-fee structure, the attorneys must pay for all costs of running a law office out of these low fees, including: rent, computers, telephones, facsimile machines, copier, Internet services, legal research, office supplies, and, administrative support, among others.[64]

---

[62] It should not be assumed by the reader that the 12th Judicial District ever had a "staffed public defender office" in the traditional sense of having staff attorneys and supervisors in addition to necessary support staff, like investigators, social workers, and professional paralegal workers. In fact, the staffed office functioned much like a contract model although the attorneys did receive some limited benefits. Additionally, the IDB paid for overhead expenses of office space, copiers, Internet services, etc.

[63] To effectuate the requirements of standards regarding indigent defense contracting, the U.S. Department of Justice funded the preparation of a Model Contract for Public Defense Services by NLADA and the Criminal Courts Technical Assistance Project, "to help counties and states interested in contracting for indigent defense services identify and address issues regarding cost, accountability, workload, and quality of services" (see Bureau of Justice Assistance Bulletin, http://www.ncjrs.org/pdffiles1/bja/185780.pdf, at p. 4). Mr. Boruchowitz, consultant on the 12th Judicial District assessment, is one of the model contract's primary authors. A hard copy is attached as Appendix G (page 90). An electronic version of the model contract is available on-line at: www.nlada.org/DMS/Documents/1015619283.17/Full%20volume.doc.

[64] In *State v. Wigley*, 624 So. 2d 425 (La. 1993), the Louisiana Supreme Court held that, in order to be reasonable and not oppressive, any assignment of counsel to defend an indigent defendant must provide for reimbursement of the assigned attorney of properly incurred and reasonable out-of-pocket expenses and overhead costs. Before appointing counsel to represent an indigent, the district court has the responsibility to determine that funds sufficient to cover the anticipated expenses and overhead are likely to be available to reimburse counsel. If the district court determines funds are not available to reimburse appointed counsel, it should not appoint members of the private bar to represent indigents.

A similar state court decision in Alabama also requires attorneys to be compensated for overhead expenditures and is illustrative to show how Louisiana's IDBs subvert the *Wigley* decision by entering into flat-fee contracts. In Alabama, compensation rates are set by statute at $60 per hour for in-court work and $40 per hour for out-of-court work. Statutory language entitles attorneys in Alabama to any additional "reasonably incurred" expenses approved by the courts. In *James W. May v. State*, 672 So. 2nd 1310 (1995), the Alabama Supreme Court let stand a ruling of the Alabama Court of Criminal Appeals ordering the state to pay indigent defense attorneys' overhead costs for "reasonably incurred" expenses. Setting the presumptive hourly overhead rate at $30 an hour, the State of Alabama now pays attorneys $90 per hour for in-court work.

Therefore, assuming that an indigent defense attorney worked half-time on indigent defense cases in Alabama (or 1,020 hours per year), the presumptive hourly overhead rate in *May* indicates that a half-time indigent defense attorney needs $30,600 just to cover overhead in Alabama. Financial, cultural and regional similarities between Alabama and Louisiana suggest that attorneys in Louisiana have similar costs to maintain a law office. In contrast to Alabama, the post-arraignment felony contract attorneys are paid approximately $30/hour ($31,000/1,020 hours = $30.39/hour, or the presumptive rate to cover overhead in Alabama). The misdemeanor and juvenile delinquency attorney is paid at a rate that is equivalent to $18.82/hour ($19,200/1,020 hours = $18.82/hour).

18      IN DEFENSE OF PUBLIC ACCESS TO JUSTICE

Similarly, the attorneys must pay for the cost of litigation support, including: investigation, expert witnesses, and social service assistance.

In 2002, the most recent year for which complete financial data was available, the majority of IDB revenues in Avoyelles Parish came from court costs. In that year, the 12th Judicial District IDB received $100,774 from the district court and two city court assessments, an amount equal to 68% of their total revenue ($149,018). The state DAF grant accounted for an additional $45,701, or 31% of their total revenue.[65]

In the same year, indigent defense expenditures for the 12th Judicial District totaled $186,495, creating a deficit of $37,477 for the year. The deficit was offset by decreasing the IDB dedicated account, from $113,898 at the start of the year to a final amount of $76,421 (or approximately 40% of the anticipated need for the ensuing year). It is important to note that the simple existence of *any* money in an IDB bank account at the close of the year is not an indication of the relative health of a local indigent defense system. This is because IDBs are precluded from expending all of their money and operating in the red. As such, there will always be *some* amount in an IDB account at the close of the year. Moreover, because of the unreliability of the primary indigent defense revenue stream (i.e. court costs) IDBs have no accurate way to predict their budgets from month to month, let alone for a full fiscal year. Because IDBs cannot operate on deficit spending and must guard against periods in which the money in their dedicated accounts would be less then their monthly costs, the IDBs often under-project revenue streams and operating budgets. And, because revenue does not flow to an IDB on a predictable basis, a significant year-end bank balance may be nothing more than a significant distribution of court cost revenue late in the year.[66]

As such, the simple existence of significant financial reserves in a judicial district in no way signifies that the district is satisfying its federal constitutional obligations under *Gideon*, only that the reliance on court costs as the primary funding mechanism creates disparity between parishes thereby undercutting the establishment of a uniform system throughout the state as required by the Louisiana Constitution.

---

[65] An additional $2,453 in miscellaneous revenue includes accrued interest on the indigent defense fund.

[66] NLADA does believe that a year-end bank balance that is far in excess of the previous year's total indigent defense expenditure, and far above the norm of other parishes, indicates a systemic disparity of resources between parishes, as will be shown in the next chapter.

Chapter III
Primary Findings:
The Inadequate Funding & Lack of Independence
of Louisiana's Indigent Defense System

*OVERALL FINDING: In direct violation of the Louisiana Constitution, government (both state and local) has not created a "uniform system for securing and compensating qualified counsel for indigents" at "each stage of the proceeding." Instead, Louisiana has constructed a disparate system that fosters systemic ineffective assistance of counsel due primarily to inadequate funding and a lack of independence from undue political interference. These two main systemic deficiencies produce numerous ancillary problems including a lack of oversight, training and supervision of those entrusted with the defense of the poor. When combined with the crushing caseloads public defenders are forced to carry, these factors prevent the state from securing justice for all, protecting the peace, and promoting the general welfare of its people.*

The problems found with the indigent defense system in Louisiana, as demonstrated by our research in Avoyelles Parish, are so severe and pervasive that the balance of this report will serve to detail the evidence to support our one overall finding (above). The indigent defense system in Louisiana is beyond the point of crisis and is so weakened in relation to the other criminal justice system components that it calls into question the ability of the entire criminal court system to dispense justice accurately and fairly. As U.S. Attorney General Janet Reno observed in 1999, "(i)f one leg of the system is weaker than the others, the whole system will ultimately falter."[67] The failure of the system to secure justice for all should come as no surprise to policy-makers, as Louisiana's indigent defense system has been studied over and over again and consistently has been found to be deficient in protecting the right to counsel.[68]

This chapter explores the two primary problems (inadequate funding and lack of independence) that produce the systemic ineffective assistance of counsel to be detailed in Chapter IV to follow. Where applicable, references to national and local standards have been cited to demonstrate the significant extent to which the state has failed to protect the rights of people of insufficient means faced with the potential loss of liberty in criminal proceedings. Also, where applicable, materials and observations from our field evaluation are referenced to provide the reader with context to understand how the right to counsel is routinely, consistently and systematically denied in Avoyelles Parish and throughout the state.

NLADA encourages the Louisiana Task Force on Indigent Defense to develop recommendations that will bring the Louisiana indigent defense system into compliance with the ABA *Ten Principles* and its constitutional obligations under *Gideon*. NLADA is prepared to assist the Task Force in accomplishing its mission.

---

[67] U.S. Department of Justice, Office of Justice Programs, *Improving Criminal Justice Through Expanded Strategies and Innovative Collaborations: A Report of the National Symposium on Indigent Defense*, NCJ 181344, February 1999.

[68] *Supra*, note 4.

_Finding #1_: _In direct violation of its constitutional obligations under_ Gideon _and ABA_ _Principle #2, the State of Louisiana fails to adequately fund indigent defense services._ _This results in a disparate funding system that fosters ineffective assistance of counsel in_ _the parishes._

In an effort to methodically analyze the Louisiana indigent defense funding structure, NLADA has broken down our first finding into four sub-sections to assist the reader in understanding the extent to which Louisiana stands alone in the nation in terms of the reasons for failing to comply with the state-funding mandate of _Gideon_ and ABA _Principle #2._

_1.1:  Louisiana is the only state in the nation to attempt to fund the majority of its_ _Constitutional obligation to provide indigent defense services through court costs._

Since the U.S. Supreme Court in _Gideon_ ordered the states to provide indigent defense services, 22 states have undertaken to fund indigent defense services entirely at the state level,[69] while another six states now fund at least 75% of all indigent defense costs.[70]  Three other states fund at least fifty percent of the cost of defense services.[71] Louisiana and Alabama rely on a combination of state funding and court costs.  The rest rely to a large extent on local funding or, in the case of Pennsylvania and Utah, rely on county funding exclusively (See Chart 3-1, page 21).  This means that Louisiana and 27 other states are in violation of ABA _Principle #2_ that states: "Since the responsibility to provide defense services rests with the state, there should be state funding…"

Alabama and Louisiana are the only two states that attempt to fund their indigent defense systems through a combination of state funding and court costs.  Though Alabama is categorized with Louisiana for funding overview purposes, there are critical differences between the two states' indigent defense funding structures that deserve explanation.  As in Louisiana, Alabama levies and imposes a fee, or "tax", in every criminal case in district, juvenile or municipal court.[72]  Unlike Louisiana, the revenue from these fees is remitted on a monthly basis to a "Fair Trial Tax" fund administered by the State Treasury.  This pooling of resources at the state level stands in contrast to Louisiana's insistence on keeping generated revenues in the jurisdiction from which they were collected.[73]

---

[69] Alaska, Arkansas, Colorado, Connecticut, Delaware, Hawaii, Maine, Maryland, Massachusetts, Minnesota, Missouri, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Oregon, Rhode Island, Vermont, Virginia, West Virginia, and Wisconsin.

[70] Florida (80.14%), Iowa (96.99%), Kansas (77.64%), Kentucky (94.81%), Tennessee (37.32%), and Wyoming (85%). Percentages provided by The American Bar Association report on indigent defense expenditures (2003) prepared by The Spangenberg Group.

[71] Montana (51%), Oklahoma (66.22%), and South Carolina (67.41%).

[72] In Alabama, the fee is currently set at $16.

[73] The Fair Trial Tax fund also receives revenue from filing fees in civil cases.  In small claim cases, $13 of the $30 dollar filing fee goes to the fund.  Litigants in civil cases in district court are assessed $109 dollars of which $21 goes to the Fair Trial Tax Fund.  Circuit filing fees are $145.  The Fair Trial Tax Fund receives $25 from this revenue source.



Chart 3-1
Indigent Defense Funding in the United States

Indigent Defense Funding Source:
- 100% State        (22)
- County (100%)     (2)
- State & Court Fees (2)
- State < 50%       (15)
- State > 50%       (3)
- State > 75%       (6)

Alabama's fair trial tax was designed to uniformly offset the *entire* county cost of providing indigent defense services at the local level.[74] Thus, to the extent that the fair trial tax fund is not sufficient to cover the entire cost to the counties, the state is required to expend general fund revenues to cover the deficit. Because projections of collections rates never materialized as originally forecasted, the revenue stream from court costs has remained relatively stagnant over time. So, as increased caseloads, rising assigned counsel rates and new science, like DNA evidence, has increased the cost of providing indigent defense services throughout the state, the percentage of indigent defense expenditure paid by the Alabama state government has grown correspondingly. In 2002, the State of Alabama paid for approximately 74.3% of all indigent defense expenditures (or roughly $28 million of $37,698,403).

The State of Louisiana does not have a corresponding state general fund contribution to offset the difference between the amount of money that can be raised through court costs and the actual cost of providing adequate public defense services. Overall, Louisiana IDBs expended $21,080,773 of revenue garnered through court costs and recoupment efforts statewide on indigent defense services in 2002. The State of Louisiana contributed $2,973,719 in district assistance funds and another $4.8 million toward LIDAB's capital, appellate and post-conviction representation programs. In total,

---

[74] The State Comptroller of Alabama keeps $50,000 from the fund to offset the costs of administering the fund.

just under $29 million was expended for indigent defense services statewide. Because state funding accounted for slightly more than a quarter of all statewide expenditures (27%), it can be stated unconditionally that Louisiana is the last and only state to rely predominantly on court cost assessments to fulfill its constitutional obligation to provide legal representation in all cases in which the right to counsel applies.

*1.2:   Funding indigent defense through court surcharges has proven to be unreliable because there is no correlation between the ability of a jurisdiction to raise revenues and the resources required to provide adequate defense services to those unable to hire an attorney.   Funding indigent defense through court surcharges creates resource disparities between the parishes.*

Indigent defense revenue streams generated by court surcharges can vary greatly due to a wide number of factors. For instance, jurisdictions with high poverty rates generally have a more difficult time collecting revenues from people than would jurisdictions in better economic standing. That is to say, though a high poverty jurisdiction may in fact assess as many (or more) court costs as a neighboring affluent jurisdiction, the fact that the majority of people in the poorer community do not have the ability to meet their financial obligations to the court means that the poorer community will generate fewer actual dollars for the defense of the indigent.[75]   The problem is compounded because the same factors that contribute to high poverty are also associated with increased crime. For instance, crime rates tend to increase when there is a high level of unemployment.[76]   Thus, at a time when court revenue collections may be down due to high unemployment, the criminal justice system is often expected to *increase* its workload. But because less affluent jurisdictions have a higher percentage of people eligible for public defense services, the need for indigent defense funding is in fact *inversely* correlated with the ability to generate revenues.[77]

---

[75] Many jurisdictions across the country assess court costs despite the recognition that people of insufficient means have major difficulties in meeting court-imposed financial obligations. In these jurisdictions, there is a general acceptance that the court may never see much revenue from these assessments, yet the imposition of them serves the goal of holding adjudicated guilty defendants accountable for their actions. At the same time, these jurisdictions do not rely on such court costs as the primary funding stream to ensure the adequate protection of the right to counsel, as is the case in Louisiana.

[76] Amburgey, Bryce. Kentucky Department of Public Advocacy. "Will 9/11 Drive Crime Rates and Defender Workloads Up? The Experts Say Yes." *NLADA Cornerstone*, Winter 2001/2002, Issue 4; Gould, Eric with Bruce Weinberg and David Mustard. "Crime Rates and Local Labor Market Opportunities in the United States: 1979-1997. National Bureau of Economic Research Summer Institute Workshop. Cambridge, MA. July 6, 1998 (Revised October 2000).

[77] Additionally, a more affluent jurisdiction may have more resources to dedicate to the apparatus of collections, again increasing collection rates in comparison to communities with higher poverty.

A closer look at the funding of Louisiana's IDBs in 2002 is illustrative.[78] The 38th Judicial District (Cameron) has one of the lowest poverty rates of the 41 judicial districts in the state (12.30%).[79] At the close of the year, the district IDB had $197,580 in their dedicated account. During 2002, only $108,331 was expended on indigent defense services. This means that at the start of 2003, the 38th Judicial District IDB already had more than 182% of their budget for the ensuing year in the bank. Contrast this with Evangeline Parish (the Parish comprises the entire 13th Judicial District and has a poverty rate of 32.20%). There, indigent defense services cost slightly more than $94,000 while revenues from court costs only brought in $69,294. Even with the LIDAB DAF grant of $12,362 (plus miscellaneous funds of slightly more than $10,000), the 38th Judicial IDB ran at a deficit in 2002 and had to tap into their reserve account to make up the difference of $2,018. At the close of 2002, the Evangeline IDB had only $14,346 (or 15.3% of their projected need for 2003).

Similarly, Orleans Parish (poverty rate: 27.9%) expended nearly $365,000 more in 2002 than they were able to bring in through all of their revenue sources (including the LIDAB grant). It cost the Orleans IDB slightly more than $2.6 million to provide indigent defense services, as against revenues of a little less than $2.3 million. This left the Parish with only 15.7% of its estimated need in its IDB bank account. In fact in three of the four years studied, Orleans Parish significantly outspent their indigent defense revenue stream.[80] If the same pattern were to continue, and if IDBs were allowed to expend funds based on need rather than on resource availability, the Orleans Parish IDB – the same parish that was the subject of the *Peart* ruling more than a decade ago – would deplete all of its IDB reserves in 2005.

Though the financial health of individual parishes is perhaps the most important factor in determining the effect reliance on court surcharges has on a district's indigent defense delivery system, it is not the sole factor. Complicating the picture is the fact that because so much indigent defense funding is generated through traffic tickets, even parishes with high poverty may be able to generate significant revenue simply because a

---

[78] NLADA went to considerable effort to gather and analyze financial records from all 41 judicial district IDB's. We requested and received financial audits of all IDB's from the Office of the Legislative Auditor for the State of Louisiana for the years 1999-2002. With the state requirement that small parishes need only undergo audits every other year, this resulted in NLADA reviewing 161 separate audits. Next, NLADA entered data relating to revenue sources (court costs, DAF grants, and miscellaneous), expenditures and unused monies into a Microsoft Excel© database for analysis. Though such an exercise could have been conducted by anyone in the state, to the best of our knowledge, this is the first such complete assessment of indigent defense funding and spending ever conducted in Louisiana. Tables showing the district-by-district financial picture can be found in Appendix H (page 111) of this report. Three equal discrepancies were found by NLADA during the course of this exercise. In 1999, District 37 (Caldwell) reported an ending IDB bank balance of $11,506. The following year's audit reported a balance of only $1,098 to start the year, a difference of $10,408 that is unaccounted for. Similarly, in 2000 the 22nd Judicial District (Washington, St. Tammany) reported a year-end balance of $748,580. The ensuing year's audit reported an opening balance of $746,870, a difference of $1,710.00 unaccounted for. Finally, the 26th Judicial District (Jefferson) reported $27,716 more at the start of 2001 than was reported at the close of 2000.

[79] Poverty rates for Louisiana's Parishes for 2000 are available from the U.S. Census Bureau at www.census.gov. District Poverty rates were calculated by NLADA by applying Parish poverty rates to the specific Parish populations, then adding up the total number of people in poverty for all parishes in a single judicial district. This sum was then divided by the total population of a judicial district.

[80] In 1999, expenditures outpaced revenues by $280,353. The following year, more than $175,000 was spent on indigent defense than could be generated through all revenue streams. In 2002, the difference was $364,833. In one year (2001) revenues did exceed expenditures because 21% of the entire DAF funding went to the one parish (Orleans Parish received $631,016 from LIDAB that year). This severely crippled other parishes' ability to provide adequate public defense services.

major highway passes through the jurisdiction. Thus, some Judicial Districts like the 20th (comprised of East and West Feliciana) have revenue streams that will always outpace indigent defense costs despite their relatively high poverty rate (21.72%).[81] For example, in 2002 nearly $27,000 more was recouped through court costs than was expended on indigent defense services (revenue: $100,898; expenditure: $74,109). The 20th Judicial District rolled that nearly $27,000 into its IDB bank account. At the close of 2002, the 20th Judicial District had over $305,000 in their account, or more than 412% of their expected need.[82]

In 2002, twenty-four of the 41 judicial districts (or 59%) were not able to raise enough revenue to offset the cost of indigent defense services. Combined, they had annual deficits totaling $1,859,030. The other 17 (or 41% of the judicial districts) added a combined $640,353 to their IDB accounts. At the close of 2002, as many parishes struggled to provide adequate representation to the poor, over $9 million of unused indigent defense funding sat in IDB bank accounts across the state.[83]

*1.3:   Funding indigent defense through court costs has proven to be additionally unreliable because the policies and practices of other policy-makers can have a deleterious effect on the primary revenue stream for public defense services.*

Because the majority of local indigent defense funding comes from court costs, policymakers who may not fully appreciate the requirements of *Gideon* and subsequent cases expanding the right to counsel may make decisions that directly, and negatively, affect the primary revenue stream for indigent defense. For example, some parishes in Louisiana have attempted to secure stable local revenue streams through gaming – most notably Riverboat Casinos in the western part of the state. The desire to increase traffic to such local sources of revenues may lead to a policy whereby the local police reduce enforcement of speeding laws in order to avoid discouraging gaming visitors. Such a policy may indeed help the economic fortunes of a parish, but it directly and negatively impacts the revenue sources available for indigent defense services.

This example actually did occur in Caddo Parish where local law enforcement reduced enforcement of traffic violations, resulting in a detrimental impact to the local IDB. From 1999 to 2002, indigent defense revenue garnered through court costs in 1st Judicial District (Caddo Parish) fell over 5% (from $1,227,832 to $1,166,202).[84] As revenue for indigent defense services diminished, the need for services grew. In 1999,

---

[81] Louisiana Highway 61 runs from Baton Rouge through the judicial district.

[82] In the four years (1999-2002) that NLADA analyzed IDB audits, the 20th Judicial District added significant revenue to their IDB bank account at the close of each fiscal year. In 1999, $45,228 was added to the IDB bank account. The following year, another $27,549 was added. The closing of 2001 saw $34,105 contributed to the IDB account, followed by $26,789 in 2002. In none of these years did the IDB expenditure exceed $74,109 (2002). Thus, over the four-year period the IDB bank balance grew by 41% (from $217,239 to $305,593). During the same period indigent defense expenditures in the parish rose only 14% (from $64,957 to $74,109).

[83] The insistence of trying to fund indigent defense through court costs was criticized in State v. Peart, 621 So.2d 780, 789 (La. 1993). Calling such funding structure " an unstable and unpredictable approach," the Court gave an especially egregious example of how the system can fail: "when the City of East Baton Rouge ran out of pre-printed traffic tickets in the first half of 1990, the indigent defender program's sole source of income was suspended while more tickets were being printed." Id. At 789 n. 10.

[84] Over this time period, LIDAB assistance to the Caddo Parish IDB decreased by 2.2% (from $501,401 to $490,149), resulting in an overall indigent defense funding decrease of 4.2% over the four year period.

Caddo Parish reported 5,886 criminal cases in District Court.[85]   Four years later that number had grown to 6,860 (or an increase of 16.6%).   Thus, a 16.6% increase in need was met with a 4.2% reduction in resources.   The Caddo Parish IDB responded by reducing the balance in its dedicated account.  In 1999, the 1st Judicial District IDB had $903,852 in its dedicated account.  By 2002, that available funding decreased by 74.4% down to $231,660 (or only 13.78% of their 2002 expenditure).

In Avoyelles Parish, the practice of the Sheriff also negatively impacts the available resources for indigent defense services.  The Sheriff only accepts full payment of a person's financial court obligations for the reason that accepting partial payments would greatly increase the cost of administering the collections system.  The Sheriff's policy is much different than in many jurisdictions in the country that will accept a payment for as little as $5.00 at intermittent periods until the balance is paid off.  Such a policy means that an indigent person must try to save the entire amount of their obligation to the court and pay it in one lump sum.  Though many defendants may never be able to pay off their debt entirely, accepting partial payments would allow more money to flow to the IDB than the current policy does.  Moreover, accepting partial payments from all sources (traffic fines, other court costs and recoupment) would make the revenue stream more consistent, allowing an IDB to experience less fluctuations in monthly receipts and allowing for more accurate budget forecasting.

Furthermore, the Sheriff stated that he often brings traffic tickets to the District Attorney to try to get a reduction in fines, adding "if you have a personal friend who has helped you politically, you get it reduced and you pay it for them."  Above and beyond the ethical and legal issues the Sheriff's comment raise, the reduction of traffic tickets for political gain has a direct negative impact on the Avoyelles Parish indigent defense-funding stream.[86]

*1.4:   Funding indigent defense services through recoupment has proven to be unreliable because there is no correlation between the ability of a jurisdiction to raise revenues and the resources required to provide adequate defense services to those unable to hire an attorney.*

The third of the ABA's *Ten Principles* addresses the obligation of indigent defense systems to provide for prompt financial eligibility screening of defendants, toward the goal of early appointment of counsel.[87]  National standards direct that client

---

[85] Though NLADA does not believe that current indigent defense caseload statistics in Louisiana are reliable given the lack of a uniform definition of a "case", the lack of uniform case-tracking systems, and the lack of a statewide governmental body empowered to verify reported indigent defense data, one gauge of need is to look at the number of criminal cases reported on an annual basis to the Louisiana Supreme Court.  The reported increase represents both indigent and non-indigent criminal cases.  Our experience nationally indicates that indigency rates generally hold steady over time.

[86] This exchange transpired during the NLADA interview of Sheriff William Belt on September 17th, 2003 at the local jail.  Robert Boruchowitz and David Carroll conducted the interview.  In the hopes of understanding how expensive traffic violations can be in Avoyelles Parish, NLADA representatives asked the Sheriff to give a cost estimate of a ticket related to going ten miles per hour over a posted speed limit.  In response, the Sheriff took a small stack of tickets from his desk and read off the dollar amounts ranging between $100 and $160.  When asked why he had a stack of traffic tickets on his desk he offered the information that he was going to try to get the tickets reduced for the reason quoted above.

[87] ABA Principle 3: *"Clients are screened for eligibility, and defense counsel is assigned and notified of appointment, as soon as feasible after clients' arrest, detention, or request for counsel.  Counsel should be furnished upon arrest, detention or request, and usually within 24 hours thereafter."* Standardized procedures for client eligibility screening

eligibility determinations should be performed by public defense agencies or a neutral screening agency of the court.[88]   In the 12th Judicial District, judges are responsible for indigent defense screening. From our interviews and court observations, it is obvious that little, if any, indigency screening is conducted in Avoyelles Parish from the bench.[89]

The failure to conduct financial eligibility screenings has broad implications for the system's attempts to recoup the cost of defense services from clients. From our courtroom observations, Avoyelles Parish routinely assesses recoupment charges to virtually every indigent defense client.[90]   It seems that in lieu of specific financial verification, the court assumes a certain ability to pay and assesses recoupment fairly uniformly.[91]   National standards do permit cost recovery from indigent-but-able-to-contribute defendants, but only under very limited circumstances. Post-disposition cost recovery, as practiced in Avoyelles Parish, is strictly prohibited under all national standards.

Although various states have tried it over the years, including via statute, civil suit, lien, or court-ordered condition of probation, post-disposition recoupment has been struck down by some courts, and has been a practical failure. Courts have struck down recoupment statutes on equal protection, due process and Sixth Amendment grounds.[92]

---

serve the interest of uniformity and equality of treatment of defendants with limited resources. When individual courts and jurisdictions are free to define financial eligibility as they see fit – e.g. ranging from "absolutely destitute" to "inability to obtain adequate representation without substantial hardship," with factors such as employment or ability to post bond considered disqualifying in some jurisdictions but not in others – then the resulting unequal application of the Sixth Amendment has been suggested, by the National Study Commission on Defense Services, to constitute a violation of both due process and equal protection. *NSC* commentary at 72-74.

[88] *NSC*, Guideline 1.6. *Cf.* ABA *Defense Services*, Standard 5-7.3.

[89] Such a policy is not unusual across the country. In fact, many jurisdictions have no eligibility guidelines and conduct no inquiry, or simply appoint a lawyer for all defendants who claim they cannot afford retained counsel. The reasons for such systems (or non-systems, to be more accurate) vary: poverty rates among the defendant population may have been empirically found to be so high that the cost of eligibility screening would exceed the potential cost-savings; the need to keep court dockets moving may have been determined by the judiciary to be more important than taking the time and effort to conduct eligibility screening; or the reason may be simple inertia on the part of the responsible officials.

But many jurisdictions have determined that important fiscal goals of cost-control and accountability are served by implementing procedures to ensure that no one who can afford counsel is appointed one at public expense. In such jurisdictions, there is often very thorough verification of financial information provided by the defendant – many times by an independent pre-trial services unit and often at substantial costs. For a fuller discussion of eligibility standards employed in the United States, please see Appendix I (page 115).

In Avoyelles Parish, several of the people we interviewed, including at least one defense attorney, were under the impression that a "significant" number of people who would otherwise be able to afford counsel are given a public defender for the sake of expediency in moving the court dockets along. Public Defenders have no control over the number of indigent defense cases in the system -- they must and should accept every case assigned to them by the court. Should it prove true that a "significant" number of people who could otherwise afford counsel are getting free services, it would directly impact the available revenues for those who are truly indigent. Though a more formalized system would surely cost the court some money (both state and local), it again raises the possibility that a policy decision by a body other than an IDB directly impacts the IDB's ability to deliver competent services. In this case, the court's decision to not expend its own resources in an effort to prevent ineligible persons from getting an attorney may be decreasing the amount of funding available for the truly indigent.

[90] A flat fee of $125 was charged in almost all felony cases. Clients are also routinely charged for the cost of the prosecution.

[91] While many indigent defendants might be able to pay something, we were told that very few can actually go out and hire an attorney. Almost all criminal defense attorneys in Louisiana charge a "fixed fee." It is exceedingly difficult to hire an attorney to defend any felony for less than $5,000.00 and to defend any misdemeanor for less than $750.00.

[92] *James v. Strange*, 407 U.S. 128 (1972) (Kansas recoupment statute; equal protection); *Rinaldi v. Yeager*, 384 U.S. 306 (New Jersey statute requiring repayment of the cost of a transcript on appeal; equal protection); *Giacco v.*

Imposition of recoupment as a condition of probation can additionally lead to the incarceration of indigent people under circumstances that a non-indigent person would not be exposed to, in violation of equal protection.[93]

The practical difficulties are obvious. Imposition of a debt on a marginally indigent person, already convicted of a criminal offense, with the option of incarceration for failure to pay constitutionally barred, yields a likelihood of recovery so low (less than 10%, according to a U.S. Department of Justice Study[94]) that the revenues produced are less than the administrative costs of processing recoupment orders.

In attempting to confirm that recovery levels were low, NLADA questioned the Parish Sheriff as to the collection rate of recoupment costs assessed in the 12th Judicial District. The Sheriff stated that he had a 100% collection rate. Asked how that was possible given national experience to the contrary, he stated that he cuts deals with inmates who have not managed to pay off the debts to "stay" an extra 30-60 days in jail and participate in the work release program. This policy exposes the parish to serious financial liability for civil right violations (e.g., under 42 U.S.C. §1983) and further depletes the already limited funding stream for indigent defense services.[95]

*Finding #2: In violation of ABA Principle 1, Louisiana's indigent defense system lacks independence from undue political interference.*

As stated in the U.S. Department of Justice, Office of Justice Programs report, *Improving Criminal Justice Through Expanded Strategies and Innovative Collaborations: A Report of the National Symposium on Indigent Defense*: "The ethical imperative of providing quality representation to clients should not be compromised by outside interference or political attacks."[96] Courts should have no greater oversight role over lawyers representing indigent defendants than they do for attorneys representing paying clients. The Courts should also have no greater oversight of indigent defense practitioners than they do over prosecutors. As far back as 1976, the National Study Commission on Defense Services concluded that: "The mediator between two adversaries cannot be permitted to make policy for one of the adversaries."[97]

---

*Pennsylvania*, 382 U.S. 399 (1966) (recoupment statute; due process/vagueness); *Olson v. James*, 603 F.2d 150 (10th Cir. 1979) (Oregon recoupment statute; due process); *Fitch v. Belshaw*, 581 F. Supp. 273 (D. Or. 1984) (recoupment statute; due process and Sixth Amendment).

In *Fuller v. Oregon*, 417 U.S. 40 (1974), the U.S Supreme Court found that it is not a Constitutional violation to require indigent defense recoupment from people who are eligible for public counsel at the time of their conviction but who subsequently acquire the means to bear the costs of his legal defense.

[93] *Bearden v. Georgia*, 461 U.S. 660 (1985) (imprisoning an indigent defendant who tried and failed to pay restitution violates equal protection and the fundamental fairness guaranteed by the Fourteenth Amendment).

[94] *Containing the Cost of Indigent Defense Programs: Eligibility Screening and Cost Recovery Procedures* (National Institute of Justice, 1986), at 34-35.

[95] An interview with a local private attorney revealed that the other effect of the Sheriff refusing to accept partial payments of court costs is that defendants are subsequently revoked, without counsel, for failure to timely pay the court costs. This is illegal under Louisiana law, which like the law everywhere holds that you cannot be imprisoned for being poor. But, without a lawyer at the probation revocation hearing there is no one to advocate for the defendant in showing that (s)he was simply unable to pay despite all best efforts.

[96] NCJ 181344, February 1999, at 10.

[97] *NSC Report*, at 220, citing National Advisory Commission on criminal Justice Standards and Goals (1973), commentary to Standard 13.9.

The first of the ABA's *Ten Principles* addresses the importance of independence in indigent defense representation.  The Principle provides that:

> *The public defense function, including the selection, funding, and payment of defense counsel, is independent. The public defense function should be independent from political influence and subject to judicial supervision only in the same manner and to the same extent as retained counsel. To safeguard independence and to promote efficiency and quality of services, a nonpartisan board should oversee defender, assigned counsel, or contract systems. Removing oversight from the judiciary ensures judicial independence from undue political pressures and is an important means of furthering the independence of public defense. The selection of the chief defender and staff should be made on the basis of merit, and recruitment of attorneys should involve special efforts aimed at achieving diversity in attorney staff.*[98]

By vesting the District Court judiciary with the authority to appoint the members of the local indigent defense boards, Louisiana Revised Statutes, Title 15 §144 is in direct violation of this ABA principle.   NLADA has promulgated guidelines to assist jurisdictions in establishing independent oversight boards.   NLADA's *Guidelines for Legal Defense Services* (Guideline 2.10) states:

A special Defender Commission should be established for every defender system, whether public or private. The Commission should consist of from nine to thirteen members, depending upon the size of the community, the number of identifiable factions or components of the client population, and judgments as to which non-client groups should be represented.

Commission members should be selected under the following criteria: The primary consideration in establishing the composition of the Commission should be ensuring the independence of the Defender Director.

    a.         The members of the Commission should represent a diversity of factions in order to ensure insulation from partisan politics.

    b.         No single branch of government should have a majority of votes on the Commission.

    c.         Organizations concerned with the problems of the client community should be represented on the Commission.

    d.         A majority of the Commission should consist of practicing attorneys.

---

[98] National standards address the need for independence in the context of all three basic models for delivering indigent defense services in the United States. Where private lawyers are assigned, the concern is with unilateral judicial power to select lawyers to be appointed to individual cases, and to reduce or deny the lawyer's compensation. Where contracts with nonprofit public defense organizations or law offices are used, the concern focuses primarily on flat-fee contracts which pay a single lump sum for a block of cases regardless of how much work the attorney does, creating a direct financial conflict of interest with the client, in the sense that work or services beyond the bare minimum effectively reduces the attorney's take-home compensation. Where a public defender system is used, the concern is with vesting the power to hire and fire the chief public defender in a single government official, such as the jurisdiction's chief executive or chief judge, a concern compounded when that official must run for popular election.

e.      The Commission should not include judges, prosecutors, or law enforcement officials.

f.      Members of the Commission should serve staggered terms in order to ensure continuity and avoid upheaval.

Though we do not believe that the majority of District Judges in Louisiana are conscious of even the "appearance" of undue influence in their control of local IDBs, the failure of the state to create checks and balances among all three branches of government in the appointment process has a direct and detrimental effect on the independence of the indigent defense system. For example, the funding crisis in Caddo Parish led the local judiciary to attempt to usurp the power for administration and oversight of the indigent defense system from the IDB. Though the Louisiana Revised Statutes are clear that the local judiciary must appoint from a list submitted by the local bar association, the 1st Judicial District Judges rejected several of the nominees and appointed three people who had not been nominated by the Bar Association (and do not practice criminal law). Further overstepping their reach under national standards, the District Court has appointed lawyers who have not been approved by the IDB to cases. In one such case, the judiciary appointed two attorneys to a second-degree murder case – neither of whom practices criminal law. Litigation over this situation recently has been filed in state court.

In Avoyelles Parish, independence issues manifest themselves in other less obvious ways. Over the past five years, the Avoyelles Parish IDB has had a significant number of people appointed to serve on the four-person board. Turnover has been high, resulting in a lack of continuity regarding oversight of the system.[99] At the time of our visit the IDB consisted of three people, none of whom were attorneys or came from backgrounds in criminal justice.[100] While made up of well-meaning people, the IDB as appointed by the court is singularly lacking in anyone with the training, experience, and knowledge to make informed choices about the recruitment, selection, and supervision of contract lawyers.[101] The decision to move from a public defender office to a contract system was made because the IDB sees its role as controlling costs and does not fully appreciate its role in upholding the right to counsel under the State and Federal constitutions. The expansion of the flat-fee contracting model across the state is indicative of similar problems in other jurisdictions in the state.

---

[99] During an interview with IDB Chair Charles Jones, NLADA was told that the number of people that have been on the IDB over the past eight years numbered over 20. In a subsequent phone call, Mr. Jones said that the number was high, but not quite that high. On September 25, 2003, NLADA sent an overnight letter to Mr. Jones requesting copies of minutes for IDB meetings for the past two years in an attempt to begin quantifying the number of people on the IDB. NLADA did not receive a response to our request.

[100] The Chair is the Assistant Vice-Principle of the local high school. One IDB member is a real estate developer and nightclub owner. The other does some counseling and is a licensed embalmer. An attorney does technically hold the fourth seat, though the attorney has not attended a meeting in over a year and was not involved in the critical decisions that resulted in the contract model now in place.

[101] This failure to safeguard independence of the indigent defense system stands in contrast to LIDAB Standard 1-1.1.

Chapter IV
Ancillary Findings:
The Effect of Inadequate Funding & Lack of Independence
On the Delivery of Indigent Defense Services

This chapter looks at the deleterious effect that the inadequate funding and lack of independence of the indigent defense system has on the level of services delivered to the poor facing the potential loss of liberty in criminal proceedings.

*Finding #3: In violation of ABA Principle 8, the failure to ensure adequate funding and independence of the indigent defense system has led to the prevalence of flat fee contract systems in those districts with poor revenue streams in an attempt to save money. Flat-fee contracts are universally rejected by all national standards because they create a monetary conflict between the defense provider and the client.*

An IDB in a judicial district in which the need for public defense services is greater than can be afforded through court costs and state assistance grants must look for cost savings to stay afloat. There are only two ways to cut costs related to indigent defense: either reduce the number of cases coming into the system or cut spending on salaries and case-related expenses. Since public defenders do not control their own caseload (it is dictated by the prosecution and courts), IDBs across the state have moved away from full-time staffed public defender offices to low-bid, flat fee contract systems in which an attorney or consortium of attorneys take all of the indigent defense cases in a jurisdiction for a fixed fee in an effort to hold down costs and compensate for the failure of the state to adequately fund the system.

Avoyelles Parish is a good microcosm for studying the dynamics involved in the closing of a public defender office in favor of a flat-fee contract system. Over the four-year period from 1999-2002, the 12th Judicial District experienced a 12% increase in indigent defense expenditures (from $166,006 to $186,495 annually). The same four-year period saw revenues decrease 7.2% (down from $160,607 to $149,018). In 2002, the 12th judicial district ran a deficit of $37,477. The IDB decided to disband the public defender office that was experiencing a normal 3% expenditure increase each year in favor of the flat fee system described in Chapter II of this report. Cost savings came from not having to pay benefits to the attorneys and staff and shifting the responsibility for investigation services to the contracted attorney. At the time of our study, the projected cost of running the flat fee system for a full year was approximately $146,400,[102] or nearly 22% less than 2002 expenditure level, and approximately 12% lower than 1999 levels.

Such a move to flat fee contracting is oriented solely toward cost reduction, in derogation of ethical and constitutional mandates governing the scope and quality of representation. Fixed annual contract rates for an unlimited number of cases, as practiced in Avoyelles Parish, create a conflict of interest between attorney and client, in violation of well-settled ethical proscriptions compiled in the *Guidelines for Negotiating and*

---

[102] Projections were made by taking all of the expenditures recorded on the 12th Judicial District IDB's Quickbooks® system through September 15th and prorating it for a full twelve month period. The same largest expenditure is in contract attorney fees ($112,200 or 77% of the entire annual expenditure). The balance is mostly related to leasing agreements for copiers from when there was a staffed public defender office, insurance, accounting and auditing services, legal fees, etc. NLADA projected less than $2,000 will be spent on client related costs (or 1.4% of the entire budget).

*Awarding Governmental Contracts for Criminal Defense Services,*[103] written by NLADA and adopted by the ABA in 1985. Guideline III-13, entitled "Conflicts of Interest," prohibits contracts under which payment of expenses for necessary services such as investigations, expert witnesses, and transcripts would "decrease the Contractor's income or compensation to attorneys or other personnel," because this situation creates a conflict of interest between attorney and client. The same guideline addresses contracts which simply provide low compensation to attorneys, as practiced in Avoyelles Parish, thereby giving attorneys an incentive to minimize the amount of work performed or "to waive a client's rights for reasons not related to the client's best interests."[104]

For these reasons, all national standards, as summarized in the eighth of the ABA's *Ten Principles* direct that: "Contracts with private attorneys for public defense services should never be let primarily on the basis of cost; they should specify performance requirements and the anticipated workload, provide an overflow or funding mechanism for excess, unusual or complex cases, and separately fund expert, investigative and other litigation support services."

This move to flat-fee contract systems, as experienced in Avoyelles Parish, has retarded the collective statewide indigent defense expenditure rate to levels unmatched by comparison states. Once again, Alabama is illustrative. In 1999, Alabama's Fair Trial Tax generated approximately $8,787,000 in revenue. To this amount, the state contributed an additional $12,228,000 (or more than 58% of the total). The following year, the state contribution rose more than 11% (up to $13,600,000). The 2001 fiscal year saw the Fair Trial Tax revenues again stay relatively stable, but the state costs jumped to approximately $25 million. In 2002, Alabama counties spent $37,698,403 on indigent defense, $28 million of which came from state government (or 74.3%). This means that in four years, the revenue able to be garnered from court costs rose by only slightly more than 10% (from $8,787,000 to $9,698,403) at a time when actual indigent defense costs and state contributions rose by nearly 80%.

Contrast this with Louisiana. While Alabama's revenue through court costs rose by only 10% over four years, Louisiana's collective court costs revenue stream was not even that successful – increasing only 5.8% (from $19,930,297 to $21,080,773). And, whereas the actual costs for providing constitutionally mandated defender services in Alabama rose by 80%, the combined cost of state and local indigent defense expenditures in Louisiana *only rose by 5.3%* (from $27,430,297 to $28,880,773). To meet the rising costs of providing indigent defense services, the State of Alabama increased its assistance to counties by 129% (from $12,228,000 to $28 million) whereas in Louisiana the 5.3% increase in costs of providing services *was met with a decrease in state DAF funding of nearly 16%* (from $3,527,370 down to $2,973,719).

This is not to suggest that Alabama provides adequate representation to its poor facing criminal proceedings. In fact, Alabama's plan for defender services has been

---

[103] www.nlada.org/Defender/Defender_Standards/Negotiating_And_Awarding_ID_Contracts

[104] The 12th Judicial District system is also in violation of *Louisiana Rules of Professional Conduct*, Rule 1.7(b) which states: A lawyer shall not represent a client if the representation of that client may be materially limited...by the lawyer's own interests, unless: (1) The lawyer reasonably believes the representation will not be adversely affected; and (2) The client consents after consultation..." When the IDB enters into flat-fee contracts, they place the attorney in a position of violating the Louisiana Rules of Professional Conduct.

universally criticized for its systemic deficiencies, *including inadequate funding.*[105] Rather, it is more telling that Louisiana's funding *does not even match Alabama's low threshold.*

By comparison, the three states with the closest populations to Alabama and Louisiana (Oregon, Minnesota and Colorado) all have lower poverty and crime rates, but have much higher indigent defense expenditures. Colorado spends $9.36 per capita (a total expenditure of $40 million). Minnesota spends $10.47 per capita (or $50 million). And, Oregon with a population that is 39.4% smaller than Louisiana (3.3 million) spends $76 million on indigent defense or 874% more than the State government spends in Louisiana (and 153% more than is spent by both the State and its parishes). The State of Oregon spends $23.09 per capita on indigent defense services, while the State of Alabama spends only $6.40. The State of Louisiana spends $1.70 per person to guarantee that people of insufficient means are afforded the protection of their constitutional right to counsel.

*Finding #4: In violation of ABA Principle 5, the failure to adequately fund and ensure the independence of the indigent defense system results in attorneys handling caseloads far in excess of national standards. The crushing caseloads exist despite the fact that indigent defendants in misdemeanor cases are being denied attorneys without a proper waiver of their right to counsel in violation of the U. S. Supreme Court mandate in Argersinger v. Hamlin, 407 U.S. 25 (1972) and Shelton v. Alabama, 535 U.S. 654 (2002).* In April 2003, The American Council of Chief Defenders (ACCD)[106] issued an ethics opinion declaring that a chief public defender is ethically prohibited from accepting a number of cases that exceeds the capacity of the agency's attorneys to provide competent, quality representation in every case. When confronted with the prospect of overloading cases or reductions in funding and staffing which will cause the agency to exceed workload capacities, the chief executive of the public defender agency is ethically required to refuse acceptance to any and all such cases.[107] The opinion notes that the consequences of noncompliance can include bar disciplinary action against the defender as well as financial liability on behalf of the jurisdiction. The ACCD opinion is based on long-standing, national indigent defense standards for workload, as discussed below.

The flat-fee contract structure has caused a severe caseload issue in Avoyelles Parish, as will be detailed below. Where a contract system is employed the local IDB stands in the stead of a Chief Public Defender. The local IDB is thus the appropriate entity to insist that national workload standards be met and adhered to. But because the IDB members appointed by the court in the 12th Judicial District are not lawyers and are

---

[105] See for example: Bright, Stephen B., "Neither Equal Nor Just: The Rationing and Denial of Legal Services to the Poor When Life and Liberty are at Stake," New York University School of Law *Annual Survey of American Law*, Volume 1997, page 783 (published in 1999).

[106] The ACCD is a section of NLADA composed of chief executives of indigent defense programs across the country. ACCD is dedicated to supporting leaders of all types of indigent defense systems through the open exchange of information and ideas.

[107] The ACCD opinion is included as Appendix J (page 118) and is available electronically at: www.nlada.org/DMS/Documents/1050081883.26/Ethics%20op-workload%20final.doc.

Case 2:14-cv-01342-JCZ-KWR   Document 1-1   Filed 06/05/14   Page 86 of 319

not versed in the ethical requirements of national standards, no action to bring caseloads into compliance with national standards has been undertaken.

The fifth of the ABA's *Ten Principles* provides:

> *Defense counsel's workload is controlled to permit the rendering of quality representation. Counsel's workload, including appointed and other work should never be so large as to interfere with the rendering of quality representation or lead to the breach of ethical obligations, and counsel is obligated to decline appointments above such levels. National caseload standards should in no event be exceeded, but the concept of workload (i.e., caseload adjusted by factors such as case complexity, support services, and an attorney's nonrepresentational duties) is a more accurate measurement.*

Regulating an attorney's workload is one of the simplest, most common and direct safeguards against overloaded public defense attorneys and deficient defense representation for low-income people facing criminal charges. The National Advisory Commission on Criminal Justice Standards and Goals first set numerical caseload limits in 1973[108] under the auspices of the U.S. Department of Justice, which, with slight modifications in some jurisdictions, have been widely adopted and proven quite durable in the intervening three decades.[109] They have been refined, but not supplanted, by a growing body of methodology and experience in many jurisdictions for assessing "workload" rather than simply the number of cases, by assigning different "weights" to different types of cases, proceedings and dispositions, depending on how much time is required to provide adequate representation.[110] Workload limits have been reinforced by a number of systemic challenges to under-funded indigent defense systems, where courts do not wait for the conclusion of a case, but rule before trial that a defender's caseloads will inevitably preclude the furnishing of adequate defense representation.[111]

---

[108] Numerical caseload limits are specified in *NAC* Standard 13.12 (maximum cases per year: 150 felonies, 400 misdemeanors, 200 juvenile, 200 mental health, or 25 appeals), and other national standards state that caseloads should "reflect" (*NSC* Guideline 5.1) or "under no circumstances exceed" (*Contracting*, Guideline III-6) these numerical limits.  The workload demands of capital cases are unique: the duty to investigate, prepare and try both the guilt/innocence and mitigation phases today requires an average of almost 1,900 hours, and over 1,200 hours even where a case is resolved by guilty plea. *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* (Judicial Conference of the United States, 1998).

[109] See *Indigent Defense Caseloads and Common Sense: An Update* (NLADA, 1992), surveying state and local replication and adaptation of the NAC caseload limits.

[110] See *Case Weighting Systems: A Handbook for Budget Preparation* (NLADA, 1985); *Keeping Defender Workloads Manageable*, Bureau of Justice Assistence, U.S. Department of Justice, Indigent Defense Series #4 (Spangenberg Group, 2001) (www.ncjrs.org/pdffiles1/bja/185632.pdf).

[111] See, e.g.: *Kennedy v. Carlson*, 544 N.W.2d 1 (Minn. 1996); *State v. Peart*, 621 So.2d 780 (La. 1993); *City of Mount Vernon v. Weston*, 68 Wash. App. 411, 844 P.2d 438 (1993); *Arnold v. Kemp*, 306 Ark. 294, 813 S.W.2d 770 (1991); *State v. Lynch*, 796 P.2d 1150 (Okla. 1990); *In re Order on Prosecution of Criminal Appeals by the Tenth Judicial Circuit*, 561 So.2d 1130 (Fla. 1990); *Hatten v. State*, 561 So.2d 562 (Fla. 1990); *Luckey v. Harris*, 860 F.2d 1012 (11th Cir. 1988), *cert den.* 495 U.S. 957 (1989); *State ex rel. Stephan v. Smith*, 242 Kan. 336, 747 P.2d 816 (1987); *People v. Knight*, 194 Cal. App. 537, 239 Cal. Rptr. 413 (1987); *State v. Hanger*, 146 Ariz. 473, 706 P.2d 1240 (1985); *State v. Smith*, 140 Ariz. 355, 681 P.2d 1374 (1984); *Corenevsky v. Superior Court*, 36 Cal.3d 307, 682 P.2d 360 (1984); *State v. Robinson*, 123 N.H. 665, 465 A.2d 1214 (1983); *State ex rel. Wolff v. Ruddy*, 617 S.W.2d 64 (Mo. 1981), *cert. den.* 454 U.S. 1142 (1982).

Assessing workload in Louisiana is complicated by the fact that there is no central repository for collecting caseload data. The limited funding of IDBs leave little, if any, funding to secure adequate case-tracking systems or support staff to complete necessary data entry.[112] After extensive review, NLADA was unable to confirm the total number of indigent defense cases that occur in Avoyelles Parish. Interviews with defense providers revealed that the contract defenders do not track the number of cases carried per year and could not estimate their own caseload.[113] The IDB Chairperson indicated that felony indigent defense caseload information was available from the court. Unfortunately, NLADA was only able to get aggregate caseload totals and was unable to get the supporting data to verify those numbers.[114] NLADA also reviewed caseload data on the District Attorney's case-tracking system and determined that data fields exist that would capture important indigent defense data if those fields were maintained consistently and uniformly. Subsequent interviews revealed that such consistency was not maintained.[115] With the lack of access to verifiable data, NLADA's workload analysis is based instead on the number of cases the IDB reported to LIDAB.

The 12th Judicial District IDB Chair informed an NLADA site team member that he accepts the court indigent defense caseload numbers, without further verification, when filling out the LIDAB DAF application. Avoyelles Parish reported to LIDAB that 986 felony cases were opened in 1999. The next year, that number dropped to 758. By 2002, the number of felony cases reported to LIDAB fell to 497 felony cases. If these numbers were factually accurate, it would mean that the judicial district's indigency rate (calculated as the number of public defender cases divided by the total number of felony

---

[112] Taxpayers in the state should not have to tolerate any state money (even the little amount currently dedicated to indigent defense) being expended without some manner of ensuring that the money is being spent efficiently and the necessary services are actually being provided. Even in those districts that rely solely on local funding, poorly funded and poorly managed indigent defense systems produce wasteful spending in other criminal justice components (corrections, courts, prosecution, etc.) that do spend state money. There is no way to assure that money is being well spent without objective, verifiable data. Once again, LIDAB requests data only of those districts applying for state funds but does not have the capacity or authority to verify those figures.

[113] This is very telling in and of itself. If one cannot track the number of people served, then the caseload must be too excessive to effectively represent clients.

[114] NLADA staff sent a formal request for caseload data to District Judge Bennett on September 25, 2003. The letter indicated that NLADA was willing to pay for reasonable costs associated with having court personnel gather the data and any costs associated with sending the materials to our offices. The letter went unanswered and numerous follow-up calls went unreturned.

[115] In a letter dated September 25, 2003, NLADA staff formerly requested of District Attorney Riddle an electronic copy of the underlying data tables of the CRIMES database used in his office. The letter made it clear that we did not want or need any information the District Attorney consider proprietary (for instance we did not need and were not asking for client names, notes on the case, etc.). Instead, NLADA was interested in the following types of data fields observed on the CRIMES system: Charge Type (felony, misdemeanor, juvenile, etc.); Defense Attorney Name; Arrest Date; Arraignment Date [and any other event dates (pre-trial conference, trial, etc.)]; Disposition Information (i.e., pled guilty, found guilty, mistrial, etc.); and/or, Sentencing Information (jail or prison sentence, probation, etc.). NLADA offered to convert the data for analysis and absorb the cost of producing the information. In lieu of the electronic format, NLADA requested hard copy print outs of the same information.

District Attorney Riddle did respond to our request in a timely manner and put us in touch with Mr. David Baxter, Director of Information Systems for the Louisiana District Attorneys Association. Mr. Baxter and Mr. Riddle were cooperative, but it was ultimately determined that the CRIMES database system had not been running long enough in Avoyelles Parish to produce useful data and that defense attorney names were not being tracked uniformly. In an e-mail dated October 14th, 2003, District Attorney Riddle indicated that his office was from that point forward going to track such information regularly.

cases) decreased from a high of 51.9% in 1999 to only 25.1% in 2002.[116] It is not logical to conclude that in a district with such high poverty rates, half to three-quarters of all felony defendants were able to retain private attorneys.[117] District Judge Bennett estimated in our interview that about 90% of felony defendants are given counsel. This estimate is consistent with national indigency rates averages that indicate that 80-90% of all felony defendants are indigent.[118] Thus, NLADA's indigent defense workload assessment is based on felony caseload numbers that are most assuredly lower than what the contract attorneys are actually carrying.

National standards regulating indigent defense caseloads in adult felony cases recommend that an attorney handle no more than 150 cases per year *if that is the only type of case handled by the attorney.* In 2002, the 12th Judicial District reported to LIDAB that they were assigned 497 new felony cases (nearly 50% less than the number reported in 1999). Assuming the same number of cases occurred in 2003 and were divided evenly among the three post-arraignment felony contract attorneys, each attorney would have handled 166 felony cases last year (or slightly more than the national workload standard of 150). But the national standards assume that the attorney is working *full-time* on indigent defense cases. In Avoyelles Parish, the attorneys work part-time. The contract attorneys estimated that between a half to two-thirds of their time is spent on indigent defense cases. Thus, using the most conservative estimate that each of the three attorneys work at a 2/3 full-time equivalent capacity, the three part-time attorney's time spent on indigent defense cases equal the work output of two full-time equivalent (FTE) attorneys. Each FTE attorney therefore is assigned 249 felony cases, or, 166% of the national felony caseload standard.[119]

---

[116] The Supreme Court of Louisiana, *Annual Report 2002 of the Judicial Council of the Supreme Court* (2003), and *Annual Report 1999 of the Judicial Council of the Supreme Court,* (2000), indicates that District Court criminal cases have risen steadily each year in Avoyelles Parish, from 1,900 in 1999 to 1,980 in 2002 (an increase of 4.21%). Based on these totals, the number of indigent defense cases reported to LIDAB produces the extraordinarily low indigency rates.

[117] This is especially true given the opinion of some interviewees that even people who can otherwise afford counsel are given a lawyer at taxpayers expense in Avoyelles Parish.

[118] A 2001 report of the Washington State Office of Public Defense reports that the state's trial-level superior court indigency rate is 85-90%. A comparison of that rate to other states found it to be similar to a number of states, including: Colorado (80%), Arizona (92%), Missouri (90%), Nebraska (90%), Georgia (90%), California (95-99%), North Dakota (80%) and New York (90%). See: Washington State Office of Public Defense, *Criteria & Standards for Determining and Verifying Indigency,* February 9, 2001, page 12. Report is available at: www.opd.wa.gov/Publications/Other%20Reports/Criteria%20&%20Standards%20for%20Indigency-%202001.pdf

[119] Again these numbers are most assuredly underreported. Relying on District Judge Bennett's estimates and national experience, if 80% of the total felony cases prosecuted in the district in 2002 (or 1,584 of 1,980) was used as the starting point for this analysis each FTE felony attorney would handle 792 felony cases per year or *528% of the national felony workload standard.* And, if we assumed that attorneys worked half time instead of two-thirds time, each FTE felony attorney would handle 1,056 cases or *704% of the national felony workload standard.*



36     IN DEFENSE OF PUBLIC ACCESS TO JUSTICE



Chart 4-1
Average Annual Felony
Cases Assigned Per
FTE Attorney
(Avoyelles Parish)



National standards regulating attorney caseloads in felony cases recommend that a full-time equivalent attorney handle no more than 150 such cases per year. An FTE attorneys in Louisiana's 12th Judicial District is *assigned* 249 felony cases annually, or 166% of the standard

The starting point for analyzing workload thus has the indigent defense felony attorneys in Avoyelles Parish already far exceeding national standards. But the national standards are based on work done on *any* felony case handled during the year and not just those opened during the year in question. To the extent that there are any cases that are continued from previous years (which cannot be determined accurately at this point in time) the attorneys' caseloads are even greater than portrayed in Chart 3-2 (above). It is universally true that the number of cases assigned in one year will not be completed until at least the following year. Since we have no way to ascertain that number here, we will use national standards to illustrate how this reality impacts caseloads. Relying on national standards, an attorney was not able to perform all of the ethical requirements to guarantee an adequate defense unless he adhered to the national felony caseload standard. Under such a scenario, an attorney could only work on 150 such cases. Thus, even though an attorney maybe assigned 249 felony cases, only 150 could be disposed of during the year. In the 12th Judicial District, that would mean that a full-time equivalent attorney would have an additional 99 cases pending at the start of the next year (249 – 150 = 99). If in that ensuing year, the attorney again were assigned another 249 cases, he would have an additional 198 cases pending at the start of the subsequent year. This scenario leads one to conclude that there is either a significant pending felony caseload building in Avoyelles Parish or that the contract attorneys are not performing all of the requisite duties needed to ensure an adequate defense of the poor, or both.[120]

The situation above does not even factor in private caseloads, indigent defense cases handled in other judicial districts or other work handled by the contract attorneys. For instance, one of the three contract felony attorneys also handles indigent defense

---

[120] The cost implications to the entire criminal justice system of a growing backlog are wide-ranging. If defense attorneys are unprepared to move forward on a case, court time and resources for judges, bailiffs, court reporters, district attorneys, etc. are utilized inefficiently. Additionally, as pending cases grow, attorneys may adopt a triage system in which their attention is turned to whatever is the next court date on their calendar without taking into account the circumstances of all of their other clients. When this occurs, defendants may linger in jail pre-trial or be wrongly incarcerated post-trial, substantially increasing corrections costs. Conversely, an attorney may opt to "cut corners" to keep their caseload manageable, again bringing into question the adequacy of the representation afforded to the poor, and raising the prospect of costly ineffective-assistance-of-counsel claims and wrongful convictions. The loss of trust in the system has tangible impacts on systemic costs and efficiencies in that jurors and witnesses become reluctant to come forward. Moreover, public confidence in the integrity of the system is lost when the community perceives that inadequate representation creates a system that metes out justice differently to the rich and the poor.

cases in neighboring Rapides Parish (the only parish in the 9th Judicial District).  In that district, the contract attorney certified in a letter to the Rapides Parish Chief Public Defender (dated December 17th, 2003) that she was representing 476 felony defendants (4 of which were capital cases) *in that Parish alone.*  This is over three times the national felony caseload standard without factoring in the Avoyelles Parish caseload or the time required to adequately defend a person's life against capital charges.

Though the NAC standards do not establish specific workload standards for death penalty cases, a number of studies have determined that an attorney must put in between 1,200 hours (in a case settled by plea bargain) and 1,900 hours (for a case that goes to trial) to adequately defend a person on capital charges.[121]  If one assumes that an attorney works 2,080 hours per year,[122] this means that an attorney handling capital cases *should handle no more than one or two capital cases per year and nothing else.[123]*

Therefore, this one Avoyelles Parish contract attorney handles the workload of 6.3 FTE attorneys while working part-time,[124] plus whatever private cases she has been retained to handle on behalf of paying clients.  On top of this, the contract attorney in question teaches part-time at Southern Law School.  Assuming a 1,387 hour work year (which is based on two-thirds time dedicated to indigent clients and does not include any time off for holidays, sick days and/or vacation days), clients facing felony charges are afforded, on average, approximately two hours a piece of this attorney's time *including those charged with capital offenses.[125]*  For those readers unfamiliar with criminal defense practices, below is a partial list of duties ethically required of this attorney to complete on the average felony case:

---

[121] See: Judicial Conference of the United States, *Federal Death Penalty Cases: Recommendations Concerning the Cost & Quality of Defense Representation,* 1998 (available on-line at: www.uscourts.gov/dpenalty/4REPORT.htm#a004).  Also see: American Bar Association, *Guidelines for the Appointment & Performance of Defense Counsel in Death Penalty Cases,* Revised Edition February 2003, footnote 114 (available at: www.abanet.org/deathpenalty/guidelines.pdf).

[122] It is necessary for any workload analysis to establish some baseline for a work year.  For non-exempt employees who are compensated for each hour worked, the establishment of a baseline work year is quite simple.  If an employee is paid to work a 35-hour workweek, the baseline work year is 1,820 hours (or 35 hours times 52 weeks).  For exempt employees who are paid to fulfill the parameters of their job regardless of hours worked, the establishment of a work year is more problematic.  An exempt employee may work 35 hours one week, and 55 hours the next.  NLADA uses a 40-hour workweek for exempt employees for two reasons.  First, a 40-hour work week has become the *maximum* workweek standard used by other national agencies for determining workload capacities of criminal justice exempt employees (See: National Center for State Courts, *Updated Judicial Weighted Caseload Model,* November 1999; The American Prosecutors Research Institute, *Tennessee District Attorneys General Weighted Caseload Study,* April 1999; U.S Department of Justice, Office of Juvenile Justice and Delinquency Programs, *Workload Measurement for Juvenile Justice System Personnel: Practice and Policy,* November 1999); The Spangenberg Group, *Tennessee Public Defender Case-Weighing Study;* April 1999.)  Second, discussions with Mr. Don Fisk and Mr. Arthur Young of the U.S. Department of Labor, Bureau of Labor Statistics suggest that using a 40-hour work week for measuring workload of other local and state government exempt employees is the best method of approximating staffing needs.

[123] It should be noted that one of the other 12th judicial district contract felony attorneys also accepts appointments to capital cases in other parishes.

[124] With 472 felony cases in Rapides Parish and an estimated 166 felony cases in Avoyelles Parish, this attorney's total indigent defense caseload is 638.  Dividing the 638 cases by the national standard of 150 felony cases results in the need for 4.25 FTE attorneys.  The four capital cases require two attorneys based on the evidence presented in footnote 107.

[125] On January 22, 2004, a *Peart* motion was filed in Rapides Parish in the capital case of *State v. Delores Jones,* alleging that the defendant is receiving ineffective assistance of counsel from her IDB attorneys (one of whom is the Avoyelles Parish contract attorney referenced above), because of their excessive caseloads and insufficient support in Rapides Parish.

On cases that are disposed by a plea bargain:[126]

- Meeting and interviewing the client;
- Preparing and filing necessary initial motions (e.g. bail reduction motions; motion for preliminary examination; motion for discovery; motion for bill of particulars; motion for initial investigative report; etc.)
- Receiving and reviewing the state's response to initial motions;
- Conducting any necessary factual investigation, including locating and interviewing witnesses, locating and obtaining documents, locating and examining physical evidence; among others;
- Performing any necessary legal research;
- Preparing and filing case-specific motions (e.g. motions to quash; motions to suppress; etc.)
- Conducting any necessary motion hearings;
- Engaging in plea negotiations with the state;
- Conducting any necessary status conferences with the judge and state;

Additional duties for cases that go to trial:

- Preparing for trial (e.g., conduct jury screening, draft opening and closing statements, etc.)
- Meeting with client to prepare for trial;
- Conducting the trial; and,
- Preparing for sentencing.

As this list makes evident, there is no attorney who can perform adequately with such a workload.

The caseload situation for non-felony cases (misdemeanor and juvenile delinquency) is just as troubling in Avoyelles Parish. NLADA was not able to confirm accurate indigent defense misdemeanor and juvenile delinquency cases for Avoyelles Parish because of the same difficulties associated with tracking felony cases. Additionally, there is no requirement to report misdemeanor or juvenile caseload data to LIDAB. What we can state is that it is not uncommon for jurisdictions in other parts of the country to have a 3:1 ratio of indigent defense misdemeanor cases to felony cases.[127] That is, for every felony prosecuted in a jurisdiction, three misdemeanors are prosecuted. Thus, if 497 felonies were reported to LIDAB in 2002, it is a fair assumption that indigent defense attorneys might be expected to handle nearly 1,500 misdemeanors per year. As reported in the *Louisiana Supreme Court Annual Report, 2002*, Bunkie City Court opened 331 misdemeanor cases while the court in Marksville opened 1,030. This equals 1,361 cases, a proportion roughly in line with the rest of the nation. If we assume, consistent with national experience, that 80% of these were indigent defense cases, the

---

[126] The following is just a partial list of ethical duties required under national and state performance guidelines. Performance Guidelines for Criminal Defense Representation (NLADA, 1995) is available on-line at: www.nlada.org/Defender/Defender_standards/Performance_Guidelines. LIDAB's *Standards Relating to the Performance of Counsel Providing Representation to Indigent* is available at: www.lidab.com/Acrobat%20files/Chapter%206.PDF.

[127] The Spangenberg Group, *Comparative Analysis of Indigent Defense Expenditures & Caseloads in States with Mixed State and County Funding*, February 1998. Prepared for the Georgia Indigent Defense Council on behalf of the American Bar Association, Bar Information Program. The report is available on-line at: www.abanet.org/legalservices/sclaid/defender/research.html.

12th judicial district IDB would have opened 1,088 misdemeanor cases (or a 2:1 ratio of misdemeanors to felonies).

National standards state that an attorney should handle no more than 400 misdemeanor cases in a single year if that is the only type of case being assigned to the attorney. In Avoyelles Parish, the one misdemeanor attorney handles all 1,088 cases, or 272% of the national standard *for a full-time attorney*. This one attorney also handles juvenile delinquency cases. National standards for juvenile delinquency cases state that an attorney should handle no more than 200 cases if juvenile delinquency cases were the only types of cases handled. The 12th Judicial District opened 321 juvenile cases in 2002 (Bunkie city court opened 225 and Marksville opened 96). Again, assuming consistent with national experience that 80% of these were indigent defense cases, the IDB contract attorney would have to handle 256 such cases, or 128% of the national juvenile delinquency workload standard.

Again, the national standards are based on an attorney handling only one type of case, and one type of case only, on a full-time basis. · In those jurisdictions where attorneys work mixed caseloads (i.e. carrying some combination of various case types like misdemeanors and juvenile delinquency cases as occurs in the 12th Judicial District), the national standards need to be prorated. For example, should an attorney divide his work evenly between misdemeanors and juvenile delinquency cases, each of the standards would need to be divided by two and summed up. An attorney under this scenario should handle no more than 300 cases a year (misdemeanor: 200; juvenile delinquency 100). The lone contract attorney in Avoyelles Parish works well beyond this established workload standard (See Chart 4-2, page 40), carrying 448% of the determined mixed caseload standard or the equivalent workload of four and a half full-time attorneys. This of course does not take into account his private cases or pending indigent defense cases. It also does not take into account the fact that he is expected to staff felony arraignment calendars at District Court. [128]

---

[128] It is important to note that the role of support staff (investigators, social workers, paralegals, legal secretaries, and office managers) in public defender offices has taken on more importance over time both in terms of quality and cost-effectiveness. Investigators, for example, have specialized experience and training to make them more effective than attorneys at critical case-preparation tasks such as finding and interviewing witnesses, assessing crimes scenes, and gathering and evaluating evidence – tasks that would otherwise have to be conducted, at greater cost, by an attorney. Similarly, social workers have the training and experience to assist attorneys in fulfilling their ethical obligations with respect to sentencing, by assessing the client's deficiencies and needs (e.g., mental illness, substance abuse, domestic problems, educational or job-skills deficits), relating them to available community-based services and resources, and preparing a dispositional plan meeting the requirements and expectations of the court, the prosecutor and the law. Such services have multiple advantages: as with investigators, social workers are not only better trained to perform these tasks than attorneys, but more cost-effective; preparation of an effective community-based sentencing plan reduces reliance on jail, and its attendant costs; defense-based social workers are, by virtue of the relationship of trust engendered by the attorney-client relationship, more likely to obtain candid information upon which to predicate an effective dispositional plan; and the completion of an appropriate community-based sentencing plan can restore the client to a productive life, reduce the risk of future crime, and increase public safety.

Because of this, some states impose further restrictions on their indigent defense caseload standards. For example, public defenders in Indiana that do not maintain state-sponsored attorney to support staff ratios cannot carry more than 300 misdemeanor cases per year (down from the standard of 400 misdemeanors for public defenders with appropriate support staff). The Avoyelles Parish indigent defense system had no support staff whatsoever at the time of our site visit.

Both the ABA and NLADA standards recognize that support services are a vital part of adequate representation. Standard 5-4.1 of the ABA Standards for Criminal Justice, Providing Defense Services, directs that: "The legal representation plan should provide for investigative, expert, and other services necessary to quality legal representation. The Guidelines for Legal Defense Systems in the United States issued by the National Study Commission on Defense Services direct that "defender offices should employ investigators with criminal investigation training and experience. A minimum of one investigator should be employed for every three staff attorneys in an office." The Guidelines further prescribe precise numeric ratios of attorneys to non-attorney staff: One full time Legal Assistant for every four FTE attorneys; One full time Social Service Caseworker for every 450 Felony Cases; One full time Social Service



Chart 4-2
Average Annual
Misdemeanor &
Juvenile Delinquency
Cases Assigned Per
FTE Attorney in
Avoyelles Parish

As indicated below, it appears that the contract indigent defense attorney in Avoyelles Parish may not handle the total estimated number of misdemeanor defendants described in the above analysis (though even eliminating *all* of the misdemeanors would still leave the attorney handling cases in excess of national standards) because of our observations that show a number of misdemeanor defendants going entirely without counsel in direct violation of the U.S. Supreme Court mandates in *Argersinger v. Hamlin, 407 U.S. 25 (1972)* and *Shelton v. Alabama, 535 U.S. 654 (2002)*.

In 1972, the U.S. Supreme Court extended the right to counsel in *Gideon* to any misdemeanor cases involving the possibility of incarceration.[129] Thirty years later in *Shelton v. Alabama* the Court mandated that governments must provide counsel to not only those indigent defendants who are sentenced to any term of incarceration, but to defendants who received probationary or suspended sentences which may be subsequently converted into incarceration by virtue of a technical violation of the terms of the probation or suspended sentences. Nationally, this is a very significant number of cases; more than four million offenders receive probation or a suspended sentence annually, and of these, 13% (or some 600,000) are subsequently incarcerated for violating their conditions of probation.[130] In making its ruling, the Court noted that 34 states were already in compliance with its ruling by virtue of providing a statutory right to counsel in such cases, including Louisiana.[131] Unfortunately, there is a big difference between the Court's reading of the Louisiana statutes and what actually happens.

---

Caseworker for every 600 Juvenile Cases; One full time Social Service Caseworker for every 1200 Misdemeanor Cases; One full time Investigator for every 450 Felony Cases; One full time Investigator for every 600 Juvenile Cases; and, One full time Investigator for every 1200 Misdemeanor Cases.

[129] *Argersinger v. Hamlin, 407 U.S. 25 (1972)*.

[130] Probation and Parole in the United States, 2001 (Bureau of Justice Statistics, U.S. Department of Justice, www.ojp.usdoj.gov/bjs/abstract/ppus01.htm)

[131] See footnote 8 of majority opinion.

In Avoyelles Parish, NLADA witnessed a few misdemeanor defendants appearing with legal counsel, but many more entered guilty pleas without counsel. The court does not use "waiver of counsel" forms to provide even minimal indicia that the waiver is both voluntary and knowing. In two instances guilty pleas were accepted, and the defendant was given a jail sentence without any discussion or colloquy to waive the right to counsel in complete violation of *Argersinger*.[132]

Similarly, a number of people charged with misdemeanors were given probation and suspended sentences without counsel, and without being provided with information that would allow them to make an informed waiver, in violation of *Shelton*. When asked about the violations, neither the District Court Judge nor the District Attorney was aware of the Supreme Court decision in *Shelton* and requested a citation to the decision from NLADA.

One reason the Supreme Court said it is so important to ensure that defendants are given competent representation at the front end of their case is because there is no representation for probation violation hearings should the defendant be revoked for not meeting the terms of his or her probation. At the end of the District Court docket, NLADA site team members witnessed a defendant that was brought before the Judge in chains. The probation officer was there, but no defense attorney was present.[133] The defendant appeared to suffer from a drug problem. The probation officer read the violation summary: on June 4, 2002, the defendant pled guilty to drug possession and was sentenced to three years suspended and placed on three years probation. The Judge asked the defendant if he had anything to say, and he responded: "I have a bad drug habit and need help." The Judge imposed the three years that had been suspended, and the defendant was led out of the courtroom. Counsel would have had a real advocacy role in such a case -- possibly referring this case to a social worker for evaluation, assessment, and treatment possibilities that could result in reducing recidivism.

When we asked the judge about counsel appointments for individuals accused of violating probation terms, he responded that he would appoint counsel if the defendant asked for counsel when served with his probation violation papers by the probation officer. NLADA can only speculate about what these officers say and do. What we do know is that a probation officer's role is law enforcement and (s)he should not be placed in the position of advocating legal weaknesses in the state's case on behalf of the defendant.[134]

*Finding #5: In violation of ABA Principle 6, the failure to adequately fund and ensure independence of the indigent defense system results in attorneys being assigned cases which they are not qualified to handle.*

The sixth of the ABA's *Ten Principles* provides that:

---

[132] NLADA notified the District Attorney of this oversight in a subsequent interview and e-mail. One defendant was given a thirty-day sentence with credit for time served; the other was given a 90-day sentence.

[133] No prosecutor was present either.

[134] On a related subject, under the parole statute (La. R.S. Title 15 §574.5), the sheriff, whose parish jail houses sentenced felons for the Department of Corrections, may also determine eligibility for intensive incarceration program administered by the sheriff. The sheriff then also controls parole readiness evaluations for the Parole Board. This is an example of the significant scope of control which sheriffs exercise over defendants, inmates, and post-disposition justice.

> *Defense counsel's ability, training, and experience match the complexity
> of the case. Counsel should never be assigned a case that counsel lacks
> the experience or training to handle competently, and counsel is obligated
> to refuse appointment if unable to provide ethical, high quality
> representation.*

This requirement derives from all attorneys' ethical obligations to accept only
these cases for which they know they have the knowledge and experience to offer zealous
and quality representation.[135] This Principle integrates this duty together with various
systemic interests — such as efficiency and the avoidance of attorney errors, reversals and
remands, findings of ineffective assistance of counsel, wrongful convictions and/or
executions, and attendant malpractice liability — and restates it as an obligation of the
indigent defense system within which the attorney is engaged to provide legal
representation services.

Typically, this requirement is implemented by dividing attorneys into
classifications according to their years and types of experience and training, which
correspond to the level of complexity of cases, the severity of charges and potential
punishments, and the degree of legal skills generally required. Attorneys can rise from
one classification to the next by accumulating experience and training. This is true under
all three delivery models: assigned counsel programs commonly maintain various
different "lists" from which attorneys are selected according to the classification of the
offense; public defender programs place attorneys in different divisions of the office; and
contract systems award proposals based on experience level and case complexity.

As noted earlier, Avoyelles Parish recently hired an inexperienced attorney to
handle all juvenile and misdemeanor cases, as well as all felony arraignments. The
attorney is just out of law school. Although he worked for a year as an appellate clerk, he
has no previous trial-level experience. In questioning the IDB on the decision-making
process to hire this attorney, the board members stated at various times that a small
community like Avoyelles Parish allows them the intimacy to know who is a "good"
person. In the case of this attorney, they wanted to help a local community member
establish his own private practice by giving him trial experience while he builds his own
private clientele. The attorney himself said as much. He does the defender work "to
cover bills," until he can build his own practice and "until I don't have to do it any
longer."

Though the IDB decision may have been well-meaning, the lives of poor people
and juveniles cannot be a "practice" forum for recent law school graduates to learn
through the process of "sink or swim." Moreover, at-risk juveniles, in particular, require
special attention from public defenders if there is hope to change behavior and prevent
escalating behavioral problems that increase the risk that they will eventually be brought
into the adult criminal justice system in later years. These are commonly children who
have been neglected by parents and the range of other support structures that normally
channel children in appropriate constructive directions. When they are brought to court
and given a public defender who has a heavy caseload and no experience other than to
dispose of the case as quickly as possible, the message of neglect and valuelessness

---

[135] See, e.g., *ABA Model Rules of Professional Conduct*, Rule 1.1; *ABA Defense Function*, Standard 4-1.6(a); *NLADA
Performance Guidelines*, 1.3(a).

continues, and the risk of not only recidivism, but of escalation of misconduct, increases.[136] Recognizing this, other public defender systems have elevated the priority of juvenile representation and established special divisions not only to promote assessment and placement of juveniles in appropriate community-based service programs, but also to train and collaborate with others in the system to support the same goals, such as jail officials, judges, prosecutors and policy makers.[137]

Even misdemeanor cases can result in life altering consequences that should be recognized as a reason for requiring trained counsel. Skilled attorneys are necessary to properly advise clients and help them understand the impact a criminal record has on employment, housing, eligibility for health or income-support benefits, or immigration status – all issues that may involve future court actions at public expense.

When questioned about his use of experts for evaluation and for forensic assessment as well as investigators in juvenile cases, the young attorney looked somewhat blank and indicated that he never called upon or used such resources. When asked about the possibility of an alternative dispositional plan he stated "it's not ever going to happen."[138] The failure of the state to adequately fund indigent defense services forces IDBs to consider using flat-fee contracts. Because available revenue streams are inadequate, these flat-fee contracts often offer rates so low ($19,200) that only someone trying to establish a practice right out of law school would consider accepting the agreement for a contracted amount.

*Finding #6: In violation of ABA Principles 3 and 7, the failure to ensure adequate funding and independence of the indigent defense system undermines the timeliness of appointment of attorney and results in a lack of continuity of representation. Both erode clients' right to a speedy trial.*

Requirements of prompt appointment of counsel are based on the constitutional requirement that the right to counsel attaches at "critical stages" that occur before trial, such as custodial interrogations,[139] lineups,[140] and preliminary hearings.[141] In 1991, the

---

[136] On January 12, 2004, the *Daily Advertiser* of Lafayette, Louisiana ran an interview with the current Governor of the state, Ms. Kathleen Blanco. In it, the problem of high juvenile recidivism rates was discussed. In response to the question, "What are you looking at in the area of prison reform?" the then Governor-elect stated: "Juvenile justice. We realize that we have a 70 percent recidivism with our youth. They have been taken into these adult-like prison settings. They have been separated from their families. Particularly for first-time and nonviolent offenders, this is pretty traumatic. I like to believe a very large percentage of these kids could be saved. I am in total agreement with the Juvenile Justice Commission. We need to establish something like the Missouri model, where their recidivism rates are dramatically lower, something like 20 or 25 percent." The full interview is available on-line at: www.acadiananow.com/news/html/A9B0E022-4DBD-4FBF-930D-87EF1BC7E5FD.shtml.

[137] See Juvenile Sentencing Advocacy Project, Miami/Dade County, Florida (proposal for this and other successful federal Byrne grants on-line at www.nlada.org/Defender/Defender_Funding/Successful). See also Youth Advocacy Project, Roxbury, MA (www.nlada.org/News/NLADA_News/1005694565.43).

[138] For their report, *The Children Left Behind: Update* (2002) ABA and JJPL site teams conducted courtroom observations in Avoyelles Parish. In juvenile revocation cases we were told that the juvenile probation officer effectively serves as prosecutor, judge and defense lawyer. The juvenile probation officer obtains waivers of legal counsel, and was observed to conduct in-chambers meetings with the judges without the presence of the defendant. One attorney interviewed said that he had not seen one case in 20 years where the judge did not follow the probation officer's recommendation. The information in this footnote was obtained in interview with the American Bar Association, Juvenile Justice Center and The Juvenile Justice Project of Louisiana representatives.

[139] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[140] *Kirby v. Illinois*, 406 U.S. 682 (1972).

U.S. Supreme Court ruled that one critical stage – the probable cause determination, often conducted at arraignment – is constitutionally required to be conducted within 48 hours of arrest.[142] Most standards take these requirements beyond the constitutional minimum requirement, to be triggered by detention or request, even though formal charges may not have been filed, in order to encourage early interviews, investigation, and resolution of cases, and avoid discrimination between the outcomes of cases involving indigent and non-indigent defendants.[143]

District Judges in the 12th Judicial District hold what is known colloquially as a 230.1 hearing – a hearing to set bail – within 48 hours.[144] Counsel is not appointed at these hearings. Instead, formal appointment of an attorney is handled at the arraignment hearing. By statute, defendants in Louisiana are entitled to a "speedy trial,"[145] and upon filing of a speedy trial motion, the District Attorney must set the matter for arraignment within thirty days, unless just cause for a longer delay is shown.[146] Thus, arraignment and a defendants first chance for a probable cause determination can happen as much as a month after arrest -- *if there is a formal motion for a speedy trial*. But since there is no attorney to file such a motion on behalf of an indigent person, even this marginal improvement in delay is denied to indigent defendants.[147] As such, arraignments, and consequently appointment of counsel, can occur several months after arrest in direct violation of the U.S. Supreme Court mandate.[148]

A further caveat to this finding must be mentioned. A motion for a probable cause hearing in Louisiana is only allowable *prior to indictment*. Since almost all felony charges in Avoyelles Parish are initiated by indictment, and since there is no lawyer to file the motion on the defendant's behalf until after indictment, indigent defendants in Avoyelles Parish virtually never get to have a District Judge make a probable cause determination.

Further eroding a client's right to a speedy trial in Avoyelles Parish is the practice of appointing different attorneys at arraignment and post-arraignment. The seventh of the ABA's *Ten Principles* addresses the question of whether an indigent client may be represented by different attorneys at different stages of the proceeding ("stage," "zone" or

---

[141] *Coleman v. Alabama*, 399 U.S. 1 (1970).

[142] *County of Riverside v. McGlaughlin*, 500 U.S. 44.

[143] *ABA Defense Services*, commentary to Standard 5-6.1, at 78-79.

[144] This is in accord with Louisiana Code of Criminal Procedure, Article 230.1.

[145] La. Revised Statutes, Title XIV, Art. 701.

[146] These rules require a District Attorney to file an indictment or bill of information within 45 days of arrest for a misdemeanor and within 60 days for a felony, if the defendant is held in custody at the jail. The time period is increased if the defendant is released either on bail or on his own recognizance, to 90 days on a misdemeanor charge and 150 days for a felony. Failure to follow these timelines can result in the release of the defendant, if in custody, or release of bail obligations, if not in custody.

[147] Additionally, in *State v. Vermail* the Second Circuit Court of Appeals held that the State can institute prosecution at any time prior to a speedy trial hearing making the defendant's motion moot.

[148] NLADA heard from various interviewees that a client might be "lost" in the jail system from time to time without counsel ever being appointed. This occurs because the District Attorney only knows of those cases for which he has received the appropriate documentation from the Sheriff. Should paperwork be misplaced, a client can literally stay in jail for weeks and months at taxpayer expense, without any type of due process.

"horizontal" representation), or should have the same attorney throughout, and provides
that an effective public defense system requires that:

> *The same attorney continuously represents the client until completion of
> the case. Often referred to as "vertical representation," the same
> attorney should continuously represent the client from initial assignment
> through the trial and sentencing. The attorney assigned for the direct
> appeal should represent the client throughout the direct appeal.*

Standards on this subject note that the reasons usually given for public defense
systems to use "horizontal representation" are related to saving money and time. The
practice of having an inexperienced lawyer handle felony arraignments before handing
off those cases that survive arraignment in the 12th Judicial District fits this same pattern.
The theory goes that "arraignment only" lawyers need only sit in one place all day long,
receiving a stream of clients and files and then passing them on to another lawyer for the
next stage, in the manner of an "assembly line."[149]

But standards uniformly and explicitly reject horizontal representation,[150] for
various reasons: it inhibits the establishment of an attorney-client relationship, fosters in
attorneys a lack of accountability and responsibility for the outcome of a case, increases
the likelihood of omissions of necessary work as the case passes between attorneys, and
is both cost-ineffective and demoralizing to clients as they are re-interviewed by a
different attorney starting from scratch.[151] In Avoyelles Parish our observation of felony
arraignments was that the attorney saw his primary duty as getting acceptable pleas.[152]

Thus, the failure to appoint an attorney that will handle the case from beginning
to disposition undermines the intent of early appointment of counsel and erodes any
chance of conducting a trial in a reasonable period of time. Under the speedy trial statute,
if a motion is granted, trials for a defendant facing a felony charge must occur within 120
days if detained or 180 days if the defendant is not in custody.[153] Since the felony
arraignment-only attorney does nothing substantial on the case prior to arraignment and
has no responsibility for the case post-arraignment, nothing that would help the client

---

[149] *NSC* at 470.

[150] *ABA Defense Services*, commentary to Standard 5-6.2, at 83.

[151] *NSC* at 462-470, citing *Wallace v. Kern* (slip op., E.D.N.Y. May 10, 1973), at 30; *Moore v. U.S.* (432 F.2d 730, 736
(3rd Cir. 1970); and *U.S. ex rel Thomas v. Zelker*, 332 F.Supp. 595, 599 (S.D.N.Y. 1971).

[152] It was apparent that the attorney had not previously met with the vast majority of clients, let alone conducted any
investigation or initial interviews. The attorney was seeing the case file for the first time at the hearing without access
to complete discovery. Because the arraignment-only attorney routinely does not meet his clients prior to arraignment,
he only has a few minutes to consult with his clients, discuss the case with the prosecutor, and appear on the
arraignment calendar. While we were told that the day we saw was unusual in that so many people pled guilty at their
first appearance, we also were told that many more pled guilty at their second appearance, that generally there is no
meeting with the client in between the two court appearances, and that generally no investigation or research is done on
the case by the defense lawyer. Not only is there not enough time to determine whether a plea offer is reasonable, there
also is not enough time to build a relationship of trust between the client and the lawyer.
  In many places in the United States indigent defense attorneys do not meet their clients before felony arraignments
or practice horizontal representation, but in these jurisdictions there is a presumption that no plea will be entered into at
this early stage because there is recognition that there has been no time to prepare a defense, conduct research or
complete an investigation of the facts.

[153] Likewise, a person charged with a misdemeanor must have his trial commence within 30 days (in-custody) or 60
days (out-of-custody).

(investigation, psychiatric exams, drug-treatment placement) occurs until his trial attorney receives the case. In most instances, this will be on the eve of preliminary hearings or pre-trial settlement conferences – several months later. The speedy trial rules have proven ineffective to overcome this dynamic because under Louisiana Statutes, the defense lawyer must stipulate on the record that he or she is prepared to go to trial. Since they are effectively just beginning the case, the lawyer cannot do so, and often waives the right to a speedy trial.[154]

The result is that any actual substantive work on a case occurs many months after arrest. During this time, witnesses are lost, memories get cloudy, and crime scenes are disrupted. The ability of a defense attorney to mount a credible defense is severely hampered with such passing of time. More importantly, any opportunity an indigent defendant may have to prove his or her innocence is likewise jeopardized.[155]

*Finding #7: In violation of ABA Principle 9, the failure to ensure adequate funding and independence of the indigent defense system results in a systemic failure to provide comprehensive training.*

The ninth of the ABA's Ten Principles provides:

*Defense counsel is provided with and required to attend continuing legal education. Counsel and staff providing defense services should have systematic and comprehensive training appropriate to their areas of practice and at least equal to that received by prosecutors.*

Standards requiring training are typically cast, like the discussion of attorney qualifications above, in terms of both quality of representation to clients and various systemic interests in maximizing efficiency and avoiding errors. Commentary to the ABA *Standards for Providing Defense Services* views attorney training as a "cost-saving device" because of the "cost of retrials based on trial errors by defense counsel or on counsel's ineffectiveness." The Preface to the NLADA *Defender Training and Development Standards* states that quality training makes staff members "more productive, efficient and effective."[156] In adopting the *Ten Principles* in 2002, the ABA emphasized the particular importance of training with regard to indigent criminal defense

---

[154] The delay in bringing cases to timely disposition has been raised as a major problem throughout the state. In Calcasieu Parish it takes an *average* of 501 days to dispose of a felony case, and only 20% of all felony cases are disposed of within one year of the date of arrest. The average length of time from arrest to arraignment on a felony charge is *315 days*. By comparison, the U.S. Department of Justice reports in *Felony Sentences in State Courts, 1998*, Bureau of Justice Statistics Bulletin, October 2001, that the average time from arrest to disposition for felony cases nationwide is 214 days, with 90% of all felony cases disposed of within a year. See: Kurth, Michael M and Daryl V. Burkell, *Defending the Indigent in Southwest Louisiana*, July 2003, page 29.
Furthermore, the University of New Orleans Survey Research Center conducted a citizen's evaluation of the Louisiana Courts in 1998. The research found that "Delay in the courts is an area in which the public gives Louisiana negative evaluations. Only a third of the users and non-users think that court cases are completed in a reasonable amount of time and that waiting time in court is reasonable." Further: "The vast majority of Louisiana residents believe that there is too much time between arrest and trial." Survey summary available at: www.uno.edu/~poli/suprem98.htm.

[155] The indigent defense system in Avoyelles Parish does not meet LIDAB Standard 5-1.1 that requires that "counsel should be provided to the accused as soon as feasible and, in any event, after custody begins, at appearance before a committing magistrate, or when formal charges are filed, whichever occurs earliest." The system also fails LIDAB standards for continuity of representation (Standard 5-1.4).

[156] www.nlada.org/Defender/Defender_Standards/Defender_Training_Standards.

by endorsing, for the first time in any area of legal practice, a requirement of *mandatory* continuing legal education.   Standards typically relate indigent defense training to the level of training available to prosecutors in the jurisdiction. As stated in the Attorney General's Introduction to *Redefining Leadership for Equal Defense: Final Report of National Symposium on Indigent Defense 2000*, "public defenders need access to training resources to the same degree that Federal, State and local prosecutors have the same."[157]

New-attorney training is essential, and should cover matters such as how to interview a client, the level of investigation, legal research and other preparation necessary for a competent defense, trial tactics, relevant case law, and ethical obligations. Effective training includes a thorough introduction to the workings of the indigent defense system, the district attorney's office, the court system, and the probation and sheriff's departments as well as any other corrections components. And it makes use of role playing and other mock exercises, and videotapes to record student work on required skills such as direct and cross-examination, and interviews (or mock interviews) of clients, which are then played back and critiqued by a more experienced attorney or supervisor.

As these standards indicate, training should be a continual facet of a public defender agency.  Skills need to be refined and expanded, and knowledge needs to be updated as laws change and practices in related fields, such as forensics, evolve.  Thus, on-going training is always critical, but even more so where, as in Avoyelles Parish, experienced attorneys never received any initial "New Attorney" training and may need to re-learn skills or unlearn bad practices. Without training, attorneys are left to determine on their own what constitutes competent representation and will often fall short of that mark.   This is especially true when there are no practice guidelines in place and performance is not monitored on an on-going basis.  There simply is no systematic, on-going indigent defense training in Avoyelles Parish or in the rest of the state.

*Finding #8: In violation of ABA Principle 10, the failure to ensure adequate funding and independence of the indigent defense system results in a lack of accountability for attorney performance and systemic ineffective assistance of counsel.*

The tenth of the ABA's *Ten Principles* frames standards regarding the duties of attorneys in individual cases in terms of the indigent defense system's obligation to ensure that attorneys are monitored for compliance with such standards:

> *Defense counsel is supervised and systematically reviewed for quality and efficiency according to nationally and locally adopted standards. The defender office (both professional and support staff), assigned counsel, or contract defenders should be supervised and periodically evaluated for competence and efficiency* [citing the ABA's *Defense Function Standards* and NLADA's *Performance Guidelines for Criminal Defense Representation*].

Because the IDB members in Avoyelles Parish do not have the knowledge or training to enable them to oversee any aspect of the delivery of indigent defense services

---

[157] Office of Justice Programs, U.S. Department of Justice (www.ojp.usdoj.gov/indigentdefense/symposium.pdf), at viii.

in the Parish, the method of delivery, caseloads, quality of representation, etc., seems to be left to the discretion of the contract public defenders. Left without enforced standards or training the attorneys have little or no understanding of what constitute ethically required standards of practice.

The NLADA site team noticed many troublesome practices of the defense attorneys that fell far from the mark of competent representation. Indeed, basic components of representation that are required by the Constitution, ethical rules that govern attorney conduct and LIDAB standards, were lacking. With one attorney, the representation was so deficient that the accused individual was left to advocate on his own behalf, despite the fact that counsel was in the courtroom. The attorney's practice was to stand 15 feet or so away from the defendant during guilty pleas, including those defendants in chains. The attorney was at times laughing with prosecutors or court staff during the proceeding in which his clients were forced to provide their own representation. In one such case, the defendant told the judge that he was not guilty of one of the burglary charges in the bill of information, and after discussion at the bench, the state moved to dismiss that particular charge – though the original plea in relation to sentencing was kept in tact. The defense attorney did nothing even after the judge admonished the lawyer to pay attention.[158]

In another instance, despite constitutional requirements and the LIDAB standard recognizing the grave consequences of conflicts of interests, NLADA observed a public defender represent two co-defendants that were charged in the same incident with felony theft. According to the evidence presented in court, one defendant allegedly took $500 from a wallet he found and gave some of the money to the other. They were allegedly both intoxicated and wanted the money for liquor at the time of the incident. There may have been a trial issue as to whether or not the receiving defendant actually knew that the money from his co-conspirator was stolen. There were also questions of competency as one testified to having only an eighth grade education, and the other had a tenth grade education. Despite these potential issues, both pled guilty and received three-year suspended sentences, mandatory requirements to attend theft school, and had to pay substantial fines, costs and fees. When questioned later about the dual representation, the attorney in question indicated that if they had not pled guilty, he would have made sure that each defendant had received separate counsel appointments. Both men were constitutionally entitled to individual counsel, whether they pled or went to trial. The attorney's response evidences "casualness" about the right to one's own attorney and the rights of poor people that is highly problematic and contrary to the attorney's ethical duties, especially where no waiver of a separate right to counsel was entered either on the record or through a written waiver of conflict.[159]

---

[158] It is important to mention that LIDAB Standard 6-1.1(B) states: "The basic duty the lawyer for the accused owes to the administration of justice is to serve as the accused's counselor and advocate with courage, devotion and to render effective, quality representation."

[159] LIDAB Standard 9-1.3 states: "The potential for conflict of interest in representing multiple defendants is so grave that ordinarily defense counsel should decline to act for more than one of several codefendants except in unusual situations when, after careful investigation, it is clear either that no conflict is likely to develop at trial, sentencing, or at any other time in the proceeding or that common representation will be advantageous to each of the codefendants represented and, in either case, that: (A) The several defendants give an informed consent to such multiple representation; and (B) The consent of the defendants is made a matter of judicial record. In determining the presence of consent by the defendants, the trial judge should make appropriate inquiries respecting actual or potential conflicts of interest of counsel and whether the defendants fully comprehend the difficulties that defense counsel may encounter in defending multiple clients."

Again contrary to constitutional requirements (to investigate cases), one defense attorney told us that he has no investigation resources for defender cases and that he has not filed a motion for an expert in at least three years because he has not needed one. He noted that there are a "tremendous amount of confessions." He said he does not investigate cases with multiple witnesses and a confession noting, "why would you investigate what your client told you? There is nothing to investigate."[160]   A different defense attorney could not recall one case in 20 years in which there had been a defender investigation.  This same attorney does not meet his indigent clients in his office or at all between arraignment and pre-trial hearings.  He sends them a letter asking them to identify who their witnesses are and what they would say, and tells them to meet at court for the pre-trial conference, where another plea offer is made and he reviews the file again.  If the client provides a list of witnesses, this particular defense attorney will have his private staff subpoena them for trial.   He says the decision on whether he will interview the witnesses "depends on the facts we have." He noted that in a criminal jury week, there are between five and 20 trials set per IDB attorney.

We witnessed another case where the defense attorney had no idea that the client he had just talked to for a mere 30 seconds, and who was pleading guilty to the equivalent of statutory rape, could not have been found guilty because he was not the requisite number of years older than his girlfriend -- who was in court to support him.  The District Court judge recognized the error.  When later asked about this case, the lawyer told us that he had asked the client how old he was and if the client did not know or gave a misleading answer the lawyer could not be held accountable.  To compound the problem, the lawyer then let his client plead to the unproven crime of trespass (despite the girlfriend's admission that he had been invited into the premises), as if there was some kind of quid pro quo plea bargain that needed to be maintained after the sex charges were dismissed.[161]

---

[160]   Among the issues to be investigated are: mental health issues, substance abuse, duress or other codefendant pressures, false confessions, etc.

[161]   An interview with the District Attorney after this case revealed that the mother of the young woman would have testified that there was no permission for the defendant to be on her property so the trespass case might have ultimately been provable.  In any event, the defense counsel was not aware of this fact and it certainly indicates the lack of preparation and investigation on a serious charge.

One significant problem with this type of casualness to serious charges is that the collateral ramifications are significant. La. R.S. 14:80 defines "Felony Carnal Knowledge of a Juvenile" as consensual sexual intercourse where the defendant is 19 or older and the "victim" is 12 to 16, OR the defendant is 17 or older and the "victim" is 12 to 14.  This offense carries up to 10 years in prison or fine of $5,000 or both.

Felony Carnal Knowledge is a "sex offense" pursuant to La. R.S. 15:541(14.1), because it is a provision of "Subpart A(1) of Part V of Chapter 1 of Title 14." A conviction of Felony Carnal Knowledge, therefore, subjects the defendant to sex offender reporting requirements throughout the entirety of his sentence, La. R.S. 15:542, and to registration requirements for 10 years following release on parole or probation or from prison, La. R.S. 15:542(C), 15:542.1(H).

The sex offender reporting requirements include: registering as a sex offender with the Sheriff and the Chief of Police where they live; mailing notice of their neighbors of the crime of conviction, name, address, physical description and a photograph; mailing notice to the superintendent of the school district where he lives; mailing notice to the lessor, landlord, or owner of his residence; mailing notice to the superintendent of parks and recreation where he lives; publishing a notice in the newspaper on two separate days, with his photograph; and, giving notice to the Louisiana Bureau of Criminal Identification and Information of any college or technical school where he attends or works.

These requirements pertain every time he moves.  Then, for the 10 years after his sentence, he still has to register annually with the Louisiana Bureau of Criminal Identification and Information, which maintains his information in the "State Sex Offender and Child Predator Registry." He has to continue to register under these laws even if they receive a pardon of their conviction.

If the defendant was placed on probation (or later made parole), he would also have to attend a sex offender treatment program, at his own expense, throughout the probation and/or parole, La. C.Cr.P. art. 895(J), and give blood and saliva samples, La. C.Cr.P. art. 895(E).

All of these incidents occurred on a single day in which the District Judge, the District Attorney and the contract defense attorneys were aware that members of the NLADA site team were in the audience conducting court observations. Two of the attorneys appeared qualified to be handling felony cases under normal circumstances, but the high workload, the lack of training, the lack of oversight and the delay in beginning anything substantive on a case until months after arrest resulted in even these attorneys providing ineffective assistance of counsel.

_Finding #9: In violation of ABA Principle 4, the failure to ensure adequate funding and independence of the indigent defense system results in the continual abridgement of indigent defense clients' right to confidentiality._

The fourth of the ABA's _Ten Principles_ provides that in an effective public defense delivery system –

> _Defense counsel is provided sufficient time and a confidential space with which to meet with the client. Counsel should interview the client as soon as practicable before the preliminary examination or the trial date. Counsel should have confidential access to the client for the full exchange of legal, procedural and factual information between counsel and client. To ensure confidential communications, private meeting space should be available in jails, prisons, courthouses and other places where defendants must confer with counsel._

As the Principle itself states, the purpose is "to ensure confidential communications" between attorney and client. This effectuates the individual attorney's professional ethical obligation to preserve attorney-client confidences,[162] the breach of which is punishable by bar disciplinary action. It also effectuates the responsibility of the jurisdiction and the indigent defense system to provide a structure in which confidentiality can be preserved[163] – perhaps nowhere more important than in indigent criminal defense, where liberty and even life are at stake, and client mistrust of the public defender as a paid agent of the state is high.[164]

Substantive conversations on felony cases between clients and attorneys in Avoyelles Parish were conducted in the open courtroom audible to the courtroom audience, including other defendants, victims, family members, the judge, law enforcement officers, prosecuting attorneys, and others. Initial conversations on DUI misdemeanor cases had apparently been held in some other area of the courthouse, though they clearly were not one-on-one conversations between defendant and attorney but rather involved all of the DUI misdemeanor defendants at once. In some instances,

---

Finally, there is almost nowhere that a "sex offender" can live, work, or attend church. The parole board is allowed to make a condition of parole "such other specific conditions as are appropriate." La. R.S. 15:574.4. A typical sex offender parole requires that the parolee not have unsupervised contact with any person under the age of eighteen (18), and the parole officers and board construe this to apply to church attendance, living with your own children or step-children or siblings, eating at McDonalds, or going anywhere where you might brush up against a child.

[162] ABA _Model Rules of Professional Conduct_, Rule 1.6; _Model Code of Professional Responsibility_, DR 4-101; ABA _Defense Function_, Standard 4-3.1; NLADA _Performance Guidelines_, 2.2.

[163] _NSC_, Guideline 5.10

[164] _Id_, and commentary at p. 460.

NLADA representatives observed indigent defense clients talking directly to the prosecutor about his or her case without the defense lawyer interceding.[165]

In addition to an apparent lack of physical space set aside for private attorney-conversation, an equally important reason for the confidentiality breaches was that the defense attorneys did not understand the critical importance of "client interviews," both for investigative purposes, and to fulfill ethical obligations concerning client relations.[166] In discussing ways to improve the possibility of out-of-custody clients coming to interviews, one of the lawyers said he could not be bothered with bringing a calendar to court to set up appointments, or setting aside a regular afternoon to meet clients. His expressed attitude was that it was not his problem and that it did not matter anyway. The majority of the "interviews" we witnessed took no more than 30 seconds. Following one such "interview" the client entered a plea, and was sentenced on the spot to five years at hard labor.

Just as troublesome is the lack of confidentiality of the IDB office. During our site visit, the IDB office was being shared with probation officers. Clients receiving probation were requested to go to the IDB office to meet with officers. There were no IDB staff members available on the premises and a single probation officer was conducting interviews in one semi-private office. Remarkably, client case files were in open boxes and easily perused by clients, probation officers or anyone walking in off of the street.

Finally, the practice of the local Sheriff infringes on attorney-client communication, and thus, confidentiality. The Avoyelles Parish Sheriff is the owner of a communications conglomerate that provides e-mail and Internet communications to a large share of regional clients, including the IDB. One of his subsidiaries owns and operates the phone system in the jails. Several interviewees informed us that the company charges $5.00 to place a collect call and then charges long distance rates for the entirety of the conversation. This policy has forced the IDB and the contract lawyers to set a policy that no collect calls from the jail be accepted due to financial constraints. Such a policy forces initial interviews to occur at arraignment under the conditions described above.[167]

---

[165] Such conversations are in violation of the American Bar Association's *Criminal Justice Standards*. Standard 3-4.1(b) for the prosecution function, "Availability for Plea Discussions," states: "[a] prosecutor should not engage in plea discussions directly with an accused who is represented by defense counsel, except with defense counsel's approval. Where the defendant has properly waived counsel, the prosecuting attorney may engage in plea discussions with the defendant, although, where feasible, a record of such discussions should be made and preserved." The discussions between defendants and the District Attorney were not conducted before the defendant had properly waived their right to counsel. The ABA standards are available at: www.abanet.org/crimjust/standards/pfunc_toc.html.

[166] NLADA does believe that one of the contract attorneys has a more client-centered approach than the others, but that workload concerns prevent this attorney from providing adequate representation in all cases.

[167] The jail phone system was the subject of previous litigation. In 1991, Judge Michael Johnson was elected to and assumed the office of Judge of the Twelfth Judicial District Court. Before and after assuming office, Johnson, together with a partner owned and operated Cajun Callers, which provided pay telephone service for all Avoyelles Parish jail inmates. Judge Johnson was responsible for the management of Cajun Callers both before and after he became a judge, and received substantial income for his efforts ($254,616.44 in 1995). *In re Johnson*, 683 So.2d 1196, 1198 (La. 1996). A conflict was found with the judge owning the phone system since he stood to benefit from having more people in jail.

There currently is no ethical conflict for a Sheriff to own the jail telephone system. But, LIDAB Standard 6-2.1(C) states: "Personnel of jails, prisons, and custodial institutions should be prohibited to any extent from examining or otherwise interfering with any communication or correspondence between client and defense counsel relating to legal action arising from charges, detainment, or incarceration."

*Finding #10: In violation of ABA Principle 8, the failure to ensure adequate funding and independence of the indigent defense system results in the lack of resource parity between the prosecution and defense in Louisiana.*

The number of prosecutions brought in a jurisdiction drives indigent defense workload. And, since prosecution resources (both funding and staffing) significantly effects the number of prosecutions brought, increased prosecution funding directly increases defender workload.[168] Disparity of resources between public defenders and prosecutors exacerbates the inability of public defenders to keep up with workload increases and causes delay in dispensing justice to victims, witnesses and defendants.[169] For this reason, the eighth of the ABA's *Ten Principles* addresses the issue of resources for indigent defense, specifically in comparison with prosecution resources:

> *There is parity between defense counsel and the prosecution with respect to resources and defense counsel is included as an equal partner in the justice system. There should be parity of workload, salaries and other resources (such as benefits, technology, facilities, legal research, support staff, paralegals, investigators, and access to forensic services and experts) between prosecution and public defense.... No part of the justice system should be expanded or the workload increased without consideration of the impact that expansion will have on the balance and on the other components of the justice system. Public defense should participate as an equal partner in improving the justice system. This principle assumes that the prosecutor is adequately funded and supported in all respects, so that securing parity will mean that defense counsel is able to provide quality legal representation.*

The principle of parity between the resources of a district attorney's office and an indigent defense system is fairly straightforward. It derives from the fact that indigent defense workloads are driven by external factors – both by the prosecution, as noted, and by indigency rates among the defendant population. Whatever the percentage of criminal defendants entitled to counsel in a jurisdiction that are typically indigent, that same percentage is used as a starting point for calculating the ratio of prosecution funding to indigent defense funding. These figures may be adjusted up or down depending on the existence of other relevant factors increasing or decreasing one side's workload or budget.

---

[168] NLADA does not take a position on whether or not the District Attorney's office in Avoyelles Parish is adequately funded.

[169] Chief Justice Warren Burger wrote in 1972 "society's goal should be 'that the system for providing the counsel and facilities for the defense should be as good as the system which society provides for the prosecution.'" (*Argersinger v. Hamlin*, 407 U.S. 25, 43 (concurring opinion). The Justice Department's 1999 report, *Improving Criminal Justice* concludes that: "Salary parity between prosecutors and defenders at all experience levels is an important means of reducing staff turnover and avoiding related recruitment/training costs and disruptions to the office and case processing. Concomitant with salary parity is the need to maintain comparable staffing and workloads – the innately linked notions of 'equal pay' for 'equal work.' The concept of parity includes all related resource allocations, including support, investigative and expert services, physical facilities such as a law library, computers and proximity to the courthouse, as well as institutional issues such as access to federal grant programs and student loan forgiveness options."

For example, the prosecutor's office may have some duties not requiring indigent defense representation, such as certain civil cases or providing victim support services, or internal policies may lead it to routinely decline prosecution in a certain percentage of the cases reviewed upon referral by the police. On the other hand, indigent defense providers may not have access to supplemental types of funding available to the prosecutor's office, such as forfeited assets, fines, or federal grants; and as in all jurisdictions, some key resources and services available to prosecutors are furnished through other agencies budgets, and are hence "off budget" and not visible in a simple comparison of direct appropriations to the local offices of the District Attorney and the Public Defender. Examples of such "off-budget" items include the investigative resources of local law enforcement, state and federal crime labs, psychiatric and mental health experts, and federal agency personnel (e.g., FBI). As the U.S. Department of Justice has suggested, such policies, practices, and off-budget resources must be calculated into the parity balance sheet.[170]

In Louisiana there is nothing close to parity between prosecution and defense. On average, Louisiana prosecutors outspent their indigent defense counterparts by nearly 3 to 1 (total reported statewide expenditure for prosecution: $75,790,140; statewide indigent defense trial-level resources: $25,279,558).[171] Again, this does not take into account the amount of investigative resources provided at no cost to the prosecution by police, sheriffs, or FBI but which the indigent defense system must pay for directly, nor the cost of state crime labs or experts. At the close of 2002, Louisiana district attorneys collectively had over $38 million in reserves -- a 420.55% disparity between the collective statewide IDB reserves.

Prosecutors in Louisiana also have the long-standing benefit of a retirement system enacted by the State Legislature in 1956. District Attorney staff who joined the retirement system after 1990 receive 3.5% of their final year's salary multiplied by the number of years service every year upon retiring. For example an attorney working for 25 years as a district attorney, and who made $75,000 in the final year of her career, would earn $65,625 per year upon retirement. Other benefits include disability, early retirement, and death benefits. At the close of 2002, the District Attorneys Retirement System had a year-end balance of $135,176,917 in reserves. Contract public defense attorneys must budget for their own retirement.[172]

---

[170] See *Indigent Defense Services in Large Counties, 1999,* Bureau of Justice Statistics, U.S. Department of Justice (www.ojp.usdoi.gov/bjs/abstract/idslc99.htm) ("Some categories of expenses are typically borne by indigent defense but not necessarily by local prosecution agencies, thus hindering direct comparisons (e.g., expenditures of prosecutors' offices may not include investigative resources provided by law enforcement agencies, forensic laboratory work or expert witnesses, office space or technology, and training").

[171] See Appendix K (page 127) for a district-by-district parity analysis of indigent defense and prosecution services. This analysis simply reflects what was reported to the State Legislative Auditor. There are a number of instances in which further analysis is warranted. For example, in 2002, the District Attorney audit of the 34th Judicial District (St. Bernard Parish) reported that only $6,298.00 was expended by the office. Comparatively, the IDB in the same parish reported expending $272,509.00. Such differences are far and few between and the analysis reveals overwhelmingly that Louisiana's judicial districts do not practice resource parity between prosecution and defense.

[172] The availability of retirement benefits to those attorneys working in staffed public defender offices vary from district to district. For example, the 19th Judicial District (East Baton Rouge) does have a 403(b) Plan in place that was approved by the IDB in 1992. The IDB contributes 7.8% of the employee's salary to the Plan. The employee is not required to contribute, but he or she can if so desired. The 19th Judicial District also has a 401K cafeteria plan available for employees, though the IDB does not contribute to this plan.

Again, the 12th Judicial District serves as a good example of what this disparity means on a local level. To begin with, both the IDB and the District Attorney receive a near-equal percentage of court-imposed fees. Moreover, in every court case we witnessed, guilty defendants were assessed both the cost of defense counsel *and* the cost of prosecution.[173] Thus, the District Attorney office begins with a nearly equal share of the primary indigent defense revenue stream *before* factoring in state and local monies.

The District Attorneys office in Avoyelles Parish consists of ten prosecuting attorneys. In addition to District Attorney Riddle, one attorney is the First Assistant District Attorney. Two prosecutors are exclusively assigned to one of the two District Courtrooms and another two prosecutors are assigned to the other courtroom. One prosecutes juvenile offenders and handles prosecutions in Bunkie City Court. One attorney heads up the Special Victims Unit.[174] One of the attorneys operates as a floater, while the other handles the civil department. The office has 12 support staff.[175]

The indigent defense system on the other hand operates with just four part-time attorneys, or the equivalent of two full-time attorneys. Three of the attorneys share workspace and have to pay for all of their office support (rent, overhead, Internet access) out of the money earned through their indigent defense contracts and private cases.[176] The IDB generally has a staff position to handle the bookkeeping and other administrative functions, though at the time of our visit, this position was vacant.

The disparity in resources between the prosecution and defense functions is graphically reflected in the differences that exist between the two Avoyelles Parish offices. The district attorney's office recently underwent an $850,000 renovation, including all new computers with high-speed Internet access. We were told that most of the changes were funded through Federal grants, though some Parish money was used. Ms. Riddle's office exudes professionalism with all of the modern conveniences offered to prosecutors.

By contrast, the Indigent Defender Board Office is in disarray. Generally unmanned (at least at the time of our visit), the office looked abandoned. The waiting area was poorly lit, and papers and case files were piled in the one hallway that connected the few offices.

---

[173] Depending on severity of the charge, the District Attorney's share of court costs is between $10-$20. IDB gets $25 regardless of severity of the charge. Additionally, the District Attorney and the IDB both receive $125 apiece to offset the cost of the prosecution and defense, respectively.

[174] District Attorney Riddle created the Special Victims Unit (SVU) upon taking office. While a State Representative he authored the bill that allows victims to allocute at the sentencing phase. SVU cases include: domestic violence, sex offenses, and crimes against the elderly and against minors. Other support staff includes a "Hot Check Coordinator" assigned to work with businesses in an effort to assist them in collection of bad checks.

[175] This number includes the Victims Assistance Coordinator (VAC). The State authorized and funded a VAC for each judicial District. As in other jurisdictions, the VAC is dedicated to the concerns of victims, such as hearing dates, sentencing dates, release dates from jail of the criminal, and other matters.

[176] The fourth indigent defense attorney has a private office in Rapides Parish, making it all but impossible for clients to meet here in her office.



Indigent Defender Board Office



District Attorney's Office

56    IN DEFENSE OF PUBLIC ACCESS TO JUSTICE

## Summary of Chapters III & IV

In violation of LIDAB's own requirement for receiving district assistance grant funding, the 12th Judicial District IDB is not "immediately" working on achieving the goal of meeting LIDAB-promulgated standards; in fact documented evidence indicates that any "work" undertaken by the IDB has resulted in the indigent defense system in Avoyelles Parish falling further away from the statewide standards.

As indicated in Chapter I of this report, The American Bar Association's *Ten Principles of a Public Defense Delivery System* was devised as a set of standards which constitute the fundamental criteria to be met for a public defense delivery system to deliver effective and efficient, high quality, ethical, conflict-free representation to accused persons who cannot afford to hire an attorney. The substantial failing of the system to meet these standards can only mean that the indigent defense system devised by the legislature in Louisiana delivers ineffective, inefficient, poor quality, unethical, conflict-ridden representation to the poor. Based on a review of Louisiana statutes, LIDAB standards, recent reports by other reputable organizations, and our own firsthand courtroom observations in Avoyelles Parish, NLADA has created an easy to reference scorecard (below) regarding the extent to which the indigent defense system in Louisiana fails to meet the vast majority of the *Ten Principles*:

| ABA Principle | Explanation | Grade |
|---|---|---|
| 1. *The public defense function, including the selection, funding, and payment of defense counsel, is independent.* | Louisiana Statutes do not safeguard against undue judicial interference. Judges appoint IDB board members in direct violation of this principle. | F |
| 2. *Where the caseload is sufficiently high, the public defense delivery system consists of both a defender office and the active participation of the private bar.* | Instead of creating public defender offices in those jurisdictions where high caseloads warrant such a model, Louisiana's judicial districts have instead closed public defender offices in favor of flat-fee contract systems. The indigent defense system is not entirely state-funded as directed in this Principle's subsection. | F |
| 3. *Clients are screened for eligibility, and defense counsel is assigned and notified of appointment, as soon as feasible after clients' arrest, detention, or request for counsel.* | As demonstrated in Avoyelles Parish, clients are not screened for eligibility. Counsel is not appointed in a timely manner. Clients are not appointed counsel in the early stages of a case. Statutory guarantees of a "speedy trial" are not effective in practice. | F |
| 4. *Defense counsel is provided sufficient time and a confidential space with which to meet with the client.* | As demonstrated in Avoyelles Parish, client confidentiality is continually abridged. The failure of attorneys to meet with clients before court forces meetings to be held in the courtroom. There are no provisions in Louisiana statutes safeguarding confidentiality. | F |
| 5. *Defense counsel's workload is controlled to permit the rendering of quality representation.* | Louisiana statutes do not safeguard against public defender overload. Workload of Louisiana public defenders are far in excess of all nationally recognized standards, as demonstrated in Avoyelles Parish and a recent report in Calcasieu Parish. Failure to control caseload permits poor quality representation. | F |

| ABA Principle | Explanation | Grade |
|---|---|---|
| 6. *Defense counsel's ability, training, and experience match the complexity of the case.* | Louisiana statutes do not safeguard against unqualified attorneys being appointed to indigent defense cases. As demonstrated in Avoyelles Parish, attorneys are assigned cases for which they are not qualified to represent. There is no systematic indigent defense training in the state. | F |
| 7. *The same attorney continuously represents the client until completion of the case.* | As demonstrated in Avoyelles Parish, the same attorney does not represent clients from assignment through disposition. | F |
| 8. *There is parity between defense counsel and the prosecution with respect to resources and defense counsel is included as an equal partner in the justice system.* | A review of all prosecutor and IDB financial audits reveal that there is no parity between prosecution and indigent defense resources. Indigent defense is not a co-equal partner in the justice system in Louisiana. | F |
| 9. *Defense counsel is provided with and required to attend continuing legal education.* | All attorneys are required to attend continuing legal education in Louisiana,[177] In violation of this Principle's subsection, the general training is not specifically appropriate to the indigent defense field. Indigent defense training is not equal to the prosecutor training. | C |
| 10. *Defense counsel is supervised and systematically reviewed for quality and efficiency according to nationally and locally adopted standards.* | Louisiana statutes provide no guarantee that indigent defense attorneys be reviewed for quality. LIDAB has no authority or capacity to do so. There is no supervision or quality review of the indigent defense system. | F |

---

[177] The *Rules of the Supreme Court of Louisiana* require all attorneys to complete 12.5 hours on continuing legal education (CLE) annually. At least one hour each must be devoted to ethics and legal professionalism.

Chapter V
An Analysis of the Failure of Post-*Peart* Reform
to Improve the Quality of Indigent Defense Services in Louisiana

*Finding #11: As demonstrated in the previous two chapters, the trial-level indigent defense system in Louisiana is rife with systemic deficiencies despite the single biggest reform effort of the post-Peart era – the Louisiana Indigent Defense Assistance Board. LIDAB has failed to improve the quality of trial-level indigent defense services for four main reasons: since its inception it has been essentially flat-funded despite increased responsibilities; participation in the District Assistance Fund (DAF) program is not dependent on compliance with state standards; LIDAB is not a regulatory commission empowered to verify the uniformity and accuracy of reported statistics nor does it have the capacity to do so; and, the DAF funding matrix is fundamentally flawed in assessing need. Moreover, the district assistance fund model can never work in a funding system that is reliant on court costs and recoupment as the primary revenue stream.*

The single biggest effort to reform indigent defense services over the past decade was the creation of the Louisiana Indigent Defense Assistance Board (LIDAB), and its predecessor the Louisiana Indigent Defender Board (LIDB). LIDAB, and in particular the state's district assistance fund, is patterned on the successful state assistance grants model employed in the State of Indiana. Louisiana, however, has significantly altered the Indiana model, and in doing so, has ceded its constitutional responsibilities to the local level in such a way that results in neither the state nor the local government having accountability for the issue.

After a brief description of the Indiana indigent defense system, this Chapter will explore the fundamental flaws responsible for the failure of LIDAB to improve the delivery of defense services to indigent defense clients at the trial-level.

*A Closer Look at Indigent Defense Services in Indiana*

Like Louisiana, Indiana has a strong home-rule tradition, favoring local autonomy over state control in many matters. Indigent defense in Indiana has always been organized at the county level, and has been provided primarily by part-time "public defenders," generally operating under a contract. Indiana's indigent defense standards[178] are written, as are Louisiana's, at the state level, by a statewide independent commission, and compliance by the counties is purely voluntary. However, unlike Louisiana, counties that choose to comply with the state indigent defense standards are eligible to have a portion of their indigent defense costs reimbursed by the state. A state statute authorizes the reimbursement from state funds of 40% of the indigent defense expenditures of counties that meet certain standards (including client eligibility, attorney qualifications and workload).[179] A county that wishes to be considered for reimbursement is statutorily

---

[178] *Standards for Indigent Defense Services in Non-Capital Cases, with commentary*, Indiana Public Defender Commission, effective Jan. 1, 1995, as amended October 28, 1998.

[179] IC 33-9-11-4(b); 33-9-15-10.5(b). The 40 percent reimbursement figure applies only in non-capital felony and juvenile cases. Misdemeanor cases are not eligible for reimbursement. State reimbursement is available in capital cases, with two differences: the standards are issued by the state Supreme Court (as Rule 24 of the state's Rules of Criminal Procedure), rather than the state Public Defender Commission, under similar statutory authority; and the reimbursement rate is raised to 50 percent – producing a standards-compliance rate of 100 percent.

required to establish a local County Public Defender Board of at least three members, whose responsibilities include writing a comprehensive plan for indigent defense in the county, appointing a county public defender, overseeing the office and its budget, and submitting requests for state reimbursement.[180]

The State Public Defender is a separate entity from the Commission that provides representation in all post-conviction proceedings, as well as some direct appeals. Indigent defense in Indiana is further assisted through an indigent defense resource center, the Indiana Public Defender Council (IPDC). IC 33-9-12 directs IPDC to: assist in the coordination of indigent defense providers through preparing manuals of procedures; assist in the preparation of trial briefs, forms and instructions; conduct research and studies of interest to indigent defense practitioners; and maintain liaison contact with study commissions, organizations and agencies of all branches of government (local, state and federal) that will benefit criminal defense as part of the fair administration of justice.

*11.1: Despite expanded services, LIDAB has been essentially flat-funded since its inception. No new monies have been appropriated to offset the cost-of-living or the cost of an expansion of services, some of which were legislatively mandated.*

Louisiana has not matched Indiana's ability to increase state funding to the state assistance grants program. When LIDB was first created on the heels of the *Peart* decision, $5 million was budgeted by the Louisiana Legislature for its success. In the next year, the budget was increased to $7.5 million where it has stayed, for the most part, for the next eight years.[181] During this time, the cost of living has climbed by 20.73%.[182] Since 1999, the earliest year for which court data is readily available, district court criminal and traffic cases have increased 10.5%.[183] During this time, LIDAB services were expanded by the Legislature to include providing defense services in post-conviction cases without any new resources dedicated to the agency.

Thus, increased need, costs and services have been met with no new funding. As such, Louisiana's state assistance program funds have not only decreased but have fluctuated inconsistently from year to year from a high of $3.5 million in 1999 to as low as $1,044,048 in 2000.[184] This means that if the pool of judicial districts that need assistance grows over time, the actual dollars going to any particular IDB will likely decrease. And, as the cost of providing indigent defense services increases, the percentage of revenues from LIDAB should fall exponentially. As history has shown,

---

[180] IC 33-9-15-6; IC 33-9-15-10.5. Counties with populations under 12,000 are exempted from the requirement to establish a County Public Defender Board.

[181] The initial $5 million appropriation and subsequent increase to $7.8 million is significantly lower then the $20 million recommendation of noted indigent defense expert Robert L. Spangenberg. See: The State of Louisiana Supreme Judicial Court, Judicial Counsel's Statewide IDB Commission, *Study of the Indigent Defense System in Louisiana*, 1992, prepared by The Spangenberg Group.

[182] See the American Institute of Economic Research: www.aier.org/cgi-bin/colcalculator.cgi.

[183] The Supreme Court of Louisiana, *Annual Report 2002 of the Judicial Council of the Supreme Court*, 2003. *Supra* note 43.

[184] This funding fluctuation is caused by the fact that IDBs operate on a calendar year, while LIDAB dispenses state grants on a fiscal year. In fiscal year 2001, LIDAB disseminated $3 million but only $1.044 million in calendar year 2000. This put a huge burden on local IDBs to make up the difference.

IDBs will likely respond to this dynamic by further lowering the quality of services to fit available resources.

This stands in direct contrast to Indiana, where funding to the Commission has increased over time to offset a higher and higher percentage of counties that have come into compliance with the state standards. When state reimbursement in Indiana was first authorized in 1993, $1.25 million was dedicated to the commission to reimburse counties at a rate of 25% of all county indigent defense expenditures (and 13 counties came into compliance that first year). In 1997, the Commission's appropriation increased to $3 million and the reimbursement rate was raised to 40%. Though the reimbursement rate is still 40%, state expenditures of $7 million annually has allowed an additional 41 counties to qualify for reimbursement – for a current total of 54 of Indiana's 92 counties that have opted in (or 58.7% of counties that are in compliance with state standards).[185] Significantly, this is the increased expenditure of the state assistance to counties program. The money for the State Public Defender (which is akin to many of the LIDAB expanded services) and money for the resource center (for which there is no correlation to Louisiana) is appropriated under separate line items. The State of Indiana now spends over $14 million in total on indigent defense services.

*II.2: Participation in LIDAB's DAF program is not dependent on compliance with state standards.*

As demonstrated in Indiana, compliance with state standards (and thus improvement in services) is directly related to the availability of state reimbursement. When the Indiana Commission originally adopted their non-capital standards in 1989, and when compliance was completely voluntary, no counties were known to be in compliance. Improvement in Indiana's indigent defense services only came because no money is ever disseminated to counties unless and until compliance with standards has been objectively demonstrated.

LIDAB Board members have been resistant to employing a similar philosophy of making district assistance money dependent on compliance with state standards. At the LIDAB hearing at the state Capitol in April 2003, LIDAB board members expressed the belief that the funding crisis is so bad in Louisiana that they would be derelict in their ethical duties to withhold *any* money to the local IDBs. Yet, if DAF assistance is forthcoming no matter what, there is no incentive for judicial districts ever to ensure adequacy of services through compliance with standards. In this way, Louisiana is like Georgia, which also had a state assistance board that did not enforce standards. After numerous lawsuits and reports uncovered that the failure to enforce standards resulted in constitutionally inadequate defense services throughout the state, the Georgia Legislature passed a bill, that was subsequently signed in to law by the Governor, replacing the

---

[185]   *Annual Report of the Public Defender Commission, 2001-2002* available at: www.in.gov/judiciary/admin/pub_def/docs/01-02-ann-rept.doc. It is important to note that the Indiana Commission is experiencing funding issues. In the last fiscal year, the Commission had to prorate reimbursements to counties due to lack of funding. The Indiana Supreme Court has requested a budget of $8.8 million (FY 2004) and $9.5 million (FY 2005) for the Commission while the state Budget Agency has proposed flat funding. See *Letter from Indiana Public Defender Commission, Norm Lefstein, to the Chair of the Senate Finance Committee* at: www.in.gov/judiciary/admin/pub_def/docs/fundingletter.doc.   This exposes a main flaw in the indigent defense delivery model that attempts to improve indigent defense quality through state financial incentives to local jurisdictions. Should state funding not increase at a rate to continue to entice local jurisdictions to improve services, local government may choose simply to not provide adequate representation to the poor.

statewide assistance to local counties structure with a state administered system of
regional public defender offices.[186]

*11.3:   LIDAB has no verification mechanism to guarantee the uniformity and accuracy
of self-reported caseload statistics.*

As noted earlier in the report, LIDAB is not a regulatory commission with powers
to compel local jurisdictions to comply with its standards nor does it have the capacity to
institute procedures for verification.  As such, there is no ombudsperson at LIDAB to
verify that the caseload data reported are factually true.  We are not implying that local
IDBs would purposefully and consciously report false data in an effort to secure more
funding -- though the system certainly is not set up to deter such abuse.  Rather, because
there is no uniform definition of what constitutes a "case," some jurisdictions may be
reporting the number of felony charges, another reporting the number of felony
defendants, still another reporting felony indictments/informations, and still others some
combination thereof. The impact of this is enormous.

Because LIDAB's DAF funding formula is so heavily weighted to caseload, a
jurisdiction that reports the number of felony "charges" will unfairly get more assistance
than a jurisdiction that reports number of "defendants."[187]  It is not possible for LIDAB
to visit every judicial district to verify the caseload numbers, and indeed, Mr. Ed
Greenlee of LIDAB informed us that he has never been to Avoyelles Parish at all in his
professional capacity.

It is important at this point in time to revisit the inconsistency of the caseload
numbers reported to LIDAB for Avoyelles Parish. Over the four-year period from 1999
to 2002 the reported felony caseload numbers decreased by approximately 50% despite
the view of the majority of interviewees that the indigent defense caseload in the 12th
Judicial District continues to increase year after year. Had the 12th Judicial District IDB
reported even 75% of the total district felony cases reported in the *Louisiana Supreme
Court Annual Report* (or 1,485 of 1,980) instead of simply relying on unverified court
reports, their LIDAB DAF grant in 2003 would have increased from the $25,666 they
did receive to $199,885 (or an increase of 678.8%).[188]

---

[186] http://www.georgiacourts.org/aoc/press/IDsigning-PR.pdf

[187]  The Conference of State Court Administrators and the National Center for State Courts' publication *State Court
Model Statistical Dictionary, 1989,* instructs administrators to "[c]ount each defendant and all charges involved in a
single incident as a single case (page 19)." A defendant that is charged with reckless driving who subsequently assaults
the arresting officer would be counted as one case for reporting purposes.  On the other hand, a defendant who is
charged with shoplifting from one store on one day and another store on another day should have the cases treated as
two cases for workload purposes since the public defender would have to interview two sets of witnesses, visit two
different crime scenes, etc.  This holds true even if the two shopliftings were filed on a single bill of information.

[188]  The imprecision of caseload counts can be attributed to a number of factors. First and foremost, the lack of funding
does not allow IDBs to invest in case-tracking software to allow for accurate case counts.  Second, because attorneys
are paid the same amount regardless of caseload (at least in Avoyelles Parish and other flat-fee contract districts) there
is no district-level financial requirement to track cases accurately.  Finally, because the Avoyelles Parish IDB does not
have the legal perspective to understand the implications of heavy workloads, it may not have been given a high
priority.

   The low number of felony cases the IDB received from the court may be a matter of clerical error or a failure to
include the name of the attorney of record in all cases on any case-tracking system.  If a report is run asking for the
number of cases represented by Attorney W, and Attorney W's name was entered in only half of the cases, the report
would under-report the actual number of cases the attorney actually handle.  NLADA was not allowed to review the
court case-tracking system and thus this is only a hypothesis that has not been proven.

*11.4: LIDAB's district assistance fund matrix is not methodologically sound because the disproportional reliance on "Opened Felony Cases" is not an accurate measure of needed resources.*

Even if open felonies were reported uniformly and accurately, and LIDAB was in a position to verify the statistics, "opened felony cases" or new assignments is not a sound measure of resource need. First of all, a jurisdiction may have a high percentage of juvenile delinquency cases or misdemeanor cases that is never factored into the equation. For example, District Y may have 500 felony cases, but only 100 juvenile delinquency cases whereas District Z may have 450 felony cases, 250 juvenile cases and 1,000 misdemeanor cases. Under the current LIDAB formula District Y would get more assistance despite District Z having a greater need for services (assuming that both hypothetical districts are uniform in every other way— e.g., have the same cash reserves, etc.).

More importantly, new felony assignments alone cannot give an accurate portrayal of need without an examination of pending cases, as explained earlier in this report. For instance, suppose that District A has 220 new felony cases in a given year but can only dispose of 150 of them. It leaves a balance of 70 cases still to be completed during the ensuing year. If in year two the same District is assigned another 220 felony cases but can still only adequately dispose of 150, the District will have 140 cases pending at the start of year three. This means that in year three, District A has 360 felony cases to work on (despite only being assigned 220 new cases). Contrast this with District B that has 250 new felony cases assigned to it during year one but can dispose of all of them. The same thing happens in each of the subsequent years. Under DAF disbursement calculations, District B would get more funding (again if all other factors are equal) though District A has a greater need for indigent defense resources.

*11.5: The successful Indiana model of providing monetary incentives to local indigent defense boards that comply with standards will <u>never</u> work in an indigent defense funding system that relies primarily on revenues garnered through court costs and recoupment.*

Louisiana's primary reliance on court costs to fund indigent defense services stands in contrast to Indiana's mixture of state and local governmental general funding for similar services. The distinction is critical and worth exploring because it will never be possible for the DAF program to work effectively in Louisiana.

In Indiana, county government has a financial stake in the delivery of indigent defense services. Hypothetically, Indiana County W may have spent $300,000 on indigent defense services in the year before applying for state assistance. To come into compliance with the workload standards, the county may have to add two attorneys at $60,000 each. Doing so raises their expenditure to $420,000. Yet, because the state will reimburse them 40% of the costs (or in this example $168,000) the net result in improving indigent defense through compliance with standards means that the county will actually save $48,000 in the next year ($168,000 - $120,000 = $48,000).

In Louisiana, there is no financial incentive to the police juries to ever improve indigent defense in this manner because they are not required to contribute anything toward the cost of indigent defense. If LIDAB were to require compliance with standards under the current delivery structure, *there is no way for an IDB to try and increase its revenue stream in an attempt to improve services.* Whereas an Indiana county may decide that the initial investment in indigent defense services will eventually bring greater

savings and make a decision to make indigent defense a fiscal priority over some other government responsibility, Louisiana's IDBs have no such ability to shift revenue from one budget line to the other – they only have the one pot of money that is woefully inadequate.

*This does not mean that the answer to the indigent defense funding crisis is to shift the entire burden of paying for the right to counsel to the police juries.* Though a local government general fund appropriation for indigent defense would certainly be more stable and reliable then the current Louisiana funding system, all national standards call for 100% state-funding because leaving local government responsible for administering and funding indigent defense services puts an undue hardship on local jurisdictions to ensure adequate representation of poor people accused of crimes. Nationally, counties with fewer sources of revenue may have to dedicate a far greater portion of their limited budget to defender services than would counties in better economic standing. Thus, at a time when tax-revenues may be down due to depressed real estate prices and people leaving the community, the criminal justice system's workload often escalates. [189]     A county's revenue base may also be strained during economic downturns because of the need for increased social services, such as indigent medical costs. In addition, counties also must provide the citizenry with other important services, such as public education. The need to balance these responsibilities while maintaining fiscal accountability to the local citizenry often leaves county officials in the unenviable position of having to choose between funding needed services and upholding the constitutional commitment to guarantee adequate indigent defense services.

Moreover, since the state sets criminal justice policy that directly impacts the cost of indigent defense services, the state must be held responsible for the fiscal impact of its decisions. In other words, if an indigent defense fiscal impact statement was required of any new legislation creating a new crime, expanding the number of district judges, or increasing state appropriations for district attorneys or other law enforcement, policy-makers may not be as willing to enact the legislation if they know that the result will increase another budget item, indigent defense, for which they are accountable. [190]

---

[189] As reported earlier in this report, crime rates tend to increase when there is a high level of unemployment. *Supra*, note 76.

[190] Of course, legislative action can decrease costs as well. For example, if the legislature decriminalized more non-serious, non-violent misdemeanors and felonies, the right to counsel would no longer apply and the workload of public defenders would decrease. This initial step at decreasing public defender workload comes at no cost.

*Finding #12:*  *The newly created up-front application fee will not generate the projected revenue forecasted in the bill.*

The only allowable recoupment plans under national standards are ones in which indigent-but-able-to-contribute clients pay for part of the cost of their defense prior to the disposition of the case.  There are two principle forms of these "contribution" plans: 1) a promissory note to pay all or part of the representation, signed by a defendant or the parent/guardian of a juvenile defendant before the disposition of the case;[191] and, 2) up-front administrative fees or costs payable during the financial eligibility screening process.

In 2003, the State of Louisiana passed legislation authorizing a $40 eligibility fee to be imposed on people seeking the services of the public defender, in each judicial district.[192]  A report of the American Bar Association, *2001 Public Defender Up-Front Application Fees Update,* informs jurisdictions contemplating such programs that "[a]ll revenues should supplement, not supplant, general fund appropriations" and that "[t]he existence of such programs does not relieve governments' obligation to fund adequate public defense services."[193]  But, because state DAF grants will be based on a schematic that takes into account revenues collected through the up-front fee *before* calculating state disbursements (and potentially make a district not qualify for DAF funding); the new up-front fee may in fact supplant state funding.  Moreover, the ABA report concludes, "[a]pplication fee programs do not generate a large amount of revenue.  Only 6-20% of all people requesting appointment of counsel are able to pay and do pay."  Based on this, at best the new revenue stream will bring in $80,000 to $100,000.  This is significantly below the fiscal impact statement attached to the bill ($5. million).  Moreover, to the extent that any money is actually collected through the new fee, it is likely to be substantially offset by reductions in revenues from the exorbitant court costs already being imposed, which are at or beyond the outside limit of most indigent defendants' ability to pay.

Finally, as demonstrated in Avoyelles Parish, some jurisdictions do not screen applicants for eligibility at all.  The NLADA site team did not observe a single defendant being screened or assessed this fee during our site visit.  Without screening processes, defendants cannot be charge the $40 fee.  So to the extent that revenue projection were based on simple caseload data without taking into account the number of judicial districts that do not bother with eligibility screening, the new fee will generate far less revenue than the $80,000-$100,000 projected above.

---

[191] Though payments of promissory notes do not have many of the legal ramifications associated with post-disposition cost-recovery programs, they can be just as costly to administer.

[192] Sixteen other states now have such fees (AR, CT, DE, FL, KY, MA, MN, NJ, NM, ND, OR, SC, TN, VT and WI). Six other states allow counties the discretion to impose such a fee (CA, CO, GA, IN, OH, and OK).

[193] The ABA report was prepared by The Spangenberg Group and is available on-line at: www.abanet.org/legalservices/downloads/sclaid/indigentdefense/pdapplicationfees2001-narrative.pdf

## Chapter VI
### The Louisiana Correctional System &
### The Importance of Indigent Defense Reform

The practices of the correction system in Louisiana make the need for an adequate defense system particularly acute. Louisiana has the highest per capita rate of incarceration in the nation, with 794 inmates per 100,000 residents, according to a report from the Bureau of Justice Statistics released in late July 2003.[194] From all accounts, the state's high incarceration rate is impacted by a state policy that essentially allows parish jails to profit from housing state prisoners.

In response to a serious prison over-crowding situation, the state began housing state prisoners in local jails in the late 1970's. Each parish or local jail is paid $22.39 by the state each day for every Louisiana Department of Corrections prisoner it holds. This is a huge cost savings for the state that otherwise would have to pay approximately $40 per day to house prisoners at state facilities. On the other hand, the extremely low wages paid to most local jail workers allows the parish jails to realize profits by housing state inmates.[195] As a result, all felons sentenced to less than 20 years currently serve their entire sentence in local jails, with the result that a system that was originally supposed to be a mere stopgap measure has become firmly entrenched. Currently, the state pays $145 million a year to local Sheriffs to house state prisoners with little, or more likely no, accountability as to how the money is used or the services provided to prisoners.[196]

Because of potential financial advantage of holding state prisoners, there was a major proliferation of local jails throughout the state in the late 1990's as Parish Sheriffs competed against one another for the "windfall" that came from holding state prisoners. Nowhere was that more true than in Avoyelles Parish.   To promote economic development in the Parish, the Sheriff was a leading proponent of building more local jail space.[197] Currently, the Avoyelles Parish Sheriff has 319 full time deputies and another 295 part-time deputies, making him one of the largest employers in the Parish.[198]

In an effort to retard, or reverse, the escalation of corrections costs the State Legislature recently repealed mandatory sentencing for many nonviolent crimes, allowed a review of some drug possession cases and created a new sentence review mechanism to aid some prisoners seeking probation or parole. These significant changes have caused

---

[194] 37,000 of the state's nearly 4.5 million residents are incarcerated in federal prison, state prison or local jail (or approximately 1 out of every 121 residents are locked up).

[195] For instance without state prisoners, Sheriffs are more typically paid only $3.50 per day by the local police jury to house those arrested for misdemeanor crimes or those awaiting trial.

[196] On September 17, 2003, a total of 907 people were incarcerated under the supervision of the Avoyelles Parish Sheriff in the Marksville Main Jail (319), the Avoyelles Women's Correctional Center (192), the Avoyelles Bunkie Detention Center (226), or the Avoyelles Simmesport Center (170). Of these, 784 were state inmates, or 86.4% of the total number in jail. On the day of our site visit, the Avoyelles Parish Sheriff's Office held 16 federal prisoners (1.8% of the total population) and 28 other inmates who we were told were out-of-state prisoners (3.1%). Only 79 people in jail, or 8.7% of the total population, were parish or city. Avoyelles Parish Sheriff's Office, *Population Breakdown Report*, September 17, 2003.

[197] At the time of our visit, there were 1,126 jail beds under the authority of the Avoyelles Parish Sheriff. The Avoyelles Parish Sheriff told NLADA representatives that he sees it as part of his civic duty as an elected official to try to spur on economic development.

[198] The Sheriff is the third largest employer in Avoyelles behind the casino and school department. See: www.entergy.com/content/LA/ed/profiles/Avoyelles2_parish.pdf.

local sheriffs to scramble for resources to keep from having to reduce the size of their staff. One such way sheriffs fill vacant bed spaces is by acting on warrants for minor offenses. Though the money for housing revocation defendants is not as great as state prisoners, police juries are obligated to pay for these costs. Another manner to keep jails at maximum capacity is to hold federal prisoners, and even some out-of-state prisoners. Both practices are employed in Avoyelles Parish.[159]

Contrary to the desire of the Avoyelles Parish Sheriff to spur economic development through the expansion of corrections, national research has concluded, "the contention that prisons are a valuable economic tool [in rural America] has not been grounded in any empirical evidence."[200] There are a number of reasons why expanded correctional facilities are actually bad for the local economy. First, correctional facilities have few linkages to the local economy.[201] That is, unlike manufacturing or agricultural industries, corrections offer few "spin-off" industries. Whereas an automobile plant may generate local growth in companies supplying raw materials to be processed, a correctional facility only has the immediate jobs associated with housing people. Moreover, what few spin-off industries are associated with expanded correctional facilities, like food service or communication services, are commonly owned by local sheriffs, in whole or in part. Moreover, large correctional facilities in rural America have been objectively shown to "pit local residents in competition for employment with inmates."[202] Avoyelles parish is a good example of this dynamic. The Sheriff enforces a work release program in which prison labor is offered to non-profit organizations (churches, hospitals, graveyards) and governmental agencies at costs well below minimum wage. The program is supported by garnishing 50% of the prisoner wages and charging them the cost of transportation to and from work. Considering the relatively small size of the Parish and the relatively large number of prisoners, the work release program has the effect of eliminating a large number of jobs that otherwise would be going to people who are not incarcerated. Given the high poverty and low high school graduation rates in Avoyelles Parish, the jail workforce is used to do the types of low-skilled jobs that may be in short supply for a less highly skilled workforce. In short, the expansion of the prison work force reduces opportunities for people of little or no economic resources who are then led to consider crime as a means of supporting themselves.[203]

---

[159] Despite these efforts, on the day of our site visit the Avoyelles Parish Sheriff's Office was at 81% its maximum capacity (or 907 of 1,126). *Supra*, note 196.

A study of the financial audit of Parish Sheriffs for 2002 shows that the Avoyelles Parish Sheriff is one of only four parishes in the state reported a negative year-end balance (Caldwell Parish, Tangipahoa, and West Carroll were the others). The Avoyelles Parish Sheriff reported a deficit of $183,190. Analysis of Sheriff's audits is included as Appendix L (page 128). For comparison purposes with IDB and district attorney audits, NLADA grouped Parish Sheriffs by judicial districts (though the Sheriffs do not operate in this manner). Interestingly, in doing so, the number of Sheriffs reporting deficits is reduced by half (Avoyelles and Caldwell).

[200] The Sentencing Project, *Big Prisons, Small Towns: Prison Economics in Rural America*, page 19.

[201] Clement, D. *Big House on the Prairie*, Fed Gazette: A Publication of the Federal Reserve Bank of Minneapolis. (January 2000).

[202] *Supra* note 200.

[203] The jail workforce situation in Avoyelles Parish is not universal for every Louisiana Parish. Indeed, Dr. Bernadette Palumbo of the Louisiana State University at Shreveport preliminary analysis of the indigent defense system in Caddo Parish indicates that 70% of the population of that parish jail consists of pre-trail detainees (an NLADA site team member conducted a telephone interview with Dr. Palumbo in early February 2004). Nationally, early entry of counsel into cases helps to divert certain indigent defense clients out of jail (See, for example, United States Department of

Across the country, public defenders not only serve the general population by providing representation services in specific criminal cases, but also by challenging the questionable practices of the other governmental agencies that do not serve the interests of justice. In this case, the assumptions underlying the premise that the economic fortunes of Avoyelles Parish is tied to keeping the parish jails at maximum capacity must be challenged at every turn. As the title implies, public defenders serve the interests of the *public.* In Avoyelles Parish, and elsewhere, this critical responsibility of public defenders is undermined if local judges appoint less than qualified people to oversee the indigent defense system, legislators refuse to adequately fund the system, District Attorneys turn a blind eye to unethical practices of defense practitioners, the judiciary allows the system of justice to falter, and the Sheriffs stand to directly profit from increased incarceration rates.

Investing in indigent defense services produces cost savings throughout the rest of the criminal justice system. Louisiana legislators must examine and repair the system that allows vast amounts of unused resources to sit in bank accounts across the state while constitutional rights are not protected due to lack of funding. As was the case with the amount of money sitting in dedicated prosecutor bank accounts, the amount of unused money sitting in the Sheriff's accounts across the state is staggering to someone unfamiliar with local government practices in Louisiana. At the close of 2002, over $310 million was sitting unspent in reserve accounts, or enough money to fully fund indigent defense services at its current low rate for 10 years.[204]

---

Justice, National Institute of Justice, *The Implementation and Impact of Indigent Defense Standards,* December 2003). Without such defendants being unnecessarily detained pre-trial or incarcerated post-trial, correctional resources are more precisely targeted to people who pose a real threat to public safety or are a flight risk. The situation in Caddo Parish gives credence to the assertion in the Louisiana State Bar Association resolution that "the failure of Louisiana to meet the majority of the ABA *Ten Principles* has produced inefficiencies and increased costs throughout the criminal justice system, including unnecessary pretrial detention."

[204] See Appendix L (page 127).

### Chapter VI
### Conclusion

The right to counsel is one of the only checks afforded to those of modest means against an unjust intrusion by the state upon their life and liberty. Without adequate defense services ensuring a fair day in court, the social fabric of our democratic way of life begins to erode. As Justice Hugo Black declared in the *Gideon* decision: "The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours." The Louisiana Constitution states that one of the legitimate ends to government is to secure justice for *all*. Both state and local government (inclusive of the executive, legislative and judicial branches) were specifically established in Louisiana to "protect the rights" of all people, *including* those traditionally marginalized by society: people of color, children, the mentally ill, the developmentally disabled, immigrants, those addicted to drugs or alcohol, and the poor. Neither the Louisiana nor the Federal Constitution allows for justice to be rationed to the poor for any reason -- including insufficient funding or political expediency. As demonstrated in this report, Louisiana fails to meet its federal obligations under *Gideon*. In violation of Louisiana's own Constitution, the indigent defense funding structure is not "uniform" among the parishes and does not "secure qualified counsel." And, with no lawyers present in the early stages of a case, counsel is not secured for people of insufficient means "at each stage of the proceeding."

\*\*\*\*\*

*"The right to effective assistance of counsel is not, of course, just about separating the innocent from the guilty. It's the most fundamental of a criminal defendant's constitutional rights, guilty or innocent, and without it, the whole premise of our criminal justice system simply collapses. Without adequate counsel, none of the other constitutional or statutory or jurisprudential rights can be protected or exercised. Due process, fundamental fairness, and equal protection simply disappear."*

*- Judge Helen "Ginger" Berrigan, United States District Court*
*Eastern District of Louisiana, October 31, 2003[205]*

---

[205] *Supra*, note 1.

Appendix A
*Louisiana State Bar Association's Gideon Resolution*

VIII.6

LOUISIANA STATE BAR ASSOCIATION
HOUSE OF DELEGATES JUNE 12, 2003

RESOLUTION RE: APPOINTMENT OF A BLUE RIBBON COMMISSION TO
DEVELOP AND IMPLEMENT A STRATEGIC PLAN FOR INDIGENT DEFENSE
REFORM

WHEREAS, 2003 marks the 40th anniversary of the Supreme Court's decision in *Gideon
v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed. 2d 799 (1963), establishing the
obligation of the states, pursuant to the Sixth and Fourteenth Amendments to the U.S.
Constitution, to provide counsel to persons accused of felony crimes who cannot afford to
hire a lawyer;

WHEREAS, the Supreme Court stated in *Gideon* the "obvious truth" that "in our
adversary system of criminal justice, any person haled into court, who is too poor to hire
a lawyer, cannot be assured a fair trial unless counsel is provided for him";

WHEREAS, the Supreme Court has consistently extended the right to counsel to critical
stages of criminal proceedings and any case that may result in the potential loss of liberty,
including: direct appeals -- Douglas v. California, 372 U.S. 353 (1963); custodial
interrogations -- *Miranda v. Arizona*, 384 U.S. 436 (1966); juvenile proceedings resulting
in confinement -- *In Re Gault*, 387 U.S. 1 (1967); preliminary hearings -- *Coleman v.
Alabama*, 399 U.S. 1 (1970); misdemeanors involving imprisonment -- *Argersinger v.
Hamlin*, 407 U.S. 25 (1972); and, most recently, misdemeanors involving suspended
sentences -- *Shelton v. Alabama*, 535 U.S. 654 (2002);

WHEREAS, the Louisiana Constitution of 1974, Article 1, Sec. 1, states that one of the
ends of government is to "secure justice for all";

WHEREAS, Louisiana Constitution of 1974, Art 1., Sec. 13, entitles an accused person
to the assistance of counsel "appointed by the court if he is indigent and charged with an
offense punishable by imprisonment," and states, "The legislature shall provide for a
uniform system for securing and compensating qualified counsel for indigents."

WHEREAS, Louisiana is one of a minority of states (18 of 50, or 36%) that do not
assume at least half of the constitutional obligation to fund indigent defense services at
the state level and the only state in the nation that attempts to fund the majority of its
obligation through court costs collected on criminal offenses, primarily traffic tickets;

WHEREAS, a District's funding is wholly unrelated to need because there exists no
correlation between a court's ability to assess/collect court costs and the resources levels
needed to ensure adequate, constitutionally-guaranteed counsel;

WHEREAS, less affluent Districts without a high volume of traffic violations are hard pressed to provide resources for an adequate defense, including proper investigation and expert witnesses when appropriate;

WHEREAS, the Louisiana Indigent Defense Assistance Board (LIDAB) was created to supplement local funding and set uniform standards, but lacks a mechanism to enforce standards;

WHEREAS, LIDAB has been assigned additional responsibilities without receiving additional funding, while defense caseloads and the costs associated with representation have increased;

WHEREAS, LIDAB lacks the funding to collect and verify statistical data on indigent defense caseloads and costs and to monitor performance to hold Districts accountable for the efficient and effective use of taxpayer resources;

WHEREAS, the American Bar Association (ABA) recommends that, in order to design a system that provides effective, efficient, high quality, ethical, and conflict-free legal representation to criminal defendants who are unable to afford an attorney, states must meet the following Ten Principles of a Public Defense Delivery System:

1. The public defense function, including the selection, funding, and payment of defense counsel, is independent.
2. Where the caseload is sufficiently high, the public defense delivery system consists of both a defender office and the active participation of the private bar.
3. Clients are screened for eligibility, and defense counsel is assigned and notified of appointment, as soon as feasible after clients' arrest, detention, or request for counsel.
4. Defense counsel is provided sufficient time and a confidential space within which to meet with the client.
5. Defense counsel's workload is controlled to permit the rendering of quality representation.
6. Defense counsel's ability, training, and experience match the complexity of the case.
7. The same attorney continuously represents the client until completion of the case.
8. There is parity between defense counsel and the prosecution with respect to resources and defense counsel is included as an equal partner in the justice system.
9. Defense counsel is provided with and required to attend continuing legal education.
10. Defense counsel is supervised and systematically reviewed for quality and efficiency according to nationally and locally adopted standards.

WHEREAS, the failure of Louisiana to meet the majority of the ABA *Ten Principles* has produced inefficiencies and increased costs throughout the criminal justice system, including unnecessary pretrial detention, increased congestion of court dockets, and increased appellate reversals due to ineffective assistance of counsel;

WHEREAS, Louisiana has the highest per capita incarceration rate in the United States, a consequence of which is disproportionately high financial requirements imposed on state and local governments to operate jails and prisons;

WHEREAS, the lack of resources has effectively barred Public Defenders from providing counsel at the early stages of the prosecution, resulting in overcrowding in local jails due to the large-scale detention of accused persons prior to their indictment and creating serious budget problems for Parish Government and local Sheriffs;

WHEREAS, Public Defenders carry cases far in excess of nationally-recognized standards, preventing constitutionally-effective representation for individual clients;

WHEREAS, Public Defenders are forced to meet clients for the first time in court without adequate time or private space to safeguard confidential attorney-client communications;

WHEREAS, inadequate funding has led to a proliferation of low-bid, flat fee contracts in which a public defender is expected to handle an unlimited amount of cases for a fixed rate, thereby giving attorneys an incentive to minimize the amount of work performed;

WHEREAS, revenue shortfalls have led to the routine denial of counsel to many indigent misdemeanor defendants in Louisiana's Parish and City Courts, in direct violation of the mandate to provide counsel in misdemeanor cases carrying a potential loss of liberty or a suspended sentence;

WHEREAS, insufficient funding has led some jurisdictions to adopt a horizontal representation system in which different attorneys serve clients at different phases of a case, a practice at odds with nationally-recognized standards;

WHEREAS, by letter of February 27, 2003 the U.S. Department of Justice informed Governor Mike Foster of its "...investigation into whether juveniles with cognitive impairments are waiving their right to counsel in delinquency proceedings in violation of the United States Constitution and federal law. The investigation is being conducted pursuant to the Violent Crime Control and Law Enforcement Act, 42, U.S.C. § 14141".

WHEREAS one of the principal missions of the Louisiana State Bar Association is to "assure access to and aid in the administration of justice;"

WHEREAS, state government has created a system in which the loss of one's liberty may be more dependent on a person's income-level and the jurisdiction in which the crime is alleged to have been committed than on the factual merits of the case;

WHEREAS, district judges appoint the members of the local indigent defense boards, potentially compromising the independence of the public defense function and creating a situation in which the aims of the court can conflict with the rights of the accused;

THEREFORE, be it resolved that, in honor of the 40th anniversary of *Gideon v. Wainwright*, the Louisiana State Bar Association shall forward this resolution to Governor M.J. "Mike" Foster, Jr., Chief Justice Pascal F. Calogero, Jr., Senate President

72      IN DEFENSE OF PUBLIC ACCESS TO JUSTICE

John J. Hainkel, Jr. and Speaker of the House Charlie DeWitt urging all three branches of Louisiana state government to cooperate to establish a Blue Ribbon Commission to develop a strategic plan for indigent defense system reform and set a timetable for implementation

JAMES E. BOREN
Delegate, 19th Judicial District
East Baton Rouge Parish

THOMAS LORENZI
Delegate, 14th Judicial District
Calcasieu Parish

## Appendix B
*Louisiana House Resolution 151*

HLS 03-797                                                    ORIGINAL

Regular Session, 2003

HOUSE RESOLUTION NO. 151

> BY REPRESENTATIVES L. JACKSON, ALARIO, K. CARTER,
> CAZAYOUX, GALLOT, GREEN, HUNTER, M. JACKSON,
> LAFLEUR, LANDRIEU, MARTINY, MURRAY, RICHMOND, AND
> TOWNSEND

INDIGENT DEFENSE: To create the Louisiana Task Force on Indigent
Defense Services

A CONCURRENT RESOLUTION

To recognize the 40th anniversary of the Supreme Court's decision in *Gideon v.
Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed. 2d 799 (1963), and to
rededicate the State of Louisiana to the promise of equal justice for all,
regardless of income, in accordance with the American Bar Association's
(ABA) *Ten Principles of a Public Defense Delivery System*, by creating the
Louisiana Task Force on Indigent Defense Services.

WHEREAS, 2003 marks the 40th anniversary of the Supreme Court's decision
in *Gideon v. Wainwright*, mandating that states provide counsel to persons who
are accused of felony crimes and who cannot afford to hire their own lawyer;
and

WHEREAS, the Supreme Court stated in *Gideon* the "obvious truth" that "in
our adversary system of criminal justice, any person haled into court, who is too
poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided
for him"; and

WHEREAS, the Supreme Court has consistently extended the right to counsel
to critical stages of criminal proceedings and any case that may result in the
potential loss of liberty, including: direct appeals -- Douglas v. California, 372
U.S. 353 (1963); custodial interrogations -- *Miranda v. Arizona*, 384 U.S. 436
(1966); juvenile proceedings resulting in confinement -- *In Re Gault*, 387 U.S. 1
(1967); preliminary hearings -- *Coleman v. Alabama*, 399 U.S. 1 (1970);
misdemeanors involving imprisonment -- *Argersinger v. Hamlin*, 407 U.S. 25
(1972); and, most recently, misdemeanors involving suspended sentences --
*Shelton v. Alabama*, 535 U.S. 654 (2002); and

WHEREAS, the Louisiana Constitution of 1974, Article 1, Sec. 1, states that
one of the ends of government is to "secure justice for all"; and

WHEREAS, reflecting the right to counsel mandated by the Sixth Amendment to the Constitution, Louisiana Constitution Article I, Section 13 entitles an accused person to the assistance of counsel "appointed by the court if he is indigent and charged with an offense punishable by imprisonment," and states, "The legislature shall provide for a uniform system for securing and compensating qualified counsel for indigents;" and

WHEREAS, Louisiana is the last state in the nation that attempts to fund the majority of its constitutional obligation to provide qualified counsel through court costs collected on criminal offenses, primarily traffic tickets; and

WHEREAS, there exists no correlation between a court's ability to assess and collect court costs and the resource levels needed to ensure adequate, constitutionally guaranteed right to counsel, producing a non-uniform system in which the right a district's funding is wholly unrelated to need, is unpredictable, and leaves local boards without the ability to effectively budget from year to year; and

WHEREAS, the Louisiana Indigent Defense Assistance Board (LIDAB) was created to supplement local funding and to increase uniformity among the districts through the use of standards, but lacks the resources and authority to make compliance with its standards mandatory or to raise the indigent defense system to its constitutionally mandated level; and

WHEREAS, Louisiana's current system lacks the ability to collect and verify statistical data on indigent defense caseloads and costs and to monitor performance to ensure the efficient and effective use of taxpayer resources; and

WHEREAS, the American Bar Association recommends that in order to design a system that provides effective, efficient, high quality, ethical, and conflict-free legal representation to criminal defendants who are unable to afford an attorney, states must meet the following Ten Principles of a Public Defense Delivery System:

1. The public defense function, including the selection, funding, and payment of defense counsel, is independent.
2. Where the caseload is sufficiently high, the public defense delivery system consists of both a defender office and the active participation of the private bar.
3. Clients are screened for eligibility, and defense counsel is assigned and notified of appointment, as soon as feasible after clients' arrest, detention, or request for counsel.
4. Defense counsel is provided sufficient time and a confidential space within which to meet with the client.
5. Defense counsel's workload is controlled to permit the rendering of quality representation.
6. Defense counsel's ability, training, and experience match the complexity of the case.

7. The same attorney continuously represents the client until completion of the case.

8. There is parity between defense counsel and the prosecution with respect to resources and defense counsel is included as an equal partner in the justice system.

9. Defense counsel is provided with and required to attend continuing legal education.

10. Defense counsel is supervised and systematically reviewed for quality and efficiency according to nationally and locally adopted standards.

WHEREAS, Louisiana values a fair and reliable criminal justice system; and

WHEREAS, on June 12, 2003, the Louisiana State Bar Association adopted a resolution urging all three branches of state government to cooperate to establish a Blue Ribbon Commission to develop a strategic plan for indigent defense system reform and set a timetable for implementation of that plan; and

WHEREAS, this House Resolution reflects the substantive provisions of, and has been adopted in furtherance of, the Resolution adopted by the House of Delegates of the Louisiana State Bar Association on June 12, 2003.

THEREFORE, BE IT RESOLVED that the Louisiana Task Force on Indigent Defense Services is hereby created.

BE IT FURTHER RESOLVED that the Louisiana Task Force on Indigent Defense Services shall be composed of the following persons, or their designees:

(1)    The chief justice of the Louisiana Supreme Court;
(2)    The president of the Conference of Court of Appeals Judges;
(3)    The president of the Louisiana District Judges Association;
(4)    The president of the Louisiana Council of Juvenile and Family Court Judges;
(5)    The president of the Louisiana City Court Judges Association;
(6)    The president of the Council for a Better Louisiana;
(7)    The executive director of the Louisiana Interchurch Conference;
(8)    The president of the Louisiana AFL-CIO;
(9)    The president of the Louisiana Association of Business and Industry;
(10)   The deans of the four Law Centers in Louisiana;
(11)   The governor of Louisiana;
(12)   The Louisiana commissioner of administration;
(13)   The president of the Louisiana Public Defender Association;
(14)   The president of the Louisiana Criminal Defense Lawyers Association;
(15)   The president of the Louisiana State Bar Association;
(16)   The director of the Louisiana State Law Institute;
(17)   The president of the Louisiana Legal Services Corporation;

(18)     The president of the Louisiana Chapter of the Louis A. Martinet• Society;

(19)     The president of the Louisiana Association of Women Attorneys;

(20)     The secretary of the Louisiana Department of Social Services;

(21)     The president of the Louisiana Senate;

(22)     The speaker of the Louisiana House of Representatives;

(23)     The chairmen of the Louisiana House Committee on Appropriations and the Louisiana Senate Committee on Finance;

(24)     The chairmen of the House Committee on Administration of Criminal Justice and the Senate Committee on Judiciary C;

(25)     The director of the Louisiana Indigent Defense Assistance Board.

BE IT FURTHER RESOLVED that the Louisiana Task Force on Indigent Defense Services shall study the system in Louisiana of providing legal representation to indigent persons who are charged with violations of criminal laws and shall make an initial report of its findings, together with any recommendations for changes in legislation, to the Legislature of Louisiana no later than March 1, 2004.

BE IT FURTHER RESOLVED that this Resolution shall become effective at noon on the second Monday of January 2004.

## Appendix C
*Louisiana Senate Resolution 112*

ENROLLED

Regular Session, 2003

SENATE RESOLUTION 112

BY SENATOR C. JONES

### A RESOLUTION

To recognize the 40th anniversary of the Supreme Court's decision in *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed. 2d 799 (1963), and to rededicate the State of Louisiana to the promise of equal justice for all, regardless of income, in accordance with the American Bar Association's (ABA) *Ten Principles of a Public Defense Delivery System,* by creating the Louisiana Task Force on Indigent Defense Services.

WHEREAS, 2003 marks the 40th anniversary of the Supreme Court's decision in *Gideon v. Wainwright,* mandating that states provide counsel to persons who are accused of felony crimes and who cannot afford to hire their own lawyer; and

WHEREAS, the Supreme Court stated in *Gideon* the "obvious truth" that "in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him"; and

WHEREAS, the Supreme Court has consistently extended the right to counsel to critical stages of criminal proceedings and any case that may result in the potential loss of liberty, including: direct appeals -- Douglas v. California, 372 U.S. 353 (1963); custodial interrogations -- *Miranda v. Arizona,* 384 U.S. 436 (1966); juvenile proceedings resulting in confinement -- *In Re Gault,* 387 U.S. 1 (1967); preliminary hearings -- *Coleman v. Alabama,* 399 U.S. 1 (1970); misdemeanors involving imprisonment -- *Argersinger v. Hamlin,* 407 U.S. 25 (1972); and, most recently, misdemeanors involving suspended sentences -- *Shelton v. Alabama,* 535 U.S. 654 (2002); and

WHEREAS, the Louisiana Constitution of 1974, Article 1, Sec. 1, states that one of the ends of government is to "secure justice for all"; and

WHEREAS, reflecting the right to counsel mandated by the Sixth Amendment to the Constitution, Louisiana Constitution Article 1, Section 13 entitles an accused person to the assistance of counsel "appointed by the court if he is indigent and charged with an offense punishable by imprisonment," and states, "The legislature shall provide for a uniform system for securing and compensating qualified counsel for indigents;" and

WHEREAS, Louisiana is the last state in the nation that attempts to fund the majority of its constitutional obligation to provide qualified counsel through court costs collected on criminal offenses, primarily traffic tickets; and

WHEREAS, there exists no correlation between a court's ability to assess and collect court costs and the resource levels needed to ensure adequate, constitutionally guaranteed right to counsel, producing a non-uniform system in which the right a district's funding is wholly unrelated to need, is unpredictable, and leaves local boards without the ability to effectively budget from year to year; and

WHEREAS, the Louisiana Indigent Defense Assistance Board (LIDAB) was created to supplement local funding and to increase uniformity among the districts through the use of standards, but lacks the resources and authority to make compliance with its standards mandatory or to raise the indigent defense system to its constitutionally mandated level; and

WHEREAS, Louisiana's current system lacks the ability to collect and verify statistical data on indigent defense caseloads and costs and to monitor performance to ensure the efficient and effective use of taxpayer resources; and

WHEREAS, the American Bar Association recommends that in order to design a system that provides effective, efficient, high quality, ethical, and conflict-free legal representation to criminal defendants who are unable to afford an attorney, states must meet the following Ten Principles of a Public Defense Delivery System:

1.  The public defense function, including the selection, funding, and payment of defense counsel, is independent.
2.  Where the caseload is sufficiently high, the public defense delivery system consists of both a defender office and the active participation of the private bar.
3.  Clients are screened for eligibility, and defense counsel is assigned and notified of appointment, as soon as feasible after clients' arrest, detention, or request for counsel.
4.  Defense counsel is provided sufficient time and a confidential space within which to meet with the client.
5.  Defense counsel's workload is controlled to permit the rendering of quality representation.
6.  Defense counsel's ability, training, and experience match the complexity of the case.
7.  The same attorney continuously represents the client until completion of the case.
8.  There is parity between defense counsel and the prosecution with respect to resources and defense counsel is included as an equal partner in the justice system.
9.  Defense counsel is provided with and required to attend continuing legal education.

10. Defense counsel is supervised and systematically reviewed for quality
and efficiency according to nationally and locally adopted standards.

WHEREAS, Louisiana values a fair and reliable criminal justice system; and

WHEREAS, on June 12, 2003, the Louisiana State Bar Association adopted a
resolution urging all three branches of state government to cooperate to
establish a Blue Ribbon Commission to develop a strategic plan for indigent
defense system reform and set a timetable for implementation of that plan; and

WHEREAS, this Senate Resolution reflects the substantive provisions of, and
has been adopted in furtherance of, the Resolution adopted by the House of
Delegates of the Louisiana State Bar Association on June 12, 2003.

THEREFORE, BE IT RESOLVED that the Senate of the Legislature hereby
creates the Louisiana Task Force on Indigent Defense Services.

BE IT FURTHER RESOLVED that the Louisiana Task Force on Indigent
Defense Services shall be composed of the following persons, or their
respective designees:

    (1)    The chief justice of the Louisiana Supreme Court;
    (2)    The president of the Conference of Court of Appeals Judges;
    (3)    The president of the Louisiana District Judges Association;
    (4)    The president of the Louisiana Council of Juvenile and Family
         Court Judges;
    (5)    The president of the Louisiana City Court Judges Association;
    (6)    The president of the Council for a Better Louisiana;
    (7)    The executive director of the Louisiana Interchurch Conference;
    (8)    The president of the Louisiana AFL-CIO;
    (9)    The president of the Louisiana Association of Business and
         Industry;
    (10)   The deans of the four Law Centers in Louisiana;
    (11)   The governor of Louisiana;
    (12)   The Louisiana commissioner of administration;
    (13)   The president of the Louisiana Public Defender Association;
    (14)   The president of the Louisiana Criminal Defense Lawyers
         Association;
    (15)   The president of the Louisiana State Bar Association;
    (16)   The director of the Louisiana State Law Institute;
    (17)   The president of the Louisiana Legal Services Corporation;
    (18)   The president of the Louisiana Chapter of the Louis A. Marinet
         Society;
    (19)   The president of the Louisiana Association of Women Attorneys;
    (20)   The secretary of the Louisiana Department of Social Services;
    (21)   The president of the Louisiana Senate;
    (22)   The speaker of the Louisiana House of Representatives;

(23)   The chairmen of the Louisiana Senate Committee on Finance and the Louisiana House Committee on Appropriations;

(24)   The chairmen of the Senate Committee on Judiciary C and the House Committee on Administration of Criminal Justice; and

(25)   The director of the Louisiana Indigent Defense Assistance Board.

BE IT FURTHER RESOLVED that the Louisiana Task Force on Indigent Defense Services shall study the system in Louisiana of providing legal representation to indigent persons who are charged with violations of criminal laws and shall make an initial report of its findings, together with any recommendations for changes in legislation, to the Legislature of Louisiana no later than March 1, 2004;

BE IT FURTHER RESOLVED that this Resolution shall become effective at noon on the second Monday of January 2004.

## Appendix D
### *"Ten Principles of a Public Defense Delivery System"*

Copyright ©2002 by the American Bar Association.

All rights reserved.  No part of this document may be reproduced in any form or by any electronic or mechanical means including information storage and retrieval systems without permission in writing from the publisher, except by a reviewer who may quote brief passages in a review.

Reprinted with Permission of the American Bar Association.

*I.*   *The public defense function, including the selection, funding, and payment of defense counsel,[1] is independent.   The public defense function should be independent from political influence and subject to judicial supervision only in the same manner and to the same extent as retained counsel.[2]  To safeguard independence and to promote efficiency and quality of services, a nonpartisan board should oversee defender, assigned counsel, or contract systems.[3] Removing oversight from the judiciary ensures judicial independence from undue political pressures and is an important means of furthering the independence of public defense.[4]  The selection of the chief defender and staff should be made on the basis of merit, and recruitment of attorneys should involve special efforts aimed at achieving diversity in attorney staff.[5]*

*2.*   *Where the caseload is sufficiently high,[6] the public defense delivery system consists of both a defender office[7] and the active participation of the private*

---

[1] "Counsel" as used herein includes a defender office, a criminal defense attorney in a defender office, a contract attorney or an attorney in private practice accepting appointments.  "Defense" as used herein relates to both the juvenile and adult public defense systems.

[2] National Advisory Commission on Criminal Justice Standards and Goals, Task Force on Courts, Chapter 13, *The Defense* (1973) [hereinafter "NAC"], Standards 13.8, 13.9; National Study Commission on Defense Services, *Guidelines for Legal Defense Systems in the United States* (1976) [hereinafter "NSC"], Guidelines 2.8, 2.18, 5.13; American Bar Association Standards for Criminal Justice, *Providing Defense Services* (3rd ed. 1992) [hereinafter "ABA"], Standards 5-1.3, 5-1.6, 5-4.1; *Standards for the Administration of Assigned Counsel Systems* (NLADA 1989) [hereinafter "Assigned Counsel"], Standard 2.2; NLADA *Guidelines for Negotiating and Awarding Contracts for Criminal Defense Services,* (1984) [hereinafter "Contracting"], Guidelines II-1, 2; National Conference of Commissioners on Uniform State Laws, *Model Public Defender Act* (1970) [hereinafter "Model Act"], § 10(d); Institute for Judicial Administration/American Bar Association, *Juvenile Justice Standards Relating to Counsel for Private Parties* (1979) [hereinafter "ABA Counsel for Private Parties"], Standard 2.1 (D).

[3] NSC, *supra* note 2, Guidelines 2.10-2.13; ABA, *supra* note 2, Standard 5-1.3(b); Assigned Counsel, *supra* note 2, Standards 3.2.1, 2; Contracting, *supra* note 2, Guidelines II-1, II-3, IV-2; Institute for Judicial Administration/ American Bar Association, *Juvenile Justice Standards Relating to Monitoring* (1979) [hereinafter "ABA Monitoring"], Standard 3.2.

[4] Judicial independence is "the most essential character of a free society" (American Bar Association Standing Committee on Judicial Independence, 1997).

[5] ABA, *supra* note 2, Standard 5-4.1

[6] "Sufficiently high" is described in detail in NAC Standard 13.5 and ABA Standard 5-1.2.  The phrase can generally be understood to mean that there are enough assigned cases to support a full-time public defender (taking into account distances, caseload diversity, etc.), and the remaining number of cases is enough to support meaningful involvement of the private bar.

*bar. The private bar participation may include part time defenders, a controlled assigned counsel plan, or contracts for services.[8] The appointment process should never be ad hoc,[9] but should be according to a coordinated plan directed by a full-time administrator who is also an attorney familiar with the varied requirements of practice in the jurisdiction.[10] Since the responsibility to provide defense services rests with the state, there should be state funding and a statewide structure responsible for ensuring uniform quality statewide.[11]*

3. *Clients are screened for eligibility,[12] and defense counsel is assigned and notified of appointment, as soon as feasible after clients' arrest, detention, or request for counsel. Counsel should be furnished upon arrest, detention or request,[13] and usually within 24 hours thereafter.[14]*

4. *Defense counsel is provided sufficient time and a confidential space with which to meet with the client. Counsel should interview the client as soon as practicable before the preliminary examination or the trial date.[15] Counsel should have confidential access to the client for the full exchange of legal, procedural and factual information between counsel and client.[16] To ensure confidential communications, private meeting space should be available in jails, prisons, courthouses and other places where defendants must confer with counsel.[17]*

---

[7] NAC, *supra* note 2, Standard 13.5; ABA, Standard 5-1.2; ABA Counsel for Private Parties, *supra* note 2, Standard 2.2. "Defender office" means a full-time public defender office and includes a private nonprofit organization operating in the same manner as a full-time public defender office under a contract with a jurisdiction.

[8] ABA, *supra* note 2, Standard 5-1.2(a) and (b); NSC, *supra* note 2, Guideline 2.3; ABA, *supra* note 2, Standard.5-2.1.

[9] NSC, *supra* note 2, Guideline 2.3; ABA, *supra* note 2, Standard 5-2.1.

[10] ABA, *supra* note 2, Standard 5-2.1 and commentary; Assigned Counsel, *supra* note 2, Standard 3.3.1 and commentary n.5 (duties of Assigned Counsel Administrator such as supervision of attorney work cannot ethically be performed by a non-attorney, citing ABA Model Code of Professional Responsibility and Model Rules of Professional Conduct).

[11] NSC, *supra* note 2, Guideline 2.4; Model Act, *supra* note 2, § 10; ABA, *supra* note 2, Standard 5-1.2(c); *Gideon v. Wainwright*, 372 U.S. 335 (1963) (provision of indigent defense services is obligation of state).

[12] For screening approaches, see NSC, *supra* note 2, Guideline 1.6 and ABA, *supra* note 2, Standard 5-7.3.

[13] NAC, *supra* note 2, Standard 13.3; ABA, *supra* note 2, Standard 5-6.1; Model Act, *supra* note 2, § 3; NSC, *supra* note 2, Guidelines 1.2-1.4; ABA Counsel for Private Parties, *supra* note 2, Standard 2.4 (A).

[14] NSC, *supra* note 2, Guideline 1.3.

[15] American Bar Association Standards for Criminal Justice, *Defense Function* (3rd ed. 1993) [hereinafter "ABA Defense Function"], Standard 4-3.2; *Performance Guidelines for Criminal Defense Representation* (NLADA 1995) [hereinafter "Performance Guidelines"], Guidelines 2.1-4.1; ABA Counsel for Private Parties, *supra* note 2, Standard 4.2.

[16] NSC, *supra* note 2, Guideline 5.10; ABA Defense Function, *supra* note 15, Standards 4-2.3, 4-3.1, 4-3.2; Performance Guidelines, *supra* note 15, Guideline 2.2.

[17] ABA Defense Function, *supra* note 15, Standard 4-3.1.

5. *Defense counsel's workload is controlled to permit the rendering of quality representation.   Counsel's workload, including appointed and other work, should never be so large as to interfere with the rendering of quality representation or lead to the breach of ethical obligations, and counsel is obligated to decline appointments above such levels.[18]   National caseload standards should in no event be exceeded,[19] but the concept of workload (i.e., caseload adjusted by factors such as case complexity, support services, and an attorney's nonrepresentational duties) is a more accurate measurement.[20]*

6. *Defense counsel's ability, training, and experience match the complexity of the case.  Counsel should never be assigned a case that counsel lacks the experience or training to handle competently, and counsel is obligated to refuse appointment if unable to provide ethical, high quality representation.[21]*

7. *The same attorney continuously represents the client until completion of the case.  Often referred to as "vertical representation," the same attorney should continuously represent the client from initial assignment through the trial and sentencing.[22] The attorney assigned for the direct appeal should represent the client throughout the direct appeal.*

8. *There is parity between defense counsel and the prosecution with respect to resources and defense counsel is included as an equal partner in the justice system.  There should be parity of workload, salaries and other resources (such as benefits, technology, facilities, legal research, support staff, paralegals, investigators, and access to forensic services and experts) between prosecution and public defense.[23]   Assigned counsel should be paid a reasonable fee in*

---

[18] NSC, *supra* note 2, Guideline 5.1, 5.3; ABA, *supra* note 2, Standards 5-5.3; ABA Defense Function, *supra* note 15, Standard 4-1.3(e); NAC, *supra* note 2, Standard 13.12; Contracting, *supra* note 2, Guidelines III-6, III-12; Assigned Counsel, *supra* note 2, Standards 4.1,4.1.2; ABA Counsel for Private Parties, *supra* note 2, Standard 2.2 (B) (iv).

[19] Numerical caseload limits are specified in NAC Standard 13.12 (maximum cases per year: 150 felonies, 400 misdemeanors, 200 juvenile, 200 mental health, or 25 appeals), and other national standards state that caseloads should "reflect" (NSC Guideline 5.1) or "under no circumstances exceed" (Contracting Guideline III-6) these numerical limits. The workload demands of capital cases are unique: the duty to investigate, prepare and try both the guilt/innocence and mitigation phases today requires an average of almost 1,900 hours, and over 1,200 hours even where a case is resolved by guilty plea. *Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation* (Judicial Conference of the United States, 1998). *See also ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (NLADA, 1988; ABA, 1989) [hereinafter "Death Penalty"].

[20] ABA, *supra* note 2, Standard 5-5.3; NSC, *supra* note 2, Guideline 5.1; *Standards and Evaluation Design for Appellate Defender Offices* (NLADA 1980), Standard 1-F.

[21] Performance Guidelines, *supra* note 15, Guidelines 1.2, 1.3(a); Death Penalty, *supra* note 19, Guideline 5.1.

[22] NSC, *supra* note 2, Guidelines 5.11, 5.12; ABA, *supra* note 2, Standard 5-6.2; NAC, *supra* note 2, Standard 13.1; Assigned Counsel, *supra* note 2, Standard 2.6; Contracting, *supra* note 2, Guidelines III-12, III-23; ABA Counsel for Private Parties, *supra* note 2, Standard 2.4 (B) (i).

[23] NSC, *supra* note 2, Guideline 3.4; ABA, *supra* note 2, Standards 5-4.1, 5-4.3; Contracting, *supra* note 2, Guideline III-10; Assigned Counsel, *supra* note 2, Standard 4.7.1; Appellate; *supra* note 20, ABA Counsel for Private Parties, *supra* note 2, Standard 2.1 (B) (iv). *See* NSC, Guideline 4.1 (includes numerical staffing ratios, e.g., there must be one

addition to actual overhead and expenses.[24] Contracts with private attorneys for public defense services should never be let primarily on the basis of cost; they should specify performance requirements and the anticipated workload, provide an overflow or funding mechanism for excess, unusual or complex cases,[25] and separately fund expert, investigative and other litigation support services.[26] No part of the justice system should be expanded or the workload increased without consideration of the impact that expansion will have on the balance and on the other components of the justice system. Public defense should participate as an equal partner in improving the justice system. This principle assumes that the prosecutor is adequately funded and supported in all respects, so that securing parity will mean that defense counsel is able to provide quality legal representation.

9.  Defense counsel is provided with and required to attend continuing legal education. Counsel and staff providing defense services should have systematic and comprehensive training appropriate to their areas of practice and, at least equal to that received by prosecutors.[28]

10.  Defense counsel is supervised and systematically reviewed for quality and efficiency according to nationally and locally adopted standards. The defender office (both professional and support staff), assigned counsel, or contract defenders should be supervised and periodically evaluated for competence and efficiency.[29]

---

supervisor for every 10 attorneys, or one part-time supervisor for every 5 attorneys; there must be one investigator for every three attorneys, and at least one investigator in every defender office). NSC, Standards 13.7, 13.11 (chief defender salary should be at parity with chief judge; staff attorneys at parity with private bar).

[24] ABA, *supra* note 2, Standard 5-2.4; Assigned Counsel, *supra* note 2, Standard 4.7.3.

[25] NSC, *supra* note 2, Guideline 2.6; ABA, *supra* note 2, Standards 5-3.1, 5-3.2, 5-3.3; Contracting, *supra* note 2, Guidelines III-6, III-12, and *passim*.

[26] ABA, *supra* note 2, Standard 5-3.3(b)(x); Contracting, *supra* note 2, Guidelines III-8, III-9.

[27] ABA Defense Function, *supra* note 15, Standard 4-1.2(d).

[28] NAC, *supra* note 2, Standards 13.15, 13.16; NSC, *supra* note 2, Guidelines 2.4(4), 5.6-5.8; ABA, *supra* note 2, Standards 5-1.5; Model Act, § 10(e); Contracting, *supra* note 2, Guideline III-17; Assigned Counsel, *supra* note 2, Standards 4.2, 4.3.1, 4.3.2, 4.4.1; NLADA *Defender Training and Development Standards* (1997); ABA Counsel for Private Parties, *supra* note 2, Standard 2.1 (A).

[29] NSC, *supra* note 2, Guidelines 5.4, 5.5; Contracting, *supra* note 2, Guidelines III-16; Assigned Counsel, *supra* note 2, Standard 4.4; ABA Counsel for Private Parties, *supra* note 2, Standards 2.1 (A), 2.2; ABA Monitoring, *supra* note 3, Standards 3.2, 3.3. Examples of performance standards applicable in conducting these reviews include NLADA Performance Guidelines, ABA Defense Function, and NLADA/ABA Death Penalty.

IN DEFENSE OF PUBLIC ACCESS TO JUSTICE     85

Appendix E
*Letter from District Judge Bennett to NLADA*



**TWELFTH JUDICIAL DISTRICT COURT**
AVOYELLES PARISH COURTHOUSE
312 NORTH MAIN STREET
MARKSVILLE, LOUISIANA 71351

WILLIAM J. BENNETT
JUDGE, DIVISION B
P.O. BOX 84
MARKSVILLE, LA 71351

PHONE
(318) 253-9418
FAX
(318) 253-9418

August 18, 2003

Mr. David J. Carroll
Director of Research & Evaluation National Legal Aid & Defender Association
1140 Connecticut Avenue
NW Suite 900
Washington, DC 20036-4019

Dear Mr. Carroll,

I am in receipt of and thank you for yours dated August 8, 2003.  Both myself and Judge Mark Jeansonne, Judge of Division A of the Twelfth Judicial District Court welcome and look forward to your visit. Your letter requested the opportunity to conduct interviews with the Judges and other criminal justice stakeholders in our Parish regarding the adequacy of indigent defense services. In anticipation of your visit, I offer the following general information:

1) Pursuant to statute, there is an Avoyelles Parish Indigent Defender Board which is presently comprised of five board members, with the chairman of the board being Charles Jones (ret. colonel). The Avoyelles Parish Indigent Defender Board maintains an office at the following address and phone number:

Indigent Defender Board Office
East Mark Street
P.O. Box 111
Marksville, Louisiana 71351
318-253-0091

2) The Avoyelles Parish Indigent Defender Board employs four attorneys on a part-time basis. Three attorneys are assigned to the felony cases and one attorney is assigned to juvenile and misdemeanor cases. These individuals are as follows:

86     IN DEFENSE OF PUBLIC ACCESS TO JUSTICE

A) Maxwell Bordelon, Attorney at Law, 313 N. Main Street, Marksville, La 71351 318-253-4481

B) Bridgett Brown, 3504 Masonic Drive, P. O. Box 12478, Alexandria, La 71315 318-443-9000

C) Keith Manuel, Attorney at Law, 115 E. Mark Street, Marksville, La 71351 318-253-5126

D) Jonathan Gaspard, Attorney at Law, 313 N. Main Street, P. O. Box 546 Marksville, La 71351 - 318-240-7329

The individuals listed above, especially Colonel Jones, have access to the "numbers" which you may be interested in

We are certainly here to help you in your endeavor and look forward to meeting with you. For your information, criminal court proceedings are normally scheduled on the first and third Tuesdays for Division A and second and fourth Tuesdays for Division B. These days are for arraignments, pre-trial motions, and probation revocation hearings. Separate days are scheduled for misdemeanor trials. Additionally, felony trials are scheduled for a week at a time on approximately six occasions during the year. Our next felony week is scheduled to begin Monday, September 8, 2003, and the next felony week will begin Monday, October 20, 2003. You are more than welcome to visit with us at any time, especially any of the dates when criminal proceedings are being conducted. We look forward to meeting with you.

With kindest regards, I remain

Very truly yours,

WILLIAM J. BENNETT
12th JUDICIAL DISTRICT COURT JUDGE
DIVISION B

WJB/amh
cc: Hon. Mark Jeansonne
    Colonel Charles Jones

309

## Appendix F
### NLADA Analysis of
### LIDAB's District Assistance Fund Matrix

The first calculation in the LIDAB District Assistance Fund matrix is to divide the balance left in the IDB account at the end of the year by the year's total indigent defense expenditure.[1] If the resulting percentage is greater than 100% (i.e. if there is more money in reserve than was spent in the prior year) the IDB is not eligible for DAF grants. If the resulting percentage is less than 100%, but greater than or equal to 50%, LIDAB adjusts the IDB revenue figure by adding to it the IDB account balance at the close of the year. This is called the "Adjusted Revenue" figure. If the resulting percentage is less than 50%, the revenue figure is maintained unchanged in the "Adjusted Revenue" column.[2]

Next, LIDAB divides the total number of reported felony cases[3] into the "Adjusted Revenue." This produces a dollar figure reflecting the "Adjusted Revenue Per Case."[4] Because of the calculations done in the prior steps to adjust the revenue figures, the "Adjusted Revenue Per Case" figure does not reflect the actual cost per felony case.[5]

LIDAB then makes two separate calculations to determine the "approximate" amount of the DAF distribution for a given year. First, LIDAB takes 90% of the total amount of available funds ($2,475,000 of the total $2,750,000) and multiplies it by the percentage of the total number of felony cases statewide that were opened in a particular district (or, more correctly, the total number of felony cases opened collectively in those jurisdictions seeking DAF funds divided by the total number opened in a particular district).[6]

In an effort to further assist those jurisdictions that have higher trial rates (calculated as the number of trials divided by total felony assignments) and thus, theoretically, higher costs per case, LIDAB takes the other 10% of available DAF funds (currently $275,000 of the total $2,750,000) and multiplies it by the percentage resulting

---

[1] To illustrate the required mathematical calculations: assume that District X ends the year with $155,000 in its IDB account and expended $250,000 for indigent defense services in the prior year. The first required calculation would result in a percentage of 62% ($155,000 ÷ $250,000 = 0.62, or 62%).

[2] Since the local IDB account balance in District X is less than it expended on services last year, it is eligible for DAF grants (62% < 100%). But since its IDB account balance is more than 50% of the expenditure in the prior year, LIDAB will perform the necessary adjustment to their revenue figure (62% ≥ 50%). In this example, District X collected $210,500 in revenues in the previous year. Therefore, LIDAB determines the "Adjusted Revenue" figure by adding their revenues ($210,500) to their ending IDB account balance ($155,000). In this case, District X's "Adjusted Revenue" figure is $400,500 ($210,500 + $155,000 = $400,500.) Under prior LIDAB Directors, no adjustment was made to distinguish between IDB's with greater or lesser balances under 100% of expenditures.

[3] The definition of what constitutes a felony "case" is discussed at length in the ensuing chapter.

[4] Assume District X reported a total of 575 felonies opened during the previous year. Dividing the "Adjusted Revenue" figure ($400,500) by the total number of felony cases opened (575) produces an "Adjusted Revenue Per Case" of $696.62 ($400,500 ÷ 575 = $696.62).

[5] Again, this does not mean that District X actually spent $696.62 per felony case. Besides the adjustment, actual expenditure money is used during the year for non-felony cases, such as juvenile and misdemeanor cases, as well as felony cases opened in years prior but not closed until the year in question.

[6] If in the same year District X reported 575 felony cases opened, the total number of felonies opened in all districts seeking funds was 48,502, then the percentage of felony cases opened in District X was 1.19% (575 ÷ 48,502 = 0.0119, or 1.19%). Multiplying that percentage by the 90% of the available DAF monies ($2,475,000) equals $29,342 ($2,475,000 x 90% = $29,342).

88      IN DEFENSE OF PUBLIC ACCESS TO JUSTICE

from dividing the total number of felony jury trials collectively occurring in districts applying for DAF grants by the number of felony jury trials that occur in the district itself. The 10% figure is an arbitrary number that was approved by LIDAB to appease representatives of districts with greater trial rates.[8] That resulting amount is then added to the amount calculated in the prior step (i.e., the calculation based on felony assignments) to determine the "Approximate Fund Disbursement" amount.[9]

LIDAB then calculates the "Adjusted Fund Index," which is the percentage determined by dividing the total "Adjusted Revenue Per Case" of all of the reporting districts by the local "Adjusted Revenue Per Case."[10] The "Adjusted Fund Index" and the "Approximate Fund Disbursement" are then multiplied to produce the "Preliminary Fund Disbursement."[11]

Because of rounding issues, the sum of each district's "Preliminary Disbursement Amount" will end up being somewhat greater than the available district assistance funds. So, LIDAB divides the total available DAF grant money ($2,750,000) by the total sum of each district's "Preliminary Disbursement Amount."[12] This percentage is then applied to each district's "Preliminary Disbursement Amount" to determine the final amount of their DAF grant.[13]

---

[8] In our example, District X had 10 felony jury trials. If in the same hypothetical year the total number of jury trials in those districts applying for DAF grants was 629, District X would have provided representation in 1.59% of the jury trials statewide (10 ÷ 629 = 0.0159, or 1.59%).

[8] District X gets an additional $4,372 ($27,500 x 1.59% = $4,372).

[9] The approximate DAF grant for District X is $33,714 ($29,342 + $4,732 = $33,714). "Approximate Fund Disbursement" is a term coined by NLADA to help the reader understand the matrix used by LIDAB. LIDAB does not use this term of art.

[10] We have already determined that District X's "Adjusted Revenue Per Case" figure is $696.62. Assume that in the same year the total "Adjusted Revenue Per Case" figure for all of the districts seeking DAF grants was $563.81. District X's "Adjusted Fund Index" would be 80.95% ($563.81 ÷ $696.62 = 0.8095, or 80.95%).

[11] District X's "Approximate Fund Disbursement" was calculated to be $33,714. Since their "Adjusted Fund Index" is 80.95%, their "Preliminary Fund Disbursement" is $27,290 ($33,714 x 80.95% = $27,290). In this example, one can see how the "Adjusted Fund Index" (and therefore the "Adjusted Revenue Per Case") is used to "weight" the disbursements in favor of those districts that have less than 50% of what they expended in a given year left in their IDB bank account at the close of the year. By adding (i.e., "adjusting") a district's annual revenue to the closing IDB account balance in those jurisdictions with 50% or greater rolled over expenditure costs in their balance, a district will always have a greater "Adjusted Revenue Per Case" figure than the state average. Since this figure becomes the denominator in the "Adjusted Fund Index," these jurisdictions' "Preliminary Fund Disbursement" will always be less than their "Approximate Fund Disbursement" figure. Conversely, jurisdictions that do not have their revenues "adjusted" will always have an "Adjusted Fund Index" that is greater than 100%. Thus, these districts will always have a higher "Preliminary Fund Disbursement" than their "Approximate Disbursement" amount.

[12] In our example, the sum of each district's "Preliminary Fund Disbursement" equals $2,960,420, or $210,420 more than what is available. Therefore each district's "Preliminary Fund Disbursement" needs to be adjusted by 92.892% ($2,750,000 ÷ $2,960,420 = 0.92892, or 92.892%). This percentage will necessarily change from year to year.

[13] In the final step, District X's "Preliminary Fund Disbursement" ($27,290) is multiplied by 92.892%. District X's final DAF grant amount is $25,350 ($27,290 x 92.892 = $25,350).

### Appendix G
*NLADA's Model Contract for Public Defense Services*

The [City, County, State], referred to as "the Contracting Authority," and [law firm or non-profit organization], referred to hereafter as "the Agency," agree to the provision of public defense services as outlined below for the period [date] to [date]. The Contracting Authority Administrator is [    ], and the Managing Director of the Agency is [    ].

Following are the underlying bases for the Contract:

* [City, County, State] has a constitutionally mandated responsibility to provide public defender services which is specifically defined in [local ordinance or statute], and/or a [statutory/judicially-required] duty to provide [specify juvenile, civil commitment, etc. services].

* The Contracting Authority desires to have legal services performed for eligible persons entitled to public representation in ____ [City, County, State] by the Agency, as authorized by law.

* The Agency agrees to provide, and the Contracting Authority agrees to pay for, competent, zealous representation to its clients as required by the controlling Professional Responsibility [Rules or Code].

* The Contracting Authority and the Agency agree that any and all funds provided pursuant to this Contract are provided for the sole purpose of provision of legal services to eligible clients of the Agency.

The parties agree as follows:

### I.    DURATION OF CONTRACT

This Contract shall commence on _____ and terminate on _____, unless extended or terminated earlier in a manner allowed by this Contract.

### II.   DEFINITIONS

The following definitions control the interpretation of this Contract:

A.  <u>Eligible client</u> means a defendant, parent, juvenile, or person who is facing civil commitment or any other person who has been determined by a finding by the Contracting Authority or Court to be entitled to a court-appointed attorney, pursuant to [relevant state statute, court rule, and constitutional provision].

B.  <u>Case; Case Completion</u>: A Case shall mean representation of one person on one charging document. In the event of multiple counts stemming from

separate transactions, additional case credit will be recognized. Completion of a case is deemed to occur when all necessary legal action has been taken during the following period(s): In criminal cases, from arraignment through disposition, from arraignment through the necessary withdrawal of counsel after the substantial delivery of legal services, or from the entry of counsel into the case (where entry into the case occurs after arraignment through no fault of the Agency) through disposition or necessary withdrawal after the substantial delivery of legal services. Nothing in this definition prevents the Agency from providing necessary legal services to an eligible client prior to arraignment, but payment for such services will require a showing pursuant to the Extraordinary Expenses paragraph below. In other cases, [define according to type of case—juvenile, family, etc.].

C.   Disposition:  Disposition in criminal cases shall mean: 1) the dismissal of charges, 2) the entering of an order of deferred prosecution, 3) an order or result requiring a new trial, 4) imposition of sentence, or 5) deferral of any of the above coupled with any other hearing on that cause number, including but not limited to felony or misdemeanor probation review, that occurs within thirty (30) days of sentence, deferral of sentence, or the entry of an order of deferred prosecution. No hearing that occurs after 30 days of any of the above will be considered part of case disposition for the purpose of this Contract except that a restitution hearing ordered at the time of original disposition, whether it is held within 30 days or subsequently, shall be included in case disposition. Disposition includes the filing of a notice of appeal, if applicable. Nothing in this definition prevents the Agency from providing necessary legal services to an eligible client after disposition, but payment for such services will require a showing pursuant to the Extraordinary Expenses paragraph below. Disposition in other cases shall mean: [define according to type of case—juvenile, family, etc.].

D.   Representational Services: The services for which the Contracting Authority is to pay the Agency are representational services, including lawyer services and appropriate support staff services, investigation and appropriate sentencing advocacy and social work services, and legal services including but not limited to interviews of clients and potential witnesses, legal research, preparation and filing of pleadings, negotiations with the appropriate prosecutor or other agency and court regarding possible dispositions, and preparation for and appearance at all court proceedings. The services for which the Contracting Authority is to pay the Agency do not include extraordinary expenses incurred in the representation of eligible clients. The allowance of extraordinary expenses at the cost of the Contracting Authority will be determined by a court of competent jurisdiction in accordance with [relevant state statute, court rule, and constitutional provisions].

E.   Complex Litigation Cases:  Complex Litigation refers to: 1) all Capital homicide cases, 2) all aggravated homicide cases, 3) those felony fraud cases in which the estimated attorney hours necessary exceeds one hundred seventy (170) hours, 4) cases which involve substantial scientific information resulting in motions to exclude evidence pursuant to controlling case law emanating

from *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and *Daubert v. Merrell Dow*, 113 S.Ct. 2786 (1993), or similar opinions, and 5) other cases in which counsel is able to show the appropriate court in an *ex parte* proceeding that proper representation requires designation of the case as complex litigation.

F.    Other Litigation Expenses: Other Litigation Expenses shall mean those expenses which are not part of the contract with the Agency, including expert witness services, language translators, laboratory analysis, and other forensic services. It is anticipated that payment for such expenses will be applied for in the appropriate courts by motion and granted out of separate funds reserved for that purpose. Payment for mitigation specialists in Capital cases is included in this category.

G.    Misappropriation of Funds: Misappropriation of funds is the appropriation of funds received pursuant to this Contract for purposes other than those sanctioned by this Contract. The term shall include the disbursement of funds for which prior approval is required but is not obtained.

## III.  INDEPENDENT CONTRACTOR

The Agency is, for all purposes arising out of this Contract, an independent contractor, and neither the Agency nor its employees shall be deemed employees of the Contracting Authority. The Agency shall complete the requirements of this Contract according to the Agency's own means and methods of work, which shall be in the exclusive charge and control of the Agency and which shall not be subject to control or supervision by the Contracting Authority, except as specified herein.

## IV.  POLICY BOARD

Oversight of the Agency in matters such as interpretation of indigent defense standards, recommendation of salary levels and reasonable caseloads, and response to community and client concerns, shall be provided by the Policy Board. The Policy Board shall be [appointed/designated] by the Contracting Authority and shall consist of [3-13] diverse members, a majority of which shall be practicing attorneys, and shall include representatives of organizations directly servicing the poor or concerned with the problems of the client community, provided that no single branch of government shall have a majority of votes, and the membership shall not include prosecutors, judges or law enforcement officials. The Agency will meet regularly with the Policy Board.

## V.   AGENCY'S EMPLOYEES AND EQUIPMENT

The Agency agrees that it has secured or will secure at the Agency's own expense, all persons, employees, and equipment required to perform the services contemplated/required under this Contract.

## VI.   MINIMUM QUALIFICATIONS FOR AGENCY ATTORNEYS

A.   Every Agency attorney shall satisfy the minimum requirements for practicing law in [state] as determined by the [state] Supreme Court. Seven hours of [each year's required or (where CLE is not otherwise required) yearly] continuing legal education credits shall be in spent in courses relating to criminal law practice or other areas of law in which the Agency provides legal services to eligible clients under the terms of this Contract. The Agency will maintain for inspection on its premises records of compliance with this provision.

B.   Each Agency attorney representing a defendant accused of a [_____ (e.g. Class A)] felony, as defined in [relevant local statute], must have served at least two years as a prosecutor, a public defender, or assigned counsel within a formal assigned counsel plan that included training, or have demonstrably similar experience, and been trial counsel and handled a significant portion of the trial in 5 felony cases that have been submitted to a jury.

C.   Each staff attorney representing a juvenile respondent in a [_____ (e.g. Class A] felony, as defined in [relevant local statute], shall meet the qualifications of (B) above and demonstrate knowledge of the practices of the relevant juvenile court, or have served at least one year as a prosecutor, a public defender, or assigned counsel within a formal assigned counsel plan that included training, assigned to the prosecution or defense of accused persons in juvenile court, or have demonstrably similar experience, and handled at least 5 felony cases through fact finding and disposition in juvenile court.

D.   Each staff attorney representing a defendant accused of a [_____ (e.g. Class B or C] felony, as defined in [relevant local statute], or involved in a probation or parole revocation hearing, must have served at least one year as a prosecutor, a public defender, or assigned counsel within a formal assigned counsel plan that included training, or have demonstrably similar experience, and been sole trial counsel of record in five misdemeanor cases brought to final resolution, or been sole or co-trial counsel and handled a significant portion of the trial in two criminal cases that have been submitted to a jury alone or of record with other trial counsel and handled a significant portion of the trial in two criminal cases that have been submitted to a jury.

E.   Each attorney representing any other client assigned as a part of this Contract shall meet the requirements of (B) above or work directly under the supervision of a senior, supervising attorney employed by the Agency, who meets the requirements of (B) above. Such direct supervision shall continue

until the attorney has demonstrated the ability to handle cases on his/her own. Should the caseload under this Contract require 10 or more FTE attorneys, the Agency will provide one FTE supervising attorney for every 10 FTE caseload attorneys.

E.   Notwithstanding the above, each Capital case assigned to the Agency will be staffed by two full time attorneys or FTE attorneys. The lead attorney shall have at least seven years of criminal law experience and training or experience in the handling of Capital cases; associate counsel shall have at least five years of criminal law experience

F.   Notwithstanding the above, each Capital case assigned to the Agency will be staffed by two full time attorneys or FTE attorneys. The lead attorney shall have at least seven years of criminal law experience and training or experience in the handling of Capital cases; associate counsel shall have at least five years of criminal law experience

G.   Notwithstanding the above, each Complex Litigation case assigned to the Agency other than a Capital case shall be staffed by one FTE attorney with at least seven years of criminal law experience, or the equivalent of one half-time (.5 FTE) attorney with seven years of criminal law experience and one half-time (.5 FTE) attorney with five years of criminal law experience.

H.   Failure on the part of the Agency to use staff with the appropriate amount of experience or to supervise appropriately its attorneys shall be considered a material breach of this Contract. Failure on the part of the Contracting Authority to provide adequate funding to attract and retain experienced staff and supervisor(s) shall be considered a breach of this Contract.

VII.  PERFORMANCE REQUIREMENTS

The Agency agrees to provide the services and comply with the requirements of this Contract.  The number of cases for which such services will be required is the amount specified on Worksheet A, subject to the variance terms specified in Section VII (Variance). Any material breaches of this agreement on the part of the Agency or the Contracting Authority may result in action as described in Section XVIII (Corrective Action) or Section XIX (Termination and Suspension).

The Agency agrees to provide representational services in the following types of cases: [   ]

The Agency agrees to staff its cases according to the following provisions:

A.   Continuity of representation at all stages of a case, sometimes referred to as "vertical" representation, promotes efficiency, thoroughness of representation, and positive attorney/client relations.  The Agency agrees to make reasonable efforts to continue the initial attorney assigned to a client throughout all cases assigned in this Contract. Nothing in this section shall prohibit the Agency from making necessary staff changes or staff rotations at reasonable intervals;

or from assigning a single attorney to handle an aspect of legal proceedings for all clients where such method of assignment is in the best interest of the eligible clients affected by such method of assignment.

C.    The Agency agrees that an attorney will make contact with all other clients within 5 working days from notification of case assignment.

D.    Conflicts of interest may arise in numerous situations in the representation of indigent defendants. The Agency agrees to screen all cases for conflict upon assignment and throughout the discovery process, and to notify promptly the Contracting Authority when a conflict is discovered. The Agency will refer to the [state] Rules of Professional Conduct, as interpreted by [the [state or other relevant] Bar Association and /or] opinions of the state judiciary, and to the American Bar Association Standards for Criminal Justice in order to determine the existence and appropriate resolution of conflicts.

E.    It is agreed that the Agency will maintain average annual caseloads per full time attorney or full time equivalent (FTE) no greater than the following:

Felony Cases                        150
Misdemeanor Cases                   400
Juvenile Offender Cases             200
Juvenile Dependency Cases           60
Civil Commitment Cases              250
Contempt of Court Cases             225
Drug Court Cases                    200
[Appeals                            25]

These numbers assume that the attorney is assigned only cases that fit into one category. If, instead, a FTE attorney spends half of her time on felony cases and half of her time on misdemeanor cases, she would be expected to carry an annual caseload no greater than 75 felonies and 150 misdemeanors. If the same attorney works less than full time or splits her time between Contract cases and private business, that attorney would be expected to carry a maximum caseload proportional to the portion of her professional time which she devotes to Contract cases. All attorneys who split their time between Contract work and private business as well as work under this contract must report the quantity of hours they devote to private business to the Contracting Authority so that Agency caseload levels may be accurately monitored.

It is assumed that the level of competent assistance of counsel contemplated by this Contract cannot be rendered by an attorney who carries an average annual caseload substantially above these levels. Failure on the part of the Agency to limit its attorneys to these caseload levels is considered to be a material breach of this agreement.

Complex Litigation is considered to be outside of the normal caseload and is handled as described in Section VI. G. below.

F.  Adequate support staff is critical to an attorney's ability to render competent assistance of counsel at the caseload levels described above. The parties agree and expect that at a minimum the Agency will employ support staff services for its attorneys at a level proportionate to the following annual caseloads:

One full time Legal Assistant for every four FTE Contract attorneys
One full time Social Service Caseworker for every 450 Felony Cases
One full time Social Service Caseworker for every 600 Juvenile Cases
One full time Social Service Caseworker for every 1200 Misdemeanor Cases
One full time Investigator for every 450 Felony Cases
One full time Investigator for every 600 Juvenile Cases
One full time Investigator for every 1200 Misdemeanor Cases

In addition, attorneys must have access to mental health evaluation and recommendation services as required.

It is expected that support staff will be paid at a rate commensurate with their training, experience and responsibility, at levels comparable to the compensation paid to persons doing similar work in public agencies in the jurisdiction. The Agency may determine the means by which support staff is provided. The use of interns or volunteers is acceptable, as long as all necessary supervision and training is provided to insure that support services do not fall below prevailing standards for quality of such services in this jurisdiction.

G.  If the Agency is to be responsible for representing defendants in Complex Litigation cases, the following provisions apply. Complex Litigation cases occupy the full time or FTE of one attorney and the half time of one investigator prior to completion, except for Capital cases which typically require 2 FTE attorneys and the FTE of one investigator, as well as the services of a mitigation specialist. Aggravated homicide cases are considered Capital cases until such time as an irrevocable decision is made by the [Prosecuting Attorney/District Attorney] not to seek the death penalty in the case.

Complex Litigation cases remain pending until the termination of the guilt phase and penalty phase of the trial, or entry of a guilty plea. Upon entry of a verdict or guilty plea, such cases are complete for the purposes of accepting additional Complex Litigation cases. Payment for post-conviction, pre-judgment representation shall be negotiated.

Other special provisions of this Contract which relate to Complex Litigation are found in Section V (Minimum Qualifications) and Section VIII (Assignment of Complex Litigation).

H.  Sexual Predator Commitment Cases: "Sexual predator commitment" cases shall be handled as Complex Litigation cases.

I.    The Agency may use legal interns. If legal interns are used, they will be used in accordance with [citation to State Admission to Practice Rules].

J.    The Agency agrees that it will consult with experienced counsel as necessary and will provide appropriate supervision for all of its staff.

<u>Significant Changes</u>

Significant increases in work resulting from changes in court calendars, including the need to staff additional courtrooms, shall not be considered the Agency's responsibility within the terms of this Contract. Any requests by the courts for additional attorney services because of changes in calendars or work schedules will be negotiated separately by the agency and Contracting Authority and such additional services shall only be required when funding has been approved by the Contracting Authority, and payment arranged by contract modification.

VIII. VARIANCE

The Agency and the Contracting Authority agree that the actual number of cases assigned under this contract may vary from the numbers agreed on Worksheet A by the following levels:

| | |
|---|---|
| Monthly Variance | 20% |
| Quarterly Variance | 15% |
| Semi-Annual Variance | 15% |
| Yearly Variance | 5% |

Any deviation in the number of cases assigned that is within the limits above shall not result in alteration of payment owed to the Agency by the Contracting Authority and shall not be the cause of renegotiation of this Contract except as provided in Section XII (Requests for Modifications). The Contracting Authority agrees to make good faith efforts to keep the number of cases assigned within the variance level. In no event shall the Agency be required to accept cases above the level of the variance, even for extra compensation, if doing so would imperil the ability of the Agency's attorneys to maintain the maximum caseload standards provided in Section VI (Performance Requirements). The Contracting Authority shall provide the Agency with quarterly estimates of caseload to be assigned at least one month prior to the beginning of each calendar quarter and shall make available, upon request, the data and rationale which form the basis of such estimate(s).

IX.   ASSIGNMENT OF COMPLEX LITIGATION CASES

[If assignment of Complex Litigation cases is contemplated by this Contract,] the Agency will designate a full time or FTE attorney for that purpose. Thereafter, the Agency shall accept all Complex Litigation cases assigned to it by Contracting Authority subject to the following special provisions:

A.    The Contracting Authority shall not assign further Complex Litigation cases while the Agency has a pending Complex Litigation case, unless the Agency

has available qualified staff and the Contracting Authority provides the necessary resources.

B.   In the event the Agency attorney designated to handle Complex Litigation is not occupied with a Complex Litigation case, Contracting Authority may increase the assignment of other felony cases up to 12.5 per month.

C.   Should the services of an additional FTE attorney be required due to the pendency of a Capital case, the Contracting Authority and the Agency will negotiate a reduction in Agency caseload or provision of extra compensation to provide for the services of that attorney.

D.   Once a Complex Litigation case has proceeded for two months, Contracting Authority may request a review of the case, including but not limited to hours spent by the agency attorney(s) and the expected duration of the case. Such review may result in reclassification of the case or modification in payment structure to ensure that the requirements of Sections V.G. and VI. G above can be met.

## X.   ATTORNEY TRAINING

Ongoing professional training is a necessity in order for an attorney to keep abreast of changes and developments in the law and assure continued rendering of competent assistance of counsel. The Agency shall provide sufficient training, whether in-house or through a qualified provider of CLE, to keep all of its attorneys who perform work under this Contract abreast of developments in relevant law, procedure, and court rules. If an attorney is transferred to a particular type of case (e.g. a Capital case or other Complex litigation after having participated in the required seven hours of annual CLE required in Section V.A, the Agency shall require additional training in the particular type of case, as necessary.

## XI.   ATTORNEY EVALUATION

If the caseload in this Contract requires the services of two or more attorneys, the Agency director, or his/her designee, shall evaluate the professional performance of Agency attorneys annually. Evaluations should include monitoring of time and caseload records, review of case files, and in court observation. The Agency shall make available to Contracting Authority its evaluation criteria and evidence that evaluations were conducted, although all evaluations are to be confidential between the Agency's director and the Agency attorney.

## XII.  COMPENSATION AND METHOD OF PAYMENT

A.   For the term of this contract, the Contracting Authority shall pay the Agency a rate of $_____ for the caseload specified on Worksheet A, plus or minus the variance agreed to in Section VII (Variance).  Payments will be made on a monthly basis.  It is possible that the actual amount of compensation will vary according to other terms of this Contract.  The parties contemplate that attorneys working under this Contract will be compensated comparably to prosecutors of similar experience and responsibility.

B.   The Contracting Authority shall provide the Agency with a certification of case assignments 10 working days after the close of each calendar month. The Agency shall return the signed certification within 10 working days of receipt.  The Contracting Authority will pay the Agency by the 8th working day of the following month.

C.   If services in addition to those called for by this Contract are required because of unexpected increases in annual caseload(s), the Contracting Authority shall provide supplemental funding to the Agency at a rate to be negotiated which is commensurate with the rate paid under this Contract (or, in the event that new categories of cases (*e.g.* Capital cases or other Complex Litigation) are added, commensurate with the rate prosecutors receive for similar work) and the actual cost to the Agency of providing the extra service.  This provision in no way limits the right of the Agency to refuse to accept cases in excess of the agreed caseload and variance as described in Section VII (Variance).

D.   If the number of cases assigned by the Contracting Authority falls below the agreed caseload and variance, the Contracting Authority will remain liable for the full rate agreed unless it has complied with the provisions in Section XII (Request for Modifications).

E.   In the event of Agency failure to substantially comply with any items and conditions of this Contract or to provide in any manner the work or services as agreed to herein, the Contracting Authority reserves the right to withhold any payment until corrective action has been taken or completed.  This option is in addition to and not in lieu of the Contracting Authority's right to termination as provided in Section XIX of this Contract.

## XIII. REQUESTS FOR CONTRACT MODIFICATIONS

The Contracting Authority shall evaluate the number of cases assigned to the Agency and make projections as to the number of cases that will be assigned to the Agency in future months.  These projections will be provided to the Agency on a quarterly basis as specified in Section VII (Variance).  If the projection indicates that the cases assigned to the Agency will exceed the variance, the Contracting Authority will negotiate with the Agency for supplemental funding to cover the increased caseload, commensurate with the rate paid in this Contract and the actual cost of providing representation.  The Agency shall have the right without penalty

to refuse to accept additional cases beyond the agreed caseload and variance in order to preserve its ability to manage the caseloads of its attorneys as specified in Section VII (Variance).

If the Contracting Authority determines that forces beyond its control such as an unexpected decline in availability of cases for assignment will require the number of cases assigned to the Agency to drop below the agreed caseload and variance, the Contracting Authority may request renegotiation of the rate to be paid under this contract in writing no less than 30 days prior to the date that any change would become effective. Both parties agree in these circumstances to negotiate in good faith for a new rate proportionate to the rate paid under this Contract, taking into account the expenses incurred by the Agency and the Agency's opportunity to realize cost savings and devote resources to other work.

In addition, the Agency may submit a request for modification to the Contracting Authority in order to request supplemental funding if the Agency finds that the funding provided by the Contract is no longer adequate to provide the services required by the Contract. Such a request shall be based on an estimate of actual costs necessary to fund the cost of services required and shall reference the entire Agency budget for work under this Contract to demonstrate the claimed lack of funding. Contracting Authority shall respond to such request within 30 days of receipt. Should such supplemental funding not be approved, Contracting Authority shall notify the Agency within 30 days of the finding of the request that the supplemental funds shall not be available.

## XIV. REPORTS AND INSPECTIONS

The Agency agrees to submit to the Contracting Authority the following reports at the times prescribed below. Failure to submit required reports may be considered a breach of this contract and may result in the Contracting Authority withholding payment until the required reports are submitted and/or invocation of the Corrective Action procedures in Section XVIII (Corrective Action).

A.   Position Salary Profile

The Agency shall submit to the Contracting Authority on the last working day in January and by the 15th day of the first month of each subsequent quarter, a profile of Full-Time Equivalent (FTE) positions for both legal and support staff who perform work on this Contract, distributed by type of case. The report will designate the name and salary for each FTE employee in a format to be provided. The Contracting Authority will not release this information except as required by law. If the employee splits his/her work between work under this Contract and other business, the report will indicate the amount of time that employee devotes to private matters compared to work under this Contract.

B.   Caseload Reports

By the seventh day of the month, the Agency will report the number of cases completed in the past month, separated by category, to the Contracting Authority Administrator.

C.   Expenditure Reports

Within 20 days of the last day of each calendar month, the Agency will certify to Contracting Authority a monthly report of the prior month's expenditures for each type of case handled, in the format to be provided.  Expenditure reporting shall be on an accrual basis.

D.   Annual Subcontract Attorney Use Report

If the Agency uses any subcontract attorneys in accordance with Section XXI (Assignment and Subcontracting), the Agency shall submit to Contracting Authority a summary report.

E.   Bar Complaints

The Agency will immediately notify the Contracting Authority in writing when it becomes aware that a complaint lodged with the [state Bar Association/disciplinary body] has resulted in reprimand, suspension, or disbarment of any attorney who is a member of the Agency's staff or working for the Agency.

F.   Inspections

The Agency agrees to grant the Contracting Authority full access to materials necessary to verify compliance with all terms of this Contract.  At any time, upon reasonable notice during business hours and as often as the Contracting Authority may reasonably deem necessary for the duration of the Contract and a period of five years thereafter, the Agency shall provide to the Contracting Authority right of access to its facilities, including those of any subcontractor, to audit information relating to the matters covered by this Contract.  Information that may be subject to any privilege or rules of confidentiality should be maintained by the Agency in a way that allows access by the Contracting Authority without breaching such confidentiality or privilege.  The Agency agrees to maintain this information in an accessible location and condition for a period of not less than five years following the termination of this Contract, unless the Contracting Authority agrees in writing to an earlier disposition.  Notwithstanding any of the above provisions of this paragraph, none of the Constitutional, statutory, and common law rights and privileges of any client are waived by this agreement. The Contracting Authority will respect the attorney-client privilege.

## XV. ESTABLISHMENT AND MAINTENANCE OF RECORDS

A.   The Agency agrees to maintain accounts and records, including personnel, property, financial, and programmatic records, which sufficiently and properly reflect all direct and indirect costs of services performed in the performance of this Contract, including the time spent by the Agency on each case.

B.   The Agency agrees to maintain records which sufficiently and properly reflect all direct and indirect costs of any subcontracts or personal service contracts. Such records shall include, but not be limited to, documentation of any funds expended by the Agency for said personal service contracts or subcontracts, documentation of the nature of the service rendered, and records which demonstrate the amount of time spent by each subcontractor personal service contractor rendering service pursuant to the subcontract or personal service contract.

C.   The Agency shall have its annual financial statements relating to this Contract audited by an independent Certified Public Accountant and shall provide the Contracting Authority with a copy of such audit no later than the last working day in July. The independent Certified Public Accountant shall issue an internal control or management letter and a copy of these findings shall be provided to the Contracting Authority along with the annual audit report. All audited annual financial statements shall be based on the accrual method of accounting for revenue and expenditures.    Audits shall be prepared in accordance with Generally Accepted Auditing Standards and shall include balance sheet, income statement, and statement of changes in cash flow.

D.   Records shall be maintained for a period of 5 years after termination of this Contract unless permission to destroy them is granted by the Contracting Authority.

## XVI. HOLD HARMLESS AND INDEMNIFICATION

A.   The Contracting Authority assumes no responsibility for the payment of any compensation, wages, benefits, or taxes by the Agency to Agency employees or others by reason of the Contract.  The Agency shall protect, indemnify, and save harmless the Contracting Authority, their officers, agents, and employees from and against any and all claims, costs, and losses whatsoever, occurring or resulting from Agency's failure to pay any compensation, wages, benefits or taxes except where such failure is due to the Contracting Authority's wrongful withholding of funds due under this Contract.

B.   The Agency agrees that it is financially responsible and liable for and will repay the Contracting Authority for any material breaches of this contract including but not limited to misuse of Contract funds due to the negligence or intentional acts of the Agency, its officers, employees, representatives or agents.

C.   The Contracting Authority shall indemnify and hold harmless the Agency and its officers, agents, and employees, or any of them, from any and all claims, actions, suits, liability, loss, costs, expenses, and damages of any nature whatsoever, by reason of or arising out of any action or omission of the Contracting Authority, its officers, agents, and employees, or any of them, relating or arising out of the performance of this Contract. In the event that any suit based upon such a claim, action, loss, or damage is brought against the Agency, the Contracting Authority shall defend the same at its sole cost and expense and if a final judgment is rendered against the Agency and the Contracting Authority and their respective officers, agents, and employees, or any of them, the Contracting Authority shall satisfy the same.

## XVII.   INSURANCE

Without limiting the Agency's indemnification, it is agreed that the Agency shall maintain in force, at all times during the performance of this Contract, a policy or policies of insurance covering its operation as described below.

### A.   General Liability Insurance

The Agency shall maintain continuously public liability insurance with limits of liability not less than: $250,000 for each person, personal injury, $500,000 for each occurrence, property damage, liability, or a combined single limit of $500,000 for each occurrence, personal injury and/or property damage liability.

Such insurance shall include the Contracting Authority as an additional insured and shall not be reduced or canceled without 30 days' prior written notice to the Contracting Authority. The Agency shall provide a certificate of insurance or, upon written request of the Contracting Authority, a duplicate of the policy as evidence of insurance protection.

### B.   Professional Liability Insurance

The Agency shall maintain or ensure that its professional employees maintain professional liability insurance for any and all acts which occur during the course of their employment with the Agency which constitute professional services in the performance of this Contract.

For purposes of this Contract, professional services shall mean any services provided by a licensed professional.

Such professional liability insurance shall be maintained in an amount not less than $1,000,000 combined single limit per claim/aggregate. The Agency further agrees that it shall have sole and full responsibility for the payment of any funds where such payments are occasioned solely by the professional negligence of its professional employees and where such payments are not covered by any professional liability insurance, including but limited to the amount of the deductible under the insurance policy. The Agency shall not be required to make any payments for professional liability, if such liability is occasioned by the sole

negligence of the Contracting Authority. The Agency shall not be required to make payments other than its judicially determined percentage, for any professional liability which is determined by a court of competent jurisdiction to be the result of the comparative negligence of the Agency and the Contracting Authority.

Such insurance shall not be reduced or canceled without 30 days' prior written notice to the Contracting Authority.   The Agency shall provide certificates of insurance or, upon written request of the Contracting Authority, duplicates of the policies as evidence of insurance protection.

C.    Automobile Insurance

The Agency shall maintain in force at all times during the performance of this contract a policy or policies of insurance covering any automobiles owned, leased, hired, borrowed or used by any employee, agent, subcontractor or designee of the Agency to transport clients of the Agency.

Such insurance policy or policies shall specifically name the Contracting Authority as an additional insured. Said insurance coverage shall be primary insurance with respect to the Contracting Authority, and any insurance, regardless of the form, maintained by the Contracting Authority shall be excess of any insurance coverage which the Agency is required to maintain pursuant to this contract.

Automobile liability as stated herein shall be maintained at $500,000 combined single limit per accident for bodily injury and property damage.

D.    Workers' Compensation

The Agency shall maintain Workers' Compensation coverage as required by the [state statutory reference].

The Agency shall provide a certificate of insurance or, upon written request of the Contracting Authority, a certified copy of the policy as evidence of insurance protection.

XVIII.    EVALUATION GUIDELINES

The Contracting Authority will review information obtained from the Agency to monitor Agency activity, including attorney caseloads, support staff/attorney ratios for each area of cases, the experience level and supervision of attorneys who perform Contract work, training provided to such attorneys, and the compensation provided to attorneys and support staff to assure adherence.

## XIX. CORRECTIVE ACTION

If the Contracting Authority reasonably believes that a material breach of this Contract has occurred, warranting corrective action, the following sequential procedure shall apply:

1.  The Contracting Authority will notify the Agency in writing of the nature of the breach.

2.  The Agency shall respond in writing within five (5) working days of its receipt of such notification, which response shall present facts to show no breach exists or indicate the steps being taken to correct the specified deficiencies, and the proposed completion date for bringing the Contract into compliance.

3.  The Contracting Authority will notify the Agency in writing of the Contracting Authority's determination as to the sufficiency of the Agency's corrective action plan. The determination of the sufficiency of the Agency's corrective action plan will be at the discretion of the Contracting Authority and will take into consideration the reasonableness of the proposed corrective action in light of the alleged breach, as well as the magnitude of the deficiency in the context of the Contract as a whole. In the event the Agency does not concur with the determination, the Agency may request a review of the decision by the Contracting Authority Executive. The Contracting Authority agrees that it shall work with the Agency to implement an appropriate corrective action plan.

In the event that the Agency does not respond to the Contracting Authority's notification within the appropriate time, or the Agency's corrective action plan for a substantial breach is determined by the Contracting Authority to be insufficient, the Contracting Authority may commence termination of this Contract in whole or in part pursuant to Section XIX (Termination and Suspension).

In addition, the Contracting Authority reserves the right to withhold a portion of subsequent payments owed the Agency which is directly related to the breach of the Contract until the Contracting Authority is satisfied the corrective action has been taken or completed as described in Section XI (Compensation and Method of Payment).

## XX. TERMINATION AND SUSPENSION

A.  The Contracting Authority may terminate this Contract in whole or in part upon 10 days' written notice to the Agency in the event that —

1.  The Agency substantially breaches any duty, obligation, or service required pursuant to this Contract;

2.  The Agency engages in misappropriation of funds; or

3.    The duties, obligations, or services herein become illegal, or not feasible.

Before the Contracting Authority terminates this Contract pursuant to Section XIX. A.1, the Contracting Authority shall provide the Agency written notice of termination, which shall include the reasons for termination and the effective date of termination. The Agency shall have the opportunity to submit a written response to the Contracting Authority within 10 working days from the date of the Contracting Authority's notice. If the Agency elects to submit a written response, the Contracting Authority Administrator will review the response and make a determination within 10 days after receipt of the Agency's response.    In the event the Agency does not concur with the determination, the Agency may request a review of the decision by the Contracting Authority Executive.  In the event the Contracting Authority Executive reaffirms termination, the Contract shall terminate in 10 days from the date of the final decision of the Contracting Authority Executive.  The Contract will remain in full force pending communication of the Contracting Authority Executive to the Agency.  A decision by the Contracting Authority Executive affirming termination shall become effective 10 days after it is communicated to the Agency.

B.    The Agency reserves the right to terminate this Contract with cause with 30 days written notice should the Contracting Authority substantially breach any duty, obligation or service pursuant to this Contract. In the event that the Agency terminates this Contract for reasons other than good cause resulting from a substantial breach of this Contract by the Contracting Authority, the Agency shall be liable for damages, including the excess costs of the procurement of similar services from another source, unless it is determined by the Contracting Authority Administrator that (i) no default actually occurred, or (ii) the failure to perform was without the Agency's control, fault or negligence.

C.    In the event of the termination or suspension of this Contract, the Agency shall continue to represent clients that were previously assigned and the Contracting Authority will be liable for any payments owed for the completion of that work. The Agency will remit to the Contracting Authority any monies paid for cases not yet assigned or work not performed under the Contract.  The Contracting Authority Administrator may request that the Agency attempt to withdraw from any case assigned and not completed. Should a court require, after the Agency has attempted to withdraw, the appearance of counsel from the Agency on behalf of any client previously represented by the Agency where such representation is no longer the obligation of the Agency pursuant to the terms of this Contract, the Contracting Authority will honor payment to the Agency upon judicial verification that continued representation is required.

D.    In the event that termination is due to misappropriation of funds, non-performance of the scope of services, or fiscal mismanagement, the Agency

shall return to the Contracting Authority those funds, unexpended or misappropriated, which, at the time of termination, have been paid to the Agency by the Contracting Authority.

E.   Otherwise, this Contract shall terminate on the date specified herein, and shall be subject to extension only by mutual agreement of both parties hereto in writing.

G.   Nothing herein shall be deemed to constitute a waiver by either party of any legal right or remedy for wrongful termination or suspension of the Contract. In the event that legal remedies are pursued for wrongful termination or suspension or for any other reason, the non-prevailing party shall be required to reimburse the prevailing party for all attorney's fees.

## XXI. RESPONSIBILITY OF MANAGING DIRECTOR OF AGENCY

The managing director of the Agency shall be an attorney licensed to practice law in the State of _____. The managing director of the Agency shall be ultimately responsible for receiving or depositing funds into program accounts or issuing financial documents, checks, or other instruments of payment provided pursuant to this Contract.

## XXII.   ASSIGNMENT/SUBCONTRACTING

A.   The Agency shall not assign or subcontract any portion of this Contract without consent of the Contracting Authority. Any consent sought must be requested by the Agency in writing not less than five days prior to the date of any proposed assignment or sub-contract, provided that this provision shall not apply to short-term personal service contracts with individuals to perform work under the direct supervision and control of the Agency. Short-term personal service contracts include any contract for a time period less than one year. Any individuals entering into such contracts shall meet all experience requirements imposed by this Contract. The Contracting Authority shall be notified of any short-term contracts which are renewed, extended or repeated at any time throughout the Contract.

B.   The term "Subcontract" as used above shall not be read to include the purchase of support services that do not directly relate to the delivery of legal services under the Contract to clients of the Agency.

C.   The term "Personal Service Contract" as used above shall mean a contract for the provision of professional services which includes but is not limited to counseling services, consulting services, social work services, investigator services and legal services.

## XXIII.    RENEGOTIATION

Either party may request that the provisions of this Contract be subject to renegotiation. After negotiations have occurred, any changes which are mutually agreed upon shall be incorporated by written amendments to this Contract. Oral representations or understandings not later reduced to writing and made a part of this agreement shall not in any way modify or affect this agreement.

## XXIV.    ATTORNEYS' FEES

In the event that either party pursues legal remedies, for any reason, under this agreement, the non-prevailing party shall reimburse costs and attorneys' fees of the prevailing party.

## XXV.    NOTICES

Whenever this Contract provides for notice to be provided by one party to another, such notice shall be:

1.    In writing; and

2.    Directed to the Chief Executive Officer of the Agency and the director/manager of the Contracting Authority department/division specified on page 1 of this Contract.

Any time limit by which a party must take some action shall be computed from the date that notice is received by said party.

## XXVI.    THE PARTIES' ENTIRE CONTRACT/WAIVER OF DEFAULT

The parties agree that this Contract is the complete expression of the terms hereto and any oral representations of understanding not incorporated herein are excluded. Both parties recognize that time is of the essence in the performance of the provisions of this Contract.

Waiver of any default shall not be deemed to be a waiver of any subsequent default. Waiver of a breach of any provision of this Contract shall not be deemed to be a waiver of any other subsequent breach and shall not be construed to be a modification of the terms of this agreement unless stated to be such through written mutual agreement of the parties, which shall be attached to the original Contract.

## XXVII.    NONDISCRIMINATION

During the performance of this Contract, neither the Agency nor any party subcontracting with the Agency under the authority of this Contract shall discriminate on the basis of race, color, sex, religion, national origin, creed, marital status, age, sexual orientation, or the presence of any sensory, mental, or physical

handicap in employment or application for employment or in the administration or delivery of services or any other benefit under this agreement.

The Agency shall comply fully with all applicable federal, state, and local laws, ordinances, executive orders, and regulations which prohibit such discrimination.

## XXVIII.   CONFLICT OF INTEREST

### A.   Interest of Members of Contracting Authority and Agency

No officer, employee, or agent of the Contracting Authority, or the State of _____, or the United States Government, who exercises any functions or responsibility in connection with the planning and implementation of the program funded herein shall have any personal financial interest, direct or indirect, in this Contract, or the Agency.

### B.   Interests of Agency Directors, Officers, and Employees

The following expenditures of Contract funds shall be considered conflict of interest expenditures and prima facie evidence of misappropriation of Contract funds without prior disclosure and approval by the Administrator of the Contracting Authority:

1. The employment of an individual, either as an employee of the Agency or as an independent consultant, who is either:  (a) related to a director of the Agency;  (b) employed by a corporation owned by a director of the Agency, or relative of a director of the Agency.  This provision shall not apply when the total salary to be paid to the individual pursuant to his employment agreement or employment contract would be less than $1500 per annum.

2. The acquisition or rental by the Agency of real and/or personal property owned or rented by either:  (a) an Agency officer, (b) an Agency director, (c) an individual related to an Agency officer or Agency director, or (d) a corporation owned by the Agency, an Agency director, an Agency officer, or relative of an Agency officer or director.

Agreed:

_____          _____
Agency                               Contracting Authority

Date:_____                  Date:_____

Worksheet A

The Agency agrees to accept the following cases from the Contracting Authority for the duration of this Contract for the rates shown, subject to the terms of this Agreement:

| Case Type | Annual Caseload | Monthly Caseload | Payment |
|---|---|---|---|
| Adult Felony | | | |
| Adult Misdemeanor | | | |
| Juvenile Offender | | | |
| Juvenile Dependency | | | |
| Civil Commitment | | | |
| Misdemeanor Appeal | | | |
| [Specialty Courts; Other] | | | |
| Total: | | | |

The Agency agrees to provide the following other services for the Contracting Authority for the rate shown, subject to the terms of this agreement:

| Service | Payment |
|---|---|
| Complex Litigation | |
| 24 Hour Advisory Service | |
| In Custody Arraignments | |
| [Other] | |
| Total: | |

## 1999 Louisiana IDB Revenues & Expenditures

| Poverty Rate | Revenues: Court Costs | LIDAB Grant | Miscellaneous | Total | Expenditure Total | Deficit Balance | Fund Balance (End of FY'98) | Fund Balance (End of FY'99) | Fund Balance as % of Expenditure |
|---|---|---|---|---|---|---|---|---|---|
| 21.10% | $1,227,832.00 | $501,401.00 | $34,243.00 | $1,763,476.00 | $1,932,732.00 | $(169,256.00) | $903,832.00 | 734,596.00 | 38.01% |
| 24.20% | $186,811.00 | $6,605.00 | $6,688.00 | $200,104.00 | $192,588.00 | $7,516.00 | $201,072.00 | 208,588.00 | 108.31% |
| 23.72% | $212,027.00 | $5,000.00 | $690.00 | $217,627.00 | $288,790.00 | $(71,073.00) | $277,616.00 | 206,543.00 | 71.54% |
| 21.76% | $984,160.00 | $55,000.00 | $29,072.00 | $1,050,232.00 | $1,425,915.00 | $(366,683.00) | $676,651.00 | 309,968.00 | 21.74% |
| 27.02% | $118,573.00 | $- | $5,684.00 | $124,357.00 | $148,994.00 | $(24,737.00) | $172,891.00 | 148,154.00 | 99.44% |
| 37.81% | $137,088.00 | $58,020.00 | $1,445.00 | $196,553.00 | $205,588.00 | $(9,035.00) | $58,405.00 | 49,370.00 | 24.01% |
| 28.75% | $55,376.00 | $5,000.00 | $10,028.00 | $70,404.00 | $83,701.00 | $(13,297.00) | $326,055.00 | 312,758.00 | 373.69% |
| 21.50% | $40,653.00 | $28,555.00 | $1,072.00 | $70,402.00 | $79,402.00 | $(8,922.00) | $9,963.00 | 1,041.00 | 1.31% |
| 20.50% | $513,350.00 | $309,005.00 | $32,547.00 | $855,502.00 | $675,029.00 | $180,473.00 | $50,085.00 | 230,558.00 | 34.16% |
| 26.50% | $185,921.00 | $- | $13,218.00 | $199,139.00 | $233,298.00 | $(34,159.00) | $210,852.00 | 176,693.00 | 75.74% |
| 23.38% | $223,164.00 | $78,999.00 | $761.00 | $302,924.00 | $281,814.00 | $21,110.00 | $95,247.00 | 116,357.00 | 41.29% |
| 25.90% | $79,263.00 | $76,630.00 | $4,714.00 | $160,607.00 | $166,006.00 | $(5,399.00) | $91,999.00 | 86,600.00 | 52.17% |
| 22.20% | $99,547.00 | $18,465.00 | $- | $118,012.00 | $119,691.00 | $(1,685.00) | $18,579.00 | 16,894.00 | 14.11% |
| 15.40% | $912,456.00 | $138,271.00 | $17,157.00 | $1,067,884.00 | $1,097,257.00 | $(29,373.00) | $679,629.00 | 650,256.00 | 59.59% |
| 18.54% | $1,252,553.00 | $144,205.00 | $2,642.00 | $1,399,400.00 | $1,394,489.00 | $4,911.00 | $306,898.00 | 311,809.00 | 22.36% |
| 22.01% | $865,485.00 | $33,817.00 | $10,140.00 | $909,442.00 | $1,016,422.00 | $(116,980.00) | $364,672.00 | 247,692.00 | 24.13% |
| 16.50% | $367,909.00 | $44,852.00 | $4,890.00 | $417,651.00 | $314,417.00 | $103,234.00 | $164,593.00 | 267,827.00 | 85.18% |
| 21.39% | $438,464.00 | $63,590.00 | $1,362.00 | $503,416.00 | $386,459.00 | $116,957.00 | $38,871.00 | 155,828.00 | 40.32% |
| 17.90% | $1,851,503.00 | $435,747.00 | $302,285.00 | $2,589,535.00 | $2,387,450.00 | $202,085.00 | $227,825.00 | 429,911.00 | 18.01% |
| 21.72% | $102,913.00 | $- | $7,272.00 | $110,185.00 | $64,957.00 | $45,228.00 | $172,011.00 | 217,239.00 | 334.44% |
| 17.69% | $661,329.00 | $17,000.00 | $20,605.00 | $698,934.00 | $797,884.00 | $(98,950.00) | $603,468.00 | 504,518.00 | 63.23% |
| 12.43% | $939,473.00 | $240,449.00 | $15,469.00 | $1,195,391.00 | $1,127,000.00 | $68,391.00 | $611,535.00 | 679,926.00 | 60.33% |
| 21.28% | $350,665.00 | $- | $94,580.00 | $445,245.00 | $418,105.00 | $27,140.00 | $212,578.00 | 239,718.00 | 57.33% |
| 13.70% | $2,109,438.00 | $426,660.00 | $102,688.00 | $2,638,786.00 | $2,499,194.00 | $139,592.00 | $1,748,018.00 | 1,887,610.00 | 75.53% |
| 18.00% | $137,035.00 | $- | $7,067.00 | $144,102.00 | $140,031.00 | $4,071.00 | $124,815.00 | 128,886.00 | 92.04% |
| 15.61% | $602,063.00 | $35,000.00 | $37,462.00 | $674,525.00 | $769,479.00 | $(94,954.00) | $890,123.00 | 795,169.00 | 103.34% |
| 29.30% | $464,291.00 | $9,200.00 | $33,624.00 | $497,921.00 | $446,781.00 | $51,140.00 | $665,820.00 | 716,960.00 | 160.47% |
| 18.70% | $40,693.00 | $5,000.00 | $866.00 | $46,559.00 | $42,977.00 | $3,582.00 | $34,361.00 | 37,943.00 | 88.29% |
| 11.40% | $355,295.00 | $35,000.00 | $18,002.00 | $408,298.00 | $464,990.00 | $(56,692.00) | $393,985.00 | 337,293.00 | 72.54% |
| 15.30% | $318,698.00 | $- | $5,368.00 | $324,066.00 | $390,722.00 | $(66,656.00) | $213,946.00 | 147,290.00 | 37.70% |
| 20.90% | $270,244.00 | $5,000.00 | $- | $275,244.00 | $217,672.00 | $57,572.00 | $63,835.00 | 121,407.00 | 55.78% |
| 19.10% | $533,953.00 | $241,279.00 | $11,634.00 | $786,866.00 | $793,672.00 | $(6,806.00) | $322,052.00 | 315,246.00 | 39.72% |
| 19.90% | $104,606.00 | $9,200.00 | $16,140.00 | $129,946.00 | $138,979.00 | $(9,033.00) | $251,909.00 | 242,876.00 | 124.76% |
| 13.10% | $116,307.00 | $141,496.00 | $579.00 | $258,382.00 | $231,512.00 | $26,870.00 | $117,318.00 | 144,188.00 | 62.28% |
| 21.50% | $41,710.00 | $5,000.00 | $2,600.00 | $49,310.00 | $56,752.00 | $(7,442.00) | $9,328.00 | 1,886.00 | 3.32% |
| 15.60% | $164,405.00 | $5,000.00 | $4,487.00 | $173,892.00 | $187,832.00 | $(13,940.00) | $122,176.00 | 108,236.00 | 57.62% |
| 21.20% | $29,602.00 | $10,000.00 | $- | $39,602.00 | $41,857.00 | $(2,255.00) | $13,761.00 | 11,506.00 | 27.49% |
| 12.30% | $93,328.00 | $- | $10,302.00 | $103,636.00 | $117,829.00 | $(14,199.00) | $233,913.00 | 219,714.00 | 186.47% |
| 29.90% | $33,547.00 | $10,000.00 | $2,767.00 | $46,314.00 | $35,638.00 | $9,676.00 | $41,759.00 | 51,435.00 | 140.39% |
| 16.70% | $137,308.00 | $31,637.00 | $20,036.00 | $228,971.00 | $262,665.00 | $(33,694.00) | $159,552.00 | 125,838.00 | 47.91% |

Appendix H (continued)

## 2000 Louisiana IDB Revenues & Expenditures

| Dist# | Poverty Rate | Revenues Court Costs | LIDAB Grant | Miscellaneous | Total | Expenditure Total | Deficit Balance | Fund Balance (End of FY99) | Fund Balance (End of FY00) | Fund Balance as % of Expenditure |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 21.10% | 1,236,269.00 | 153,526.00 | 34,515.00 | 1,424,310.00 | 1,900,805.00 | (476,495.00) | 734,596.00 | 258,101.00 | 13.58% |
| 2 | 24.20% | 209,571.00 | - | 9,481.00 | 219,052.00 | 196,059.00 | 22,993.00 | 208,588.00 | 231,581.00 | 118.13% |
| 3 | 23.72% | 226,295.00 | 6,500.00 | - | 232,795.00 | 246,967.00 | (14,172.00) | 204,543.00 | 192,371.00 | 77.89% |
| 4 | 21.76% | 1,027,091.00 | 6,500.00 | 6,560.00 | 1,040,151.00 | 1,137,816.00 | (97,665.00) | 309,968.00 | 212,303.00 | 18.66% |
| 5 | 27.68% | 141,346.00 | - | 6,397.00 | 147,743.00 | 145,364.00 | 2,379.00 | 148,154.00 | 150,533.00 | 103.56% |
| 6 | 37.81% | 199,512.00 | 25,000.00 | 1,183.00 | 225,695.00 | 192,932.00 | 32,763.00 | 49,370.00 | 82,133.00 | 42.57% |
| 7 | 28.75% | 66,799.00 | - | 13,376.00 | 80,175.00 | 88,929.00 | (8,754.00) | 312,758.00 | 304,004.00 | 341.85% |
| 8 | 21.50% | 79,727.00 | - | 551.00 | 80,278.00 | 57,178.00 | 23,100.00 | 1,041.00 | 24,141.00 | 42.22% |
| 9 | 20.50% | 535,723.00 | 42,657.00 | 12,250.00 | 590,630.00 | 710,156.00 | (119,526.00) | 230,558.00 | 111,032.00 | 15.63% |
| 10 | 26.50% | 178,799.00 | - | 7,173.00 | 185,972.00 | 200,201.00 | (14,848.00) | 176,693.00 | 161,845.00 | 80.59% |
| 11 | 23.38% | 221,309.00 | 10,264.00 | 503.00 | 232,076.00 | 248,760.00 | (16,684.00) | 116,357.00 | 99,673.00 | 40.07% |
| 12 | 25.90% | 90,221.00 | 75,139.00 | 2,108.00 | 167,468.00 | 174,053.00 | (6,585.00) | 86,600.00 | 80,015.00 | 45.97% |
| 13 | 32.20% | 98,449.00 | 6,214.00 | - | 104,663.00 | 109,109.00 | 4,563.00 | 16,894.00 | 21,457.00 | 21.44% |
| 14 | 15.40% | 881,063.00 | 32,631.00 | 15,044.00 | 928,738.00 | 1,313,845.00 | (395,107.00) | 650,256.00 | 255,149.00 | 19.27% |
| 15 | 18.54% | 1,302,953.00 | 36,466.00 | 2,571.00 | 1,342,990.00 | 1,488,092.00 | (145,102.00) | 311,809.00 | 166,707.00 | 11.20% |
| 16 | 23.01% | 849,717.00 | 12,697.00 | 3,340.00 | 865,754.00 | 1,022,480.00 | (156,726.00) | 247,692.00 | 90,966.00 | 8.90% |
| 17 | 16.50% | 401,222.00 | 12,085.00 | - | 413,307.00 | 332,343.00 | 80,964.00 | 267,827.00 | 348,791.00 | 104.95% |
| 18 | 21.39% | 429,370.00 | 23,500.00 | 5,334.00 | 458,204.00 | 428,695.00 | 29,509.00 | 155,828.00 | 185,337.00 | 43.33% |
| 19 | 17.90% | 2,065,019.00 | 169,013.00 | 76,951.00 | 2,250,983.00 | 2,316,589.00 | (65,606.00) | 429,911.00 | 364,305.00 | 15.73% |
| 20 | 21.72% | 82,375.00 | - | 9,761.00 | 92,136.00 | 64,587.00 | 27,549.00 | 217,239.00 | 244,788.00 | 379.01% |
| 21 | 17.69% | 716,725.00 | 10,000.00 | 18,164.00 | 744,889.00 | 976,089.00 | (231,200.00) | 504,518.00 | 273,318.00 | 28.00% |
| 22 | 12.43% | 1,027,254.00 | 46,355.00 | 22,298.00 | 1,095,907.00 | 1,027,253.00 | 68,654.00 | 679,926.00 | 748,580.00 | 72.87% |
| 23 | 21.28% | 395,627.00 | - | 10,997.00 | 406,624.00 | 448,813.00 | (42,189.00) | 239,718.00 | 197,529.00 | 44.01% |
| 24 | 13.70% | 2,216,667.00 | 105,595.00 | 122,652.00 | 2,444,914.00 | 2,640,088.00 | (195,174.00) | 1,817,630.00 | 1,692,456.00 | 64.11% |
| 25 | 18.00% | 155,730.00 | - | 10,027.00 | 165,757.00 | 137,437.00 | 28,320.00 | 128,886.00 | 157,206.00 | 114.38% |
| 26 | 13.61% | 748,293.00 | - | 29,031.00 | 777,324.00 | 815,333.00 | (38,009.00) | 795,169.00 | 757,160.00 | 92.83% |
| 27 | 29.30% | 392,068.00 | - | 84,103.00 | 476,171.00 | 453,156.00 | (26,985.00) | 716,960.00 | 689,975.00 | 152.26% |
| 28 | 18.70% | 32,009.00 | 15,000.00 | 840.00 | 47,849.00 | 61,956.00 | (14,107.00) | 37,943.00 | 23,836.00 | 38.47% |
| 29 | 11.40% | 391,317.00 | 3,500.00 | 18,685.00 | 413,502.00 | 446,985.00 | (33,483.00) | 337,293.00 | 303,810.00 | 67.97% |
| 30 | 15.30% | 307,009.00 | - | 6,170.00 | 313,179.00 | 298,105.00 | 15,074.00 | 147,290.00 | 162,364.00 | 54.47% |
| 31 | 20.90% | 330,039.00 | 3,890.00 | - | 333,939.00 | 259,048.00 | 74,491.00 | 121,407.00 | 195,898.00 | 75.62% |
| 32 | 19.10% | 572,417.00 | 14,080.00 | 15,962.00 | 602,459.00 | 598,525.00 | 3,934.00 | 315,246.00 | 319,180.00 | 53.33% |
| 33 | 19.90% | 144,455.00 | 3,500.00 | 11,149.00 | 159,104.00 | 153,558.00 | 5,546.00 | 242,876.00 | 248,422.00 | 161.78% |
| 34 | 13.10% | 161,400.00 | 53,385.00 | 421.00 | 215,206.00 | 270,702.00 | (55,496.00) | 144,188.00 | 88,692.00 | 32.76% |
| 35 | 21.50% | 49,563.00 | 10,000.00 | - | 59,563.00 | 53,320.00 | 6,243.00 | 1,886.00 | 8,129.00 | 15.25% |
| 36 | 15.60% | 175,084.00 | 3,500.00 | 4,295.00 | 182,879.00 | 179,787.00 | 3,092.00 | 108,236.00 | 111,328.00 | 61.92% |
| 37 | 21.20% | 82,745.00 | - | 1,010.00 | 83,755.00 | 38,881.00 | 44,874.00 | 1,098.00 | 45,972.00 | 118.24% |
| 38 | 12.30% | 87,618.00 | - | 11,761.00 | 99,379.00 | 105,064.00 | (5,685.00) | 219,714.00 | 214,029.00 | 202.71% |
| 39 | 29.90% | 40,810.00 | | 1,346.00 | 42,156.00 | 44,162.00 | (2,005.00) | 51,435.00 | 49,429.00 | 111.93% |
| 40 | 16.70% | 266,815.00 | 3,500.00 | 20,803.00 | 291,178.00 | 273,518.00 | 17,650.00 | 125,838.00 | 143,488.00 | 52.46% |

Appendix H (continued)

## 2001 Louisiana IDB Revenues & Expenditures

| District | Poverty Rate | Court Costs | LUDAB Grant | Miscellaneous | Total | Expenditure Total | Deficit Balance | Fund Balance (End of FY00) | Fund Balance (End of FY01) | Fund Balance as % of Expenditure |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 21.10% | 1,207,383.00 | 472,581.00 | 22,301.00 | 1,702,265.00 | 1,717,105.00 | (14,840.00) | 258,101.00 | 243,261.00 | 14.17% |
| 2 | 24.20% | 257,858.00 | | 11,016.00 | 268,874.00 | 208,635.00 | 60,239.00 | 231,581.00 | 291,820.00 | 139.87% |
| 3 | 23.72% | 111,404.00 | 90,669.00 | 8,488.00 | 210,561.00 | 248,175.00 | (37,614.00) | 192,371.00 | 154,757.00 | 62.36% |
| 4 | 21.76% | 1,000,880.00 | - | 2,172.00 | 1,003,052.00 | 1,103,613.00 | (100,561.00) | 212,303.00 | 111,742.00 | 10.13% |
| 5 | 27.08% | 147,955.00 | - | 5,686.00 | 153,641.00 | 165,076.00 | (11,435.00) | 150,533.00 | 139,098.00 | 84.26% |
| 6 | 37.81% | 212,171.00 | - | | 212,171.00 | 173,389.00 | 38,782.00 | 82,133.00 | 120,915.00 | 69.74% |
| 7 | 28.75% | 47,504.00 | 2,334.00 | 15,846.00 | 65,684.00 | 89,390.00 | (23,706.00) | 304,004.00 | 280,298.00 | 313.57% |
| 8 | 21.50% | 64,497.00 | | 1,667.00 | 66,164.00 | 70,700.00 | (4,536.00) | 24,141.00 | 19,605.00 | 27.73% |
| 9 | 20.50% | 632,616.00 | 60,589.00 | 8,844.00 | 702,049.00 | 594,874.00 | 107,175.00 | 111,032.00 | 218,207.00 | 36.68% |
| 10 | 26.50% | 191,451.00 | | 7,052.00 | 198,503.00 | 187,999.00 | 10,504.00 | 161,845.00 | 172,349.00 | 91.68% |
| 11 | 23.38% | 254,551.00 | 5,649.00 | 570.00 | 260,770.00 | 238,785.00 | 21,985.00 | 99,673.00 | 121,658.00 | 50.95% |
| 12 | 25.90% | 92,962.00 | 108,728.00 | 3,407.00 | 205,097.00 | 171,214.00 | 33,883.00 | 80,015.00 | 113,898.00 | 66.52% |
| 13 | 32.20% | 82,785.00 | 12,392.00 | - | 95,177.00 | 100,270.00 | (5,093.00) | 21,457.00 | 16,364.00 | 16.32% |
| 14 | 15.40% | 976,983.00 | 66,928.00 | 6,634.00 | 1,050,545.00 | 1,120,373.00 | (69,828.00) | 255,149.00 | 185,321.00 | 16.54% |
| 15 | 18.54% | 1,218,704.00 | 270,112.00 | 2,334.00 | 1,491,150.00 | 1,600,938.60 | (109,788.00) | 166,707.00 | 56,919.00 | 3.56% |
| 16 | 23.01% | 972,940.00 | 104,695.00 | 2,496.00 | 1,080,131.00 | 1,011,639.00 | 68,492.00 | 90,966.00 | 159,458.00 | 15.76% |
| 17 | 16.50% | 389,327.00 | 43,445.00 | 17,521.00 | 450,293.00 | 374,376.00 | 75,917.00 | 148,791.00 | 424,708.00 | 113.44% |
| 18 | 21.39% | 433,207.00 | 25,472.00 | 6,112.00 | 464,791.00 | 487,239.00 | (22,448.00) | 185,337.00 | 162,889.00 | 33.43% |
| 19 | 17.90% | 1,795,679.00 | 353,171.00 | 312,713.00 | 2,461,165.00 | 2,533,214.00 | (71,169.00) | 364,385.00 | 293,196.00 | 11.57% |
| 20 | 21.72% | 83,019.00 | | 11,127.00 | 100,146.00 | 66,131.00 | 34,015.00 | 244,788.00 | 278,803.00 | 421.59% |
| 21 | 17.69% | 864,857.00 | 25,251.00 | 6,980.00 | 897,598.00 | 996,752.00 | (99,154.00) | 273,318.00 | 174,164.00 | 17.47% |
| 22 | 12.43% | 971,792.00 | 160,445.00 | 8,551.00 | 1,140,788.00 | 1,220,892.00 | (80,104.00) | 746,870.00 | 666,766.00 | 54.61% |
| 23 | 21.28% | 513,329.00 | | 17,216.00 | 530,545.00 | 480,406.00 | 50,139.00 | 197,529.00 | 247,668.00 | 51.55% |
| 24 | 13.70% | 1,982,667.00 | 263,667.00 | 76,474.00 | 2,312,348.00 | 2,558,370.00 | (246,022.00) | 1,720,172.00 | 1,474,150.00 | 57.40% |
| 25 | 18.00% | 156,126.00 | | 9,386.00 | 165,512.00 | 180,882.00 | (15,370.00) | 157,206.00 | 141,836.00 | 78.41% |
| 26 | 15.61% | 640,630.00 | | 18,744.00 | 659,374.00 | 1,098,091.00 | (438,717.00) | 757,160.00 | 318,443.00 | 29.00% |
| 27 | 23.06% | 432,800.00 | | 30,485.00 | 463,285.00 | 447,493.00 | 15,792.00 | 689,975.00 | 705,767.00 | 157.72% |
| 28 | 18.70% | 41,619.00 | 29,537.00 | | 71,156.00 | 81,753.00 | (10,597.00) | 23,836.00 | 13,239.00 | 16.19% |
| 29 | 11.40% | 475,066.00 | 3,000.00 | 12,714.00 | 490,780.00 | 434,112.00 | 56,668.00 | 303,810.00 | 360,478.00 | 83.04% |
| 30 | 15.20% | 299,174.00 | | 8,278.00 | 307,452.00 | 372,818.00 | (66,366.00) | 162,364.00 | 95,998.00 | 25.68% |
| 31 | 20.90% | 366,778.00 | 49,519.00 | | 416,097.00 | 401,810.00 | 14,287.00 | 195,898.00 | 210,185.00 | 52.31% |
| 32 | 19.10% | 631,520.00 | 65,948.00 | 11,819.00 | 729,287.00 | 655,226.00 | 74,061.00 | 319,180.00 | 393,241.00 | 60.02% |
| 33 | 19.90% | 143,523.00 | | 9,600.00 | 153,123.00 | 151,072.00 | 2,051.00 | 248,422.00 | 250,473.00 | 165.80% |
| 34 | 13.10% | 131,297.00 | 118,352.00 | 915.00 | 251,065.00 | 259,944.00 | (8,879.00) | 86,692.00 | 79,813.00 | 30.70% |
| 35 | 21.50% | 46,311.00 | 10,500.00 | | 56,811.00 | 52,739.00 | 4,072.00 | 8,329.00 | 12,201.00 | 23.13% |
| 36 | 15.60% | 150,338.00 | 3,000.00 | 4,870.00 | 158,208.00 | 179,023.00 | (20,815.00) | 111,328.00 | 90,513.00 | 50.56% |
| 37 | 21.20% | 57,752.00 | | 1,663.00 | 59,415.00 | 39,522.00 | 19,893.00 | 45,972.00 | 65,865.00 | 166.65% |
| 38 | 12.10% | 100,598.00 | | 7,591.00 | 108,189.00 | 119,717.00 | (11,528.00) | 214,029.00 | 202,501.00 | 169.15% |
| 39 | 12.30% | 61,279.00 | | 1,180.00 | 62,459.00 | 49,255.00 | 13,204.00 | 49,429.00 | 62,633.00 | 127.16% |
| 40 | 29.50% | 301,316.00 | 31,076.00 | 21,238.00 | 353,630.00 | 325,543.00 | 28,107.00 | 143,488.00 | 171,595.00 | 52.71% |
| | 16.70% | | | | | | | | | |

Appendix H (continued)

## 2002 Louisiana IDB Revenues & Expenditures

| Poverty Rate | Revenues | | | | Expenditure | Deficit Balance | Fund Balance (End of FY01) | Fund Balance (End of FY02) | Fund Balance as % of Expenditure |
|---|---|---|---|---|---|---|---|---|---|
| | Court Costs | LIDAB Grant | Miscellaneous | Total | Total | | | | |
| 24.10% | $ 1,166,202.00 | $ 490,149.00 | $ 12,716.00 | $ 1,669,067.00 | $ 1,680,668.00 | $ (11,601.00) | $ 243,261.00 | $ 231,660.00 | 13.78% |
| 24.20% | $ 252,423.00 | $ | $ 7,108.00 | $ 259,531.00 | $ 243,600.00 | $ 15,931.00 | $ 291,820.00 | $ 307,751.00 | 126.33% |
| 23.72% | $ 249,898.00 | $ 7,845.00 | $ 3,234.00 | $ 260,977.00 | $ 285,377.00 | $ (24,400.00) | $ 154,757.00 | $ 130,357.00 | 45.68% |
| 21.76% | $ 1,059,078.00 | $ 31,719.00 | $ | $ 1,090,797.00 | $ 1,079,671.00 | $ 11,126.00 | $ 111,742.00 | $ 122,868.00 | 11.38% |
| 27.68% | $ 141,555.00 | $ 2,833.00 | $ 600.00 | $ 144,998.00 | $ 142,921.00 | $ 2,077.00 | $ 139,098.00 | $ 141,175.00 | 98.78% |
| 37.81% | $ 178,329.00 | $ 21,494.00 | $ 733.00 | $ 200,566.00 | $ 236,375.00 | $ (35,869.00) | $ 120,915.00 | $ 85,046.00 | 35.98% |
| 28.75% | $ 48,307.00 | $ 13,240.00 | $ 6,174.00 | $ 67,721.00 | $ 94,118.00 | $ (26,397.00) | $ 280,298.00 | $ 253,901.00 | 269.77% |
| 21.50% | $ 45,192.00 | $ 20,983.00 | $ 10,782.00 | $ 76,957.00 | $ 83,069.00 | $ (6,112.00) | $ 19,605.00 | $ 13,493.00 | 16.24% |
| 20.50% | $ 632,416.00 | $ 60,689.00 | $ 8,944.00 | $ 702,049.00 | $ 594,874.00 | $ 107,175.00 | $ 218,207.00 | $ 325,382.00 | 54.70% |
| 26.50% | $ 221,096.00 | $ 10,396.00 | $ | $ 231,492.00 | $ 186,740.00 | $ 44,752.00 | $ 172,349.00 | $ 217,101.00 | 116.26% |
| 23.38% | $ 286,893.00 | $ 13,842.00 | $ 167.00 | $ 300,901.00 | $ 278,265.00 | $ 22,637.00 | $ 121,658.00 | $ 144,295.00 | 51.86% |
| 25.90% | $ 100,774.00 | $ 45,701.00 | $ 2,543.00 | $ 149,018.00 | $ 186,495.00 | $ (37,477.00) | $ 113,898.00 | $ 76,421.00 | 40.98% |
| 32.20% | $ 69,294.00 | $ 12,162.00 | $ 10,328.00 | $ 91,984.00 | $ 94,002.00 | $ (2,018.00) | $ 16,364.00 | $ 14,346.00 | 15.26% |
| 15.40% | $ 845,141.00 | $ 263,041.00 | $ 14,269.00 | $ 1,122,451.00 | $ 1,257,847.00 | $ (135,396.00) | $ 185,331.00 | $ 49,925.00 | 3.97% |
| 18.54% | $ 1,177,289.00 | $ 252,334.00 | $ 1,385.00 | $ 1,431,008.00 | $ 1,347,030.00 | $ 83,978.00 | $ 56,919.00 | $ 140,897.00 | 10.46% |
| 23.01% | $ 805,546.00 | $ 114,319.00 | $ 3,123.00 | $ 922,988.00 | $ 1,101,413.00 | $ (178,425.00) | $ 159,458.00 | $ (18,967.00) | -1.72% |
| 16.50% | $ 352,640.00 | $ | $ 23,835.00 | $ 376,475.00 | $ 421,354.00 | $ (46,879.00) | $ 424,708.00 | $ 377,829.00 | 89.25% |
| 21.39% | $ 513,209.00 | $ 3,000.00 | $ 3,996.00 | $ 520,115.00 | $ 503,210.00 | $ 16,905.00 | $ 162,889.00 | $ 179,794.00 | 35.73% |
| 17.90% | $ 1,990,728.00 | $ 366,869.00 | $ 258,229.00 | $ 2,615,826.00 | $ 2,691,107.00 | $ (75,281.00) | $ 291,196.00 | $ 217,915.00 | 8.10% |
| 21.72% | $ 94,086.00 | $ | $ 5,812.00 | $ 100,898.00 | $ 74,109.00 | $ 26,789.00 | $ 278,803.00 | $ 305,592.00 | 412.33% |
| 17.69% | $ 827,505.00 | $ 177,281.00 | $ 10,102.00 | $ 1,014,888.00 | $ 1,028,040.00 | $ (13,152.00) | $ 174,164.00 | $ 161,012.00 | 15.66% |
| 12.43% | $ 961,811.00 | $ 80,128.00 | $ 7,106.00 | $ 1,049,045.00 | $ 1,117,918.00 | $ (68,873.00) | $ 666,766.00 | $ 597,893.00 | 53.48% |
| 21.28% | $ 588,015.00 | $ | $ 108,172.00 | $ 696,187.00 | $ 557,628.00 | $ 138,559.00 | $ 247,668.00 | $ 386,227.00 | 59.26% |
| 13.75% | $ 2,228,813.00 | $ 229,284.00 | $ 27,072.00 | $ 2,485,169.00 | $ 2,545,419.00 | $ (60,250.00) | $ 1,474,150.00 | $ 1,413,900.00 | 55.55% |
| 18.00% | $ 88,759.00 | $ | $ 3,154.00 | $ 91,913.00 | $ 194,784.00 | $ (102,871.00) | $ 141,836.00 | $ 38,965.00 | 20.00% |
| 15.61% | $ 640,630.00 | $ | $ 18,744.00 | $ 659,374.00 | $ 1,098,091.00 | $ (438,717.00) | $ 318,443.00 | $ (120,274.00) | -10.95% |
| 29.30% | $ 442,494.00 | $ | $ 33,479.00 | $ 475,973.00 | $ 406,678.00 | $ 69,295.00 | $ 705,767.00 | $ 775,062.00 | 190.58% |
| 18.70% | $ 40,259.00 | $ 42,596.00 | $ | $ 82,855.00 | $ 57,138.00 | $ 25,717.00 | $ 13,239.00 | $ 38,956.00 | 68.18% |
| 11.40% | $ 408,586.00 | $ 13,520.00 | $ 6,450.00 | $ 428,556.00 | $ 475,374.00 | $ (46,818.00) | $ 360,478.00 | $ 313,660.00 | 65.98% |
| 15.30% | $ 328,063.00 | $ 4,375.00 | $ 2,032.00 | $ 334,470.00 | $ 345,370.00 | $ (10,900.00) | $ 95,998.00 | $ 85,098.00 | 24.64% |
| 20.90% | $ 323,558.00 | $ 14,566.00 | $ | $ 338,124.00 | $ 311,049.00 | $ 27,075.00 | $ 210,185.00 | $ 237,260.00 | 76.28% |
| 19.10% | $ 584,926.00 | $ 42,791.00 | $ 5,766.00 | $ 633,483.00 | $ 696,788.00 | $ (63,305.00) | $ 393,241.00 | $ 329,936.00 | 47.35% |
| 19.90% | $ 122,351.00 | $ | $ 6,443.00 | $ 128,794.00 | $ 153,633.00 | $ (24,839.00) | $ 250,473.00 | $ 225,634.00 | 146.87% |
| 13.10% | $ 118,182.00 | $ 83,847.00 | $ 747.00 | $ 201,281.00 | $ 272,509.00 | $ (69,728.00) | $ 79,813.00 | $ 10,085.00 | 3.70% |
| 21.50% | $ 47,788.00 | $ 10,500.00 | $ | $ 58,288.00 | $ 58,873.00 | $ (585.00) | $ 12,201.00 | $ 11,616.00 | 19.71% |
| 15.68% | $ 169,017.00 | $ 3,000.00 | $ 3,733.00 | $ 175,750.00 | $ 173,304.00 | $ 2,446.00 | $ 90,513.00 | $ 92,959.00 | 53.64% |
| 21.20% | $ 30,416.00 | $ | $ | $ 30,416.00 | $ 50,281.00 | $ (19,865.00) | $ 65,865.00 | $ 46,000.00 | 91.49% |
| 12.30% | $ 99,813.00 | $ | $ 3,597.00 | $ 103,410.00 | $ 108,331.00 | $ (4,921.00) | $ 202,501.00 | $ 197,580.00 | 242.39% |
| 29.90% | $ 52,328.00 | $ | $ 602.00 | $ 52,930.00 | $ 37,590.00 | $ 15,340.00 | $ 62,633.00 | $ 77,973.00 | 207.43% |
| 16.70% | $ 341,560.00 | $ 21,146.00 | $ 24,896.00 | $ 387,602.00 | $ 360,467.00 | $ 27,135.00 | $ 171,595.00 | $ 198,730.00 | 55.13% |
| 23.90% | $ 1,764,990.00 | $ 519,959.00 | $ 3,775.00 | $ 2,288,724.00 | $ 2,653,557.00 | $ (364,833.00) | $ 1,106,078.00 | $ 741,245.00 | 27.93% |

### Appendix I
*A Discussion of National Indigency Screening Procedures*

Though *Gideon v. Wainwright* requires states to provide counsel for those unable to afford counsel, it does not state explicitly how to determine financial eligibility. Jurisdictions across the country have weighed various interests when considering how best to make such determinations. Policy-makers must decide to what extent the need to ensure the public that money is being spent efficiently outweighs the cost of eligibility verification processes. If it is determined to move ahead with more rigorous screening, national standards can be used to structure the process.

The *Guidelines for Legal Defense Systems in the United States* issued by the National Study Commission on Defense Services state that, "[e]ffective representation should be provided to anyone who is unable, without substantial financial hardship to himself or to his dependents, to obtain such representation."[14] "Substantial hardship" is also the standard promulgated by the ABA.[15] While ABA Defense Services Standard 5-7.1 makes no effort to define need or hardship, it does prohibit denial of appointed counsel because of a person's ability to pay part of the cost of representation, because friends or relatives have resources to retain counsel, or because bond has been or can be posted. In practice, the "substantial hardship" standard has led many jurisdictions to create a tiered screening system. At some minimum asset threshold, a defendant is presumed eligible without undergoing further screening. Defendants not falling below the presumptive threshold are then subjected to a more rigorous screening process to determine if their particular circumstances (including seriousness of the charges being faced, monthly expenses, local private counsel rates) would result in a "substantial hardship" were they to seek to retain private counsel. The great majority of defendants currently being offered the services of public defenders in Louisiana should qualify for public counsel under the presumptive standard, thus minimizing the need to use a more expansive screening and verification process. Examples of such presumptive standards include:

- A defendant is presumed eligible if he or she receives public assistance, such as Food Stamps, Aid to Families of Dependent Children, Medicaid, Disability Insurance, or resides in public housing.[16]
- A defendant is presumed eligible if he or she is currently serving a sentence in a correctional institution or is housed in a mental health facility.

For those who do not meet the presumptive standard but who may still qualify under the "substantial hardship" standard, many jurisdictions have developed financial eligibility formulas that take into account a household's net income, liquid assets,

---

[14] Guideline 1.5.

[15] *ABA Standards for Criminal Justice: Providing Defense Services* 5-7.1 states: "Counsel should be provided to persons who are financially unable to obtain adequate representation without substantial hardship."

[16] An additional benefit to using public aid as a presumptive threshold is that other agencies already rigorously screen and verify the person to qualify for such assistance. Using these standards allows a jurisdiction to, in effect, "piggyback" onto the verification process without duplicating efforts.

"reasonable" necessary expenses and other "exceptional" expenses. The National Study Commission on Defense Services guidelines are more comprehensive than other national standards in guiding this second tier of eligibility determinations.  The first step is to determine a defendant's net income (usually verified through documented pay stubs) and liquid assets. Under Guideline 1.5, liquid assets include cash in hand, stocks and bonds, bank accounts and any other property that can be readily converted to cash. Factors not to be considered include the person's car,[17] house,[18] household furnishings, clothing, any property declared exempt from attachment or execution by law, the person's release on bond, or the resources of a spouse, parent or other person.

Next, the screening agency assesses a defendant's reasonable necessary expenses and other money owed for exceptional expenses, like medical care not covered by insurance, or court-ordered family support.  Though jurisdictions vary as to what constitutes "necessary" expenses, most include rent, day-care and utilities.

Screeners then determine an individual's available funds to contribute toward defense representation by adding the net income and liquid assets and subtracting from the total the sum of reasonable and exceptional expenses. [(Net Income + Liquid Assets) – (Reasonable + Exceptional Expenses) = Available Funds].  The resulting "available funds" can then be measured against a second tier presumptive eligibility standard.  In many jurisdictions, this second presumptive level is tied to a percentage of the Federal Poverty guidelines.  For instance, Florida sets its presumptive standard at 250% of the Federal Poverty guideline.[19]  Table I-1 (below) shows the 2002 Health and Human Services Poverty Guidelines, by family size and annual income, and compares the 250% and 150% standard for both annual and monthly income.

| Table I-1 Federal Poverty Guidelines[20] | | | | | |
|---|---|---|---|---|---|
| | | 150% | | 250% | |
| Family Size | Poverty Index | Annual | Monthly | Annual | Monthly |
| 1 | $8,860 | $13,290 | $1,107.50 | $22,150 | $1,845.83 |
| 2 | $11,940 | $17,910 | $1,492.50 | $29,850 | $2,487.50 |
| 3 | $15,020 | $22,530 | $1,877.50 | $37,550 | $3,129.17 |
| 4 | $18,100 | $27,150 | $2,262.50 | $45,250 | $3,770.83 |
| 5 | $21,180 | $31,770 | $2,647.50 | $52,950 | $4,412.50 |
| 6 | $24,260 | $36,390 | $3,032.50 | $60,650 | $5,054.17 |

In some jurisdictions, eligibility screening is terminated if a person's net income and liquid assets exceed these income thresholds, and the person is deemed ineligible for

---

[17] A defendant's vehicle may be the only thing keeping him and her off of public assistance by allowing him or her the means to get to work, or comply with conditions of probation or pretrial release such as drug or mental health treatment, or family counseling. In a large geographically expansive counties, including a car in a person' liquid assets may be ultimately more costly than appointing the person a public defender.

[18] It is assumed that the goals of the criminal justice system are not served by rendering homeless a charged-but-unadjudicated defendant, or his or her family.

[19] FL. Stat. §27.52. Though a state-by-state, county-by-county study has not been conducted to determine the total number of jurisdictions that use the Federal Poverty guidelines and some presumptive percentage thereof, the evaluation team's range of experience suggests a national norm of approximately 150% of the federal rate.

[20] *Federal Register*, Vol. 67, No. 31, February 14, 2002, pp. 6,931-6,933. For each additional household member, add $3,080.

public appointment of counsel. In others, persons can be deemed eligible if their net income and liquid assets exceed these thresholds, but reasonable and exceptional expenses bring them under the threshold.

One example of jurisdiction employing such a financial determination system is New York City. There, the formula also takes into account the seriousness of the charge. As with most jurisdictions, defendants in New York City whose gross income falls at or below the current federal poverty index are presumptively eligible for assigned counsel. However, even defendants with household gross incomes above these levels are eligible for assigned counsel, if they are financially unable to retain counsel. In determining whether a defendant is unable to retain counsel, the court considers the household's other financial commitments, including rent or mortgage payments, the cost of food and utilities, debts, the likely cost of counsel, unusual expenses, and available liquid assets.[21]

As in Florida, New York City's guidelines provide that defendants charged with misdemeanors are presumptively eligible for assigned counsel when the gross household income is at or below 250% of the federal poverty standard. The guidelines similarly provide that defendants charged with felonies are presumptively eligible for assigned counsel when the gross household income is at or below 350% of the federal poverty standard.

In lieu of the Federal Poverty guidelines, other jurisdictions take into account the going rate for private counsel to represent a defendant on various case types. For instance, private attorneys may routinely ask for a $5,000 retainer to represent a person on a felony indictment, in which case a defendant may fall above the 150% Federal Poverty index ($1,107.50 monthly available funds) but would still face a "substantial hardship" if he or she were to retain private counsel.

The three-tiered screening system described above has an added benefit to the overall justice system. In many jurisdictions, public defenders employ investigation interns to conduct these eligibility screenings at little or no cost.[22] These interns regularly go to the jail each morning and afternoon to conduct the financial screening on all people brought in on new charges. The appointment of the public defender can be made as soon as the eligibility is determined, and attorneys are able to make bail recommendations earlier, reducing the number of beds in the County jail used for pre-trial detention. And early appointment of counsel allows earlier investigation, discovery and preparation, which results in more prompt decisions regarding either negotiated dispositions or going to trial.

---

[21] Once the public defender has been assigned, a court may not relieve it on the ground of non-indigency unless the defender agency first moves to be relieved. Construing County Law §722-d, the Appellate Division has stated that "the report of counsel [is] a predicate to any action on the part of the court to relieve counsel of the assignment." *Matter of The Legal Aid Society v. Samenga*, 39 A.D.2d 912, 913 (2d Dept. 1972). Thus, for example, where a court suspects that a defendant has the resources to retain counsel because bail has been posted, at most it would ask the assigned attorney to review the accused's eligibility, keeping in mind that persons who contribute to bail cannot be required to assign their money for purposes of hiring an attorney unless they also are obligated to contribute to the defendant's support. Therefore, where bail is posted by the accused's spouse, that money can be considered as an asset in evaluating eligibility, but bail money posted by an employer, family friend or member of the defendant's extended family (aunt, uncle, cousin) ordinarily should not be considered as an asset of the accused.

[22] As mentioned above, other jurisdictions employ Pre-Trial Services departments that are able to make financial eligibility determinations at the same time as screening to determine eligibility for release on one's own recognizance.

Appendix J
*The American Council of Chief Defenders'*
*Ethics Opinion 03-01*
*April 2003*

*Situation presented:*

Due to budgetary pressures within a jurisdiction, a public defense agency is under pressure to accept a substantial budget cut, even though the agency's caseload is not projected to decrease. Alternatively, the agency faces a flat budget but substantially increasing caseloads. In either event, the agency's chief executive officer has determined that some portion of the caseload will be beyond the capacity of the staff to competently handle. What are the ethical obligations of the agency's chief executive officer in such a situation?

1. General duty of lawyer to act competently, diligently and promptly .     2
2. Indigent defender's duty to limit workload so as to ensure quality, and to decline
    excess cases     .          .          .          .          .          .          3
3. Determining whether workload is excessive     .          .          .          5
4. Special duties of the chief executive officer of a public defense agency          6
5. Civil liability of chief public defender and unit of government          .          7

*Conclusion*     .          .          .          .          .          .          .          8

*A chief executive of an agency providing public defense services is ethically prohibited from accepting a number of cases which exceeds the capacity of the agency's attorneys to provide competent, quality representation in every case. The elements of such representation encompass those prescribed in national performance standards including the NLADA Performance Guidelines for Criminal Defense Representation and the ABA Defense Function Standards.*

*When confronted with a prospective overloading of cases or reductions in funding or staffing which will cause the agency's attorneys to exceed such capacity, the chief executive of a public defense agency is ethically required to refuse appointment to any and all such excess cases.*

*Principle sources:* American Bar Association Model Code of Professional Responsibility ("Model Code"); American Bar Association Model Rules of Professional Conduct ("Model Rules"); *Ten Principles of a Public Defense Delivery System* (American Bar Association, 2002) ("ABA Ten Principles"); American Bar Association *Standards for Criminal Justice, Defense Function* (3rd ed. 1993) ("ABA Defense Function"); National Legal Aid and Defender Association *Performance Guidelines for Criminal Defense Representation* (1995) ("Performance Guidelines"); Monahan and Clark, "Coping with Excessive Workload," Ch. 23 of *Ethical Problems Facing the Criminal Defense Lawyer,* American Bar Association, 1995 ("Ethical Problems").

1. General duty of lawyer to act competently, diligently and promptly

accountable to an independent oversight board, whose job is "to promote efficiency and quality of services."

### 5. Civil liability of chief public defender and unit of government

In addition to ethical problems, both the chief public defender and the jurisdiction may have civil liability for money damages as a result of the violation of a client's constitutional right to counsel caused directly by underfunding of the public defense agency. In *Miranda v. Clark County, Nevada*, 319 F.3d 465, 2003 WL 291987, (9th Cir., February 3, 2003), the *en banc* Ninth Circuit ruled that a §1983 federal civil action may stand against both the county and the chief public defender (even though the individual assistant public defender who provided the inadequate representation does not qualify as a state actor for purposes of such a suit, under *Polk Co. v. Dodson*, 454 U.S. 312 (1981)). The chief public defender had taken various administrative steps to cut costs in response to underfunding by the county – steps other than increasing the caseloads of assistant public defenders. He adopted a policy of allocating resources for an adequate defense only to those cases where he felt that the defendant might be innocent, based upon polygraph tests administered to the office's clients. Even clients who "claimed innocence, but appeared to be guilty" through the polygraph testing, as the court put it, "were provided inadequate resources to mount an effective defense" (slip op. at 1507-08). He also adopted a policy of saving money on training, and assigning inexperienced lawyers to handle cases they were not qualified for – in this case, involving capital charges.

The court held that both policies were sufficient to create a claim of a pattern or practice of "deliberate indifference to constitutional rights," redressable under §1983. On the triage-by-polygraph policy specifically, the court wrote:

> The policy, while falling short of complete denial of counsel, is a policy of deliberate indifference to the requirement that every criminal defendant receive adequate representation, regardless of innocence or guilt. *City of Canton*, 489 U.S. at 389. This is a core guarantee of the Sixth Amendment and a right so fundamental that any contrary policy erodes the principles of liberty and justice that underpin our civil rights. *Gideon*, 372 U.S. at 340-41, 344; *Powell v. Alabama*, 287 U.S. 45, 67-69 (1932); *see also Alabama v. Shelton*, 535 U.S. 654, 122 S. Ct. 1764, 1767 (2002).

### Conclusion

*A chief executive of an agency providing public defense services is ethically prohibited from accepting a number of cases which exceeds the capacity of the agency's attorneys to provide competent, quality representation in every case, encompassing the elements of such representation prescribed in national performance standards including the NLADA Performance Guidelines for Criminal Defense Representation and the ABA Defense Function Standards.*

*When confronted with a prospective overloading of cases or reductions in funding or staffing which will cause the agency's attorneys to exceed such capacity, the chief*

executive of a public defense agency is ethically required to refuse appointment to any
and all such excess cases.

126     IN DEFENSE OF PUBLIC ACCESS TO JUSTICE

## Appendix K
*Comparative Analysis of Louisiana District Attorney Revenue & Expenditures, 2002*

| District | Expenditures DA | Expenditures PD | Difference DA-PD | Exp. Ratio DA : PD | DA Fund Balance End of 02 | PD Fund Balance End of 02 | Difference DA-PD |
|---|---|---|---|---|---|---|---|
| 1 | $ 4,702,745.00 | $ 1,680,668.00 | $ 3,022,077.00 | 2.8 : 1 | $ 1,574,058.00 | $ 231,660.00 | $ 1,342,398.00 |
| 2 | $ 595,405.00 | $ 243,600.00 | $ 351,805.00 | 2.4 : 1 | $ 134,787.00 | $ 307,751.00 | $ (172,964.00) |
| 3 | $ 1,433,391.00 | $ 285,377.00 | $ 1,148,014.00 | 5 : 1 | $ (5,757.00) | $ 130,357.00 | $ (136,114.00) |
| 4 | $ 1,700,355.00 | $ 1,079,671.00 | $ 620,684.00 | 1.6 : 1 | $ 1,950,009.00 | $ 122,868.00 | $ 1,827,141.00 |
| 5 | $ 422,650.00 | $ 142,921.00 | $ 279,729.00 | 3 : 1 | $ 234,720.00 | $ 141,175.00 | $ 93,545.00 |
| 6 | $ 662,782.00 | $ 236,375.00 | $ 426,407.00 | 2.8 : 1 | $ 410,284.00 | $ 85,046.00 | $ 325,238.00 |
| 7 | $ 369,605.00 | $ 94,118.00 | $ 275,487.00 | 3.9 : 1 | $ (18,107.00) | $ 253,901.00 | $ (272,008.00) |
| 8 | $ 945,056.00 | $ 83,069.00 | $ 861,987.00 | 11.4 : 1 | $ (28,658.00) | $ 13,493.00 | $ (42,151.00) |
| 9 | $ 2,733,069.00 | $ 594,874.00 | $ 2,138,195.00 | 4.6:1 | $ 338,769.00 | $ 118,307.00 | $ 220,462.00 |
| 10 | $ 561,948.00 | $ 186,740.00 | $ 375,208.00 | 3:1 | $ 529,980.00 | $ 217,101.00 | $ 312,879.00 |
| 11 | $ 1,101,440.00 | $ 278,265.00 | $ 823,175.00 | 4:1 | $ 329,727.00 | $ 146,387.00 | $ 183,340.00 |
| 12 | $ 510,210.00 | $ 186,495.00 | $ 323,715.00 | 2.7:1 | $ 108,722.00 | $ 76,421.00 | $ 32,301.00 |
| 13 | $ 389,462.00 | $ 94,002.00 | $ 295,460.00 | 4.1:1 | $ 373,645.00 | $ 14,346.00 | $ 359,299.00 |
| 14 | $ 837,373.00 | $ 1,257,847.00 | $ (420,474.00) | 1 : 1.5 | $ 3,159,935.00 | $ 49,925.00 | $ 3,110,010.00 |
| 15 | $ 2,507,898.00 | $ 1,347,030.00 | $ 1,160,868.00 | 1.9 : 1 | $ 1,095,265.00 | $ 140,897.00 | $ 954,368.00 |
| 16 | $ 5,586,065.00 | $ 1,101,413.00 | $ 4,484,652.00 | 5.1 : 1 | $ 2,795,976.00 | $ (18,967.00) | $ 2,814,943.00 |
| 17 | $ 1,800,097.00 | $ 423,354.00 | $ 1,376,743.00 | 4.3 : 1 | $ 1,156,369.00 | $ 377,829.00 | $ 778,540.00 |
| 18 | $ 1,592,137.00 | $ 503,210.00 | $ 1,088,927.00 | 3.2 : 1 | $ 816,434.00 | $ 179,794.00 | $ 636,640.00 |
| 19 | $ 7,151,916.00 | $ 2,691,107.00 | $ 4,460,809.00 | 2.7 : 1 | $ 2,508,110.00 | $ 217,915.00 | $ 2,290,195.00 |
| 20 | $ 477,285.00 | $ 74,109.00 | $ 403,176.00 | 6.4 : 1 | $ 154,296.00 | $ 305,593.00 | $ (151,297.00) |
| 21 | $ 768,089.00 | $ 1,011,572.00 | $ (243,483.00) | 1 : 1.3 | $ 117,604.00 | $ 177,480.00 | $ (59,876.00) |
| 22 | $ 1,441,588.00 | $ 1,117,918.00 | $ 323,670.00 | 1.3 : 1 | $ 148,872.00 | $ 597,893.00 | $ (449,021.00) |
| 23 | $ 2,545,268.00 | $ 557,628.00 | $ 1,987,640.00 | 4.6 : 1 | $ 1,365,724.00 | $ 386,227.00 | $ 979,497.00 |
| 24 | $ 14,106,396.00 | $ 2,545,419.00 | $ 11,560,977.00 | 5.5 : 1 | $ 10,000,618.00 | $ 1,413,900.00 | $ 8,586,718.00 |
| 25 | $ 171,271.00 | $ 194,784.00 | $ (23,513.00) | 1 : 1.1 | $ 1,438,697.00 | $ 38,965.00 | $ 1,399,732.00 |
| 26 | $ 1,541,403.00 | $ 1,098,091.00 | $ 443,312.00 | 1.4 : 1 | $ 932,191.00 | $ 318,443.00 | $ 613,748.00 |
| 27 | $ 1,907,611.00 | $ 406,678.00 | $ 1,500,933.00 | 4.7 : 1 | $ 623,594.00 | $ 775,285.00 | $ (151,691.00) |
| 28 | $ 222,754.00 | $ 57,138.00 | $ 165,616.00 | 3.9 : 1 | $ 37,783.00 | $ 38,956.00 | $ (1,173.00) |
| 29 | $ 457,320.00 | $ 475,374.00 | $ (18,054.00) | 1:1 | $ 559,613.00 | $ 313,660.00 | $ 245,953.00 |
| 30 | $ 646,177.00 | $ 345,370.00 | $ 300,807.00 | 1.9 : 1 | $ 771,925.00 | $ 85,098.00 | $ 686,827.00 |
| 31 | $ 1,083,471.00 | $ 311,049.00 | $ 772,422.00 | 3.5 : 1 | $ 595,250.00 | $ 237,260.00 | $ 357,990.00 |
| 32 | $ 691,431.00 | $ 696,788.00 | $ (5,357.00) | 1:1 | $ 364,317.00 | $ 337,863.00 | $ 26,454.00 |
| 33 | $ 945,144.00 | $ 153,633.00 | $ 791,511.00 | 6.2 : 1 | $ 461,166.00 | $ 225,634.00 | $ 235,532.00 |
| 34 | $ 6,298.00 | $ 272,509.00 | $ (266,211.00) | N/A | $ 1,568,187.00 | $ 13,749.00 | $ 1,554,438.00 |
| 35 | $ 304,252.00 | $ 58,873.00 | $ 245,379.00 | 5.2 : 1 | $ 31,345.00 | $ 11,616.00 | $ 19,729.00 |
| 36 | $ 492,582.00 | $ 173,304.00 | $ 319,278.00 | 2.8 : 1 | $ 407,825.00 | $ 92,959.00 | $ 314,866.00 |
| 37 | $ 309,726.00 | $ 50,281.00 | $ 259,445.00 | 6.2 : 1 | $ 86,570.00 | $ 46,000.00 | $ 40,570.00 |
| 38 | $ 243,724.00 | $ 117,290.00 | $ 126,434.00 | 2.1 : 1 | $ 74,563.00 | $ 179,355.00 | $ (104,792.00) |
| 39 | $ 143,179.00 | $ 37,590.00 | $ 105,589.00 | 3.8 : 1 | $ 263,241.00 | $ 77,972.00 | $ 185,269.00 |
| 40 | $ 1,127,831.00 | $ 360,467.00 | $ 767,364.00 | 3.1 : 1 | $ 326,668.00 | $ 198,730.00 | $ 127,938.00 |
| Orleans | $ 10,553,736.00 | $ 2,653,557.00 | $ 7,900,179.00 | 4 : 1 | $ 456,443.00 | $ 416,521.00 | $ 39,922.00 |
| Total | $ 75,790,140.00 | $ 25,279,558.00 | $ 50,510,582.00 | 3 : 1 | $ 38,250,760.00 | $ 9,095,365.00 | $ 29,155,395.00 |

## Appendix L
*Analysis of Louisiana Sheriff's Revenue & Expenditures, 2002*

| District | Revenues | Expenditures | Deficit Balance | Fund Balance End of 01 | Fund Balance End of 02 |
|---|---|---|---|---|---|
| 1 | $ 18,645,212.00 | $ 15,459,869.00 | $ 3,185,343.00 | $ 4,117,134.00 | $ 7,302,477.00 |
| 2 | $ 9,167,251.00 | $ 8,298,452.00 | $ 868,799.00 | $ 2,473,591.00 | $ 3,342,390.00 |
| 3 | $ 5,696,348.00 | $ 5,858,280.00 | $ (161,932.00) | $ 3,223,108.00 | $ 3,061,176.00 |
| 4 | $ 20,421,178.00 | $ 20,258,160.00 | $ 163,018.00 | $ 4,599,715.00 | $ 4,762,733.00 |
| 5 | $ 14,461,051.00 | $ 13,636,133.00 | $ 824,918.00 | $ 5,319,326.00 | $ 6,144,244.00 |
| 6 | $ 25,175,432.00 | $ 23,971,132.00 | $ 1,204,300.00 | $ 3,092,007.00 | $ 4,296,307.00 |
| 7 | $ 10,819,966.00 | $ 9,090,516.00 | $ 1,729,450.00 | $ 5,315,841.00 | $ 7,045,291.00 |
| 8 | $ 1,486,259.00 | $ 1,721,580.00 | $ (235,321.00) | $ 1,219,125.00 | $ 983,804.00 |
| 9 | $ 20,616,784.00 | $ 20,081,733.00 | $ 535,051.00 | $ 11,418,745.00 | $ 11,953,796.00 |
| 10 | $ 3,368,212.00 | $ 3,126,112.00 | $ 242,100.00 | $ 810,804.00 | $ 1,052,904.00 |
| 11 | $ 5,893,258.00 | $ 5,849,666.00 | $ 43,592.00 | $ 3,261,650.00 | $ 3,305,242.00 |
| 12 | $ 11,084,443.00 | $ 11,079,096.00 | $ 5,347.00 | $ (188,537.00) | $ (183,190.00) |
| 13 | $ 2,073,872.00 | $ 1,914,797.00 | $ 159,075.00 | $ 721,725.00 | $ 880,800.00 |
| 14 | $ 36,116,373.00 | $ 37,528,090.00 | $ (1,411,717.00) | $ 14,110,931.00 | $ 12,699,214.00 |
| 15 | $ 34,780,160.00 | $ 36,064,657.00 | $ (1,284,497.00) | $ 13,052,253.00 | $ 11,767,756.00 |
| 16 | $ 29,836,893.00 | $ 28,105,601.00 | $ 1,731,292.00 | $ 4,917,995.00 | $ 6,649,287.00 |
| 17 | $ 15,673,908.00 | $ 15,750,111.00 | $ (76,203.00) | $ 4,422,635.00 | $ 4,346,432.00 |
| 18 | $ 23,393,751.00 | $ 22,897,748.00 | $ 496,003.00 | $ 8,509,241.00 | $ 9,005,244.00 |
| 19 | $ 45,632,916.00 | $ 45,204,772.00 | $ 428,144.00 | $ 26,398,939.00 | $ 26,827,083.00 |
| 20 | $ 7,800,081.00 | $ 7,327,075.00 | $ 473,006.00 | $ 5,344,870.00 | $ 5,817,876.00 |
| 21 | $ 23,920,050.00 | $ 24,373,484.00 | $ (453,434.00) | $ 9,728,412.00 | $ 9,274,978.00 |
| 22 | $ 37,369,639.00 | $ 37,727,053.00 | $ (357,414.00) | $ 10,086,070.00 | $ 9,728,656.00 |
| 23 | $ 26,638,527.00 | $ 26,340,820.00 | $ 297,707.00 | $ 16,688,793.00 | $ 16,986,500.00 |
| 24 | $ 92,491,747.00 | $ 89,787,044.00 | $ 2,704,703.00 | $ 40,249,334.00 | $ 42,954,037.00 |
| 25 | $ 11,751,761.00 | $ 11,604,407.00 | $ 147,354.00 | $ 3,383,820.00 | $ 3,531,174.00 |
| 26 | $ 17,512,162.00 | $ 17,078,169.00 | $ 433,993.00 | $ 12,437,617.00 | $ 12,871,610.00 |
| 27 | $ 4,648,793.00 | $ 4,643,557.00 | $ 5,236.00 | $ 167,930.00 | $ 173,166.00 |
| 28 | $ 6,795,890.00 | $ 6,942,237.00 | $ (146,347.00) | $ 1,323,378.00 | $ 1,177,031.00 |
| 29 | $ 17,758,618.00 | $ 20,957,570.00 | $ (3,198,952.00) | $ 9,726,867.00 | $ 6,527,915.00 |
| 30 | $ 7,094,029.00 | $ 7,022,524.00 | $ 71,505.00 | $ 362,804.00 | $ 434,309.00 |
| 31 | $ 2,513,029.00 | $ 2,109,149.00 | $ 403,880.00 | $ 1,430,551.00 | $ 1,834,431.00 |
| 32 | $ 18,176,603.00 | $ 17,992,788.00 | $ 183,815.00 | $ 6,582,793.00 | $ 6,766,608.00 |
| 33 | $ 3,695,990.00 | $ 3,259,518.00 | $ 436,472.00 | $ 1,594,596.00 | $ 2,031,068.00 |
| 34 | $ 16,190,769.00 | $ 14,825,554.00 | $ 1,365,215.00 | $ 1,543,816.00 | $ 2,909,031.00 |
| 35 | $ 2,272,264.00 | $ 2,146,043.00 | $ 126,221.00 | $ 1,333,826.00 | $ 1,460,047.00 |
| 36 | $ 4,435,066.00 | $ 4,613,126.00 | $ (178,060.00) | $ 1,968,179.00 | $ 1,790,119.00 |
| 37 | $ 4,873,962.00 | $ 5,082,802.00 | $ (208,840.00) | $ 112,740.00 | $ (96,100.00) |
| 38 | $ 3,684,835.00 | $ 3,295,571.00 | $ 389,264.00 | $ 1,827,189.00 | $ 2,216,453.00 |
| 39 | $ 1,839,327.00 | $ 1,836,797.00 | $ 2,530.00 | $ 988,531.00 | $ 991,061.00 |
| 40 | $ 11,465,094.00 | $ 11,463,356.00 | $ 1,738.00 | $ 3,496,092.00 | $ 3,497,830.00 |
| Orleans | $ 83,831,963.00 | $ 91,340,487.00 | $ (7,508,524.00) | $ 60,331,443.00 | $ 52,822,919.00 |
| Total | $ 741,103,466.00 | $ 737,665,636.00 | $ 3,437,830.00 | $ 307,505,879.00 | $ 310,943,709.00 |



**NATIONAL LEGAL AID & DEFENDER ASSOCIATION**

1140 Connecticut Avenue, NW, Suite 900
Washington, D.C. 20036
(202) 452-0620 • Fax (202) 872-1031
www.nlada.org



**NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS**

1150 18th Street, NW, Suite 950
Washington, D.C. 20036
(202) 872-8600 • Fax (202) 872-869
www.nacdl.org

# Appendix #17

Exhibit "B" of petitioner's Post Conviction - a duplicate of *United States v. State of Louisiana*, 3:11-cv-00470-JJB-RLB filed 7/12/11. (The state of Louisiana is being sued by the United States Government for discriminatory practices and Non-compliance with the *NVRA of 1993.*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | |
| STATE OF LOUISIANA; J. THOMAS SCHEDLER, Louisiana Secretary of State; LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS; BRUCE D. GREENSTEIN, Secretary of the Louisiana Department of Health and Hospitals; LOUISIANA DEPARTMENT OF CHILDREN AND FAMILY SERVICES; and RUTH JOHNSON, Secretary of the Louisiana Department of Children and Family Services, | CIVIL ACTION NO. |
| Defendants. | |

## COMPLAINT

The United States of America alleges:

1. The Attorney General of the United States brings this action for declaratory and injunctive relief pursuant to the National Voter Registration Act of 1993 (NVRA), 42 U.S.C. §§ 1973gg to 1973gg-10, and 28 U.S.C. § 2201.

## JURISDICTION AND VENUE

2. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, and 2201, and 42 U.S.C. § 1973gg-9.

3. Venue is proper in this district pursuant to 28 U.S.C. §§ 98, 1391(b).

Page 1

## PARTIES

4.   The NVRA authorizes the Attorney General of the United States to bring civil actions on behalf of the Plaintiff United States of America in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out the NVRA. 42 U.S.C. § 1973gg-9(a).

5.   Defendant Louisiana is one of the states of the United States of America and is subject to the requirements of the NVRA. 42 U.S.C. §§ 1973gg-1(4), 1973gg-2(a), 1973gg-5.

6.   Defendant Louisiana Secretary of State J. Thomas Schedler is sued in his official capacity as the chief state election official responsible for coordinating Louisiana's responsibilities under the NVRA. *See* 42 U.S.C. § 1973gg-8; La. Rev. Stat. §§18:18, 36:741.

7.   Defendant Louisiana Department of Health and Hospitals ("DHH") is the state body responsible for administering a variety of public assistance and disability services programs in Louisiana, including but not limited to Medicaid; the Women, Infants, and Children ("WIC") program; the Louisiana Commission for the Deaf; the Traumatic Head and Spinal Cord Injury Trust Fund; the state children's health insurance program; and the state's mental health, behavioral health, developmental disabilities, geriatric disabilities, and addictive disorders programs. *See* La. Rev. Stat. §§ 36:251(B), 36:258(B); 36:259(S).

8.   Defendant Bruce D. Greenstein is the Secretary of DHH and is sued in his official capacity.

9.   Defendant Louisiana Department of Children and Family Services ("DCFS") is the state body responsible for administering a variety of public assistance services programs in Louisiana, including but not limited to the Supplemental Nutrition Assistance Program ("SNAP"), formerly known as the food stamp program, La. Rev. Stat. § 36:477; the Temporary Assistance to Needy Families ("TANF") Program, formerly known as the Aid to Families With Dependent Children

program and currently known in Louisiana as the Family Independence Temporary Assistance Program ("FITAP"), La. Rev. Stat. § 46:231.2; and the Kinship Care Subsidy Program ("KCSP"), La. Rev. Stat. § 46:237.

10. Defendant Ruth Johnson is the Secretary of DCFS and is sued in her official capacity.

## CAUSE OF ACTION

11. Section 7 of the NVRA requires the State of Louisiana to designate as voter registration agencies "all offices in the State that provide public assistance," as well as "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities." 42 U.S.C. § 1973gg-5(a).

12. The Louisiana DHH and DCFS provide and administer public assistance and/or State-funded programs primarily engaged in serving persons with disabilities and, therefore, are "voter registration agencies" within the meaning of Section 7 of the NVRA.

13. Defendants, their agents, and other state and local agencies not specifically named in this Complaint likewise provide and administer public assistance programs and/or State-funded programs primarily engaged in serving persons with disabilities and are therefore "voter registration agencies" within the meaning of Section 7 of the NVRA.

14. With each application for public assistance or State-funded disability services, and with each recertification, renewal, or change of address request relating to such services, each office of a voter registration agency must (1) distribute a voter registration form to the applicant or client, unless the applicant or client, in writing, declines to register to vote; (2) provide the applicant or client with a declaration/preference form that specifically asks whether the person would like to register to vote if the person is not already registered where he or she lives; informs the person that the decision whether or not to register will not affect the amount of assistance

provided by the agency; and offers assistance with completing the voter registration form; (3) provide each applicant or client with the same degree of assistance in completing the voter registration application forms as the office provides for the completion of its own forms, unless the applicant refuses such assistance; and (4) accept and transmit completed voter registration forms to the appropriate election official, in accordance with procedures set forth in Sections 7(a)(4), 7(a)(5), 7(a)(6), and 7(d) of the NVRA, 42 U.S.C. §§ 1973gg-5(a)(4), (5), & (6) and 1973gg-5(d).

15. Defendants and their agents have failed to provide voter registration opportunities as required by Section 7 of the NVRA by, *inter alia:*

    a. Failing to identify and designate as voter registration agencies (1) all offices in the State that provide public assistance; and (2) all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities. Defendants' unlawful failure to designate all required offices as voter registration agencies includes but is not limited to their failure to designate DHH's Office of Aging and Adult Services as a voter registration agency.

    b. Failing to provide their clients with a declaration/preference form that contains the information required by Section 7(a)(6)(B) of the NVRA with each application, recertification, renewal, or change of address form for benefits and services;

    c. Failing to maintain at each office of a voter registration agency sufficient supplies of voter registration applications that comply with the NVRA, and the Help America Vote Act of 2002, 42 U.S.C. § 15301, and to distribute such voter registration applications with each application, recertification, renewal, or change

of address form for public assistance and disability services, as required by Section 7 of the NVRA.

d.  Failing to accept and transmit completed voter registration applications to the appropriate election official; and

e.  Failing to supervise, train, and monitor their employees, agents, and representatives to ensure that they provide, assist with, process, collect, and transmit voter registration applications in compliance with Section 7 of the NVRA.

16.  Defendants' violations of Section 7 of the NVRA are evidenced by the fact that Louisiana has received very few voter registration applications from its public assistance and disability services offices despite the significant percentage of its population receiving such services.

17. According to data that Louisiana provided to the Election Assistance Commission ("EAC"), in 2001-2002, Louisiana received 10,522 voter registration applications from public assistance offices, or 3.3% of total applications received during that time period; in 2003-2004, that number fell to 7,391, or 1.5% of total applications received; in 2005-2006, Louisiana received 12,278 applications from public assistance offices, or 4.0% of total applications received; from 2007-2008, the number of voter registration applications fell to 8,688 applications, or 1.2% of total applications received.  During the most recent period reported to the EAC, 2009-2010, Louisiana's voter registration numbers from public assistance offices were at a ten-year low by both percentage and number of applicants.  Louisiana received only 6,037 voter registration applications from public assistance offices, representing 1.1% of all voter registration applications received from 2009-2010.

Page 5

18. The trend is similar for voter registration applications received from disability services offices. In 2001-2002, Louisiana received 1,785 voter registration applications from disability services offices, or 0.6% of all applications received; in 2003-2004, that number fell to 1,353 applications, or 0.3% of all applications received; in 2005-2006, Louisiana received 1,908 applications from disability services offices, or 0.6% of total applications received; in 2007-2008, that number fell to 1,762 applications, or .02% of all applications received. Here again, in the most recent period reported, the total number of applications received from disability services offices fell again, to 1,214, or 0.2% of all applications.

19. The low number of voter registration applications from Louisiana's public assistance and disability services offices stands in sharp contrast to the number of Louisianans receiving such services.

20. According to documents provided by Defendants to the United States, Louisiana had 1,171,028 citizens enrolled in Medicaid programs at the end of January 2011, or 25.8% of its total citizen population, according to 2010 Census data. From January 2007 to January 2011, DHH received 1,455,195 total Medicaid applications and processed 1,588,873 Medicaid renewals. From the time that DHH first began capturing data on changes of address in 2008, DHH has recorded 64,527 changes of address for Medicaid recipients.

21. According to additional documents provided by Defendants to the United States, from January 2007 to February 2011, DCFS received 1,327,130 new applications for its Supplemental Nutrition Assistance Program (commonly known as food stamps or SNAP). During this same period, DCFS made 1,143,317 redeterminations for SNAP eligibility.

22. Notwithstanding the fact that Louisiana has processed more than 3.1 million Medicaid applications, renewals, and address changes from January 2007 to January 2011, as well as more

than 2.4 million applications and eligibility redeterminations for SNAP during essentially the same period, Louisiana's public assistance agencies submitted only 14,725 voter registration applications beginning in October 2006 through October 2010.  This severe disparity is probative of Louisiana's unlawful failure to offer the voter registration opportunities required by the NVRA.

23. Further evidence of Defendants' violation of Section 7 of the NVRA includes but is not limited to the facts that, at times relevant to this Complaint:

  a.  Most Medicaid Program application forms have been non-compliant with the requirements of Section 7 of the NVRA because no information regarding voter registration was included as part of the application packet;

  b.  Many Medicaid Program offices had neither the forms nor the procedures in place to offer voter registration during the required application, renewal, and change of address processes;

  c.  Staff in regional offices of the DHH-administered Louisiana Commission for the Deaf and DHH's Office for Citizens with Developmental Disabilities did not regularly offer voter registration to applicants;

  d.  DCFS offices across Louisiana have failed to comply with Section 7 because they did not regularly offer eligible clients the opportunity to register to vote with every application, recertification, and renewal and change of address;

  e.  Many public assistance and disability services offices in Louisiana have utilized voter registration forms issued prior to when Louisiana modified its voter registration forms to comply with the requirements for mail registration forms under the Help America Vote Act of 2002, 42 U.S.C. § 15483(b)(4). Louisiana has

revised its mail voter registration form numerous times since enactment of HAVA, with the most recent revision being in January 2011. These offices' distribution of out-of-date and legally noncompliant forms indicates that they failed to regularly distribute voter registration forms in accordance with Section 7 of the NVRA;

f.   Disability services offices at a number of Louisiana colleges and universities have failed to offer the voter registration opportunities required by Section 7 of the NVRA to the students that they serve, due in part to a failure to coordinate state NVRA responsibilities by the Louisiana Secretary of State.

24. Defendants' failure to provide eligible public assistance and disability services clients with the opportunity to register to vote in the manner specified by Section 7 of the NVRA violates the NVRA.

25. Unless and until ordered to do so by this Court, Defendants will not offer all eligible public assistance and disability services applicants and clients the opportunity to register to vote as required by Section 7 of the NVRA.

WHEREFORE, the United States requests that the Court enter an ORDER that:

1.   Declares that the Defendants have failed to ensure implementation of Section 7 of the NVRA;

2.   Enjoins the Defendants, their agents and successors in office, and all persons acting in concert with them, from future non-compliance with the requirements of Section 7 of the NVRA; and

3.   Requires Defendants, their agents and successors in office, and all persons acting in concert with them, to:

354

a. Take all steps necessary—including adopting appropriate administrative policies or rules—to offer the voter registration opportunities in the manner specified by Section 7 of the NVRA;

b. Effectively publicize these voter registration opportunities to all eligible public assistance and disability services clients;

c. Within 30 days from the date of the Court's order, provide the Court with (1) a remedial plan or program—including appropriate reporting and monitoring requirements—designed to ensure that all eligible persons who apply for public assistance and/or disability services in Louisiana are offered the opportunity to register to vote as required by Section 7 of the NVRA, and (2) a plan for effectively publicizing the State's remedial plan or program;

d. Offer voter registration opportunities to all clients who applied for public assistance or disability benefits or services at covered offices in the four years prior to the date of any final order of this Court but who did not receive voter registration opportunities as required by the NVRA; and

e. Take all steps necessary to ensure immediate and ongoing compliance with Section 7 of the NVRA.

The United States further requests that this Court order any additional relief required by the interests of justice.

Date: July 12, 2011

DONALD J. CAZAYOUX, JR.
United States Attorney
Middle District of Louisiana

s/ John J. Gaupp
JOHN J. GAUPP, LBN 14976
Assistant United States Attorney
777 Florida Street, Suite 208
Baton Rouge, Louisiana 70801
Telephone:    (225) 389-0443
Fax:          (225) 389-0685
E-mail:       john.gaupp@usdoj.gov

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

s/ Bradley E. Heard
T. CHRISTIAN HERREN, JR.
MEREDITH BELL-PLATTS
BRADLEY E. HEARD, Trial Attorney
ANNA M. BALDWIN
JUSTIN WEINSTEIN-TULL
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Telephone:    (202) 305-4196
Facsimile:    (202) 307-3961
E-mail:       Bradley.Heard@usdoj.gov

356

# Appendix #18

Exhibit "A" of petitioner's Post Conviction - duplicate of the (civil suit)  *Ferrand v. Schedler*, 2:11-cv-00926 (filed 4/19/11) [suit regarding Non-compliance with the NVRA of 1993] this suit later became *Scott v. Schedler* as Roy Ferrand dropped out of the suit.]

Home   Contact   Donate   Login      search...

737 1/2 8th Street SE, Washington, DC 20003 | (888) 546-4173



**Program Areas**
Voter Poll Results
Get Out the Vote (GOTV)
Election Administration
Public Agency Registration
Litigation

**Be Informed**
Media Inquiries
Focus on the Issues
Research & Publications
Press Releases

**Stay Tuned**
Newsletter
Voting Matters Blog
Election Legislation
In the News

**Who We Are**
Our Mission
Our Staff
Our Board
Employment

## Ferrand v. Schedler (Louisiana)

*Ferrand v. Schedler* is a lawsuit brought by Project Vote, the NAACP Legal Defense Fund, Inc. (LDF), and New Orleans attorney Ronald Wilson against Louisiana Secretary of State Tom Schedler, the Secretary of the Departments of Children and Family Services, and the Secretary of the Department of Health and Hospitals, for failing to provide voter registration services at public assistance agencies as required by Section 7 of the National Voter Registration Act. The complaint was filed on behalf of the Louisiana State Conference of the NAACP and Louisiana residents Roy Ferrand and Luther Scott, Jr.

The complaint, filed on April 19, 2011, cites substantial evidence demonstrating that Louisiana is failing to provide mandatory voter registration services at its public assistance offices as required by the NVRA. Despite consistently high numbers of participants in Louisiana's food stamp and Medicaid programs, voter registration applications originating from public assistance agencies have been surprisingly low. As of 2008, voter registration applications originating in these agencies had dropped 88 percent from 1995, despite *increased* participation in public assistance programs. The complaint also cites the results of agency investigations and interviews of public assistance recipients showing widespread non-compliance.

On July 21, 2011, a federal court rejected the state's effort to dismiss the lawsuit, stating that the NAACP successfully argued that it had expended resources "on additional voter registration initiatives" because of the "defendants' failure to comply with the NVRA," and that therefore, "[t]he NAACP has demonstrated that it satisfies the injury requirement that it has standing to sue."

**Litigation Documents**

Court Order, July 21, 2011.

Complaint, April 19, 2011

Complaint Exhibit 2: Letter to Secretary Schedler, February 25, 2011

Complaint Exhibit 1: Notice Letter, January 12, 2011

### Litigation Links

**Public Agency Registration Cases**

ACORN v. Levy (Missouri)

Harkless v. Brunner (Ohio)

Indiana State Conference of NAACP v. Gargano (Indiana)

Ferrand v. Schedler (Louisiana)

Georgia NAACP v. Kemp (Georgia)

Valdez v. Duran (New Mexico)

**Voter Registration Cases**

ACORN v. Corbett

ACORN v. Cox

ACORN v. Maryland Transit Authority

Baseline v. State of Nevada

Florida NAACP v. Browning

Gonzales v. Arizona

Project Vote v. Blackwell

Project Vote v. Long

Project Vote v. Madison County Election Board

Project Vote v. Rokita

**List Maintenance & Voter Purge Cases**

Commonwealth of Kentucky v. State Board of Elections

**Voter Intimidation Cases**

Garcia v. Fox-Young, et al

**Other Resources**

Federal Election Law Links &

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ROY FERRAND, LUTHER SCOTT, JR., and LOUISIANA STATE CONFERENCE OF THE NAACP, for themselves and all other persons similarly situated, | CIVIL ACTION NO. |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| TOM SCHEDLER in his official capacity as the Louisiana Secretary of State, RUTH JOHNSON, in her official capacity as Secretary of the Louisiana Department of Children & Family Services, and BRUCE D. GREENSTEIN, in his official capacity as Secretary of the Louisiana Department of Health & Hospitals, | |
| Defendants. | |

Plaintiffs ROY FERRAND, LUTHER SCOTT JR., and LOUISIANA STATE CONFERENCE OF THE NAACP, for themselves and all other persons similarly situated, through their undersigned counsel, for their Complaint against Defendants TOM SCHEDLER in his official capacity as Louisiana Secretary of State, RUTH JOHNSON, in her official capacity as Secretary of the Louisiana Department of Children & Family Services ("DCFS"), and BRUCE D. GREENSTEIN, in his official capacity as Secretary of the Louisiana Department of Health & Hospitals ("DHH"), allege the following upon knowledge as to their conduct and upon information and belief as to the conduct of others:

1

### Introduction

1.      This action seeks declaratory and injunctive relief to redress Defendants' systemic and ongoing violations of the obligations imposed by the National Voter Registration Act of 1993 ("NVRA"), 42 U.S.C. § 1973gg-5 (hereinafter, "Section 7"), for voter registration by public assistance agencies in Louisiana.

2.      Congress adopted Section 7 to "increase the number of eligible citizens who register to vote in elections for Federal office," 42 U.S.C. § 1973gg(b)(1), including "the poor and persons with disabilities who do not have driver's licenses and will not come into contact with [motor vehicle agencies]." H.R. Cong. Rep. No. 103-66, at 19 (1993). The statute also reflects Congress's intent to combat the disproportionate harm to voter participation of racial minorities caused by discriminatory and unfair registration laws and procedures. 42 U.S.C. § 1973gg(a)(3).

3.      Section 7 mandates that "all offices in the State that provide public assistance" distribute voter registration application forms for voting in federal elections, assist applicants in completing them, accept completed voter registration applications, and transmit those applications to the appropriate state election official in a timely manner. 42 U.S.C. §§ 1973gg-5(a)(2)-(4), (d).

4.      Section 7 requires that all public assistance offices distribute a voter registration application form with "each application ... for assistance, and "with each recertification, renewal, or change of address form" relating to the receipt of public assistance. 42 U.S.C. § 1973gg-5(a)(6).

5.      Section 7 further requires that all public assistance offices provide a form that, *inter alia*, asks each client whether s/he is registered at his/her current address

2

and if not, whether the applicant "would like to apply to register to vote here today" (hereinafter, the "voter preference form"). 42 U.S.C. § 1973gg-5(a)(6)(B).

6.      Despite these clear obligations under the NVRA, Louisiana's Department of Children and Family Services ("DCFS") and Louisiana's Department of Health and Hospitals ("DHH"), both of which are "offices in the State that provide public assistance," routinely fail to provide the required voter registration services to each person who applies, recertifies, renews, or changes an address in connection with public assistance benefits, in violation of Section 7 of the NVRA. 42 U.S.C. § 1973gg-5(a)(2)(A), (4), (6).

7.      Louisiana's DCFS and DHH offices also routinely fail to distribute voter registration applications and fail to provide assistance in completing those applications to persons who apply for public assistance, or who submit a recertification, renewal, or change of address form relating to public assistance, and are therefore operating in violation of Section 7 of the NVRA. 42 U.S.C. § 1973gg-5(a)(6).

8.      Louisiana's DCFS and DHH offices routinely fail to provide the voter preference form required by Section 7 in connection with every application, recertification/renewal, and change of address for the purpose of receiving public assistance in Louisiana. 42 U.S.C. § 1973gg-5(a)(6)(B).

9.      Louisiana's DCFS and DHH offices also routinely fail to accept completed voter registration application forms and transmit them in a timely manner to the appropriate state official as required by Section 7 of the NVRA. 42 U.S.C. § 1973gg-5(d).

10.   The Louisiana Secretary of State is violating Section 7 of the NVRA by failing to effectively coordinate the state's responsibilities under the statute.   42 U.S.C. Section 1973gg-8; La. Rev. Stat. Ann. § 18:18(A)(6).

11.   As a result of Defendants' failure to provide voter registration services at DCFS and DHH offices in accordance with Section 7, many low-income citizens in Louisiana who might otherwise be enfranchised remain unregistered.

12.   As a result of Defendants' failure to provide voter registration services at DCFS and DHH offices in accordance with Section 7, Plaintiffs Roy Ferrand and Luther Scott, Jr., have been denied the opportunity to complete and submit a voter registration application form, as is required by Section 7.

13.   As a result of Defendants' failure to provide voter registration services at DCFS and DHH offices in accordance with Section 7, Plaintiff Louisiana State Conference of the NAACP and its members have expended substantial resources, including staff time and volunteer allocation, to make voter registration available to minority and low-income citizens, particularly those who should be and should have been offered voter registration by DCFS and DHH offices at every public benefits transaction that includes an application, recertification, renewal, or change of address.

### Named Parties

#### Plaintiffs

14.   Plaintiff Roy Ferrand is a Louisiana citizen who has applied for public assistance benefits in the form of Food Stamps, has been eligible for these benefits since at least 2009, and currently receives Food Stamps through DCFS.  He meets all of the requirements to register to vote in Louisiana, but is not registered where he currently

4

362

resides. DCFS did not provide him with a voter registration application form, nor offer

him assistance in completing that form, which denied him the opportunity to complete

and submit a voter registration application in conjunction with his application for Food

Stamp benefits.

15. Plaintiff Luther Scott, Jr. is a Louisiana citizen who has applied for

public assistance benefits in the form of Food Stamps, has been eligible for these benefits

since at least January 2010, and currently receives Food Stamps through DCFS. He

meets all the requirements to register to vote in Louisiana, but is not registered where he

currently resides. DCFS did not provide him with a voter registration application form,

nor offer him assistance in completing that form, which denied him the opportunity to

complete and submit a voter registration application in conjunction with his application

and subsequent recertifications for Food Stamp benefits.

16. Plaintiff Louisiana State Conference of the NAACP (hereinafter,

"Plaintiff Louisiana NAACP") is a non-partisan, interracial membership organization

founded in 1909, devoted to civil rights and racial justice. Plaintiff Louisiana NAACP is

headquartered in Baton Rouge, Louisiana.

Defendants

17. Defendants are the state officials charged with the responsibility of

ensuring Louisiana's compliance with Section 7 of the NVRA.

18. Defendant Tom Schedler is the Louisiana Secretary of State. In this

capacity, he "shall administer the laws relating to custody of voting machines and voter

registration, and for the purpose he shall ... [c]oordinate the responsibilities of th[e] state

under the National Voter Registration Act of 1993 (P.L. 103-31) as required by 42 U.S.C.

5

Section 1973gg-8." La. Rev. Stat. Ann. § 18:18(A)(6). Defendant Schedler is also generally responsible for directing and assisting the registrars of voters of the state with respect to matters pertaining to the registration of voters and prescribing uniform rules, regulations, forms, and instructions related to voter registration and voter education. La. Rev. Stat. Ann. § 18:18(A)(2), (3), (8). Defendant Schedler is sued in his official capacity as Secretary of State.

19.     Defendant Ruth Johnson is the Secretary of Louisiana's Department of Children and Family Services. DCFS is a mandatory voter registration agency. La. Rev. Stat. Ann. § 18:116(A)(1)(a). DCFS administers public assistance programs subject to the requirements of Section 7 of the NVRA, including but not limited to the Supplemental Nutrition Assistance Program ("SNAP," formerly Food Stamps), and Family Independence Temporary Assistance ("FITAP"). La. Rev. Stat. Ann. §§ 36:474(G); 46:231-231.2. Defendant Johnson is sued in her official capacity as Secretary of the DCFS.

20.     Defendant Bruce Greenstein is the Secretary of Louisiana's Department of Health and Hospitals. DHH is a mandatory voter registration agency. La. Rev. Stat. Ann. § 18:116(A)(1)(a). DHH administers public assistance programs subject to the requirements of Section 7 of the NVRA, including Medicaid, the Women, Infants, and Children (WIC) Program, and the Louisiana Children's Health Insurance Program (LaCHIP). La. Rev. Stat. Ann. §§ 36:251(B); 46:450.3; 46:976. Defendant Greenstein is sued in his official capacity as Secretary of the DHH.

6

### Jurisdiction and Venue

21.    This case arises under the NVRA, a law of the United States. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a).

22.    This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

23.    This Court has personal jurisdiction over each of the Defendants because each is a citizen of the State of Louisiana.

24.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

### Applicable Law

#### National Voter Registration Act of 1993 and Louisiana State Implementing Statutes

25.    The NVRA requires that "each state shall designate as voter registration agencies -- (A) all offices in the state that provide public assistance." 42 U.S.C. § 1973gg-5(a)(2)(A).

26.    DCFS and DHH offices are mandatory voter registration agencies under Section 7 of the NVRA. Under Louisiana law, public assistance agencies that administer public assistance in the state of Louisiana, including but not limited to the Food Stamps program (SNAP), FITAP, Medicaid, WIC, and Louisiana Children's Health Insurance Program (LaCHIP) programs, are designated as mandatory voter registration agencies. La. Rev. Stat. Ann. § 18:116(A)(1)(a).

7

27.     The NVRA requires that each voter registration agency must provide a

"voter preference form" that includes:

      a. the question, "If you are not registered to vote where you live now, would you like to apply to register to vote here today?";

      b. ...the statement, "Applying to register or declining to register to vote will not affect the amount of assistance that you will be provided by this agency.";

      c. boxes for the applicant to check to indicate whether the applicant would like to register or declines to register to vote..., together with the statement (in close proximity to the boxes and in prominent type), "IF YOU DO NOT CHECK EITHER BOX, YOU WILL BE CONSIDERED TO HAVE DECIDED NOT REGISTER TO VOTE AT THIS TIME.";

      d. the statement, "If you would like help in filling out the voter registration application form, we will help you. The decision whether to seek or accept help is yours. You may fill out the application form in private."; and

      e. the statement, "If you believe that someone has interfered with your right to register or to decline to register to vote, your right to privacy in deciding whether to register or in applying to register to vote, or your right to choose your own political party or other political preference, you may file a complaint with _____," the blank being filled by the name, address, and telephone number of the appropriate official to whom such a complaint should be addressed.

42 U.S.C. § 1973gg-5(a)(6)(B); *see* La. Rev. Stat. Ann. § 18:116(C)(1)(b).

28.     The NVRA also requires that "the following services shall be made

available" at every public assistance agency:

      a. Distribution of mail voter registration application forms...;

      b. Assistance to applicants in completing voter registration application forms, unless the applicant refuses such assistance;

8

366

    c. Acceptance of completed voter registration application forms for transmittal to the appropriate State election official [in a timely manner].

42 U.S.C §§ 1973gg-5(a)(4)(A)(i)-(iii) and 1973gg-5(d); *see* La. Rev. Stat. Ann. §§ 18:116(B)(1) and 18:116(D).

29.    The NVRA requires that public assistance agencies distribute a mail-in voter registration application form with each application for assistance, and with each recertification, renewal or change of address form relating to such assistance. 42 U.S.C § 1973gg-5(a)(6)(A); *see* La. Rev. Stat. Ann. § 18:116(C)(1)(a).

30.    The NVRA requires that public assistance agencies "provide to each applicant who does not decline to register to vote the same degree of assistance with regard to completion of the registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance." 42 U.S.C. § 1973gg-5(a)(6)(C); *see* La. Rev. Stat. Ann. § 18:116(C)(4).

31.    The NVRA requires that all public assistance offices transmit completed registration applications to the appropriate state election official "no later than 10 days after the date of acceptance", or, if a registration application is accepted within 5 days before the last day for registration to vote in an election, "no later than 5 days after the date of acceptance." 42 U.S.C. §§ 1973gg-5(a)(4)(iii) and 1973gg-5(d); *see* La. Rev. Stat. Ann. § 18:116(D).

32.    The NVRA requires that "[e]ach State shall designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under [the NVRA]." 42 U.S.C. § 1973gg-8.

9

33.    Louisiana has designated the Secretary of State as the chief state election official responsible for the coordination of state responsibilities under the NVRA. La. Rev. Stat. Ann. § 18:18(A)(6).

34.    The Secretary of State is "responsible for developing all employee training programs necessitated for acceptance of voter registration applications." La. Rev. Stat. Ann. § 18:117(A).

35.    Louisiana state law requires that DCFS and DHH "maintain such statistical records on the number of applications to register to vote as requested by the secretary of state." La. Rev. Stat. Ann. § 18:116(G).

36.    In order to ensure state compliance, the NVRA provides a private right of action to "a person who is aggrieved by a violation" of the NVRA. 42 U.S.C. § 1973gg-9. The NVRA requires that, at least ninety days prior to bringing an action to enforce the NVRA, an aggrieved person or organization must provide written notice to the "chief election official" of the state in order to identify the violation(s) and to provide the state an opportunity to cure the violation(s) prior to the commencement of litigation. Id.

### Factual Allegations

#### Louisiana's Failure to Offer Voter Registration to Public Assistance Clients as Required by the NVRA

37.    The DCFS, through its Economic Stability Section, administers public assistance programs in Louisiana including, but not limited to, SNAP and FITAP. La. Rev. Stat. Ann. § 46:51. Defendant Secretary of the DCFS, Ruth Johnson, is responsible for policy development and management of DCFS. La. Rev. Stat. Ann. § 46:52.

10

368

38.    The DHH, through its Office of Management and Finance, administers public assistance programs in Louisiana including, but not limited to, Medicaid, WIC, and LaCHIP. La. Rev. Stat. Ann. §§ 36:251(B); 46:450.3; 46:976. Defendant Secretary of the DHH, Bruce Greenstein, is responsible for policy development and management of DHH. La. Rev. Stat. Ann. § 36:254.

39.    The DCFS and DHH have failed to comply and currently are not complying with their obligations, under Section 7 of the NVRA, to offer clients the opportunity to complete and submit a voter registration application in conjunction with every application for public assistance benefits, and every renewal, recertification, and change of address relating to the receipt of public assistance benefits.

40.    The DCFS and DHH have failed and currently are failing to provide the voter preference form required by Section 7 during each statutorily-covered transaction.

41.    The Secretary of State has failed in his duty to effectively coordinate Louisiana's responsibilities under the NVRA. 42 U.S.C. § 1973gg-8; La. Rev. Stat. Ann. § 18:18(A)(6).

42.    The Secretary of State has failed in his duty to develop adequate "employee training programs necessitated for acceptance and transmittal of voter registration applications under" the NVRA. La. Rev. Stat. Ann. § 18:117(A).

43.    Defendants, through their actions and inaction, are responsible for the failure of DCFS and DHH to comply with their obligations under Section 7 of the NVRA.

369

### Low Numbers of Public Agency Voter Registrations

44.    The number of voter registration applications received from public assistance offices has sharply declined despite a substantial increase in participation in the SNAP program, one of the most widely used public assistance programs covered by Section 7 of the NVRA. Even initial application numbers alone – without consideration of recertification and change of address numbers – show a large and widening gap between food stamp applications and voter registration applications at public assistance agencies in Louisiana.

45.    The following graph shows the number of initial applications to the Louisiana Food Stamp program (SNAP) by fiscal year, as reported by the United States Department of Agriculture.[1]



---

[1] Sources: U.S. Department of Agriculture Food and Nutrition Service National Data Bank, Version 8.2 Public Use, 12/16/08.

12

46.     The United States Department of Agriculture also reports high numbers of total participants in the Louisiana food stamp program, with approximately 300,000 adult citizen participants per year, and 356,000 adult citizen participants in fiscal year 2009.[2]

47.     Notwithstanding the fact that hundreds of thousands of individuals have participated in the state's SNAP program each year, DCFS had on hand only a small number of the voter registration application forms necessary for distribution as required under the NVRA for at least the time period from January 2005 to May 1, 2010.

48.     Specifically, DCFS had only 30,900 voter registration application forms available for distribution to its clients from at least January 2005 until May 1, 2010, or a total of approximately 6,000 voter registration application forms per year, despite SNAP participation rates of over 300,000 adult citizens during each fiscal year within the same time period.

49.     DHH also reports large numbers of benefits applications received for the Medicaid program, similar to the high rate of participation in SNAP.  DHH reports having received 383,752 Medicaid applications in fiscal year 2006; 378,739 Medicaid applications received in fiscal year 2007; 340,710 Medicaid applications received in

---

[2] The U.S. Department of Agriculture Food and Nutrition Service reports 325,000 adult citizen participants in SNAP in Louisiana in fiscal year 1996; 268,000 adult citizen participants in fiscal year 1997; 255,000 adult citizen participants in fiscal year 1998; 238,500 adult citizen participants in fiscal year 1999; 232,000 adult citizen participants in fiscal year 2000; 241,000 adult citizen participants in fiscal year 2001; 278,000 adult citizen participants in fiscal year 2002; 303,000 adult citizen participants in fiscal year 2003; 335,000 adult citizen participants in fiscal year 2004; 345,000 adult citizen participants in fiscal year 2005; 319,000 adult citizen participants in fiscal year 2006; 321,000 adult citizen participants in fiscal year 2007; and 318,000 adult citizen participants in fiscal year 2008. Office of Analysis, Nutrition & Evaluation, Food & Nutrition Serv., U.S. Dep't of Agric., *Supplemental Nutrition Assistance Program (SNAP) Studies: SNAP Household Characteristics Reports* (FY1996-FY2009), http://www.fns. usda.gov/ora/MENU/Published/snap/SNAPPartHH.htm. .

fiscal year 2008; 342,136 Medicaid applications received in fiscal year 2009; and 308,092 Medicaid applications received in fiscal year 2010. According to data provided by DHH in response to records requests, during the years in question, DHH received a total of 1,445,337 applications for Medicaid.

50. The number of Medicaid applications submitted to DHH between 2005 and 2010 is reflected in the following graph:



51. In comparison with the high numbers of participants in Louisiana's SNAP and Medicaid programs, the numbers of voter registration applications submitted to election officials from public assistance agencies in the state are extremely low, having declined precipitously between 1995 (the time of implementation of the NVRA) and 2008 (the year of the most recent data from the Election Assistance Commission regarding voter registration applications collected under the NVRA).

14

52.    The number of voter registration applications submitted by public

assistance agencies between 1995 and 2008[3] is reflected in the following graph:



53.    As the data above indicates, Louisiana DHH offices have consistently

received approximately 300,000 Medicaid applications per year since at least 2006, while

SNAP participation has grown from approximately 268,000 participants in 1996 to

356,000 participants in 2009.

---

[3] Fed. Election Comm'n, *The Impact of the National Voter Registration Act on the Administration of Elections for Federal Office, 1995-1996*, at Table 2 (1997); Fed. Election Comm'n, *The Impact of the National Voter Registration Act on the Administration of Elections for Federal Office, 1997-1998*, at Table 2 (1999); Fed. Election Comm'n, *The Impact of the National Voter Registration Act on the Administration of Elections for Federal Office, 1999-2000*, at Table 2 (2001); Fed. Election Comm'n, *The Impact of the National Voter Registration Act on the Administration of Elections for Federal Office, 2001-2002*, at Table 2 (2003); U.S. Election Assistance Comm'n, *The Impact of the National Voter Registration Act on the Administration of Elections for Federal Office, 2003-2004*, at Table 2 (2005); U.S. Election Assistance Comm'n, *The Impact of the National Voter Registration Act on the Administration of Elections for Federal Office, 2005-2006*, at Table 2b (2007); U.S. Election Assistance Comm'n, *The Impact of the National Voter Registration Act on the Administration of Elections for Federal Office, 2007-2008*, at Table 2b  (2009).  All of these studies are available at http://www.eac.gov/research/national_voter_registration_act_studies.aspx.

54.     From 1996 to 2008, however, voter registration applications originating in public assistance agencies in Louisiana have declined 88%, with only 8,688 applications submitted between 2007 and 2008.

55.     This decline in voter registration applications has occurred despite the large numbers of low-income Louisiana citizens who remain unregistered. In 2008, 28 percent of adult citizens in families making less than $15,000 a year were not registered to vote, compared to 5 percent of those in families making $100,000 or more.[4]

56.     DCFS and DHH are failing in their obligation to provide the voter registration opportunities mandated by Section 7 to every individual who applies for public assistance benefits, and who renews, recertifies, or changes an address at a public assistance office relating to the receipt of public assistance benefits.

### December 2008 Investigation

57.     Multiple interviews and investigations by different organizations have revealed long-standing and systemic violations of Section 7 throughout the state of Louisiana.

58.     In December 2008, a telephonic investigation was conducted of DCFS and DHH offices that offer SNAP, Medicaid, and WIC services.

59.     Of the 59 Offices of Family Support contacted in December 2008, staff at 28 of those offices (47%) indicated that they do not make voter registration opportunities available to clients. Those offices are located in the following parishes: Vermillion Parish; Tensas Parish; Sabine Parish; Tangipahoa Parish; St. Martin Parish; Evangeline Parish; Winn Parish; Bienville Parish; Calcasieu & Cameron Parish; East

---

[4] U.S Census Bureau, Current Population Survey, November 2008 Voting and Registration Supplement [machine-readable data file], conducted by the Bureau of the Census for the Bureau of Labor Statistics. Washington: U.S. Census Bureau [producer and distributor], 2009.

Carroll Parish; Concordia Parish; Terrebonne Parish; Caddo Parish; Rapides; Washington Parish; Grant Parish; Acadia Parish; Beauregard Parish; Ascension Parish; Jackson Parish; Catahoula Parish; Monroe Regional Office; Assumption Parish; Pointe Coupee Parish; Iberville Parish; West Baton Rouge Parish; West Carroll Parish; Livingston Parish; and Iberia Parish.

60.     For example, some DCFS staff responded to inquiries about the availability of voter registration at agency offices as follows:

> (i)     Staff at the Vermillion Office responded, "Hmm, let me ask. No, they don't do that here."

> (ii)    Staff at the Evangeline Parish office responded, "Excuse me ma'am, this is the Food Stamp Office." When asked, "so you can't register people to vote here then?," the Evangeline Parish office staff responded, "Vote for what, ma'am, we just take applications for food stamps."

> (iii)   Staff at the East Carroll Parish office responded: "No ma'am, you have to do it at the Voter Registration office."

61.     Of the 19 DHH Medicaid offices contacted in December 2008, staff at 13 offices (68.4%) indicated that they do not make voter registration opportunities available to clients. Those offices are located in the following parishes: East Baton Rouge Parish; Acadia Parish; Ascension Parish; Tangipahoa Parish; LaSalle Parish; Catahoula Parish; Avoyelles Parish; Iberia Parish; Iberville & West Baton Rouge Parish Office; St. Landry Parish; Madison & Richland Parish; St. Martin Parish; and Winn Parish.

62.     For example, some of DHH Medicaid office staff responded to inquiries about the availability of voter registration at the agency offices as follows:

> (i)     Staff at the East Baton Rouge office responded, "I don't think so, no, not at this office."

17

(ii)     Staff at the Ascension Parish office responded, "No ma'am, we don't do that. You need to go to Motor Vehicles."

(iii)    Staff at the Iberville & West Baton Rouge Parish Office responded, "No, this is not a register to vote office."

63.   Of the 24 WIC offices contacted in December 2008, staff at 12 offices (50%) indicated that they do not make voter registration opportunities available to clients: St. Martin Parish Breaux Bridge WIC Clinic; Evangeline Parish Community Health WIC Clinic; SWLA Center for Health Services; Health Unit Iberia Parish; Health Unit Lafayette Parish; David Raines Community Health Center WIC Clinic (Caddo Parish); North Caddo Medical Center WIC Clinic; LSU Health Sciences Center Shreveport WIC Clinic (Caddo Parish); Cameron Parish Field Clinic; Teche Action WIC Clinic (St. Mary Parish); Aruna T. Sangisetty WIC Clinic (Terrebonne Parish); and Teche Action Clinic: Dulac (Terrebonne Parish).

64.   For example, some of DHH WIC staff responded to inquiries about the availability of voter registration at the agency offices as follows:

(i)     Staff at St. Martin Parish Breaux Bridge WIC Clinic responded, "You'd have to go to St. Martin's for that."

(ii)    Staff at the Evangeline Parish WIC Clinic, responded, "No ma'am, you sure can't. Go to the courthouse."

(iii)   Staff at Health Unit Iberia Parish responded, "No, not at my office. I can give you the clerk of court's number."

### February 2010 Investigation

65.    In February 2010, another telephonic investigation was conducted of DCFS and DHH offices that offer SNAP and Medicaid services in 11 parishes across the state.

66.    Of the 11 Offices of Family Support contacted in February 2010, staff at offices in the following 8 parishes (72%) indicated that they do not make voter registration opportunities available to clients: Concordia Parish; Iberia Parish; Jefferson Parish; Lafayette Parish; Orleans Parish; Rapides Parish; St. Martin Parish; and Terrebonne Parish.

67.    Of the 11 Medicaid offices contacted in February 2010, staff at offices in the following 7 parishes (63%) indicated they did not offer voter registration: Caddo Parish; Concordia Parish; Iberia Parish; Jefferson Parish; Orleans Parish; Rapides Parish; and St. Martin Parish.

### March-May 2010 Interviews

68.    In March-May 2010, in-person interviews were conducted of 80 individuals exiting Louisiana public assistance agencies who had conducted transactions triggering the NVRA's voter registration obligations. Interviewers also spoke with staff at public assistance offices to ask about the availability of voter registration at the office. The results of these in-person interviews reveal that voter registration services are not being provided at each statutorily covered transaction.

69.    During March-May 2010, interviews were conducted of clients and/or staff at the following offices: Medicaid Office located at 1010 Common Street, 3rd Fl., New Orleans; Office of Family Support at 1530 Iberville St., New Orleans; Office

Family Support at 2150 Westbank Expressway, Harvey (Jefferson Parish); Office of Family Support located at 3229 36th St., Metairie (Jefferson Parish); Office of Family Support at 1012 West Tunnel Blvd., Houma (Terrebonne Parish); WIC Clinic at 600 Polk St., Houma (Terrebonne Parish); and WIC Clinic at 1281 West Tunnel, Bld., Houma (Terrebonne Parish).

70.    Of the 80 clients contacted between March and May 2010, only 14 clients (17.5%) reported having been asked by any staff person during their office visit whether they would like to register to vote.

71.    In addition, staff at several of the offices contacted between March and May 2010 were unable to produce a voter registration application form when asked, including the following: Medicaid Office at 1010 Common St., 3rd Fl., New Orleans, LA; WIC Clinic at 600 Polk St., Houma, LA; and WIC Clinic at 1281 West Tunnel, Blvd., Houma, LA (WIC).

### November 2010 Interviews

72.    In November 2010, in-person interviews were conducted of 32 individuals who had conducted transactions triggering the NVRA's voter registration obligations, as they were leaving Louisiana public assistance agencies. Interviews were also conducted of staff at public assistance offices to ask about the availability of voter registration at the office. The results of these in-person interviews reveal that voter registration services are not being provided at each statutorily covered transaction.

73.    In November 2010, interviews were conducted of clients as well as staff at the following offices: Office of Family Support located at 1630 Iberville St., New Orleans (Orleans Parish); Office of Family Support located at 3229 36th St., Metairie

20

(Jefferson Parish); Office of Family Support located at 3510 General Meyer Ave., Algiers (Orleans Parish); Office of Family Support located at 2150 Westbank Expressway, Suite 201, Harvey (St. Bernard Parish); Office of Family Support located at 1919 North Blvd., Baton Rouge (East Baton Rouge Parish); Office of Family Support located at 2751 Wooddale Blvd. Baton Rouge (East Baton Rouge Parish); Office of Family Support located at 825 Kaliste Saloom, Building 6, Lafayette, (Lafayette Parish); Office of Family Support located at 900 Murray St., Room K-200, Alexandria (Rapides Parish); Office of Family Support located at 1525 Fairfield Ave., Shreveport (Caddo Parish); and the Office of Family Support located at 1306 N. 19th St., Monroe (Ouachita Parish).

74. Of the 32 clients contacted during November 2010, only one client reported having been asked by any staff person during their office visit whether they would like to register to vote. None of the other 31 clients were asked by any agency employee, including any caseworker, whether they would like to register to vote.

75. Of the 31 clients (97%) who were not asked about voter registration, one client reported that she requested a voter registration application on her own initiative during her office visit but staff did not provide the form.

76. Staff at the following 5 of the 10 offices (50%) contacted during November 2010 were unable to produce a voter registration application form when asked: 3229 36th St., Metairie; 3510 General Meyer Ave., Algiers; 2150 Westbank Expressway, Suite 201, Harvey; 825 Kaliste Saloom, Building 6, Lafayette; and 1525 Fairfield Ave., Shreveport.

77. Staff responses to inquiries about the availability of voter registration at the agency offices include:

21

(i)     Staff at the Office of Family Support, located at 2150 Westbank Expressway, Suite 201 in Harvey, responded to a request for a voter registration application form by saying, "we don't have any of those.... we don't do that here. You have to go down to the first floor." When asked, "I have to go to the Office of Motor Vehicles?" The Office of Family Support staff person replied, "Yes... again we don't do that."

(ii)     When asked for a voter registration application, staff at the Office of Family Support located at 900 Murray St., Room K-200 were unsure whether or not the office offered voter registration materials and stated, "I haven't seen them in awhile."

### DCFS Admission of Noncompliance

78.     On November 19, 2010, a request for records was sent to Defendant Secretary of DCFS Ruth Johnson relating to NVRA compliance.

79.     In its response, DCFS admitted the following:

a.     DCFS does not track the number of completed voter registrations that agency staff forward to Louisiana parish registrars;

b.     Since January 2005, DCFS has made only two requests for voter registration forms for use in DCFS offices. The first request was made on June 7, 2005 for 20,900 forms. The second request was made on November 27, 2007 for 10,000 forms.

c.     DCFS had only 30,900 voter registration application forms available for distribution from January 2005 to May 1, 2010, despite yearly SNAP participation rates of 345,000 adult citizens in fiscal year 2005[5], 319,000 adult citizens in fiscal year 2006[6], 321,000 adult citizens in fiscal year 2007[7], 318,000 adult citizens in fiscal year 2008[8], and 356,000 adult citizens in fiscal year 2009.[9]

---

[5] Office of Analysis, Nutrition & Evaluation, Food & Nutrition Serv., U.S. Dep't of Agric., Rpt. No. FSP-06-CHAR, *Characteristics of Supplemental Nutrition Assistance Program Households: Fiscal Year 2005*, at Tables B-11; B-13. (Sept. 2006), *available at* http://www.fns.usda.gov/ora/menu/Published/ SNAP/FILES/Participation/2005Characteristics.pdf.

[6] Office of Analysis, Nutrition & Evaluation, Food & Nutrition Serv., U.S. Dep't of Agric., Rpt. No. FSP-07-CHAR, *Characteristics of Supplemental Nutrition Assistance Program Households: Fiscal Year 2006* at Tables B-11; B-13 (Sept. 2007), *available at* http://www.fns.usda.gov/ora/menu/Published/ SNAP/FILES/Participation/2006Characteristics.pdf.

[7] Office of Analysis, Nutrition & Evaluation, Food & Nutrition Serv., U.S. Dep't of Agric., Rpt.

d. DCFS does not distribute a voter registration application form with each application for service, and with each recertification, renewal or change of address. The only time the agency will give a client a voter registration application form is if the client requests the form.

e. DCFS does not keep track of how many voter registration application forms it distributes to clients, nor does it keep track of how many completed voter registration application forms it collects and transmits to the parish registrars. Although the form used for application to the Child Care Assistance Program (CCAP), the Family Independence Temporary Assistance Program (FITAP), the Kinship Care Subsidy Program (KCSP) and SNAP includes a written offer of voter registration, the agency does not track whether its clients respond to the offer and how, nor does it track what the case workers do with the clients' responses or lack thereof.

f. DCFS does not track the number of voter preference forms that are completed by agency clients.

g. DCFS had not received any directives or memoranda from the Secretary of State's office regarding implementation of the NVRA from at least January 2005 until December 2010.

80.  DCFS's policy of not distributing voter registration application forms unless a client affirmatively requests the form violates the agency's obligation to ensure distribution of a mail voter registration application, and to provide assistance in completing those applications, with every application for service or assistance, and with

No. FSP-08-CHAR, *Characteristics of Food Stamp Households: Fiscal Year 2007*, at Tables B-11; B-13 (Sept. 2008), *available at*
http://www.fns.usda.gov/ora/menu/Published/SNAP/FILES/Participation/
2007Characteristics.pdf.
[8] Office of Analysis, Nutrition & Evaluation, Food & Nutrition Serv., U.S. Dep't of Agric., Rpt. No. SNAP-09-CHAR, *Characteristics of Supplemental Nutrition Assistance Program Households:   Fiscal Year 2008*, at Tables B-11; B-13 (Sept. 2009), *available at* http://www.fns.usda.gov/
ora/menu/Published/SNAP/FILES/Participation/2008Characteristics.pdf.
[9] Office of Analysis, Nutrition & Evaluation, Food & Nutrition Serv., U.S. Dep't of Agric., Rpt. No. SNAP-10-CHAR, *Characteristics of Supplemental Nutrition Assistance Program Households: Fiscal Year 2009*, at Tables B-11;  B-13 (Oct. 2010), *available at* http://www.fns.usda.gov/
menu/Published/SNAP/FILES/Participation/2009Characteristics.pdf.

each recertification, renewal, or change of address form relating to such service or assistance under 42 U.S.C § 1973gg-5(a)(6).

81.     DCFS's failure to track client responses to the voter preference form, the number of voter registration application forms it distributes to clients, or the number of completed voter registration application forms it collects and transmits to the parish registrars, is indicative of a violation of DCFS's duty to ensure distribution, equal assistance, and timely transmittal of voter registration application forms under 42 U.S.C § 1973gg-5(a)(4)(A)(i)-(iii).[10] *See* La. Rev. Stat. Ann. § 18:116(G).

82.     Defendant Secretary of State is failing to coordinate Louisiana's responsibilities under the NVRA. 42 U.S.C. § 1973gg-8.

83.     Defendant Secretary of State is failing to develop adequate "employee training programs" to ensure compliance with the NVRA. La. Rev. Stat. Ann. § 18:117(A).

### Notice of Violations and Defendants' Failure to Cure

84.     On January 12, 2011, Plaintiffs' counsel sent letters to Defendants, the Secretaries of DCFS, DHH, and the Secretary of State, in order to "provide written notice of the violation to the chief election official of the State," as required by the NVRA, 42 U.S.C. § 1973gg-9, (the "Notice Letter"). Exhibit 1.

85.     The Notice Letter explained that Defendants, the Secretaries of DCFS, DHH, and the Secretary of State, were in violation of Section 7 of the NVRA, pointing to investigations and interviews that revealed, among other things, "a number of instances in

---

[10] *See* U.S. Dep't of Justice, Civil Rights Division, Voting Section, *The National Voter Registration Act of 1993 (NVRA): Questions and Answers,* at No. 42, *available at* http://www.justice.gov/crt/about/vot/nvra/nvra_faq.php ("[S]tates should consider having a system in place to track the number of voter registration applications from each designated voter registration agency.").

which individuals were not provided with an application to register to vote as a part of their application for benefits, recertification, or change of address as required by law." *Id.*

86.     The Notice Letter further explained that Plaintiffs' counsel had "identified individuals who reported they had not received any offer of voter registration by agency staff, even though such an offer should have been made." *Id.*

87.     The Notice Letter expressed an interest in working cooperatively to "assist with developing a plan that will quickly bring the state into compliance with the requirements of Section 7 of the NVRA," and thus requested a "response, including a timeline and plan for achieving and sustaining compliance with the NVRA at Louisiana public assistance agencies." *Id.*

88.     Defendant Secretary of DHH Greenstein responded to the Notice Letter of NVRA violations with a letter from the agency's General Counsel Kimberly Humbles, dated January 24, 2011 (the "DHH Response Letter").

89.     In the DHH Response Letter, Ms. Humbles informed Plaintiffs' counsel that DHH's procedures would be reviewed to determine whether NVRA violations are occurring, and that DHH would apprise Plaintiffs' counsel of the results of that review, but did not offer any plan for bringing DHH into compliance with the NVRA.

90.     As of the date of this filing, Plaintiffs' counsel have received no further contact from DHH regarding NVRA violations or the results of the agency's review.

383

application, in accordance with federal law, as a result of Defendants' noncompliance with Section 7.

99.    Plaintiff Roy Ferrand is not currently registered to vote in Louisiana.

100.    Plaintiff Ferrand last applied for SNAP assistance in 2009 at the Office of Family Support located at 1630 Iberville St., in New Orleans, Louisiana.

101.    At no time during the application process did any agency staff person ask Plaintiff Ferrand if he wanted to register to vote or complete and submit a voter registration application form.  Plaintiff Ferrand was not given a voter registration application form.  If Plaintiff Ferrand had been offered a voter registration application form and assistance with filling out the form during his initial visit to the Louisiana public assistance agency office, he would have completed and submitted a voter registration application form.

102.    Plaintiff Luther Scott, Jr. is not registered to vote in Louisiana at his current address.

103.    Plaintiff Scott was most recently registered approximately six years ago, when he in lived New Orleans prior to Hurricane Katrina.  Plaintiff Scott moved after the Hurricane, and has moved several more times since then.  Plaintiff Scott is not registered to vote at his present address.

104.    Plaintiff Scott first applied for SNAP assistance in January 2010 at the Office of Family Support located at 1630 Iberville Street in New Orleans, Louisiana.

105.    At no time during the application process did any agency staff person ask Plaintiff Scott if he wanted to register to vote or complete and submit a voter registration application form.  Plaintiff Scott was not given a voter registration

application form. If Plaintiff Scott had been offered a voter registration application form
and assistance with filling out the form during his initial visit to the Louisiana public
assistance agency office, he would have completed and submitted a voter registration
application form.

106.   Plaintiff Scott returned to the Office of Family Support in 2010
approximately two more times after his initial application for SNAP. At no time during
any of those visits to the agency did any staff person ask Plaintiff Scott if he would like to
register to vote or complete and submit a voter registration application form. Plaintiff
Scott did not receive a voter registration application form from any agency staff person
during any of his visits to the office. If any agency staff person had offered Plaintiff
Scott a voter registration application form and assistance in completing that form during
any of his visits to the agency office, he would have completed and submitted a voter
registration application form.

### Harm to Plaintiff Louisiana NAACP

107.   Plaintiff Louisiana NAACP's mission is to ensure the political,
educational, social, and economic equality of rights of all persons, and to eliminate racial
hatred and racial discrimination. Plaintiff Louisiana NAACP's mission includes the
following principal objectives:

        a.  To ensure the political, educational, social, and economic equality
            of all citizens;

        b.  To achieve equality of rights and eliminate race prejudice among
            the citizens of the United States;

        c.  To remove all barriers of racial discrimination through democratic
            processes;

*385*

d. To seek enactment and enforcement of federal, state, and local laws securing civil rights;

e. To inform the public of the adverse effects of racial discrimination and to seek its elimination; and

f. To educate persons as to their constitutional rights and to take all lawful action to secure the exercise thereof, and to take any other lawful action in furtherance of these objectives, consistent with the NAACP's Articles of Incorporation.

108.    In furtherance of its mission, Plaintiff Louisiana NAACP has engaged in a wide range of activities in recent years, including voter registration and education efforts.

109.    Ensuring full and equal voting rights for African Americans and other communities of color has long been a key focus of the NAACP's work.  As early as 1915, in the case of *Guinn v. United States*, 238 U.S. 347 (1915), the NAACP has been involved in legal challenges to discriminatory voting laws.  Throughout the 1950's and 1960's, the NAACP was active throughout the South challenging laws where African Americans were denied the right to register and vote.  The NAACP also helped pass major civil rights legislation, including the Voting Rights Act of 1965.  Enforcement of civil rights statutes relating to voting, including the National Voter Registration Act, is a core concern of Plaintiff Louisiana NAACP.

110.    Voter registration and education is a core component of Plaintiff Louisiana NAACP's mission and central to the accomplishment of its objectives. Accordingly, Plaintiff Louisiana NAACP seeks to register all of its members, and other eligible individuals, to vote.

111.    Toward that end, Plaintiff Louisiana NAACP engages in regular voter registration drives and voter education activities across the State of Louisiana, with a

29

particular emphasis on minority communities. Plaintiff Louisiana NAACP has registered tens of thousands of people since its inception. Plaintiff Louisiana NAACP directs its voter registration and education activities at poor African Americans, because they are less likely to be registered than the more affluent.

112.    Plaintiff Louisiana NAACP will remain engaged in voter registration and education efforts, as well as other issues relating to the equal representation and participation of minority communities.

113.    Defendants' continued noncompliance with Section 7 has resulted in many low-income and minority Louisiana citizens missing their opportunity to complete and submit a voter registration application form at Louisiana public assistance offices.

114.    Defendants' continued noncompliance with Section 7 frustrates the organizational mission of Plaintiff Louisiana NAACP to protect the civil rights generally, and voting rights in particular, of the members of the communities it serves in Louisiana, and has had a direct effect on Plaintiff Louisiana NAACP's volunteer allocation with respect to its voter registration and education efforts.

115.    Plaintiff Louisiana NAACP does not employ any individuals. Plaintiff Louisiana NAACP's mission is promoted and its work carried out by volunteers. Volunteer time is spent on projects and issues that are central to its mandate.

116.    Plaintiff Louisiana NAACP allocates increased numbers of volunteers to conduct voter registration drives where the need for voter registration services is greatest. Conversely, Plaintiff Louisiana NAACP sends fewer volunteers to conduct voter registration drives in locations where more people are already registered.

387

117.   Defendants' continued noncompliance with Section 7 has forced Plaintiff Louisiana NAACP to send volunteers to assist people with voter registration and education who should have been offered those services by DCFS and DHH.   If Defendants were operating in compliance with the NVRA requirement to offer voter registration services at regular intervals at public assistance offices, Plaintiff Louisiana NAACP would be able to reallocate volunteers and resources currently devoted to voter registration drives and education activities.

118.   As a result of Defendants' violations, Plaintiff Louisiana NAACP has allocated volunteer time to voter registration that could have been devoted to registering voters at other locations, or to other activities altogether. For instance, Plaintiff Louisiana NAACP could spend more time on its disaster-relief efforts, or on its many education-related activities, such as advocacy for educational reform or after-school tutoring programs.   Plaintiff Louisiana NAACP could also spend time on issues of economic development to help local business leaders to develop capacity and infrastructure. There is no shortage of additional projects to which the Plaintiff Louisiana NAACP could devote its resources if there were less need for voter registration-related activities as a result of Defendants' violations.

119.   Plaintiff Louisiana NAACP's inability to best use its volunteers and resources will continue unless and until Defendants' violations are remedied.

### Causes of Action

### First Claim for Relief
### Violations of Section 7 of the National Voter Registration Act of 1993

120.   Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 119 as if fully set forth herein.

31

121.   Defendants have violated and continue to violate 42 U.S.C. § 1973gg-5(a)(6)(B) by failing to provide the voter preference form with every application for public benefits, recertification/renewal, and change of address.

122.   Defendants have violated and continue to violate 42 U.S.C. § 1973gg-5(a)(6)(A) by failing to provide a mail voter registration application form with every application for public benefits, recertification/renewal, and change of address.

123. .   Defendants have violated and continue to violate 42 U.S.C. § 1973gg-5(a)(6)(C) by failing to provide the same degree of assistance with completing the voter registration application form as would be provided with regard to completion of DCFS's and DHH's own forms.

124.   Defendants have violated and continue to violate 42 U.S.C. § 1973gg-5(a)(4)(A)(iii) by failing to accept completed voter registration application forms at public assistance offices.

125.   Defendants have violated and continue to violate 42 U.S.C. § 1973gg-5(d) by failing to transmit completed applications to the appropriate state election official no later than 10 days after the date of acceptance, or, if a registration application is accepted within 5 days before the last day for registration to vote in an election, no later than 5 days after the date of acceptance.

126.   Defendant Secretary of State has violated and continues to violate 42 U.S.C. § 1973gg-8 by failing to coordinate the state of Louisiana's responsibilities under 42 U.S.C. § 1973gg-5 and by failing to develop adequate employee training programs necessary for acceptance of voter registration applications under the NVRA.

127.    Plaintiffs have been aggrieved by this violation of the NVRA and have no adequate remedy at law for the Defendants' violation of their rights. Declaratory and injunctive relief are required to remedy the Defendants' violation of the NVRA and to secure ongoing compliance with the NVRA.

## Second Claim for Relief
### Violations of Louisiana State Statutes Implementing Section 7 of the National Voter Registration Act of 1993

128.    Plaintiffs incorporate by reference the allegations contained in Paragraphs 1 through 127 as if fully set forth herein.

129.    Defendants have violated and continue to violate La. Rev. Stat. Ann. § 18:116(C)(1)(b) by failing to provide the voter preference form with every application for public benefits, recertification/renewal, and change of address.

130.    Defendants have violated and continue to violate La. Rev. Stat. Ann. § 18:116(C)(1)(a) by failing to provide a mail voter registration application form with every application for public benefits, recertification/renewal, and change of address.

131.    Defendants have violated and continue to violate La. Rev. Stat. Ann. § 18:116(C)(4) by failing to provide the same degree of assistance with completing the voter registration application form as would be provided with regard to completion of DCFS's and DHH's own forms.

132.    Defendants have violated and continue to violate La. Rev. Stat. Ann. § 18:116(B)(1)(c) by failing to accept completed voter registration application forms at public assistance offices.

133.    Defendants have violated and continue to violate La. Rev. Stat. Ann. § 18:116(D) by failing to transmit completed applications to the appropriate state election

33

390

official no later than 10 days after the date of acceptance, or, if a registration application is accepted within 5 days before the last day for registration to vote in an election, no later than the close of the business day.

134.    Defendant Secretary of State has violated and continues to violate La. Rev. Stat. Ann. § 18:18(A)(6) by failing to coordinate the state of Louisiana's responsibilities under Section 7.

135.    Defendant Secretary of State has violated and continues to violate La. Rev. Stat. Ann. § 18:117(A) by failing to develop adequate employee training programs necessary for acceptance of voter registration applications under the NVRA.

136.    Defendant Johnson has violated and continues to violate La. Rev. Stat. Ann. § 18:116(G) by failing to keep statistical records on the number of completed voter registration applications that agency staff forward to Louisiana parish registrars.

137.    Plaintiffs have been aggrieved by this violation of the Louisiana state statutes implementing the NVRA and have no adequate remedy at law for the Defendants' violation of their rights.  Declaratory and injunctive relief are required to remedy the Defendants' violation of the Louisiana State Statutes implementing the NVRA and to secure ongoing compliance with the NVRA.

### Prayer for Relief

WHEREFORE, Plaintiffs respectfully request that the Court enter an Order:

(i)     Declaring, pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1973gg-9(B)(2), that the Defendants have violated Section 7 of the NVRA, 42 U.S.C. §1973gg-5, by failing to provide voter registration services as required by the NVRA at offices that provide public assistance in Louisiana;

(ii)    Permanently enjoining the Defendants, their agents and successors in office and all persons working in concert with them, from implementing practices and procedures that violate Section 7 of the NVRA, 42 U.S.C. §1973gg-5;

(iii)   Directing the Defendants, under a court-approved plan with appropriate reporting and monitoring requirements, to take all appropriate measures necessary to remedy the harm caused by their noncompliance with Section 7 of the NVRA, including, without limitation, ensuring that individuals affected by the Defendants' non-compliance with Section 7 of the NVRA are provided immediate opportunities to register to vote or change their voter registration addresses as required by Section 7;

(iv)   Directing the Defendants, under a court-approved plan with appropriate reporting and monitoring requirements, to take all steps necessary to ensure ongoing compliance with the requirements of Section 7 of the NVRA, 42 U.S.C. § 1973gg-5, including, without limitation, training and monitoring personnel to ensure that designated agencies are distributing voter registration application forms and other materials to each person who applies, recertifies, renews, or changes an address in connection with public assistance benefits; inquiring of all clients, in writing, whether they would like to register to vote or change their voter registration addresses during their visit or transaction with the agency; assisting clients in completing the voter registration applications; accepting completed voter registration application forms and transmitting them to the appropriate election authority, and providing other voter registration services and assistance as required by the NVRA;

(v)   Awarding the Plaintiffs costs and disbursements incurred in connection with this action, including, without limitation, reasonable attorneys fees and costs pursuant to 42 U.S.C. § 1973gg-9(c);

(vi)   Retaining jurisdiction over this action to ensure that the Defendants are complying with their obligations under the NVRA; and

(vii)   Awarding such other equitable and further relief as the Court deems just and proper.

DATED:  April 19, 2011

Respectfully submitted,

＿Ronald Wilson＿＿＿
Ronald L. Wilson (LSBN 13575)
701 Poydras Street – Suite 4100
New Orleans, Louisiana 70139

35

Telephone: (504) 525-4361
Facsimile: (504) 525-4380
Email: cabral2@aol.com

NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
John Payton
Debo P. Adegbile
Kristen Clarke*
Ryan P. Haygood
Dale Ho*
Natasha Korgaonkar
99 Hudson St., Suite 1600
New York, NY 10013
Telephone: (212) 965-2252
Facsimile: (212) 965-7592
Email: dho@NAACPLDF.ORG
Email: kclarke@NAACPLDF.ORG
*MOTION FOR ADMISSION PRO HAC
VICE PENDING

PROJECT VOTE
Nicole K. Zeitler*
Niyati Shah*
737 ½ 8th Street SE
Washington, DC 20003
Telephone: (202) 546-4173 Ext. 303
Facsimile: (202) 629-3754
Email: nzeitler@projectvote.org
Email: nshah@projectvote.org
*MOTION FOR ADMISSION PRO HAC
VICE PENDING

393

          **RONALD L. WILSON**
                                                ATTORNEY AT LAW

January 12, 2011

*By Facsimile and U.S. Mail*

The Honorable Tom Schedler
Louisiana Secretary of State
P.O. Box 94125
Baton Rouge, LA 70804-9125

Dear Secretary Schedler:

On behalf of the Louisiana State Conference of the National Association for the Advancement of Colored People (NAACP), its members, and all similarly situated persons and organizations, we write to notify you that Louisiana public assistance agencies are not in compliance with the National Voter Registration Act of 1993, 42 U.S.C. § 1973gg, et seq. (the "NVRA"). The NVRA establishes clear obligations on the part of state public assistance agencies to provide voter registration services. The law provides for a private right of action in the event that agencies fail to comply with the NVRA. We urge you to take steps to bring the state into compliance.

Pursuant to the NVRA, public assistance agencies are designated as "voter registration agencies" and are required to provide certain specified voter registration services. 42 U.S.C. § 1973gg-5. Louisiana public assistance agencies, including the Department of Children and Family Services and the Department of Health and Hospitals are designated as voter registration agencies under the NVRA and pursuant to La. Rev. Stat. Ann. § 116(A)(1)(a). Designated voter registration agency offices include but are not limited to offices that administer or provide services under the Food Stamp, Medicaid, supplemental food for Women, Infants and Children (WIC), and the Family Independence Temporary Assistance Program (FITAP) programs.

At a minimum, each voter registration agency in the state of Louisiana must give clients a voter registration application form with each application for benefits, recertification, and change of address. 42 U.S.C. § 1973gg-5(a)(6)(A). The agency must also give clients a form that provides space to record his/her decision whether or not to register with the agency at that time. 42 U.S.C. § 1973gg-5(a)(6)(B). The agency must provide the same degree of assistance with regard to completion of the voter registration application form as is provided by the office with regard to the completion of its own forms, unless the applicant refuses such assistance. 42 U.S.C. § 1973gg-5(a)(6)(C). All completed voter registration applications collected by the agency must be transmitted to the appropriate election official not later than 10 days after the date of acceptance, unless the registration application is accepted within 5 days before the last day for registration to vote in an election, in which case the completed application must be transmitted not later than 5 days after the date of acceptance. 42 U.S.C. § 1973gg-5(d).

Substantial evidence demonstrates that Louisiana is failing to provide mandatory voter registration services at its public assistance offices as required by the NVRA. For example, the most recent report to the U.S. Election Assistance Commission reveals that Louisiana public assistance agencies collected only 8,688 voter registration applications in 2007-2008. This represents an 88% decline since 1995-1996, when Louisiana reported 74,636 registrations from public assistance offices.

Moreover, we have conducted a survey of clients and staff at public service agencies throughout the state and have identified widespread noncompliance with the law. Our survey revealed a number of instances in which individuals were not provided with an application to register to vote as a part of their application for benefits, recertification, or change of address as required by law. We also identified individuals who reported they had not received any offer of voter registration by agency staff, even though such an offer should have been made. Our survey also revealed that personnel at numerous agencies around the state were wholly unfamiliar with their voter registration obligations under the NVRA. In addition, a number of agencies around the state did not have hard copies of voter registration forms available for clients.

We hope you will ensure that, consistent with Louisiana's obligations under the NVRA, all Louisiana citizens, including the hundreds of thousands of citizens who receive public assistance, receive the opportunity to register to vote. This letter serves as notice of a violation of the NVRA pursuant to 42 U.S.C. § 1973gg-9(b). We are eager to work cooperatively with you as well as the Secretaries of the Department of Children & Family Services and the Department of Health & Hospitals to assist with developing a plan that will quickly bring the state into compliance with the requirements of Section 7 of the NVRA. We look forward to receiving your response, including a timeline and plan for achieving and sustaining compliance with the NVRA at Louisiana public assistance agencies.

Should you have any questions or concerns, please feel free to contact Nicole Zeitler, Director of the Public Agency Voter Registration Program at Project Vote at (202) 546-4173 Ext. 303 or Dale Ho, Assistant Counsel at the NAACP Legal Defense and Educational Fund, Inc. at (212) 965-2252.

Sincerely,

*Dale Ho*

Dale Ho, Esq.
Assistant Counsel
NAACP Legal Defense & Educational
Fund, Inc.
99 Hudson St., Suite 1600
New York, NY 10013
Tel: (212) 965-2252
Fax: (212) 965-7592
Email: DHo@NAACPLDF.ORG

*Nicole K. Zeitler*

Nicole K. Zeitler, Esq.
Director
Public Agency Voter Registration
Project Vote
737 ½ 8th Street SE
Washington, D.C. 20003
Tel: (202) 546-4173 Ext. 303
Fax: (202) 543-3675
Email: nzeitler@projectvote.org

*Ronald L. Wilson*

Ronald L. Wilson, Esq.
Attorney at Law
701 Poydras Street – Suite 4100
New Orleans, Louisiana 70139
Tel: (504) 525-4361
Fax: (504) 525-4380
E-mail: cabral2@aol.com

cc:  Ruth Johnson
     Secretary
     State of Louisiana Department of Children & Family Services
     P. O. Box 3776
     Baton Rouge, LA 70821

     Bruce D. Greenstein
     Secretary
     State of Louisiana Department of Health & Hospitals
     P. O. Box 629
     Baton Rouge, LA 70821-0629

{00020541.DOC}

      RONALD L. WILSON
ATTORNEY AT LAW

February 25, 2011

*By Facsimile and U.S. Mail*

The Honorable Tom Schedler
Louisiana Secretary of State
P.O. Box 94125
Baton Rouge, LA 70804-9125

Dear Secretary Schedler:

Thank you for your response, dated February 14, 2011 (the "Response Letter") to our Notice of violations of the National Voter Registration Act, 42 U.S.C. § 1973gg, et seq. ("NVRA"), dated January 12, 2011 (the "Notice Letter"). We respectfully disagree with your assertion that we have not provided you with adequate notice under 42 U.S.C. § 1973gg-9(b). As you know, this section of the NVRA requires that the aggrieved party "provide written notice of the violation to the chief election official of the state involved." Our January 12 Notice Letter provided such notice to the State.

The NVRA requires that three "services shall be made available" at all public assistance agencies: "(i) [d]istribution of mail voter registration application forms … (ii) [a]ssistance to applicants in completing voter registration application forms, unless the applicant refuses such assistance [and] (iii) [a]cceptance of completed voter registration application forms for transmittal to the appropriate State election official." 42 U.S.C. § 1973gg-5(a)(4)(A).

The Notice Letter informed you that Louisiana is in "violation" of all three of these obligations. As we noted, our information reveals that DCFS and DHH offices, and other public assistance agencies throughout the state have

> revealed a number of instances in which individuals were not provided with an application to register to vote as a part of their application for benefits, recertification, or change of address as required by law. We also identified individuals who reported they had not received any offer of voter registration by agency staff, even though such an offer should have been made. Our survey also revealed that personnel at numerous agencies around the state were wholly unfamiliar with their voter registration obligations under the NVRA. In addition, a number of agencies around the state did not have hard copies of voter registration forms available for clients.

Notice Letter at 2. Accordingly, we have provided adequate and sufficient notice under 42 U.S.C. § 1973gg-9(b) that Louisiana is failing to provide mandatory voter registration services as required by Section 7 of the NVRA. *Cf. Nat'l Coal. for Students with Disabilities Educ. and Legal Defense Fund v. Scales*, 150 F.Supp.2d 845, 851 (D. Md. 2001) ("[T]he statement that [a state public assistance agency] failed to provide voter registration services to its clients that *made their initial*

*application for services* ... is sufficient to dispense with the notice provisions of the NVRA. Discovery procedures may be employed to test the accuracy of these allegations.") (emphasis in original).

Although you contend that the Notice Letter suffers from a "lack of specificity and generality," Response Letter at 2, we note that the statute plainly requires that an aggrieved party "provide written notice of a violation," 42 U.S.C. § 1973gg-9(b), which we have done in conformity with the statute and relevant case law. *See Scales*, 150 F. Supp. 2d at 851. We identified those agencies that have defaulted on their obligations under the statute and indicated the statutory provisions at issue. There is no requirement that we disclose all available information that substantiates our claims. The purpose of the notice requirement is simply to "provide states in violation of the Act an opportunity to attempt compliance before facing litigation." *Ass'n of Community Org. for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997). For example, as the state's Chief Election Official responsible for coordinating Louisiana's responsibilities under the NVRA, it should be a simple matter for your office to verify that those state public assistance agencies identified above and in our Notice Letter do "not have hard copies of voter registration forms available for clients." Notice Letter at 2. At a minimum, the Chief Election Official should be able to ascertain whether all state public assistance offices have voter registration applications. That you cannot readily do so is clear evidence that a more comprehensive NVRA compliance program needs to be developed for Louisiana.

Your February 14, 2011 Response Letter – which is dated more than a month after the January 12 Notice Letter – indicates that you would be interested in receiving "details or ... specifics" about the nature of your violations. We stated in the Notice Letter that we have been and remain available to meet with you to discuss the aforementioned violations in further detail and are "eager to work cooperatively with you ... to assist with developing a plan that will quickly bring the state into compliance with the requirements of Section 7 of the NVRA." Notice Letter at 2. We also note that, in response to a phone message left on February 7, 2011 by Ms. Elsie Cangelosi of your office, we attempted to contact your office on two separate occasions: first, by leaving a telephone message for Ms. Cangelosi on the same day (February 7, 2011); and second, with a follow-up email on February 10, 2011. However, we did not receive a response on either occasion. As of the date of this letter, you still have not taken the opportunity to contact us to discuss those issues raised in our Notice Letter; nevertheless we remain available to work with your office cooperatively to ensure compliance with the NVRA.

In the meantime, we can provide you with the following additional details, further illustrating the scope of the state's non-compliance, and substantiating the earlier notice that has already been provided. We note that what follows is meant to be illustrative, and not exhaustive, of the information that we have obtained substantiating the State's non-compliance with the NVRA.

Specifically, information indicated that numerous public assistance agencies in Louisiana are failing to make voter registration opportunities available as required under 42 U.S.C. § 1973gg-5(a)(6). Information demonstrating non-compliance dates back to December 2008, and stretches through the present. Of 59 Offices of Family Support surveyed during December 2008, representatives from 29 of those offices indicated that they do not make voter registration opportunities available to clients. Those 29 offices include the following parish offices: Vermillion; Tensas; Sabine; Tangipahoa; St. Martin; Madison; Evangeline; Winn; Bienville; Calcasieu & Cameron; East Carroll; Concordia; Terrebonne; Caddo; Rapides; Washington; Grant;

2

Acadia; Beauregard; Ascension; Jackson; Catahoula; Monroe; Assumption; Pointe Coupee; Iberville; West Baton Rouge; West Carroll; Livingston; and Iberia.

Our information also revealed similar problems at 12 of the state's WIC offices including the St. Martin Parish Breaux Bridge WIC Clinic; Evangeline Parish Community Health WIC Clinic; SWLA Center for Health Services; Health Unit Iberia Parish; Health Unit Lafayette Parish; David Raines Community Health Center WIC Clinic; North Caddo Medical Center WIC Clinic; LSU Health Sciences Center Shreveport WIC Clinic; Cameron Parish Field Clinic; Teche Action WIC Clinic; Aruna T. Sangisetty WIC Clinic; and Teche Action Clinic: Dulac.

Finally, staff at the following 13 Medicaid offices indicated that their offices do not offer voter registration: East Baton Rouge; Acadia; Ascension; Tangipahoa; LaSalle; Catahoula; Avoyelles; Iberia; Iberville & West Baton Rouge; St. Landry; Madison & Richland; St. Martin Parish; and Winn.

Further information revealed ongoing problems at Offices of Family Support and Medicaid offices across the state as of February 2010. Staff at the following 11 Offices of Family Support indicated they did not offer voter registration: Concordia; Iberia; Jefferson; Lafayette; Orleans; Rapides; St. Martin; and Terrebonne. Of the 11 Medicaid offices reviewed, staff at offices in the following 7 parishes indicated they did not offer voter registration: Caddo; Concordia; Iberia; Jefferson; Orleans; Rapides; and St. Martin.

More recent information received between March through November, 2010 revealed non-compliance at various Offices of Family Support in the following parishes: Caddo, East Baton Rouge, Jefferson, Lafayette, Orleans, Ouchita, Rapides, and Terrebonne.

At many of the agencies identified above, agency staff failed to make registration opportunities available while clients were completing applications for benefits, submitting recertifications, and/or providing a change of address. In addition, individuals seeking services at many of the sites identified above were not asked if they wanted to register to vote during their visit, nor provided an application to register to vote.

In sum, our information reveals specific instances of noncompliance with the NVRA, which, in combination with the low numbers of persons registering to vote at public assistance agencies in Louisiana, *see* Notice Letter at 1, are indicative of long-term, systemic violations that must be remedied immediately.

We reiterate that we are available to meet with you to discuss these and other details of the State's violations of the NVRA in more detail. Please feel free to contact Nicole Zeitler, Director of the Public Agency Voter Registration Program at Project Vote at (202) 546-4173 Ext. 303 or Dale Ho, Assistant Counsel at the NAACP Legal Defense and Educational Fund, Inc. at (212) 965-2252 to arrange a meeting.

Sincerely,

*Dale Ho*

Dale Ho, Esq.
Assistant Counsel
NAACP Legal Defense & Educational
Fund, Inc.
99 Hudson St., Suite 1600
New York, NY 10013
Tel: (212) 965-2252
Fax: (212) 965-7592
Email: DHo@NAACPLDF.ORG

*Nicole K. Zeitler*

Nicole K. Zeitler, Esq.
Director
Public Agency Voter Registration
Project Vote
737 ½ 8th Street SE
Washington, D.C. 20003
Tel: (202) 546-4173 Ext. 303
Fax: (202) 543-3675
Email: nzeitler@projectvote.org

*Ronald L. Wilson*

Ronald L. Wilson, Esq.
Attorney at Law
701 Poydras Street – Suite 4100
New Orleans, Louisiana 70139
Tel: (504) 525-4361
Fax: (504) 525-4380
E-mail: cabral2@aol.com

cc:   Ruth Johnson
      Secretary
      State of Louisiana Department of Children & Family Services
      P. O. Box 3776
      Baton Rouge, LA 70821

      Bruce D. Greenstein
      Secretary
      State of Louisiana Department of Health & Hospitals
      P. O. Box 629
      Baton Rouge, LA 70821-0629

# Appendix #19

Petitioner's Post Conviction Application with Memorandum of Law
Attached Motions for Appointment of Counsel; Evidentiary Hearing,
Discovery, and Authentication of documents secured through
Discovery filed. Unanswered (to date) Requests for Admissions

Rigoberto Funes # 571875
Main Prison, Spruce-4
La. State Penitentiary
Angola, LA 70712

24TH JUDICIAL District Court Clerk
200 Derbigny
Clerk of Court's Office
Gretna, La. 70119

RE:   Rigoberto Funes v. N. Burl Cain, Warden, La. State Penitentiary, Docket No. 08-5641

Dear Clerk:

Please find enclosed an Original of my Pro Se Pleadings, to wit:

1.   Application for Post Conviction Relief.

2.   Memorandum of Law and Argument in Support.

3.   Motion and Order Requesting Evidentiary Hearing and Appointment of Counsel.

4.   Motion to Compel an Answer.

5.   Petition and Order for Writ of Habeas Corpus Ad Testificandum.

6.   Motion and Order for Production of Genuine Documents of Trial Transcripts and Records.

I respectfully ask that you please file and set same for judicial consideration.

In addition, please find enclosed another copy of this cover letter that I respectfully ask that

you please "file/date" stamp and return to me in the attached self-addressed stamped envelope.

This matter is submitted in forma pauperis.

Respectfully Submitted:

*Rigoberto Funes*
Rigoberto Funes # 571875
Main Prison CBB Lower
LA. STATE PENITENTIARY
ANGOLA, LA 70712

Enclosures

cc: w/encl District Attorney, Jefferson Parish

i

401

APPENDIX "A"
Adopted October 14, 1976
Effective January 1, 1977

### UNIFORM APPLICATION FOR POST-CONVICTION RELIEF

Rigoberto Funes                              ·No. _____
NAME OF PETITIONER          (to be filled in by clerk)

571875                                       24th     JUDICIAL DISTRICT
PRISON NUMBER

La. State Penitentiary                       PARISH OF  WEST FELICIANA
PLACE OF CONFINEMENT        STATE OF LOUISIANA

        vs.

N. Burl Cain, Warden
CUSTODIAN            (Warden,
Superintendent, Jailor, or authoriz-
ed person having custody of
petitioner

Please serve CUSTODIAN and
DISTRICT ATTORNEY, _____ JUDICIAL DISTRICT, STATE OF
LOUISIANA.

### INSTRUCTIONS --- READ CAREFULLY

(1) This petition must be legibly written or typed, signed by the petitioner and
sworn to before a notary public or institutional officer authorized to administer
an oath. Any false statement of a material fact may serve as the basis for a
criminal prosecution. All questions must be answered concisely in the proper
space on the form. Additional pages are not permitted except with respect to
the facts which you rely upon to support your claims for relief. No citation of
authorities or legal arguments are necessary.

(2) Only one judgment may be challenged in a single petition except that con-
victions on multiple counts of a single indictment or information may be
challenged in one petition.

(3) YOU MUST INCLUDE ALL CLAIMS FOR RELIEF AND ALL FACTS
SUPPORTING SUCH CLAIMS IN THE PETITION.

(4) When the petition is completed, the original must be mailed to the clerk of
the district court in the parish where you were convicted and sentenced.

(5) You must attach official documentation showing your sentence and the crime
for which you have been convicted. You may obtain that documentation from
the clerk of court of the district court of the parish where you were sentenced
or from the institution where you are confined. If that documentation is not
attached, you must allege that steps were taken to obtain it.

(6) Petitions which do not conform to these instructions will be returned with a
notation as to the deficiency.

### PETITION

1. Name and location of court which entered the judgment of conviction
   challenged     24th Judicial District, Parish of Jefferson _____

2. Date of judgment of conviction    _____

3. Length of sentence

4. Nature of offense involved (all counts)

1

402

5. What was your plea? (check one)

   (a) Not guilty (   X )

   (b) Guilty (     )

   (c) Not guilty and not guilty by reason of insanity (     )

If you entered a guilty plea to one or more counts and not guilty to other counts, give details: _____

_____

_____

   (d) Name and address of the lawyer representing you at your plea (if you had no lawyer, please indicate)   Not Available _____

_____

   (e) Was the lawyer appointed (  X ) or hired (   ) ? (check one)

6. Kind of trial: (check one)

   (a) Jury (  X )

   (b) Judge only(    )

7. (a) Name and address of the lawyer representing you at your trial: _____

   Not Available _____

   (b) Was the lawyer appointed (  X ) or hired(   ) ? (check one)

8. Did you testify at the trial? Yes (  X ) ( No   )

9. (a) Give the name and address of the lawyer who represented you at sentencing for the conviction being attacked herein.

      Same as 5(d) above _____

   (b) Was the lawyer appointed (X   ) or  hired   ) ? (check one)
             (

10. Did you appeal from the judgment of conviction?   Yes ( X )   No(   )

11. If you did appeal, give the following information:

   (a) Citation, docket number, and date of written opinion by the Supreme Court or Court of Appeal (if known) _____

   _____

   (b) Name and address of lawyer representing you on appeal: _____

      Same as 5(d) above _____

   _____

   (c) Was the lawyer appointed (   ) or hired ( X ) ? (check one)

12. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any application for post-conviction relief with respect to this judgment in any state or federal court. Yes (  ) No (X  )

13. If your answer to 12 is "yes", give the following information:

   (a) (1) Name of Court   _____

   (b) (2) Nature of proceeding   _____

2

403

(3) Claims raised _____

_____
_____
_____
_____

(4) Did you receive an evidentiary hearing on your application?

Yes    (X)    No    (  )

(5) Was relief granted or denied? _____

(6) Date of disposition _____

(7) Citation of Opinion (if known) _____

(8) Name and address of lawyer representing you (if none, so state)

_____
_____

(9) Was the lawyer appointed    (  ) or hired  (  )? (check one)

(b) Have you filed any other application for post-conviction relief with respect to the challenged conviction?

Yes    (  ) No  (  )

If "yes", set forth the details (as above) on separate paper and attach.

(c) Did you appeal or seek writs of review from the denial of any post-conviction application?

(1) First petition, etc. Yes (    )  No(   )

(2) Second petition, etc. Yes    (  ) No (  )

(d) If you did not appeal or seek writs from the denial of any post-conviction application, explain briefly why you did not: _____

_____
_____

(e) Name of the lawyer who represented you on appeal from the denial of any post-conviction application (if none, so state):

(1) First petition _____

(2) Second petition _____

3

404

## CLAIMS FOR RELIEF

State concisely facts supporting your claim that you are being held unlawful-ly. If necessary, you may attach extra pages stating additional claims and supporting facts. Do not argue points of law.

The following is a list of those claims, and only those claim, that may provide you with grounds for relief:

(1) Your conviction was obtained in violation of the constitution of the United States or the State of Louisiana;

(2) The court exceeded its jurisdiction;

(3) Your conviction or sentence subjected you to double jeopardy;

(4) The limitations on prosecution had expired;

(5) The statute creating the offense for which you were convicted and sentenced is unconstitutional;

(6) The conviction or sentence constitute the ex post facto application of law in violation of the Constitution of the United states or the State of Louisiana.

A REMINDER: THE ABOVE LIST CONTAINS ONLY THOSE CLAIMS THAT YOU MAY RAISE FOR RELIEF. YOU MUST SET FOURTH ALL OF YOUR COMPLAINTS ABOUT YOUR CONVICTION IN THIS AP-PLICATION. YOU MAY BE BARRED FROM PRESENTING ADDI-TIONAL CLAIMS AT A LATER DATE.  Remember that you must state the FACTS upon which your complaints about your conviction are based. MERE CONCLUSORY ALLEGATIONS WILL NOT SUFFICE.

## REPETITIVE APPLICATIONS

The above claims may not provide grounds for relief if any of the following applies to you:

(1) Unless required in the interest of justice, any claim for relief which you fully litigated in an appeal shall not be considered.

(2) Any claim of which you had knowledge and inexcusably failed to raise in the proceeding leading to conviction may be denied by the court.

(3) Any claim which you missed in the trial court and inexcusably failed to pursue on appeal may be denied by the court.

(4) A successive application may be dismissed if it fails to raise a new or dif-ferent claim.

(5) A successive application may be dismissed if it raises a new or different claim that was inexcusably omitted from a prior application.

This application will provided space for you to explain the reasons why you failed to raise your claims in the proceedings leading to conviction,  or failed to urge the claim on appeal, or failed to include the claim in a prior application.

4

485

## CLAIM[S]

YOU MAY ATTACH ADDITIONAL PAGES SETTING FORTH THE
REQUIRED INFORMATION (BELOW) IF ADDITIONAL CLAIMS ARE
ASSERTED

Claim:   Please see attached Memorandum of Law

_____

(a) Supporting FACTS (tell your story briefly without citing cases or law):

　　　Please see attached Memorandum of Law

　Violation of the Nation Voter Registration Act of 1993

　Violation of petitioner's right to Effective Assistance of Counsel

　Violation of Kentucky v. Batson

　Conflict of Interest (counsel and not Exposing Unconstitutional IBD system)

　Prosecutorial Misconduct

　Unconstitutional and Erroneous Jury charge and description of other offenses

　　(And the others listed on the Memorandum Of Law In Support)

_____

_____

(b) List names and addresses of witnesses who could testify in support of your

　claim. If you cannot do so, explain why:   Claims are based upon the

　record or the absence thereof.

_____

_____

_____

_____

_____

_____

(c) If you failed to raise this ground in the trial court prior to conviction,
on appeal or in a prior application, explain why:  Appealable claims were
raised on appeal, and the post conviction claims are being raised here under
the means available to exhaust them. Pursuant the holding in Martinez v.
Ryan, (U.S. Supreme Court 2012), petitioner requests appointment of counsel
to develope the claim of ineffective assistance of trial counsel.

406

A. Do you have in a state or federal court any petition or appeal now pending as to the judgment challenged? Yes (    ) No ( X )  If "yes", name the court _____

B. Do you have any future sentence to serve after you complete the sentence imposed by the judgment challenged? Yes    (    ) No ( X )

(1) If so, give name and location of court which imposed sentence to be served in the future: _____

(2) Give date and length of sentence to be served in the future:
_____
_____

(3) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes (    ) No ( X )

WHEREFORE, petitioner prays that the Court grant petitioner relief to which he may be entitled.

_____Rigoberto Funes_____
Signature of Petitioner

_3rd___   _6th___   _2013___
Day/      Month      /Year

## APPLICATION FOR APPOINTMENT OF COUNSEL

I am unable to employ counsel to represent me in this matter because I have no assets or funds except:

what appears in my prison account. _____
_____
_____
_____

(Write "None" above if you have nothing; otherwise, list your assets including funds in prison accounts.)

_____Rigoberto Funes_____
Signature of Petitioner

**AFFIDAVIT**

STATE OF LOUISIANA

PARISH OF    WEST FELICIANA

_____Rigoberto Funés_____ , being first duly sworn says that
(Name of Petitioner)

he has read the foregoing application for post-conviction relief and swears or
affirms that the allegations contained in the petition are true to the best of
his information and belief. He further swears or affirms that he is unable to
employ counsel because he has no assets or funds which could be used to hire an
attorney except as listed above. (Delete reference to appointment of counsel if
inapplicable)

_____Rigoberto Funés_____
Signature of Petitioner

SWORN TO AND SUBSCRIBED before me this    3rd    day

of _____June_____ , 20 13.

Notary Public or other person authoriz-
ed to administer an oath.

John B. Joseph, Jr. #25176
Ex-Officio Notary
La. Dept. Of Pub. Safety & Corr.

468

IN THE
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON
STATE OF LOUISIANA


DOCKET NO: 08-5641


Rigoberto Funes
Petitioner

**VERSUS**

BURL CAIN, WARDEN
LA. STATE PENITENTIARY
Respondent


(All exhibits in State v. Isaiah Doyle, 05-05262, 24th JDC, are adopted in full here by their
original identification in that case as the relate to the violation of the NVRA of 1993)


*************************************************************************

APPLICATION FOR POST CONVICTION RELIEF
WITH MEMORANDUM OF LAW IN SUPPORT AND
REQUEST FOR AN EVIDENTIARY HEARING

*************************************************************************

ORIGINAL POST-CONVICTION BRIEF FILED ON BEHALF OF
Rigoberto Funes – PETITIONER


RESPECTFULLY SUBMITTED:


_Rigoberto Funes_
Rigoberto Funes #571875
MAIN PRISON, Spruce-4
LA. STATE PENITENTIARY
ANGOLA, LA 70712

409

IN THE
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON
STATE OF LOUISIANA

STATE EX REL. Rigoberto Funes      DOCKET NO. 08-5641
     Petitioner

VERSUS      FILED_____

BURL CAIN, WARDEN
LA. STATE PENITENTIARY      _____
     Respondent      Deputy Clerk

## MEMORANDUM OF LAW AND ARGUMENT IN SUPPORT OF APPLICATION FOR POST CONVICTION RELIEF AND REQUEST FOR AN EVIDENTIARY HEARING

MAY IT PLEASE THE COURT:

NOW INTO COURT comes, Rigoberto Funes, pro se petitioner who respectively moves this Honorable Court pursuant to *La.C.Cr.P. arts. 924-930.8* to review his claims herein that will support that his convictions and sentence was obtained in violation of both the United States and Louisiana Constitutions. The issues presented entitles petitioner to a reversal of his conviction and or an evidentiary hearing with the appointment of counsel, where a record will be established to support that petitioner is entitled to the relief sought.

### TIMELINESS OF APPLICATION

The claims raised herein fall in accordance with the statutory requirements of *924-930.8 of the Louisiana Code of Criminal Procedure*, in that, it is within the State's time bar procedure. Glover v. Cain, 128 F.3d 900 (5th Cir. 1997). The Court held: Louisiana statute providing that prisoners had to seek Post-conviction relief within two years after judgment of conviction and sentence became final was independent and adequate state procedural rule. Petitioner is in compliance therewith.

### PROCEDURAL IMPLICATIONS - ROLE OF STATE POST CONVICTION

In theory, those convicted of crimes still have remedies even if their convictions have been affirmed on direct appeal. The writ of habeas corpus, originally preserved by the federal constitution has an analogous counterpart in every state constitution. State post-conviction relief reviews the legal errors that may have occurred at trial and allows for expansion of the record where the original transcript does not reflect potential constitutional error. Indeed, state post-conviction is often the first time a court hears claim of ineffective assistance of counsel, prosecutorial misconduct, jury irregularity, or facts discovered subsequent to or after trial that support the petitioner's conviction was obtained in violation of the Constitutions of the United States or Louisiana. Through time and custom, state post-conviction remedies are required to be brought to the state's court attention and

1

410

exhausted before any federal habeas review will take place.

Trial attorneys were appointed from the Jefferson Parishes Indigent Defender Program, and for the purposes of Appeal, Counsels from the Louisiana Appellate Project were appointed. Petitioner contends that both his trial and appellate counsel provided ineffective assistance of counsel when they failed to investigate and present to the trial court that the State's failure to comply with the *National Voter's Rights Act of 1993* was ultimately having a discriminatory effect upon the Grand Jury used to indict petitioner and his co-defendants as well as the Petit jury composition which would ultimately hear the case against him and his co-defendants. All attorney's involved in this case were ineffective, and flagrantly so, because they routinely failed to lodge individual and articulated objections on behalf of their clients, instead, if one attorney objected, the remaining attorneys would simply state that they adopted the objection but would not articulate any special reasons for their respective client's objection as to individual reasons.

As to the the *NRVA* violation, specifically, the non-compliance with the federal mandate, resulted in minorities  being denied the benefit of a lawfully protected duty imposes upon public service employees to aid them in becoming registered voters which would have ultimately enabled them to become eligible Grand and Petit jurors.

The failure of trial counsel to present this issue constituted ineffectiveness becomes deficient counsel allowed a "structural error" to *whisk by* unchallenged.   Unchallenged and/or preserved for review, it was not preserved for the direct appeal process which ultimately makes it ripe for review here.

Petitioner avers that he is in need of the appointment of counsel and the scheduling of an evidentiary hearing wherein evidence will be produced, in the form of documentary and testimonial evidence, which ultimately supports the finding that petitioner's conviction was obtained in violation of both Constitutions, that of the *United States Constitution* and the *1974 Constitution for the State of Louisiana* and the *National Voter's Rights Act of 1993*.

A review of the constitutional violations cited in the application for post conviction ( violation of *Batson* and forcing the use of all peremptory strikes to be used against some jurors who should have been dismissed for cause) confirms trial counsel's deficient and prejudice actions in representing petitioner and "fall below an objective standard of reasonableness." The claims as presented contain solid, meritorious arguments based on direct controlling precedent and in fundamental fairness must be brought to the court's attention and reviewed on the merits. *United States v. Williams*, 183 F.3d 458, 462 (5th Cir. 1999).

4/1

A due diligent effort was made by petitioner to timely obtain the trial transcripts of the jury selection has failed. Consequently, he requests their production pursuant *State ex rel. Bernard.* The production of this transcript would support the issues Batson and Peremptory challenge issue, therefore, an objective factor external to the his defense constitute cause that prevented him from raising these claims on direct appeal, which cannot fairly be attributed to him. *McCleskey v. Zant,* 499 U.S. 467, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (quoting *Murray,* 477 U.S. at 488) (emphasis supplied). Counsel may be at fault for not requiring the production of these records on appeal, but counsels lapse cannot be imputed to the petitioner.

A criminal defendant has a constitutional right to receive effective assistance of counsel on at trial and direct appeal is governed by the familiar two part *Strickland* test. Failure to reach the merits of the claims presented herein will result in prejudicing petitioner's right to seek judicial review of all constitutional violations that rendered his trial fundamentally unfair. Louisiana law does state that a: [p]etitioner may bring claims of constitutional violations on post conviction relief under the provisions of *La.C.Cr.P. art. 930.3(1)* therefore, *La.C.Cr.P. art. 930.4* is inapplicable. See, *State v. Costilio,* 443 So.2d 238 (La.App. 1 Cir. 1984).

A claim of ineffective assistance of counsel which is a matter more properly addressed in an application for post conviction relief, filed in the trial court where a full evidentiary hearing can be conducted. *State v. Prudholm,* 446 So.2d 729 (1984). Ineffectiveness of trial and appellate counsel is to be assessed by a two-part test as outlined in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 676 (1984). If a procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the State, which may not conduct trials at which persons who face incarceration must defend themselves without adequate legal assistance." *Murray,* supra, citing *Cuyler v. Sullivan,* 466 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980).

If this Court consider any of these claims procedurally defaulted prior to reaching the merits, this Court must find he (petitioner) was denied ineffective assistance of counsel on appeal. Further, petitioner has also submitted his reasons through this pleading sufficient to warrant the relief requested and the appointment of counsel to help address the claim of ineffective assistance of trial counsel in this first direct-appeal on this particular claim which he was required to raise for further developement in this Application for Post Conviction Relief. This dual pleading direct appeal of the ineffective assistance of trial counsel claim/application for post conviction is sufficient to comply with the provisions of *La.C.Cr.P. art. 930.4F.* Therefore, ineffective assistance on the part of appointed trial

counsel or appointed appellate counsel constitutes external objective factors created by the State. Beyond this, the state is unilaterally responsible for refusing to provide petitioner with the composition of a trial and grand jury composition which conform to the mandates of law federal law. (NRVA). The prior suppression/concealment of this information as it specifically pertains to Jeferson parish and the restriction of access to the means to investigate and present the information resulted in the state restrict petitioner's ability to raise the related claims in a "supplemental" appellate brief while the case was on partial direct appeal impracticable.

## JURISDICTION

Jurisdiction is proper in this Honorable Court pursuant to *La. Const. Art. I §§ 19, 22* and *Art. V § 2 (1974)*.

## STATEMENT OF THE CASE

On January 8, 1998, Rigoberto Funes was charged by Grand Jury Indictment with four (4) counts of second degree murder, violations of statutes (*R.S. 14:30, I*) relative to such. Count II was dropped and petitioner proceeded to trial on counts I, III, and IV. A twelve member jury found him guilty as charged on the remaining counts..

Petitioner was subsequently sentenced to three (3) consecutive life terms of imprisonment to be served consecutively. Petitioner's Motion for Reconsideration of Sentence was denied by the trial court.

On December 28, 2011, the Fifth Circuit Court of Appeal affirmed defendant's convictions, but remanded for resentencing. *State v. Funez*, ____ So.2d ___ (11-KA-120, La.App. 5 Cir. 12/28/11). Defendant timely filed a writ of certiorari in the Louisiana Supreme Court. The Supreme Court denied relief on May 25, 2012. (2012-KO-0290)

## FACTS OF THE CASE

Petitioner Funes and several other co-defendants other were charged with the the second degree murder of four persons during the commission of the robbery. After being indicted for first degree murder, the charges were reduced to second degree murder because the bar owner gun was traced to the bullet which resulted in the demise of the fifth person so that charge was dropped.

## LAW AND ARGUMENTS

### PRO SE PLEADINGS ARE TO BE HELD TO LESS STRINGENT STANDARDS THAN FORMAL PLEADINGS DRAFTED BY LAWYERS

The law, as it is presently exists does not hold a pro se prisoner to the high standards in which attorneys are held to. Further, the pro se prisoner is to be given the benefit of any favorable doubts regarding his pleading, because he may suffer from an inability to articulate what is really wrong in

4

413

his case.  Most importantly, this is how the United States Supreme Court addressed the issue in

*Haines v Kenner*, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972):

> "A pro se complaint, "however inartfully **pleaded," must be
> held to "less stringent standards** than formal pleadings
> drafted by lawyers" and **can only be dismissed for
> failure to state a claim if it appears " 'beyond a
> reasonable doubt that the plaintiff can prove no
> set of facts in support of his claim which would
> entitle him to relief.'"** Id., at 520-52, 92 S.Ct.  At 596,
> quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct.  99, 2 L.Ed2d
> 80 (1957).

Under this settled-principle of law, this Honorable Court is duty-bound to permit the

development of the underlying facts of this case.  Petitioner, hereby invokes his right to be held to

a less stringent standard which provides that his pleading "can only be dismissed for failure to

state a claim if it appears 'beyond a reasonable doubt that the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief'."   Plaintiff contends that precedent of the

United States Supreme Court regard pro se pleadings is binding.

### CLAIM NO. 1

### FACTS NOT KNOWN EXCEPTION *FERRAND V. SCHEDLER*

As it stands, 1.) there is no requirement of "due diligence" in seeking facts upon which to file

a claim predicated upon *Article 930.4* FACTS NOT KNOWN[1] or 2.) a time limitation for meeting the

exception.[2]  As written *art. 930.4* is designed to deprive only certain applicants (those without new

facts [*art 930.8(A)(1)*], of the unlimited time period within which to file an application for post-

conviction relief.  Because this is a limited and selective restriction, it cannot be said  that art.

*930.8(A)(1)* therefore denies those meeting the exception their right of access to court...).

Consequently, this petitioner does not fall in the catagory of one who failed to raise a known issue on

appeal.

Also, the Louisiana Supreme court has made clear that there is no "due diligence requirement

in seeking the facts to be used in meeting an exception to procedural bars.  However, out of abundance

of caution, plaintiff did file this application within two years of discovering that: "the Parish of East

Jefferson, State of Louisiana, through its public assistance offices has been violating the *NVRA*

(National Voters Right Act), which in turn had a direct impact on the composition of plaintiff's

---

[1] State ex rel. Hills v.  State, 54 So.3d 1109 (La.  2011)

[2] State ex rel Golver v.  State, 660 So.2d 1189 (La.  1995)

414

petit/trial jury."

As explained, the Louisiana Supreme Court, by per curiam decision in *State ex rel. Hills*, Supra, found that the First Circuit Court of Appeals erred when it dismissed Hills' application as untimely based upon the time lapse between his post-conviction discovery of the discrepancy in the trial transcripts and the filing of his application for post conviction relief. The Court reasoned:

> "The exception to the [two] year time bar provided by La.C.Cr.P. art. 930.8(A)(1) for claims based on facts 'not known to the petitioner or his attorney' imposes no express diligence requirement on the inmate and remains subject only to the laches-like provisions La.C.Cr.P. 930.8(B)..."

For the reason given, every justice of the Louisiana Supreme Court agreeably held: Hills' post conviction discovery of the discrepancy in his own trial transcript (a trial in which Hills was in fact present) met the requirement(s) of the procedural bar exception. Logically then, plaintiff's post-conviction and post-appeal discovery of the violation of the Federal *NVRA* [3] and its impact on the composition of his trial jury meets this exception as well. These are facts which plaintiff had no knowledge of, nor knew the Parish of East Baton Rouge, State of Louisiana to be violating nor was he aware that this violation of the *National Voters Rights Act* was significantly altering the composition of his trial jury, until, he was given notice of the case of *Ferrand v. Schedler*, 2:11-cv-00926-LMA-JCW.

Also, for the convenience of both the Court in this case as well as the Law Clerk's, plaintiff contends that he firmly meets the exceptions of the procedural bars relied upon by the state. In *State v. Orman*, supra, pursuant the procedural bar exception *930.8(A)(1)*, Orman raised two claims relating to the states primary witness (Dee Dee Davis). As to Orman's first claim in relation to Davis, the Court found it was procedurally barred because the records revealed that the facts underlying that claim were known to the plaintiff as early as 1998. In addressing solely that issue the court wrote:

> "While [the] holding [*Carlin v. Cain*, 706 So.2d 968 (La. 1998)] relieves an applicant from due diligence in seeking to discover facts that will support an exception to the limitation, it does not relieve the applicant from timely asserting a claim, once the facts supportive of that claim have been discovered."

However, contrasting the decision rendered as to claim one, the court found that Orman's second claim relating to Davis, was not procedurally barred *because the facts underlying that*

---

[3] Plaintiff obtained a copy of the Civil Suit filed in *Ferrand v. Schedler*, Case 2:11-cv-00926, Document 1 Filed 4/19/11. See Exhibit "A" (This civil suit is attached hereto and it is 37 pages long, and it has exhibits from Attorney Ronald Wilson ("Notice Letter-2 pages) and another from Attorney Ronald Wilson ( Letter to Secretary Schedler-pages 4 pages). These exhibits are copies of correspondence to Secretary of State, Honorable Tom Schedler.

415

*claim were filed in the district court within two years of Orman's January 2005 discovery of those facts.* Here the same principle is applicable.

Plaintiff was made aware of the extensive investigation conducted by the NAACP, Project Vote, and Attorney Ronald Wilson of New Orleans, regarding the violating of the *NVRA* in late 2011. This is November of 2012, whereas plaintiff filed this pleading months ago on or about 8/2/2012. In addition hereto, this claim will be further developed below.

This Federal Constitutional Violation challenges the exclusionist practices of state actors who by failing and/or refusing to perform their jobs, caused a direct negative impact on the pool of jurors available to be members of petitioner's trial/petit jury. The Federal Question here is: "Whether or not this form of jury-fixing" so infects the Due Process and Equal Protection of both petitioner and members of society, until accountability is warranted in the form of ordering a new trial?"

Having been given the opportunity to directly argue this issue and the State not doing so in its procedural objections waived briefing of the issue. This clears the way for this Honorable Court to declare "null" and "void" the previous trial in this matter based upon the constitutional merit of this claim. To show the court the disparity in the persons who sought public assistance in Louisiana and was entitled to the full protection and operation of the *NRVA*, the following charts are provided and petitioner wishes to be appointed counsel and given access to subpoena power, witnesses, and expert witnesses in order to verify and interpret these graphs for the court. Though the disparities are obvious, plaintiff avers that with the assistance sought, he can meet his burden of proving this claim. The charts are listed and titled below.

416







As reflected above, there are gross disparities in the amount of people who sought public assistance versus the amount of voter registration applications available and/or. The failure to implement the *NVRA of 1993*, was pervasive and widespread. At one point, the Department

8

of Children & Family Services did not have enough voter registration applications forms available for distribution nor was assistance offered to applicants who may have needed help in completing the forms as required by law.

The United States Department of Agriculture reported high numbers of total participants in the Louisiana food stamp program (SNAP), with approximately 325,000 (1996); 268,000 (1997); 255,000 (1998) and 238,500 (1999) adult citizen participants per year, and 356,000 adult citizens in fiscal year 2009. Compared to the figures on the charts above, the disparity is obvious. Most importantly, the Department of Children & Family Services, has conceded in *Ferrand v. Schedler*, to non-compliance with the *NVRA*, thus, plaintiff has made a relevant showing of a claim which if established, would entitle him to relief. (See *La.C.Cr.P. Art. 927(A)*) Plaintiff furthers that he hereby requests that this Honorable Court takes "Judicial Notice" over all the facts, evidence and pleadings filed in *Ferrand v. Schedler*, 2:11-cv-00926, (U.S. Eastern District of Louisiana 2011),(See Exhibits "A" and "B" as it relates to proving plaintiff's complaints of deprivation of a constitutionally protected right which had a discriminatory (class discrimination) effect upon the composition of his trial/petit jury.

**DEFERRAL OF IAC CLAIM FROM DIRECT APPEAL TO PCR BY COURT JUDGEMENT CONSTITUTES 'CAUSE' MANDATING COUNSEL BE PROVIDED ON THE CLAIM OF TRIAL COUNSEL INEFFECTIVENESS AND USES THE EVIDENCE FROM "An Assessment of Trial Level Defense Services in Louisiana 40 years after Gideon"**

Plaintiff contends that *Art. 927(A)* in pertinent part provides:

> If the application alleges a claim which if established would entitle the petitioner to relief, the court shall order the custodian, through the district attorney in the parish in which the defendant was convicted, to file any procedural objections he may have, or an answer on the merits if there are no procedural objections within a specified period not in excess of thirty days.

This provision gives the state [a period not in excess of thirty days] to file procedural objections. The only requirement imposed upon the plaintiff is: "to allege a claim which, if established, would entitle petitioner to relief." Plaintiff, as the petitioner in this proceeding, has met this threshold requirement on every claim presented for review, because each of the claims presented, once established, would entitle him to the relief sought.

In its procedural objection, the state's focus was on whether or not *Martinez v. Ryan*, was applicable to the plaintiff's case and facts. Plaintiff avers that *Martinez* is applicable and that he has an available remedy in this Honorable Court. Because ineffective assistance of counsel claim are routinely deferred from the direct appeal process to post conviction proceedings by

418

judgement of the Circuit Courts of Appeal, within the State of Louisiana. This same issue was subsequently raised before the La. Supreme Court who stated, "ineffective assistance of counsel claims are better raised on post conviction where an evidentiary hearing can be held." These holdings function as a deferral of Ineffective Assistance of Trial Counsel issue to post-conviction proceedings where factual developement can take place.    This defferal practice effectively combines the IAC (ineffective assistance of counsel) claims as direct appeal claims relayed for review with the claims that are going to be raised as post-conviction claims.

What effect did the deferrals have on petitioner's rights, a crushing one, as set out and described in *Martinez*.  The post-conviction proceedings here are the first opportunity that a petitioner will have to have this claim heard, because no court heard the merits of the claim on appeal. For this reason, direct appeal proceedings remained ongoing at the time plaintiff filed his Application for Post-Conviction Relief.  For the purposes of that action, the court should be mindful that there was a consolidation of the deferred IAC claim from the direct appeal. The direct appeal claim of  "ineffective assistance of counsel" was not heard on direct-appeal but re-directed to the post- conviction proceedings, specifically for further development, which to date has not occurred.  Consequently, the continuation of the direct-appeal (IAC claim) and post-conviction proceedings  proceedings took place simultaneously as one.

Trial counsel was ineffective for having made several prejudicial stipulations which allowed evidence to go before the jury without affording his client the benefit of the *6th Amendment's, Confrontation Clause* and Due Process Clause. Petitioner is entitled the full protections of both and petitioner was constructively denied a proper defense on this issue as a result of underfunding, political interference and systemic ineffectiveness as set for in the "Assessment of Trial Level Defense Services in Louisiana 40 years after Gideon," (See Exhibit "C") Researched and written by the National Legal Aid Defender Association, Commissioned by the National Association of Criminal Defense Lawyers." Petitioner agrees with and hereby adopts herein, by both reference and attaching hereto a diplicate of the same, the whole of there assessment as applicable to his case and how he was constructively denied his right to conflict-free and effective assistance of counsel due to systemic ineffectiveness which constructively deprives him of his *sixth amendment* right to effective assistance of counsel. As exhibit "D", offered is correspondence from Honorable Justice Calegero.

The state's theory of petitioner being responsible for firing a fatal shot was rested upon the foundation that there was an  alleged match between a gun found and what petitioner is alleged to have

4/9

had in his possession, the bullet from the victim's and shell casings found on the scene of the crime. For comparative purposes, when the gun was test-fired and the results compared between the crime scene evidence and the test-fire evidence, the state's expert declared a match.

Despite the opinion of the state's expert opinion, the petitioner hereby alerts this Honorable Court to a critical and "NEW DEVELOPMENT," which crumbles a substantial portion of the foundations of the state's case.

There is a book which has been published in the field of science which establishes some critical facts now accepted amongst the leading scientist in the field of forensics. The book is entitled "STRENGTHENING FORENSIC SCIENCE," by: the National Academy of Science.[1] This book reveals that matching guns to bullets and bullets to guns as "junk science" and is wholly unreliable. As such, petitioner contends that in the absence of what has been purported to be a match between the gun and the bullet fragments which were extracted from the victim(s). For this reason, if there has been any false matches, petitioner is entitled to the protection of the *Sixth Amendment* which specifically provides for Due Process of Law and a fair trial, this can only be secured by affording petitioner the moneys for expert testing on the bullets and bullet fragments himself. Trial counsel should have had this done, however, trial counsel (as an independant and seperate claim was ineffective) for not making full use of this new scientific development in defense of his client. This also deprived petitioner of his rights pursuant the 14th amendment in its entirety. Petitioner wishes the appointment of counsel to ammend and/or supplement this pleading as need for he lacks the ability to perform the substantive and fundamental duties which ultimately make the post conviction process meaningful, and since this is a claim of ineffective assistance of trial counsel, the procedural and equitable considerations set out in *Martinez v. Ryan*, 566 U.S. ---, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012)

In the absence of the appointment of counsel, the adjudication of any ineffective assistance of trial counsel claim cannot be deemed reliable or trustworthy. This is especially so in this case where there was no further factual development beyond what the appellate court and appellate counsel had before them, and used in the piece-meal appellate process. The present litigation of the ineffective assistance of trial counsel claim(s) is definitely warranted in this instance. Why? Because *Martinez* teaches that, when ineffective-assistance of trial counsel claims are raised on

---

[1] Petitioner hereby invokes his right to secure out of state witnesses so that the authors of this work can come in as expert witnesses and verify how and why the science relied upon by the state and the jury to convict petitioner amounts to unreliable "junk science" and this is sufficient to warrant the finding of reasonable doubt. Petitioner wishes to have the aid of counsel in or to secure the presence and attendance of these witnesses in a timely and prepared manner for demonstrations to the court.

11

appeal, they are routinely deferred into the post-conviction collateral proceeding where that will be the first time that the merits of the claim will be addressed, then counsel "must" be appointed to represent the appellee on that issue. Having counsel on one's first appeal is a matter of right and since this claim constitutes a continuation of the appellate process, such is necessitated. At this time failing to appoint counsel, the trial court would constructively deprive appellant/plaintiff the fundamental and substantive right to have the guiding hand of counsel at a "critical stage" in the proceedings wherein this will be the first time ever that trial counsel's ineffectiveness is heard. (*U.S. v. Cronic*, violation).

## CLAIM NO. 3
**PETITIONER'S SIXTH AMENDMENT RIGHT TO A FAIR TRIAL WAS VIOLATED DURING THE SELECTION OF THE JURY? (*BATSON* AND *STRICKLAND* VIOLATIONS)**

Petitioner contends that he was denied his constitutional right to a fair and impartial trial in violation of his right to an unbiased jury, when his counsel failed to object and allowed him to be tried by a jury where races, classes, genders, and persons possessing certain politicians views were excluded on those basis alone. Most were excluded for non-race neutral reasons.

Petitioner argues that the prosecutor used all of his peremptory challenges to exclude blacks from the jury based solely on their race without objection by counsel. Thus, he was denied his right to effective assistance of counsel in that aspect as set out in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.CT. 2052, 2064, 80 L.Ed.2d 674 (1984), where such representation is unreasonable and clearly prejudicial to the petitioner. In an effort to stifle petitioner's efforts to develop present and exhaust this claim, appellate counsel was ineffective in his appellate respresentation for not raising the the claim before the court of appeal that he was being prejudiced in has ability to present and exhaust the claim of Due Process Violations under the 6th Amendment and the 14th Amendment, and the Eqneal protection Clause of the 14th Amendment as it is applicable to the Grand and Petit Jury selection process which have been negative impacted in Jefferson Parish particularly. By restricting appellate counsel access to the transcripts of the Voire Dire in these combined appeal/ post conviction proceedings, petitioner is constructively being deprived of substantive and fundamental constitutional rights.

More important, petitioner argues that this is a violation of the United States Constitution. *Batson v. Kentucky*, 476 U.S. 79, 106 S.CT. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that when the State racially exercise its peremptory challenges to excuse black potential jurors from the petit jury on the account of their race, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution is violated. The Court set forth the standard that a defendant must

establish to prove a prima facie case of purposeful discrimination. Under this standard, the defendant must show that he is a member of a cognizable racial group, and that the prosecutor exercised peremptory challenges to remove from the venire members of the defendant's race. Second, defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate. Third, defendant must show that these facts and any other relevant circumstances raise and inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. Id., 106 S.CT. at 1723.

Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors. The prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption - - or his intuitive judgment -- that they would be partial to the defendant because of their shared race. Id., 106 S.CT. at 1723. Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or affirming his good faith in making individual selection. Id., 106 S.CT. at 1723-1724.

Petitioner also contends that during the jury voir dire, the State used more peremptory challenges than is required by law, and if the jury voir dire transcript was provided to petitioner, he would substantiate his allegations that his constitutional rights were violated.

Additionally, petitioner argues that during the selection of the jury, several jurors stated that they could not be impartial to the defense because they had a pre-determined notion of petitioner's guilt and the trial court failed to remove these jurors for cause or rehabilitate them. Also these jurors were selected because defense counsel had used all his peremptory challenges and he could not challenge these jurors on that basis. The question here remains, was petitioner deprived of his right to be tried by a fair and impartial jury? The right to trial by an impartial jury lies at the very least of due process. *Irvin v. Dowd*, 366 U.S. 717, 6 L.Ed.2d. The answer to the above question is, "*NO*," petitioner was not afforded that right.

Petitioner submit that these instances during jury voir dire violated his right to a fair and impartial jury, as guaranteed by the *Fifth*, *Sixth* and *Fourteenth Amendments* of the United States Constitution.

CLAIM #4
TRIAL COURT VIOLATED PETITIONER'S DUE PROCESS RIGHTS TO A FAIR TRIAL WHEN IT FAILED TO INSTRUCT OR SEQUESTER THE JURY WHEN IT RETIRED DURING RECESS AND BREAKS DURING TRIAL.

422

Petitioner contends that he was denied the right to a fair trial under the Sixth Amendment to the United States Constitution when the trial court failed to instruct the jury or sequestered them so that they were not allowed to discuss the case with others, read any media accounts of the trial, or report any information that someone or something had influence on their verdict. The trial record is bare of any instructions concerning the trial court charging the jury prior to releasing them for recess. As for as petitioner can recollect, he following instructions from the trial court is somewhat similar.

THE COURT:

> All right. Ladies and gentlemen, your lunch has arrived. When you are ready to come back to finish up the trial, please let the deputy sheriff know. Don't wait for us. Just keep in mind the longer we break, the later we go home. Court recesses for lunch. The Court stands in recess. Please remand the defendant.

The record merely states that (Whereupon, a recess taken.). The jury sequestration procedures and non-instructions employed by the trial court failed to properly insulate the jurors from extraneous influences, or the possibility thereof, and at no time did the trial court adhere to the mandatory instructions required in all criminal cases. See, Hale v. United States, 435 F.2d 737 (1970). The the locality of Jefferson, a city steadily on the rise in population and serious felony crimes, where conversation of non-juror third parties and jury members more than likely resulted in the jury verdict being based upon, and affected by, influences extraneous of the legal evidence introduced at trial.

La.C.Cr.P. art. 791 C provides that "In non-capital cases, the jury shall be sequestered after the court's charge and may be sequestered at any time upon order of the court." The purpose of this instruction is to insulate the jurors from outside influence, or the possibility thereof, and to insure that their verdict will based upon the evidence developed at trial. State v. Parker, 372 So.2d 1037 (La.1979). Due process requires that the accused receive a trial by an impartial jury free from outside influences. Sheppard v. Maxwell, 384 U.S. 333, 362, 86 S.CT. 1507, 1522, 16 L.Ed.2d 600 (1966). Stated differently, "the right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent jurors'. The failure to accord an accused a fair trial violates even the minimal standards of due process." Irvin v. Dowd, 366 U.S. 717, 722, 81 S.CT. 1639, 1642, 6 L.Ed.2d 751 (1961).

Petitioner argues that he was deprived of due process because the jury was swayed by influences outside the courtroom, it is the duty of the Court to independently review the trial records and hold an evidentiary hearing with members of the jury present, so that their testimony will be heard that their verdict was not based upon the influence of third parties to convict an alleged violent offender as a having committed second degree murder, that it is believed to have occurred during an alleged armed robbery. When juror misconduct concerns influences from outside sources, the

complete failure to hold a hearing constitutes an abuse of discretion and is reversible error because a presumption of prejudice arises when the trial court learn of such influences. United States v. Phillips, 664 F.2d 971 (5th Cir. 1981); Marshall v. United States, 360 U.S. 310, 312, 79 S.CT. 1171, 3 L.Ed.2d 1250 (1959). The traditional rule in such cases has been that there must exist a nexus between the community prejudice and jury prejudice; there must be a showing that "prejudice found its way into the jury panel." Pamplin v. Mason, 364 F.2d 1, 6 (5th Cir. 1966). Several Supreme Court decisions have fashioned the principle that in certain extreme circumstances where there has been "inherently prejudicial publicity," McWilliams v. United States, 394 F.2d 41, 44 (8th Cir. 1968), the actual existence of prejudice in the jury box need not be shown. Petitioner submits through the testimony of jurors, it will be established that information of his prior convictions and arrests were discussed by citizens in the hallways and outside the courtroom where the jurors had opportunity to hear and engage in improper discussion. More discussion took place outside the courthouse where some jurors were allowed to take a smoke break after they ate lunch. These jurors also were influenced in their verdict by members of the deceased victim's family revealing information about what the district attorney had told them about the accused's criminal history.

Although jurors stated on voir dire that anything they knew about the case would not hinder their ability to give both the state and defendant a fair trial, prejudice seeped into their minds during these absences from the courtroom. The record does not support that the trial court admonished the jury at no time to ignore publicity about the trial, or report if anyone discussed the case with them; this charge is mandatory in criminal proceedings. State v. Hill, 562 So.2d 12 (La.App. 5 Cir. 1990). In complaining of the prejudice in this case, it is not the quantity, but the quality that survives in the locality of Jefferson. In essence, petitioner contends he could not receive a fair trial because he was the subject of extensive "discussion" of his unadjudicated criminal history in the locality of Jefferson, a prominence that brings prejudice. Although the record fails to disclose that any prejudice to the petitioner could have resulted, never-the-less the mandate of La.C.Cr.P. art. 791 must be complied with or it is reversible error. Therefore, petitioner is entitled to a reversal of his convictions, or in the alternative an evidentiary hearing be held where testimony will establish a record to support that the jury verdict was obtained by the outside influence of the people of the locality of Jefferson along with members of the deceased victim's family who lingered in the hallways and stood outside the courthouse. The news clippings showed that not only did the community reek with disgust for petitioner and his co-defendant's but rather they wanted them "hung" or at a minimum, deported. Some of the prejudicial information was coming from the cops. On the blog about the shooting in this case,

15

424

a blogger titled beccazer o 11/19/08 at 1:20AM wrote in pertinent part:

> BTW, heard it from a JP detective that one of the patron/victims
> wouldn't give up his wallet and was shot, THEN the owner started
> shooting. But the TP gets things wrong all the time, no different here.

Another titling themself as gasmoney wrote

> I guess another way would be to dig out one of the two bullets still
> lodged in Mario Funes and compare it to the one that killed the victim.
> If they matcj then Mr. Gomez likely did accidentally kill the victim. If
> they don't match, then likely it was Rivera's 357 that did it.

What these posts show is that leading up to the trial, there was a continuous flow of

conversation and opinion within the community and those who interact with the Jefferson Parish

community and the predominant sentiment was these were illegals and they should not have been in

America to begin with and that they should be executed. For this reason, the selection and

composition of the jury as a fair cross-section of any venue would have been appropriate, but this was

impossible in Jefferson Parish due to the deliberate non compliance with the Federal National Voter

Registration Act of 1993.

## CLAIM NO. 5
### THE TRIAL JUDGE COMMITTED REVERSIBLE ERROR WHEN HE MADE ERRONEOUS AND MISLEADING COMMENTS ON THE RESPONSIVE VERDICTS.

Petitioner contends that his Constitutional rights to a fair trial and due process of law under

the Fifth and Fourteenth Amendments were violated when the trial judge made erroneous and

misleading comments on the responsive verdicts. During the jury charge/instructions, the trial judge

gave misleading comments to the responsive verdicts for second degree murder and manslaughter.

Petitioner contends that the judge's comment is reversible error, because the trial judge

precluded the jurors from considering returning lesser verdicts and misled them as to their evaluation

of the possible verdicts. The Louisiana Supreme Court has noted that "Louisiana juries are instructed

to return a guilty verdict for the offense charged if warranted by the evidence and to consider lesser

verdicts only if the evidence does not justify a conviction for the greater offense." Roberts v.

Louisiana, 428 U.S. 325, 334 n.10, 96 S.CT. 3001, 49 L.Ed.2d 974 (1976).

This essentially has the effect of taking away the possible lesser verdict from the jury's

consideration unless they can all agree that the accused is not guilty of the charged crimes. However,

it has long been held that the defendant is entitled to an instruction on a lesser included offense if the

evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the

greater. In State v. Copeland, 530 So.2d 526 (La. 1988), the court stated, "we are aware that the rule

of Beck v. Alabama, 447 U.S. 625, 100 S.CT. 2382, 65 L.Ed.2d 392 (1980), applies in a case where

425

the failure to instruct on lesser included offenses results from the omission of the trial judge as well as from the operation of state law. Cordova v. Lynaugh, 838 F.2d 764 (5th Cir. 1988), cert denied, __ U.S.__, 108 S.CT. 2832, 100 L.Ed.2d 369 (9th Cir. 1986)."

In Keeble v. United States, 412 U.S. 205, 208, 93 S.CT. 1993, 1995, 36 L.Ed.2d 844, Justice Brennen noted that providing the jury with the "third option" of convicting on a lesser included offense ensures that the jury will accord the defendant the full benefit of the reasonable doubt standard. Justice Brennen went on to say:

> ". . . Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction . . ." Id. 100 S.CT. at 2388.

This point was reiterated by Justice White in Beck v. Alabama, 447 U.S. 625, 100 S.CT. 2382, 2388, 65 L.Ed.2d 392 (1980), where he quoted Justice Brennen.

Similarly, in State v. Copeland, 532 So.2d 526 (La. 1988) the court held that when "a defect in the instructions effectively withdraws second degree murder and manslaughter from the jury's consideration, due process is violated." This effect of withdrawing those verdicts from the jury's consideration deprives the defendant of due process of law. Petitioner avers that the same effect applies in this instant case concerning the responsive verdicts of second degree murder v. manslaughter. In sum, petitioner contends that jurors usually follow the court's instructions, and they believe that the judge is the overseer of the proceedings and they rely on his instructions and comments heavily in their deliberations. Without a doubt, the judge's comment contributed to petitioner's convictions. Petitioner contends that the trial judge committed reversible error, thereby warranting the granting of a new trial.

## CLAIM NO. 6
WHETHER PROSECUTORIAL MISCONDUCT OCCURRED WHEN THE (1) PROSECUTOR IMPROPERLY VOUCHED FOR THE CREDIBILITY OF THE STATE WITNESSES AND (2) FAILED TO CORRECT PERJURED TESTIMONY IN VIOLATION OF PETITIONER'S SIXTH AMENDMENT RIGHT TO A FAIR TRIAL?

(1) Improper Vouching:

Petitioner submits and the record support that the prosecutor made improper comments during the state's closing argument to the jury by vouching for the credibility of several of the state's witnesses, and appealing to the jury for sympathy in accepting the testimony of the victim as absolute truth. Thus, petitioner contends that his due process right to a fair trial under the Sixth Amendment of the Untied States Constitution and Article I § 2 of the Louisiana Constitution were violated. State v. Palmer, 775 So.2d 1231 (La.App. 1 Cir. 2000).

"Vouching constitutes an assurance by the prosecuting attorney of the credibility of a

426

Government witness through personal knowledge or by other information outside of the testimony before the jury." United States v. Walker, 155 F.3d 180, 184 (3d Cir. 1998). While the comments at issue are artfully phrased and ill-advised, they quite clearly are based on the prosecutor's personal opinion. United States v. Munoz, 150 F.3d 401, 414 (5th Cir. 1998). This combination of remarks by the prosecutor himself, together with vouching through the testimony of several witnesses, persons who position the jury might easily identify with the integrity of the United States, presents vouching in a very powerful form. In trying to bolster a witness's credibility, a prosecutor may not overstep the bounds of propriety and fairness. Improper vouching occurs when the prosecutor places "the prestige of the government behind the witness" by proving "personal assurances of [the] witness's veracity." United States v. Roberts, 618 F.2d 530, 533 (9th Cir. 1980) cert denied, 452 U.S. 942, 101 S.CT. 3088, 69 L.Ed.2d 957 (1981). First, the summation from the prosecutor states that police and social worker and persons hired to protect children do such a good and thorough job which makes them more credible, trustful and not a liar. Further, to make the victim's and others who testified for the state more credible, he states: when they couldn't answer the question, they said, "I don't recall or I don't remember." This was improper vouching by "placing the prestige of the government behind a witness through personal assurance of the witnesses' veracity. By his own language, the prosecutor asserted to the jury that members of the police force are not liars, and when they don't know the answer, they say, they don't remember. Here, an experienced assistant district attorney, deliberately introduced into the case his personal opinion of the witnesses' credibility. He repeatedly ignored his special obligation to avoid improper suggestions and insinuations. A prosecutor has no business telling the jury his individual impressions of the evidence. The prosecutor need not invoke the name of the government in offering his personal belief. No explanation was given of how the State ascertains the honesty or veracity of its witnesses. Indeed, there is nothing in the record upon which the prosecutor have grounded his statement.

The United States Supreme Court discussed the dangers of vouching in United States v. Young, 470 U.S. 1, 18-19, 105 S.CT. 1038, 84 L.Ed.2d 1 (1985). The Court stated the following:

> The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the 'Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

This matter should be remanded for a new trail and because this practice has long been held

427

unconstitutional.

(2) Perjured Testimony:

Petitioner contends that the prosecutor's actions in failing to correct the testimony of witnesses whom I knew to be untruthful constitutes prosecutorial misconduct. Conversely, if the prosecutor has knowingly used perjured testimony or false evidence, the standard is considerably less onerous: the conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict. Napue v. Illinois, 360 U.S. 264, 79 S.CT. 1173, 3 L.Ed.2d 1217 (1959). The proper question for this Honorable Court to determine at an evidentiary hearing is, whether "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." See, United States v. Agurs, 427 U.S. 97, 103, 96 S.CT. 2392, 2397, 49 L.Ed.2d 324 (1976). Such a corruption of the truth-seeking process strike at the confidence of the conviction and sentence of petitioner, Rigoberto Funes.        Moreover, given the attention required to support a juror's determination of credibility to assist in his finding of proof beyond a reasonable doubt, whether the jurors minds could have been changed to support their reasoning in reaching a verdict of guilty as charged.

In our criminal justice system the prosecutor has at his disposal the substantial resources of the government as well as considerable other advantages. In exchange, the system reposes great trust in the prosecutor to place the ends of justice above the goal of merely obtaining a conviction. Imber v. Pachman, 424 U.S. 409, 96 S.CT. 984, 47 L.Ed.2d 128 (1976); Kirkpatrick v. Whitley, 992 F.2d 491 (5th Cir. 1993). See also *ABA Model Rules of Professional Conduct, Rules 3.3(a)(4), 3.4(a), (b), and (f), and 3.8*, all of which has been violated by the prosecution.

This contention implicates the United States Supreme Court's decision in Napue. To prove a *Napue* claim, the accused must show that the prosecutor acted in collusion with the witness to facilitate false testimony. The prosecutor in this case allowed the State witness to give false testimony without correction, therefore, the convictions gained as a result of that perjured testimony must be reversed, if the witness's testimony reasonably could have affected the jury's verdict, even though the testimony may be relevant only to the credibility of the witness. Id. at 269, 79 S.CT. 1173. Furthermore, fundamental fairness to an accused, *i.e.*, due process, is offended "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Id. When false testimony has been given under such circumstances, the defendant is entitled to a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial. Giglio v. United States, 405 U.S. 150, 92 S.CT. 763, 31 L.Ed.2d 104 (1972). In this case,

19

428

petitioner's argument is wholly substantiated as he provides a copy of the police report/interviews with the alleged victim lend support to his contentions, which eliminates this claim as a bare assertion. State v. Broadway, 753 So.2d 801 (La.1999).  The prosecution's actions raise serious questions about both the reality and appearance of fairness in petitioner's conviction and punishment. Absent an adequate and factual record, petitioner respectfully asks the Court not to sweep away these charges on the assumption that the jury would not have arrived at a different conclusion, had it been told of the matters he attributes to the prosecution. .

Petitioner argues that the State's conduct in this issue is governed by the principle of Napue v. Illinois, supra. It is true as supported by the statements, not only did the witness lie, the prosecutor also knew that the expect in ballistics was not being honest.  It would be upon hearing the expert's testimony about linking guns to certain bullets, tend to believe the accuracy of the court qualified expert's testimony under oath.  However,  a rational trier of fact would discount the expert's testimony had they knew that the ballistics process of linking a bullet to a poarticular gun is flawed, then they would have discounted this testimony or possibly the judge would not have allowed it.

The United States Supreme Court has held that there is no place in our system of criminal justice for prosecutorial misconduct. Nash v. Illinois, 389 U.S. 906, 88 S.CT. 222 (1967); Giles v. Maryland, 386 U.S. 66, 87 S.CT. 793, 17 L.Ed.2d 737 (1967).

The presentation of known false evidence is incompatible with the rudimentary requirements of our system of justice.  Mooney v. Holohan, 294 U.S. 103, 55 S.CT. 340, 79 L.Ed. 791 (1935). To gain release based upon it, a petitioner must show that the testimony was material and affected the outcome of the trial; that the government knew or should have known that the testimony was false. United States  v. Chagra, 735 F.2d 870 (5th Cir. 1984). A conviction must be set aside if there is any reasonable possibility that the use of false testimony could have affected the trial. United States v. Bagley, supra. The cardinal proposition is that "[t]he constitutional right of a criminal defendant to cross-examine witnesses against him that are free to testify without fear of the state retaliation."

The Court must provide a cumulative evaluation of the false testimony, keeping in mind that petitioner does not have to show that his trial would have resulted in acquittal or that there would an insufficiency of the evidence to support a conviction. *Petitioner need only to show a reasonable likelihood that the false testimony affected the jury's verdict.* Bagley, 105 S.CT. at 3382 n. 9.

What is also important to the fair administration of justice in this case is the fact that it is now known that the witness's sworn testimony was the result of the prosecution's misconduct, where the

429

prosecutor knew both of the witnesses were testifying falsely and he did nothing to correct it. In accordance with the law and argument presented, petitioner's conviction in this matter should be set aside, and in the alternative, this matter scheduled for an evidentiary hearing.

## CLAIM NO. 8
COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL WHEN COUNSEL FAILED TO SEEK QUASHING OF THE GRAND JURY INDICTMENT ON THE GROUNDS OF VILATION OF THE NATIONAL VOTER REGISTRATION ACT OF 1993. THE JURY PANEL FOR THE GRAND AND PETIT JURY WERE BOTH QUASHABLE .. "YES."'

Petitioner contends that this violation of constitutional protections set forth, is clear and precise. There was no fair cross-section of jefferson parish which viewed the evidence and returned an indictment. Why? Because the Parish of Jefferson was steeped in violating the *National Voter Registration Act of 1993* and further was engaging in a form of purging the pool of jurors avaiable to participate in the petit jury process. See , yet, she had reached a conclusion that petitioner was guilty. This juror unambiguously stated that she likely could not be fair to Mr Funes because of close (Yet undisclosed) friendships/relations to several crime victims and past experience. Nothing in the record shows the state made divulged any information that would assist in the removable of any juror in knew to be tainted by bias, nor does the record sho that trial counsel conducted background checks on any of the jurors. Although many of these jurors selected in violation of the the *NVRA*, many of them were removable for cause *LSA-C.Cr.P, Art. 797(2)*, *State v. Holmes*, 619 So.2d 761 (La. App. 4th Cir. 1993).

In cases involving juror with predisposed dispositions towards guilt of the accused prior to trial, the Louisiana Supreme Court has observed in addressing a trial court's erroneous denial of cause challenge stating that:

> "An erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights constituting reversible error. *State v. Divers*, 681 So.2d 320 (La. 1996); *Smith v. Gearinger*, 888 F.2d 1334 (11th Cir. 1989).

Court has a duty to intervene in the cause of justice being properly administered. There can be no strategic reason for failing to seek the removal a juror properly excusable for cause, where as here, defense counsel had to exercise a peremptory strike(s) to remove the clearly biased juror(s). Likewise, prejudice is clear. Mr. Funes entitlement to twelve peremptory challenges was infringed upon by Asst. District Attorney, the Court and trial counsel.

Counsel's failure to seek removal for cause of clearly disqualifiable jurors deprived petitioner of his Constitutionally guaranteed right to strategically exercise peremptory challenges and is a manifestation of pure ineffectiveness. Counsel's ineffectiveness struck at the heart of minimal requirements for competent attorney conduct. Counsel's ineffectiveness infringed upon his client's

430

right to a fair trial, and to have this trial take place before an impartial jury. As a result, cancel fell below the objective standard of reasonableness of an attorney in that situation. These jurors made it clear that they could not be fair and was predisposed to find Funes guilty as charged or at least one of the listed verdicts which established some form of guilt, even if it was just to get a measure of revenge on behalf of the Gomez's. These jurors came fro a relatively small parish that consists primarily of business and industrial pursuits and the community is thoroughly intertwined and the internet trafic which came about after this incident shows that the community was outraged and wanted to expell all immagrants illegal or not counsel took no action which was the true result of a thorough incestigation into the background processes which lead to the composition of the grand and petit jury pools and thereafter allowed the selection process of jurors to run afoul of petitioner's constitutional right to equal protection and due process of the law.

## CLAIM NO. 9
### INEFFECTIVENESS BY NOT SECURING REBUTTAL EXPERTS FOR THE DEFENSE

Finally, petitioner argues that his trial counsel and appellate counsel were ineffective for faiting to assign and argue ineffective assistance of counsel regarding trial counsel. Trial Counsel failed to object to numerous constitutional violations which occurred and/or he caused, thereby failing to preserve issues that could have been presented on direct appeal, thus exposing this petitioner (an indigent petitioner) to run the risk of the invocation of procedural bars. The issues presented in this post conviction support that petitioner's convictions and sentence were obtained in violation of the Constitutions of both, the United States of America and the Louisiana Constitution of 1974.

Accordingly, trial and appellate counsel was ineffective and petitioner's convictions should be set aside, or in the alternative an evidentiary hearing granted.    In Ake v. Oklahoma, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985), the Supreme Court recognized the indigent defendant's right to expert assistance. However, in order to meet the requirements of Ake, the defendant without means must "make an ex parte threshold showing to the trial court that [the area of expertise] is likely to be a significant factor in his defense. . . ." Id. at 82-83 (emphasis supplied).

Petitioner was further denied effective assistance of counsel when trial counsel failed to secure expert witnesses on behalf of his client.. Although the allegations against petitioner were circumstantial at best, trial counsel failed to secure in as much as a single expert witness in an attempt to refute the state's expert.

Counsel provided no expert in an effort to refute the stat's "junk science evidence about matching bullets to guns, nor did counsel have any expet present to bring forth the disparity in the miniority population allowed to participate in the Grand and Trial jury process and a result of

431

discriminatory practices, all this violated petitioner's right to due process and equal protection of the law.

## CLAIM #10
INDEPENDENT CLAIM OF "GRAND JURY AND TRIAL JURY DISCRIMINATION" THIS IS A "NEW FACT" PREVIOUSLY NOT KNOWN TO PETITIONER AND IT MEETS THE EXCEPTION OF 930.4 and 930.8(A)(1) (THIS CLAIM SHOWS A NEED FOR EXPERTS)

Petitioner, is entitled to relief pursuant to the *Fifth, Sixth, Eight, Thirteenth and Fourteenth Amendments* of the *United States Constitution, Article I, Sections 2, 3, 3, 13, 14, 16, 17, 19, 20, 22, 24, and 27* if the Louisiana Constitution and any other known applicable law known to exists which is applicable here, and moves this Honorable court to conduct an evidentiary hearing and upon hearing all the relevant evidence, grant the nullification of his conviction and sentence and grant a new trial as to guilt or innocence; to arrest the judgement of the trial jury and dismiss it as a whole and to grant the new trial on the grounds of racial discrimination and class discrimination in the composition of the petit jury pools as a direct result of a violation of the *National Voter's Rights Act of 1993*.

I.    UNLAWFUL AND SYSTEMATIC EXCLUSION OF LOW-INCOME, DISABLED, PUBLIC ASSISTANCE RECIPIENTS, BLACK, OTHER MINORITY JURORS FROM THE JURY VENIRE

a)    Overview

The venire presented for jury selection in this case was obviously underrepresented by minorities of the East Baton Rouge area that the United States Federal Government has become embroiled in this action and is seeking remedy of the refusal of the State of Louisiana to comply with the mandates of the *National Voter's Registration Act of 1993*.

On July 12, 2011, in a remarkable development, the government of the united States to the extraordinary step of filing suit against the State of Louisiana, the Secretary of State, and various state agencies for violating the *National Voter Registration Act*. (NRVA). Complaint, *United States v. State of Louisiana et al*, No. 3:11-CV-00470-JJB-DLD (M.D. Jul. 12, 2011). The lawsuit denounces the state of Louisiana's refusal to comply with the law mandating that certain voter registration opportunities be made available to persons with disabilities and low-income citizens. Id. The law violated demands that voter registration material and assistance be provided not only upon the initial registration of such persons but also any time they notify an agency providing them with assistance of change in address or renewal of benefits. *42 U.S.C. 1973gg et seq.*

In Louisiana, as a direct result of historic and entrenched racial disadvantage, a massively disproportionate number of African-Americans are low-income citizens living with disabilities. As a result, Louisiana's refusal to provide for registration and address change opportunities for the poor and disabled in this state has fallen, for the most part, on the black community, and to a significant but

432

lesser degree on other communities of color in Louisiana.

As discussed herein, an analysis of the jury summons process in East Baton Rouge Parish establishes that the direct effect of Louisiana's deliberate, persistent, and illegal refusal to afford to those of low income the registration and address change opportunities required by law has resulted in the underrepresentation of those economic and social groups on jury venires and consequently, the underrepresentation of black jurors on jury venires. This underrepresentation of low-income minorities was also cited in *Ferrand v. Schedler*. The *United States v. State of Louisiana et al*, No. 3:11-CV-00470-JJB-DLD (M.D. Jul. 12, 2011), suit focused on low-income and the disabled, but both derive from the same premise. The momentous lawsuit filed by the Civil Rights Division of the Department of Justice (DOJ) has uncovered phenomena that explain the underrepresentation that was noted in the *Ferrand v. Schedler* case and complained of in petitioner's most recent application for post-conviction relief. (All exhibits in State v. Isaiah Doyle, 05-03262, 24th JDC, are adopted in full here by their original identification in that case)

The nullification of the trial jury's verdict of guilt, the recognition of any conviction deriving therefrom and the imposition of any/all sentences deriving therefrom should all be declared nullities and a new trial ordered. The practice of the state of Louisiana in refusing to abide by the mandate of the *National Voter Registration Act of 1993* violated the *Sixth Amendment* fair cross-section requirement (as incorporated into the *Fourteenth Amendment*) and the *Equal Protection Clause of the Fourteenth Amendment*, in addition to other law refference in this pleading. This pleading is a supplement to the pre-existing claim of a violation of the *NRVA* in petitioner's original successive per-application based upon these facts previously not known to the petitioner or his attorney and the holdings in *Martinez v. Ryan* (U.S. Supreme Ct. 2012).

b)   The State of Louisiana has deliberately chosen to;

   1.)   violate federal law; and

   2.)   to limit its voter registration activities to the direct
          prejudice of the poor, disabled and predominately
          black citizens of this state.

The requirements of the *National Voter Registration Act of 1993 (NRVA) of 1993* sets out mandatory provisions for various aspects of voter registration in the States, Louisiana included. These provisions require that certain agencies be designed as voter registration offices, and that they offer a variety of information, outreach, and assistance to patrons. While *Section 5 of the NVRA* required States to offer voter registration opportunities at motor vehicle agencies, *Section 6* outlines requirements that such registration opportunities be offered by mail-in application. *42 U.S.C. 1973gg-*

433

*4, -5 Section 7 of the NVRA* mandates that public assistance and disability agencies offer voting registration opportunities and assistance. Id at -6.

Pursuant to the NRVA, whenever the Louisiana Office of Motor Vehicles (OMV) is involved in a license application, renewal, or change of address transaction, the transaction must also serve as a registration to vote or change of voter address unless the applicant ots ot. 42 U.S.C. 1973gg-4. The same is true for OMV issuance of Louisiana identification cards. Id. Furthermore, the NVRA compels any office that either provides public assistance[5] or services to persons with disabilities[6] (through state funded programs) to offer voter registration services. *42 U.S.C. 1973gg-5.* These services are extensive, and include providing any applicant for recertification, renewal or change of address with respect to such services or assistance with a voter registration form and providing them assistance in completing the form. See id. The offices must also provide a preference/declination form to determine if the applicant wishes to be registered to vote at their address and advise them that benefits and assistance are unrelated to the decision to register or not register. Id. The agency must accept registration forms and transmit them to the Secretary of State. *42 U.S.C. 1973gg-6(a)(4)(A).*

As the Department of Justice contends, the State of Louisiana has:

   (1)    failed to designate the relent agencies as voter registration agencies;

   (2)    failed to provide preference/declination forms;

   (3)    failed to make available voter registration forms;

   (4)    failed to transmit forms, and;

   (5)    failed to train staff to comply with the NVRA.

See complaint/suit at *United States v. State of Louisiana*, et al., No. 3:11-CV-00470-JJB-DLD (M.D. La. Jul. 12, 2011).

> The necessisty of the National Voter Registration Act in light of the
> century-long struggle for the enfranchisement of African-Americans
> and rural poor and rural disabled.

The *National Voter Registration Act of 1993* is the latest legislative action in the century-

---

[5] Public assistance "includes any of the following federal public assistance programs: the Supplemental Nutrition Assistance Program (SNAP, formerly the Food Stamp Program), the Special Supplemental Nutrition Program for Women, Infants and Children (WIC), the Temporary Assistance for Needy Families (TANF) program (formerly the AID to Families with Dependent Children or AFDC program) the Medicaid program, and the State Children's Health Insurance Program (SCHIP)." The United States Department of justice, "The National Voter Registration Act of 1993 (NRVA): Questions and Answers" at ¶ 13, available at www.justice.gov/crt/about/vot/nvra/nvra_faq.php

[6] This includes "offices providing vocational rehabilitation, transportation, job training, education counseling, rehabilitation, or independent-living services for persons with disabilities." Id. at ¶ 14.

434

long struggle for equal voting rights for African-Americans, minority, and loc-income communities within the Unites States.  In its report recommending approval of the *National Voter Registration Act*, the Committee on House Administration took notice of this struggles' tortured history. "Restrictive registration laws and administrative procedures" of the late 1900s, that committee found, were specially designed "to keep certain groups of citizens fro voting." *H.R. Rep. No. 103-9, at 1 (1993)*.  Particularyly in Southern States such as Louisiana, those who were systematically disenfranchised were in large measure "blacks and the rural poor." *Id*  Even in the wake of the 14th and 15th Amendments, "Southern States were seeking out to accomplish an effective nullification of the war measures of Congress." *R. Wardlaw, Negro Suffrage in Georgia, 1867-1930, p. 34 (Phelps,-Stokes Fellowship Studies, No. 11, 1932)*.  These racist administrative procedures took the form of "poll tax[es], literacy tests, residency requirements, selective purges . . . [and] annual reregistration [sic] requirements." *Id.*  As soon as the U.S. Supreme court explained, such "[m]anipulative devices and practices were soon employed to deny vote to blacks." *Rice v. Cayetano*, 528 U.S. 495, 513 (2000).  Their combines effect was to create maliciously bureaucratic obstacles to voting, which "were so effective that between 1896 and 1924 . . . the turnout [of voters in the South] went from 57% to 19%, with the black vote dropping from 44% to essentially 0%." *Id* (empasis added) Of course, 1896 was a watershed year in the history of discrimination in the United States, the Supreme court upholding a Louisiana law requiring railroad companies to provide "equal but seperate" seating for African-Americans abd whites. *Plessy v. Furguson*, 163 U.S. 537, 544 (1896).

The post-Reconstruction discrimination laws were not limited to disenfranchisement of poor and minority citizens, and "[i]n the wake of *Plessy*, many states expanded their Jim Crow laws" to ensure total segregation in "residential areas, parks, and hospitals, theaters . . . [even] seperate phone books." *Regents University of California v. Blake*, 438 U.S. 265, 393 (Marshall, J., concurring). Such practices were adaptive and persistant, continuing throughout the first half of the 20th century. *See Myers v. Anderson*, 238 U.S. 368 (1915) grandfather clause); *Lane v Wilson*, 307 U.S. 268 ("procedural hurdles"); *Terry Adams*, 345 U.S. 461 (1953)(striking down a white primary); *Smith v. Allwright*, 321 U.S. 649 (1944) (white primary in Texas); *United States v. Thomas*, 362 U.S. 58 (1960) (registration); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960) (gerrymandering by race); *Louisiana v. United States*, 380 U.S. 145 (1965) (invalidation Louisiana law requiring voters to demonstrate knowledge of federal and state constitutions).  Attempts to disenfranchise African-

435

Americans in Louisiana have been particularly flagrant and protean, as the U.S. Supreme Court took pains to outline in *Louisiana v. U.S.*, 380 U.S. 145 (1965).  Since the Enactment of the *Louisiana Constitution of 1898*, "the State had put into effect a successful policy of denying Negro citizens the right to vote because of their race." Id., at 147.  After the racial-based grandfather clause was found unconstitutional in *Guinn v. United States*, 238 U.S. 347 (1915), Louisiana adopted their so-called interpretation test of 1921. Id. At 148.  This test, which required that African-Americans demonstrate "a reasonable interpretation" of any clause in the Louisiana Constitution or the Constitution of the United States," was a transparent and effective method of systematic and racial disenfranchisement. Id.; see *La. Const. 1921, Art. VIII, ss 1(c), 1(d)*.  The effect of this particular tactic was devastating: between 1921 and 1944, "the percentage of registered voters in Louisiana who were Negroes never exceeded one percent." *Louisiana v. U.S.*, 380 U.S. at 148.

Among the most entrenched of the "prerequisites to the franchise" were poll taxes, which required African-Americans to pay between $1.00 and $2.00 each year to remain eligible to vote.[7] Abita R. Ellis, "The Cost of the Vote: Poll Taxes, Voter Identification Laws, and the Price of Democracy, 86 Denver U.L. Rev. 1023, 1042 (2009).  Although such economically based legislation affected poor white and African-American voters alike, many states enacted provisions that acted as "a series of loopholes to guarantee poor white voting while" continuing to deter racial minorities.[8] Finding that "[t]he payment of poll taxes as a prerequisite to voting is a familiar and reasonable regulation," the constitutionality of poll tax legislation was upheld in *Breedlove v. Suttles*, 302 U.S. 277, 284 (1937).  While Louisiana abolished their poll tax requirements before *breedlove* in favor of such convenient discriminatory practices as the "reasonable interpretation" tests, Mississippi persisted with its poll tax late in 1966, even in the wake of *Harper v. Virginia State Bd. of Elections*. Ellis, "The Cost of the Vote" at 1043.  That decision held that "the right to vote was too precious, too fundamental to be so burdened or conditioned " on wealth. *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 607 (1966).  These types of developements in jurisprudence helped

---

[7] It is important to note not only that $1.00 to $2.00 "was an extreme amount to many," but also that these payments were cumulative and had to be paid in advance of the elections. Abita R. Ellis, "The Cost of the Vote: Poll Taxes, Voter identification Laws, and the Price of Democracy, 86 Denver U.L. Rev. 1023, 1042 (2009).

[8] These provisions are linked to the interpretation clauses mentioned earlier, whereby election officials could "register voters who could 'understand' and section of the state constitution and read to them."  This places the enfranchisement decision soley in the discretion of teh examiner.  Abita R. Ellis, "The Cost of the Vote: Poll Taxes, Voter identification Laws, and the Price of Democracy, 86 Denver U.L. Rev. 1023, 1042 (2009).

436

to counteract the history of disfranchisement of African-American and minority voters, as did the Voting Rigts Act's "complex scheme of stringent remedies aimed at areas where voting discrimination has been most flagrant." *State of South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966).

> The purpose of NVRA in the wake of the Voting Rigts Act and th Jacksonian principles underlying an enfranchised and active electorate.

The political philosophy of Andrew Jackson was instrumental both in eliminating the conditioning of the right to vote on land ownership, as well as emphasising the popular election of judges and other officials. The political lanscape prior to the advent of jacksonian democracy was dominated by a *"Jeffersonian model," favoring decision-making and the selection of lower-echelon officials by an elected elite (Congress, Legislators, the President and Governors)."* Pesris K. Noshewal, *"Judicial restraint: Resolving the Constitutional Tension Between the First Amendment Protection of Political Speech and the Compelling Interest in Preserving Judicial Integrity During Judicial Elections,"* 24 Quinnipiac L. Rev. 757, 766 (2006). Jackson's perspective eschewed a *"Return to the Jeffersonian ideal of Pastoral America run by Enlightened Farmers"* in favor of a non-freehold based universal (white male) electorate." Paul Johnson, *A History of the American People*, 220-221 (1997). The Jacksonian revolution embodied the idea that "the more people who had a presidential vote the better," and that "to liberate and empower this huge moral popular force" would eliminate "the entrenched oligarchy, the corrupt ruling elite." Id at 222. Courts have noted that "the Jacksonian revolution of the 1820's and 1830's provided political parties a new impetus" that led to political parties becoming "permanebt features in our political system." *Cromer v. State of South Carolina*, 917 F.2d 819, 833 (C.A. 4 1990). This revolution instated an upheaval "which dislodged the old ruling class typified by John Quincy Adams and brought to power" new more populists leaders. Allan Nevins, *"At the Roots of Democracy,"* NY Times (September 16, 1945).[9]

The National Voter Registration Act was precisely designed "to expand the franchise, so that every American will have the most precious of rights that we enjoy, which is access to the ballot box." *139 Cong. Rec. S2738* (daily ed Mar. 11 1993) (statement of Sen. Moseley-Braun). This represents an embodiment of the free excercise of the right to vote at the core of the political philosophy of Andrew Jackson, who said that "[t]he great constitutional corrective in the hands of the people against usurpation of power, or corruption by their agents, is the right of suffrage." Paul Johnson, *A history of the American People* at 221.

---

[9] Available at http://www.nytimes.com/books/00/11/26/specials/schlesinger-jackson.html

437

The the *Voting Rights Act of 1965* (VRA) constituted one of the most important right od the Civil Rights movement, its effect was largely limited to the abolition of transparent exclusionary voter registration characterists of the early- to mid-20th century. Although the establishment of the *VRA of 1965* "eliminated the more obvious impediments to registration," it nevertheless left a measure of "unfinished business." *H.R. Rep. No. 103-9, at 167* (1993) The impetus for the *National Voter Registration Act* was to take up this unfinished business, by addressing the "steady decline in citizen participation in Federal Elections" between 1965 and 1992. Id. Compiling date from public opinion polls, committee reports, and individual testimony, the legislature determined that increasing voter registration opportunities through methods such as agency-based registration was the "positive action Congress can take to give the greatest number of people an opportunity to participate." Id As noted in the House debates, the *NVRA* seeks to remedy the continuing legacy of "a rather unfortunate tradition," one in which "[w]e have used voter registration mechanisms . . . throughout many, many decades to prevent various groups we were from time to time and by certain groups considered undesirable, to make it very difficult for them to vote." *139 Cong. Rec. H505* (daily ed Feb. 4, 1993) (statement of rep. Swift) Representative Ed Towns confronted the issue more directly in his statements, reminding those members of the House that [t]he memories of the African-Americans are still fresh with the degrading but legal techniques used to bar them from voting, such as poll taxes, so-called literacy tests, and in some cases physical or emotional intimidation." *145 Cong. Re. 505* (daily Feb. 4, 1993) (statement of Rep. Towns). Rep. Towns concluded, expressing his support for the *NVRA* and his confidence that it would "gurantee that public institutions are used to empower American citizens to easily engage in democratic elections." Id.

The mandatory registration of public assistance and disability services lie at the heart of the *National Voter Registration Act's* goal to increase the amount of the voting eligible population registered to vote. An effort was made to limit the scope of this provision through a Senate amendment; howver, this change in the proposed law was seen as devastating its intent and effectiveness and was ultimately rejected.. See *139 Cong. Rec. H1828* (daily ed. Apr. 1, 1993). The Senate amendment would have required only armed forces recruitment offices to be mandatory voter registration agencies. Id. The main sponsor of the bill, Rep. Swift, explained that making the designation of public assistance offices optional rather than mandatory would render "this provision of legislation funcitionally inoperable." *139 Cong. Rec. H1823* (daily ed. Apr. 1, 1993)(statement of Rep. Swift). Having public assistance and disability services officies designated as mandatory

438

voter registartion agencies was deemed "conrtal to attain the goals of this legislation" because of they were not so designated, "the agency-based program would exclude a segement of the population that the motor-voter provisions would not reach, primarily the poor and disabled citizens." *139 Cong. Rea. S5642* (daily ed. May 6, 1993) (statement of Rep. Ford). The Senate report noted that "motor-voter registration programs may not adequately reach low income citizens and minorities," and cited Department of Transportaion stud for support. *S.Rep. 103-6* (1993). That study found "that almost 50 percent of those persons who do not have a drivers license have annual incomes of less than $10,000." Id. These statements and reports, as well as the steadfast determination by the *NVRA's* supporters to include the publis assistance and disabiltiy services mandate, demonstrate that the duties placed on public assistance and disability service agencies were carefully thought out, well-reasoned, and subject to open debate.

One of the most vocal critics of the *NVRA*, and particularly the mandatory designation requirment, was Representative Livingston of Louisiana. At that time, representative livingston's congressional district was primarily made up of Jefferson and St, Bernard Parishes.

During the debate on the Sante amendment, Representative Livingston further lamented that the *NVRA* is trying to "tilt the political system in favor of voting by people who go to the welfare office." id. Rep Flake, on the other hand, who "grew up in the time of poll taxes," recognized the importance of including the mandatory designation of public assistance offices, to ensure voter registration opportunities for those who were so often denied their franschise, "the very persons who despreately used a voice in out Nation's future." *139 Cong. Rea. H1823* (daily ed. Apr. 1 1993) (statement of Rep. Flake). Ultimately, the final legialation included mandatory designation for public assistance and disability services. These are the very same provisions with which Louisiana and Jefferson Parish are in flagrant non-compliance. See Complaint, *United States v. State of Louisiana* et al., No 3:11-CV-00470-JJB-DLD (M.D. La. Jul. 12, 2011).

> Louisiana's voter registration numbers are so low that the DOJ is suing the State of Louisiana, DHH, and DCFS for violations of the agency registration provisions of the NVRA

The agency registration section of the *NVRA* had been ignored in Louisiana to the extent that the Department of justice has filed a lawsuit for declaratory andf injuctive relief for non-compliance. Complaint, *United States v. State of Louisiana*, et al., No 3:11-CV-00470-JJB-DLD (M.D. La. Jul 12, 2011), (hereinafter "Complaint"). The complaint alleges that the States of Lousisiana, the Louisiana Department of Health and Hospitals (DHH), and yje Louisiana Department of Children and

30

434

Family Services (DCFS) have "failed to provide voter registration opportunities as required by *Section 7 of the NVRA*." Complaint at 4. The department of Justice finds that these violation "are evidenced by the fact that Louisiana has received very few voter registration applications from its public assistance and disability services offices despite the significant percentage of its population receiving such services.." Id at 5. These statistics are measured through Election Assistance Commission surveys which each State submits on an annual basis. In part, these surveys measure the number of voter registration applications received from motor vehicle, public assistance, diability services, and armed forces recruitment officies. *Exhibit 2, U.S. Election Assitance Commission 2010 Election Administration & Voting Survey*, at 5. In 2009-2010, there were "6,037 voter applications from public assistance offices, representing 1.1. of all voter registration applications received from 2009-2010. Complaint at 5.

In contrast, there are 1,701,020 citizens enrolled in Medicaid programs at the end of January 2011" in Louisiana. Complaint at 6. These low numbers of registration (only 14,725 from public assistance between October 2006 and October 2010), when compared with the "3.1 million Medicaid applications, renewals, and address changes from January 2007 to January 2011" create an inconsistency that "is probative of Louisiana's unlawfl failure to offer the voter registration opportunities required by the *NVRA*." Id at. 7. Despite the fact that Louisiana is bound by federal statute to provide voter registration information and assistance upon each of those 3.1 million Medicaid transactions, less than 0.5% of these transactions are resulting in any voter registration activity. The Department of Justice has cited such an overwhelming disparity as not simply indicative, but probative of non-compliance. Complaint at 7. Although in 2001-2002 Louisiana received 3.3% of all voter registration applications from public assistance offices, that number dropped to just 1.1% in 2009-2010. Id. at 5. The complaint includes allegations that [m]any Medical Program offices had neither the forms nor the procedures in place to offer voter," office of DHH "did not regularly offer eligible clients the opportunity to register to vote," multiple offices of DFCS "did not regularly offier eligible clients the opportunity to register to vote with every application," and other agencies have been distributing "out-od date and legally concompliant forms." Id. At 8.

Defendant adopts in full the factual allegations of the United States government in this pleading, attached the government's complaint and associated documentary proof, and seeks the time to fully develope and present these proofs.

Medicaid and SNAP enrollment and voter registration statistics for
Louisiana demonstrate a vastly disproportionate number of low-

440

income persons registering to vote

The Medicaid enrollment information for the entire state of Louisiana lists 674,420 African -Americans, which is 53% of the population of Medicaid eligible persons in the state (1,270, 976). Exhibit 19.11, La. Medicaid Eligibles by Race. Despite so many consumers of public assistance services, only 6, 037 persons registered to vote through such agencies, representing 1.1% of total voter registration throughout the state (532, 735). Exhibit 19.1, Voter Registrations Source for Louisiana 2009-2010. This large difference between the number of persons on Medicaid and the number of persons registering to vote through public assistance agencies prove that Louisiana is not complying with the *NVRA*. Because of the large percentage of African Americans enrolled in Medicaid, this noncompliance disproportionately affects this distinctive group.

The correlation between poverty and race demonstrated above is hardly a new or surrising condition in Louisiana. Current figures show that 63.5% of teh households on SNAP in Louisiana are African American (232,578/365,844).[10]

The statistical breakdown in Jefferson Parish Matches the statewide experience with the intended beneficiaries of the NVRA

There are 118,146 Medicaid eligible persons in Jefferson Parish. (All exhibits in State v. Isaiah Doyle, 05-05262, 24th JDC, are adopted in full here by their original identification in that case)Exhibit 19.2, DHH Medicaid Eligibles by Race. There are 53,182 African Americans who are Medicaid eligible. Exhibit 19.2, DHH Medicaid Eligibles by Race. 45% of the Medicaid eligible population in Jefferson Parish is African American. 46.7% of the Medicaid eligible population in Jefferson Parish is on Medicaid, as compared with only 14.1% of the white population. Exhibit 19.2, DHH Medicaid Eligibles by Race. Almost half of all people on Medicaid in Jefferson are African American, without taking intoo account the 10,364 persons whose race is listed as "unknown." Exhibit 19.2, DHH Medicaid Eligibles by Race.

This means that those applying for public assistance, renewing or changing addresses-the populations targeted by the *NVRA's* voter registration agencies provisions - are primarily African American. The National Voter Registration Act was designed to increase voter registration by creating interactive agency based registration sites at designated agencies throughout the United States. Jefferson Parish's failure to comply has led to a decrease in voter registration through such

---

[10] According to a 2009 study, 11% of Jefferson Parish residents received food stamps, however, there was a massive racial disparity in operation. 26% of black residents of Jefferson Parish were were receiving food stamps, while only 5% of white resident were in the program. See http://www.nytimes.com/interactive/2009/11/28/us/20091128-foodstamps.html.

441

agencies, and this has affected African Americans at a far greater rate than it affects whites. The voter registration information gathered by the Election Assistance Commission supports the conclusion that African Americans are being denied opportunities to register to vote, and therefore be included I the jury selection process. See Exhibit, Voter Registration Survery. In Jefferson Parish only 355 people registered to vote through public assitance agencies, even though 53,182 African Americans, and over 118, 146 people are on Medicaid in said parish. Exhibit 19.2 La. Medicaid Eligibles by Race. 0.3% of Medicaid recipients in Jefferson Parish registered to vote through public assistance agencies. Exhibit 19.2, Medicaid Eligibles by Race. These figures represent a substantially disproportionate number of people on public assistance as compared with the voter registration coming from such agencies.

Because Jefferson Parish is not offering the services mandated by federal law, there is a corresponding deficiency in voter registration. The jury selection procedure in Jefferson Parish is largely dependent on voter registration lists. See *La.C.Cr.P. Art 408.1(A)(1)*. Compliance with the requirements of the *NVRA* would increase voter registration for those enrolled or enrolling in public assistance programs like Medicaid.

    c)     The applicable legal standards for fair cross-section and equal protection claims

This claim is based on both the *Sixth Amendment's* fair cross-section requirement (applied to the States under the *Fourteenth Amendment's* due process clause) and the equal protection clause of the Fourteenth Amendment. It is similiarly based in *La. Const. Art. 1, § 2, 3, 12, 16* and other applicable provisions of law as discussed in this motion.

Fair Cross Section Analysis

With respect to the fair cross-section component of the claim, the Supreme Court has held that "the selection of a petit jury from a representative cross-section of the community is an essential component of the *Sixth Amendment* right to a jury trial." *Taylor v. Louisiana*, 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). The test of *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), controls when determining whether the jury venire is a representative cross-section of the community. The Supreme Court recently explained the *Duren* test as follows:

> To establish a prima facie violation of the fair cross-section requirement, this Court's pathmarking decision in *Duren* instructs, a defendant must prove that: (1) a group qualifying as "distinctive" (2) is not fairly and reasonably represented in jury venires, and (3) "systematic exclusion" in the jury-selection process accounts for the underrepresentation. 439 U.S., at 364, 99 S.Ct. 554; see supra, at 1387-1388. *Berghuis v. Smith*, ---U.S.---, 130 S.Ct. 1382, 1392 (2010).

442

In *Duren*, the Court explained the third step of the analysis as follows:

> [I]n order to establish a prima facie case, it was necessary for petitioner to show that the underrepresentation of women, generally and on his venire, was due to their systematic exclusion in the jury-selection process. Petitioner's proof met this requirement. His undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year manifestly indicates that the cause of the under representation was systematic that is, inherent in the particular jury-selection process utilized. Petitioner Duren's statistics and other evidence also established when in the selection process the systematic exclusion took place.

*Duren*, 439 U.S. at 366, 99 S.Ct. At 669. The burden then shifts to the State to justify the systematic exclusion:

> We have explained that States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury lists or panels are representative of the community. However, we cautioned that the right to a proper jury cannot be overcome on merely rational grounds. Rather, it requires that a significant state interest be manifestly and primarily advanced by those aspects of the jury-selection process, such as exemption criteria, that result in the disproportionate exclusion of a distinctive group.

*Duren* 439 U.S. at 366, 99 S.Ct. At 670. The Court explained this third prong further in Berghuis:

> The "disproportionate and consistent exclusion of women from the [Jackson County] jury wheel and at the venire stage," the Court concluded, "was quite obviously due to the system by which the juries were selected." Id. At 367, 99 S.Ct. 664. "[A]ppropriately tailored" hardship exemptions, the Court added, would likely survive a fair-cross-section challenge if justified by an important state interest. Id., at 370, 99 S.Ct. 664.

*Berghuis*, supra, 130 S.Ct. At 1393 (italics in orignal; boldface added)

The thrust of a fair cross-section, rather that an equal protection claim, is that it is not based upon the existence of discriminatory intent. Most fair cross-section claims involve jury selection methods or jury service criteria that are facially race - or gender-nuetral but that have the effect of systematically excluding a distinct group.

The Supreme Court requires automatic reversal where there is proof of systematic exclusion of specific groups from petit and grand juries. See, e.g. *Peters v. Kiff*, 407 U.S. 493, 92 S.ct. 2163, 33 L.Ed.2d 83 (1972) (exclusion of African-Americans); *Ballard v. United States*, 329 U.S. 187, 67 S.ct. 261, 91 L.Ed 181 (1946) (exclusion of women); *Thiel v. Southern Pacific, Co.*, 328 U.S. 2217, 66 S.ct. 984, 90 L.Ed. 1181 (1946) (exclusion of wage-laborers). This reversal is necessary because systematic exclusion of cognizable groups from the jury compromises the very intergrity of the trial process. *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

The Supreme Court has made the purposes animating the fair cross-section requirement abundantly clear:

(1) "guard[ing] against the excercise of arbitrary power" and ensuring that the

443

"commonsense judgement of the community" will act as "a hedge against the overzealous or mistaken prosecutor," (2) preserving "public confidence in the fairness of the criminal justice system," and (3) implementing our belief that "sharing in the administration of justice is a phase of civic responsibility."

*Lockhart v. McCree*, 476 U.S. 162, 174-175 (1986)

To this may be added the salutary effect that diverse juries have on the fact finding process. Studies on jury deliberations have shown that racially diverse juries deliberate more extensively, consider more facts, makes less factual errors in deliberation and are more willing to tackle difficult topics in deliberations than single-race juries. See, e.g, Sommers, S., *On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition on Jury Deliberations*, J. of Personality and Soc. Psychol., 2006, Vol. 90, No. 4, 597-612.

Equal Protection Analysis

In addition to the fair cross-section analysis, the Court must also scrutinize the State of Louisiana's deliberate refusal to implement the *National Voter Registration Act of 1993*. As the facts set forth above show, the state deliberately chose to violate federal law and limit its voter registration activities to the direct prejudice of the poor, disabled and predominantly black citizens of this state.

The purposeful exercise of State action to deny Americans their rights as citizens on the basis of race or economic or social group violates the *Fourteenth Amendment*:

> [T]he facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion that, whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration, and thus representing the state itself, with a mind so unequal and oppressive as to amount to a practical denial by the state of that equal protection of the laws which is secured to the petitioners, as to all other persons, by the broad benign provisions of the fourteenth amendment to the constitution of the United States. Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with and evil eye and an unequal hand, so as to practically make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution.

> *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74, 6 S.Ct. 1064, 1073 (1886).

Where the state has violated the equal protection rights of citizens who are otherwise jury-eligible, the defendant may assert those rights in his criminal proceedings. *Powers v. Ohio*, 499 U.S. 400 (1986). In order to establish a violation of the *Equal Protection Clause*, a discriminatory purpose for state action must be shown. *Washington v. Davis*, 426 U.S. 229 (1976). In this case, that purpose is shaping the racial and socio-economic make-up of the vote in Louisiana.

The Supreme Court has articulated a framework for establishing whether such a discriminatory purpose exists in the context of jury selection in a criminal case:

444

The first step is to establish that the group is one that is recognizable, distinct class, singled out for different treatment under the laws , as written or as applied. . . . Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors over a significant period of time. . . . Finally, a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.

*Castaneda v. Partida*, 430 U.S. 482, 494-495 (1977) (citations ommitted) Evidence in this

case supports the inference that Louisiana officials deliberately resisted the express commands of the

*National Voter Registration Act of 1993*. Thus, the finding of a prima-facie case is warranted and

additional fact development should be allowed.

    **d)**    **Louisiana's decision not to comply with the National Voter Registration Act violated Mr. Funes's right to have a fair cross-section of the community in his jury(ies) venire. (Grand and Petit)**

*Louisiana's decision not to comply impacts the representation of distinctive groups of Jefferson Parish Citizens on Jefferson Parish venires*

In *Lowenfeld*, the Louisiana Supreme court summarized the relevant case law defining those

groups which are considered distinctive groups for fair cross-section purposes:

A survey of past decisions shows those groups which the court found to be distinctive. Distinctions based on race or national original clearly meet this test. See *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Hernandez v. Texas*, 347 U.S. 475, 74 S.ct. 667, 98 L.Ed. 866 (1954). Women comprise such a group. *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). In *Thiel v. Souther Pacific Co.*, 328 U.S. 217, 220, 66 S.Ct. 984, 985, 90 L.Ed. 1181 (1946), the court, in finding that daily wage earners were a distinct group, said these groups include, "economic, social, religious, racial, political and geographical groups of the community."

*State. Lowenfield*, 495 So.2d 1245, 1254 (La.1985); see *State v. Cage*, 337 So.2d 1123, 1124 (la.

1976) (finding fair cross-section violation in exclusion of a group of poor black people living in

susidized housing). The Court in *Thiel* (supra) made the point that the fair cross-section requirement:

does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does not mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. *Thiel*, at 220

The listing of distinctive groups is also reflected in the Rule of the Louisiana Supreme court

prohibiting the exclusion of citizens from jury service based on their membership in one of the

protected groups"

Rule XXV. Jury Service

Section 1. It is the policy of this court that all litigants in Louisiana courts entitled to trial by jury shall have the right to grand, petit, and civil juries selected at random from a fair cross-section of the parish wherein the district court convenes, that all qualified citizens shall have the opportunity to be considered for jury service in the district courts of Louisiana and shall have an obligation to serve as jurors when

445

summoned for that purpose, and that no citizen shall be excluded from jury service in the district courts of Louisiana on account or race, color, religion, sex, national origin or economic status.

La.S.Ct.R. XXV

The distinctive groups the subject of this fair cross-section claim are:

1.) Low income citizens

2.) Citizens with disabilities

3.) Citizens who receive public assistance

4.) Black citizens

5.) Citizens who are members of other racial minorities

*Louisiana's decision not to comply has resulted in unfair and unreasonable representation of the impacted groups in Jefferson Parish venires.*

The fact of under-representation of the distinctive groups is established both directly and through inference. Given the breaking nature of the information regarding the state s of Louisiana's unlawful conduct, Defendant seeks an opportunity to further develope the factual basis of this claim and the scope of the under-representation caused. However, petitioner believes that his showing with respect to Black Citizens of Jefferson Parish meets the required standard.

According to the U.S. Census 2010, the population of Jefferson is 432, 552. The proportion og the population identified as black is 26.3%.[11]

In anticipation of Mr. Funes grand and petit trial jury summonses were issued, to be served by mail. 25.5% of those to whom summonses were sent were black.  See Exhibit 19.13, Jefferson Parish Jury Summons Date April 2009- March 2011.

The special venire of jurors presented for jury selection for Mr. Funes's trial consisted of 189 persons, 33 of whom were black. This is a percentage of 17.4%. Ultimately, the actual jury selected in Mr. Funes's case only had _____ [12] black juror(s).

The progressive under-representation of black prospective jurors in Mr. Funes's venire is shown in the table which follows:

---

[11] This information is made available on the Bureau of the Census website, operated by the U.S. government.  U.S. Census Bureau, "State and County Quick Facts: Jefferson Parish Louisiana," available at http://quickfacts.census.gov/qfd/states/22/22051.html.

[12] Voire dire portion of the trial transcript need to be produce for this information so that appointed post conviction counsel can inject any/all missing information correctly into this writ application and counsel should be given the opportunity to amend the petitioner as needed.

446



An analysis of the jury summons returns in Mr. Funes's case discloses two critical categories of summonsed jurors who did not for a part of the venire made available for trial. They are "returned from the post office - NFA" and "no show." These categories refer to people to whom a summons was either returned marked "no forwarding address" or nobody attended in response to the summons. For the "no shows" there was no proof or verification that the summonsed juror still lived at the relevant address.

For Mr. Funes's venire  46% of the summonses issued to black prospective jurors were marked as "returned from post office - NFA". That is 66% of black prospective jurors summonsed were not included in the venire because either no response or a "no forwarding address" response was received to the summons mailed to the address maintained in the jury pool database. These may be referred to as unsuccessfully summonsed jurors.

By contrast, 26% of the summonses issued to white prospective jurors[13] were marked as "no show" and a further 15% were marked as "returned from post office -NFA." That is, only 41% of non-black jurors summonsed were not included in the venire for these reasons.

Black jurors in Mr. Funes's case were unsuccessfully summonsed at the address maintained

---

[13] The same results apply where all non-black jurors are aggregated, though this is in part due to the relatively large number of white jurors and the relatively small number of other minority jurors. However, such an aggregation would mask the fact that other minority jurors are also over-represented in the number of "no show" and "NFA" entries in the computer, just as they are over-represented in the number of citizens in parish receiving public assistance.

447

in the Jefferson Parish jury pool database at a rate of 1.6 times that of white jurors.

This disparity accounts for the 8.9% absolute and 33.8% relative under-representation of black prospective jurors on the venire.

Of the jurors who given codes other than "no show" or "NFA," 17% were black, 74% were white and 9% were members of other racial minorities.

While there are numerous other ways that jurors may have ended up on the venire, the overwhelming number who did not make it to the venire were excused under the no show or NFA categories. Excusal under the other categories had no meaningful impact on the relative racial makeup of the venire in this context.

The fact that it is the disproportionate rate of unsuccessful summonses that accounts for the

## Effect of Failure to Successfully Summon Black Jurors

### Under-representation of Blacks on Venire by Percentage %



under representation of blacks on the venire is shown in the chart below:

Were it not for the disproportionate rate of "no show" and "NFA" returns on the summonses of black jurors, there would not have been the under-representation that was seen in the venire made available for Mr. Funes's trial.

A review of all jury summons activity for the last two years discloses that the disproportion in Mr. Funes's case is typical and represents a part of an ongoing, routine, routine and and regularly occurring under-representation of black jurors.

For ease of analysis in seeing the regular failure to successfully summons black jurors it is helpful to combine the returns on summonses marked as "NFA", "no show" and "JPSO attempted" under the label "unsuccessful summonses". A review of every jury summons for the period 4/1/09

to 3/31/11[14] shows that consistently across the last two years the rate of unsuccessful summonses of black prospective jurors has averaged 61% and that of of non-black prospective jurors has averaged 43%. The consistent pattern shows that black prospective jurors in the jury pool databases have been unsuccessfully summonsed at a rate of 1.4 times the rate of white prospective jurors.

The underrepresentation of black prospective jurors is shown not to be limited to Mr. Funes's own venire but is a consistent pattern across all the venires summonsed in the Parish and to represent a substantial underrepresentation.

The underrepresentation of other minority groups is also seen to be significant. Other minorities have also been unsuccessfully summonsed at a rate of 1.4 times the rate of white prospective jurors.

Given the figures described above regarding the number of black and minority residents of Jefferson Parish receiving public assistance as a result of poverty (and assistance for a disability) it is a reasonable inference that the underrepresentation is directly related to the violation of the *NVRA* and the low income and disabled populations are underrepresented in the venire for Mr. Funes and other juries in Jefferson Parish. Certainly a prima facie case is established.

Defendant specifically requests that a hearing be ordered and an opportunity to further develope the information and provide more direct proof of the underrepresentation of the groups indentified in this pleading. The DOJ's law suit establishing the violation of the *NVRA* was filed on July 12, 2011. Because petitioner is restricted by the rigors of imprisonment, information flows to him a lot slower than society at large. It was only recently (May 1, 2013) that petitioner became aware of of the existence of the suit and obtained a copy of the pleadings and some supporting documents. Petitioner had a very limited window to react to the new and critically important information which has been disclosed by the Department of Justice in a case where underrepresentation had been observed and put before the court by counsel.

*The underrepresentation of black prospective jurors in Mr. Funes's venire and other venires in the Parish is accounted for by the disproportionate failure to successfully summons black jurors by mail at the address held in the Jefferson Parish Jury pool database.*

As demonstrated above, the clear cause of the underrepresentation of black and other minority prospective jurors is that disproportionately high rate of unsuccessful summonses. The same is

---

[14] This involves 374 jury summons dates involving summonses issued to 177,702 prospective jurors. The data from these figures were calculated have been submitted to the court on a

444

alleged to be true for low income citizens and persons with a disability.

This disproportionate rate of unsuccessful summonses among this group is also shown to be directly related to the state of Louisiana's unlawful voter registration system - a system that violates federal law in a way that directly reduces the opportunity for low income citizens and persons with disabilities to register to register to vote and maintain current address information.

Lest there be any suggestion that the high "no show" figure is due to some form of apathy among black and minority citizens, regards may be had to the number of black "no show" jurors in the jury venire for whom Accurint® gives a different current address than the one on file in the clerk of court's database and the rate of failed summonses in the period when a larger number of the summonses were served by JPSO deputies.

Mr. Funes's attorneys have researched the current address of all black jurors from Mr. Funes's venire designated as "no show" in the public records database Accurint®.[15] Accurint® lists entirely different current addresses for 49% of the black jurors designated as "no show" by the clerk of court in the jury venire. Attempts to contact "no show" jurors with the same current addresses in Accurint® as the clerk of court's files revealed that even some of those jurors had moved away from those addresses. See Exhibit 3,[16] Statement of Kim Allen, July 17, 2011 (Shavita Allen is my daughter. She used to live at this address but moved away about a year and a half ago.")

Moreover, JPSO's experience attempting to personally deliver summonses further demonstrates that the vast number of minority "no show" summonses cannot be explained by the apathy of intended recipients. When JPSO were attempting personal service there was a 62% rate of unsuccessful summonses among black jurors and since the resort to mail service only, that rate sits at 57%. Moreover, under the mail service only system 35% of black jurors are marked as "no show" and 22% as NFA. When JPSO deputies attempted service of summonses only 16% of black jurors were marked as "no show", with 36% marked as "JPSO attempted" and 10% marked as "NFA". (The no show figure for white jurors was 12%).

It is clear that the "no show" figure is substantially made up of those people previously recorded as "JPSO attempted." That is people with an incorrect address in the database, as confirmed by the physical attempt at service of a JPSO Deputy. Indeed, Michael Cyprian, the JPSO Deputy in

---

[15] Accurint® combines over 4 billion current public records. LexisNexis®, Accurint® http://www.lexisnexis.com/risk/solution.accurint.aspx

[16] Counsel is needed to get this correct information.

41

450

charge of accomplishing service of summonses has confirmed to representatives of counsel that this problem has persisted for some time and has always been related to quality of the addresses in the database used to generate summonses.

Finally, as a matter of completeness, no inference should be drawn from the drop in the rate of unsuccessful summonses since personal service was abandoned. While the overall percentage of unsuccessful summonses has dropped, the racial disparity in unsuccessful service has crept up, with black jurors now unsuccessfully summonsed at 1.47 times the rate of white prospective jurors.

In short, defendant has clearly established the systematic exclusion of the identified distinctive groups of by the unlawful conduct of the State of Louisiana in depriving these groups of the legislatively mandated opportunities to register and maintain current addresses. At the same time, the State of Louisiana has required as a matter of law that jury service be based primarily upon one's presence upon the state's illegally composed voter registration list. *La.C.Cr.P. art. 408.1.*

Even if the court were not satisfied of the proof of intentional exclusion, the statistical showing made even with so little time to develop the proofs clearly establishes a prima facie case.

A prima facie case having been established, the burden falls to the state to disprove the systemic exclusion or demonstrate that the cause (breaking federal law) serves a significant state interest.

e)   **In failing to comply with the NVRA, Louisiana has purposefully discriminated against African-Americans in violation of the Equal Protection Clause.**

*Louisiana singled-out distinct groups for different treatment under the law*

Counsel adopt and incorporates their arguments from subsection b) above and state that the following distinct classes of individuals were intended targets in the state's failure to comply with the clear commands of federal law:

(1) Low income citizens

(2) Citizens with disabilities

(3) Citizens who receive public assistance

(4) Black/African-American Citizens

(5) Citizens who are members of other racial minorities

Substantial underrepresentation has occurred as a result of Louisiana's failure to adhere to federal law. Low-income citizens with disabilities, recipients of public assistance, and Black/African-American Citizens or other minority citizens of Louisiana have been substantially

451

underrepresented among new voter registrations in the parish as compared to their number in the general population.

The information already available to counsel indicates that Medicaid and other public assistance agencies are vastly underrepresented as sources of new registration applications. Complaint at 5. Available data indicate that these groups represent significant portions of the state population. Medicaid recipients, for instance, comprised 25.8% of its total citizen population, according to "2010 Census data." Complaint at 6. These figures represent a substantially disproportionate number of people on public assistance as compared with voter voter registration coming from such agencies. Given the racial and socio-economic makeup of Medicaid beneficiaries statewide (53%, Black 100% under the means-tested poverty threshold), there is a reasonable inference that the above named groups have been substantially underrepresented among new registrations over the last twenty years. This inference could be strengthened by appeal to additional relevant data, which counsel seeks additional time to conduct.

Louisiana's decision to defy law was not race-neutral

Where an allegedly "race-neutral" ground for excluding minority jurors applies disproportionately to that minority group, it is not "neutral" at all. In *Fourteenth Amendment* cases, such a purportedly "neutral" ground is considered a surrogate or proxy for race.

General principles of racial discrimination, particularly those set forth in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712 (1986) and its progeny, are applicable to analyzing whether failure to successfully summons black community members constitutes a systematic exclusion of African-American jurors. *Williams v. State*, 125 P.3d 627, 634-36 (Nev. 2005). In *United States v. Bishop*, 959 F.2d 820, 825 (9th Cir. 1992), overruled as to different holding, *United States v. Nevils*, 598 F.3d 1158, 1166 (9th Cir. 2010), the Government justified the exclusion of an African-American venire-member who lived in Compton, California, on grounds that her community was "a poor and violent community whose residents are likely to be anesthetized to such violence and more likely to think that the police probably used excessive force." The Court found that, because the vast majority of the residents of Compton were African-American, this purportedly "race-neutral" grounds was a surrogate for race.

The *Bishop* Court relied on *Hernandez v. New York*, 500 U.S. 352, 111 S.Ct. 1859, 1872-73 (1991), where, although denying relief to *Hernandez*, Justice Kennedy's opinion made clear that where a justification for jury exclusion correlates with ethnic or racial identity, that justification is not

452

"race- neutral" but is rather a proxy for racial or ethnic exclusion. Other Courts similiarly interpret *Hernandez* as forbidding the State to use, as "race-neutral" justifications, classifications that are merely substitutes for race or ethnicity. See *Lord v. State*, 749 So.2d 276, 280-81 (Miss.App.1999) (Irving, J., concurring) (justification tainted by impermissible generalizations regarding racial groups and their environment is inherently discriminatory), citing *Bishop* and *Hernandez*; *Commonwealth v. Horne*, 635 A.2d 1033 (Pa. 1994)(same).

The social and political history of the Parish also provide a context. Jefferson Parish is largely made up of what are known as "white flight" surburbs and has long had a negative reputation when it comes to matters of race. The black population in Jefferson Parish has increased, growing 75% between 1980 and 2000 and now making up nearly 27% of the Parish. That influx has been met a steady stream of racially charged incidents involving state actors, including the District Attorney's Office itself.

By way of example[17]: in December 1986 Sherrif Harry Lee ordered his deputies to routinely stop and question blacks in largely white areas. In 1987 the Jefferson Parish Council ordered a metal and steel barricade built in the middle of the street bordering Orleans Parish to keep the majority black residents of that parish of of Jefferson. In 1989 david Duke was elected as state representative for the 81st Representative District. In 1991 Jefferson Parish was ordered to establish its first ever majority black voting district. In 1994, two black men dies in the custody of the Sheriff's department, at least one of whom was reportedly hog-tied. Reacting to criticisms, Sherrif Lee withdrew police from a black neighborhood and said "To hell with them. I don't need that. I haven't heard one word of support from one black person." In 2003 two Jefferson Parish prosecutors wore ties in court with a noose and a grim reaper painted on them at pre-trial hearing in a capital case involving a black defendant, aged just 16 years at the time of the crime. In 2005, Jefferson Parish officers were discovered to be using a homemade caricature of a black prisoner as target practice. In 2005, deputies

---

[17] See Frances Frank Marcus, *Louisiana Sheriff Backed After Racial Remark*, N.Y. Times, Dec. 23, 1986, p. A17; *Barricades to Black Drivers Dismantled*, L.A. Times, Feb. 22, 1987, p.25; Kim Chatelain and Robert Rhoden, *Duke Beats Treen by 227 Votes*, Times-Picayune, Feb. 19, 1989, p. A1; Joe Darby, *Westwego Gets Order for New Black District*, Times Picayune, Oct. 30, 1991, p.B1; Joe Darby, *Jeff Suspect Who Died Was Hog-Tied*, Times Picayune, Mar. 22, 1994, p. B1; Bill Walsh, Greg Thomas, Joe Darby and Paul Atkinson, *Lee Pulls Out Cops After Two Deaths*, times Picayune, Mar. 15, 1994, p. A1; Jeffrey Gentleman, *Prosecutors' Morbid Neckties Stir Criticism*, N.Y.Times, Jan 5, 2003, p.114; *Target Practices*, Gambit Weekly, Apr. 12, 2005, p19; Michelle Hunter, *Lee Backs Lethal Response To Chase: More Than 100 Shots Left Teen Driver Dead*, Times Picayune, June 1, 2005, p.1; Gardiner Harris, *Storm and Crisis: Battling The Storm; Police in Suburbs Blocked Evacuees, Witnesses Report*, N.Y. Times, Sept.10, 2005, p.A13.

453

fired over 100 bullets at three unarmed black teens, killing a 16 year old sparking allegations of racisim. In 2006, in the midst of Hurricane Katrina's devastation, officers armed with shotguns blocked evacuees trying to flee New orleans across the Gretna Bridge, sparking more outrage from black leaders.

h) Conclusion

As the United States Supreme Court has held, "with the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process." *Powers v. Ohio*, 499 U.S. 400, 407 (1991). As deTocqueville put it:

> The jury system as understood in America seems to me as direct and extreme a consequence of the dogma of the sovereignty of the people as universal sufferage. They are both equally poweful means of making the majority prevail. . . .[T]he jury is above all a political institution . . . [and] should be made to harmonize with the other laws establishing that sovereignty.

This court should grant defendant time to develope his claim, conduct an evidentiary hearing, and require the state to present the necessary justifications for its actions under the fair cross-section and equal protection standards. Due to the violation of the Sixth and Fourteenth Amendments, this Court should grant a new trial to Mr. Funes. Further the court should also grant such relief due to the negative impact upon the jury venire composition resulting from the State of Louisiana's refusal to comply with a Federal mandate. This rejection of a federal mandate affected both the venire of petitioner's Grand Jury composition and his Petit Jury composition.

## CLAIM NO. 11
### TRIAL COURT VIOLATED PETITIONER'S DUE PROCESS RIGHTS TO A FAIR TRIAL WHEN IT FAILED TO INSTRUCT OR SEQUESTER THE JURY WHEN IT RETIRED DURING RECESS AND BREAKS DURING TRIAL.

Petitioner contends that he was denied the right to a fair trial under the Sixth Amendment to the United States Constitution when the trial court failed to instruct the jury or sequestered them so that they were not allowed to discuss the case with others, read any media accounts of the trial, or report any information that someone or something had influence on their verdict. The trial record is bare of any instructions concerning the trial court charging the jury prior to releasing them for recess. As far as petitioner can recollect, he following instructions from the trial court is somewhat similar:

THE COURT:

> All right. Ladies and gentlemen, your lunch has arrived. When you are ready to come back to finish up the trial, please let the deputy sheriff know. Don't wait for us. Just keep in mind the longer we break, the later we go home. Court recesses for lunch. The Court stands in recess. Please remand the defendant.

The record merely states that (Whereupon, a recess taken.). The jury sequestration procedures

454

and non-instructions employed by the trial court failed to properly insulate the jurors from extraneous influences, or the possibility thereof, and at no time did the trial court adhere to the mandatory instructions required in all criminal cases. See, *Hale v. United States*, 435 F.2d 737 (1970). The locality of Jefferson Parish is a city steadily on the rise in population and serious felony crimes, where conversation of non-juror third parties and jury members more than likely resulted in the jury verdict being based upon, and affected by, influences extraneous of the legal evidence introduced at trial.

*La.C.Cr.P. art. 791 C* provides that "In non-capital cases, the jury shall be sequestered after the court's charge and may be sequestered at any time upon order of the court." The purpose of this instruction is to insulate the jurors from outside influence, or the possibility thereof, and to insure that their verdict will based upon the evidence developed at trial. *State v. Parker*, 372 So.2d 1037 (La.1979). Due process requires that the accused receive a trial by an impartial jury free from outside influences. *Sheppard v. Maxwell*, 384 U.S. 333, 362, 86 S.CT. 1507, 1522, 16 L.Ed.2d 600 (1966). Stated differently, "the right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent jurors'. The failure to accord an accused a fair trial violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.CT. 1639, 1642, 6 L.Ed.2d 751 (1961).

Petitioner argues that he was deprived of due process because the jury was swayed by influences outside the courtroom, it is the duty of the Court to independently review the trial records and hold an evidentiary hearing with members of the jury present, so that their testimony will be heard that their verdict was not based upon the influence of third parties to convict an alleged violent offender as a principal to second degree murder, that it is believed to have occurred during an illegal drug transaction. When juror misconduct concerns influences from outside sources, the complete failure to hold a hearing constitutes an abuse of discretion and is reversible error because a presumption of prejudice arises when the trial court learn of such influences. *United States v. Phillips*, 664 F.2d 971 (5th Cir. 1981); *Marshall v. United States*, 360 U.S. 310, 312, 79 S.CT. 1171, 3 L.Ed.2d 1250 (1959). The traditional rule in such cases has been that there must exist a nexus between the community prejudice and jury prejudice; there must be a showing that "prejudice found its way into the jury panel." *Pamplin v. Mason*, 364 F.2d 1, 6 (5th Cir. 1966). Several Supreme Court decisions have fashioned the principle that in certain extreme circumstances where there has been "inherently prejudicial publicity," *McWilliams v. United States*, 394 F.2d 41, 44 (8th Cir. 1968),

455

the actual existence of prejudice in the jury box need not be shown. Petitioner submits through the testimony of jurors, it will be established that information of his prior convictions and arrests were discussed by citizens in the hallways and outside the courtroom where the jurors had opportunity to hear and engage in improper discussion. More discussion took place outside the courthouse where some jurors were allowed to take a smoke break after they ate lunch. These jurors also were influenced in their verdict by members of the deceased victim's family revealing information about what the district attorney had told them about the accused's criminal history.

Although jurors stated on voir dire that anything they knew about the case would not hinder their ability to give both the state and defendant a fair trial, prejudice seeped into their minds during these absences from the courtroom. The record does not support that the trial court admonished the jury at no time to ignore publicity about the trial, or report if anyone discussed the case with them; this charge is mandatory in criminal proceedings. *State v. Hill,* 562 So.2d 12 (La.App. 5 Cir. 1990). In complaining of the prejudice in this case, it is not the quantity, but the quality that survives in the locality of Jefferson. In essence, petitioner contends he could not receive a fair trial because he was the subject of extensive "discrimination" as evidenced by the attached duplicate of the suit and the figures thus found to relate to Jefferson Parish, a prominence that brings prejudice. Most importantly, the mandate of *La.C.Cr.P. art. 791* must be complied with or it is reversible error. Therefore, petitioner is entitled to a reversal of his convictions, or in the alternative an evidentiary hearing be held where testimony will establish a record to support that the jury verdict was obtained by the outside influence of the people of the locality of Jefferson Parish, along with members of the deceased victim's friends and family who lingered in the hallways and stand outside the courthouse.

### CLAIM NO. 11
CONFLICT OF INTEREST AGAINST THE ENTIRETY OF THE JEFFERSON PARISH INDIGENT DEFENDER BOARD FOR COVERING UP THE FACT THAT THEY WERE WELL AWARE OF THE SYSTEMIC INEFFECTIVE ASSISTANCE BEING PROVIDED FOR THE REASONS SET OUT IN THE  "ASSESSMENT OF TRIAL LEVEL DEFENSE SERVICES IN LOUISIANA 40 YEARS AFTER GIDEON"

Petitioner avers that the Jefferson Parish Indigent Defender Office and its employees has, for years, concealed from their clients the fact that they were under funded and the fact that they were controlled by undue political interference. These and other components worked together to deprive all their clients of their fundamental right to counsel as provided for by the State and Federal Constitution. Petitioner complains of the denial of both a State and Federal Constitutional right and requests that the claims be adjudicated under both authorities of law as independent claims. Also, those same public defenders concealed that a  portion of their pay came directly from the persons who

456

were convicted and had fines and fees assessed against them.

Constitutional Deprivations Problems:

a.) Louisiana Statutes do not safeguard against undue judicial interference. Judges appoint IDB board members in violation of independent payment of defense counsel.

b.) The public defender offices are not entirely state-funded as required, in favor of contract flat-fee services.(gross-underfunding places limitations on options available in representing clients)

c.) Client confidentiality is constantly abridged, clients are routinely denied access to counsel until the court forces a meetings between client and counsel before the court as a part of the proceedings.

d.) Louisiana Public defender statutes do not protect those accused of crimes from being the victims of public defender overload. The workload of Louisiana Public Defenders are in far excess of all nationally recognized standards. Failure to control caseload permits poor quality representation.

e.) Louisiana Statutes deprived petitioner of his federal counstitutional *sixth amendment* right to counsel by permitting unqualified attorney's to be appointed to represent indigent defender cases for which they are not qualified to represent. Additionally, there is no systematic indigent defense training in the state.

f.) A review of all prosecutor and IDB financial audits reveal that there is no parity between prosecution and indigent defender resources. Indigent defense is not a co-equal partner in the justice system in Louisiana.

g.) The general training of Continuing Legal Education is not specifically appropriate for the indigent defense field when ultimately served little if any purpose of bettering the quality of representation received by indigents accused of crimes.

h.) Louisiana Statutes provide no guarantee that indigent defense attorneys be reviewed for quality. LIDAB has no authority or capacity to do so. There is no supervision or quality review of the indigent defense system.

As a result of all the above and foregoing and whatever else appointed Post Conviction Counsel can dig up who is appointed to further investigate the allegations contained herein. These allegations require the appointment of independent counsel, and it further requires that he be given the resources to fully investigate, interview and develope the factual specifics in order to validate these claims. Further, petitioner urges that the public defenders previously appointed to represent hism in the pre-trial, trial and post-trial (appeal) proceedings did not raise the claims of ineffective assistance of counsel before and during trial because of the conflict of interest in raising this viable *sixth amendment* violation against the very system that employs them and which ultimately pays them. The failure to raise the violation of the *National Voter Registration Act* (Equal Protection and Due Process Violation) is a prime example of ineffective assitance pretrial. The failure of appeal counsel to blame trial counsel for this egregious lapse in representation shows that there is a protective shell of understanding to "not bite the hands that feeds you. For this reason, petitioner once again was deprived of his substantive and fundamental right to counsel. Prejudice is presumed only if the

457

defendant demonstrates that counsel "actively represented conflicting interests" and that and actual conflict of interests adversely affected his lawyer's performance." *Cuyler v. Sullivan*, supra, 446 U.S., at 350, 348, 100 S.Ct., at 1719, 1718 footnote omitted.

The type of breakdown in the adversarial process that implicates the *Sixth Amendment* is not limited to counsel's performance as a whole; specific errors and omissions may be the focus of a claim of ineffective assistance as well. *United States v. Cronic*, 466 U.S. 648, 657, 104 S.Ct. 2039, 2048 (1984).

However, breach of the duty of loyalty, as prejudicial conduct, is in and of itself a deprivation of one's right to counsel of choice in the absence of an express waiver and also the right to counsel free from conflicts-of-interest. The concealment of the divided loyalty undermines the client because it deprives him of critical information needed in order to decide how his case will proceed forward. This further inhibits his right to counsel acting with his best interest and the preservation of his rights while being represented. The *sixth amendment* provides that an accused has 1.) The right to counsel of choice; 2.) The right to conflict-free counsel (and once a person has an attorney who is the counsel of choice and who is not burdened by actual conflicts of interest) and 3.) the effectiveness of that counsel who has met the first two (2) criteria.

The Courts have recognized that the harm caused by representing conflicting interest is difficult to measure because the harm "is in what the advocate finds himself compelled to refrain from doing, not only at trial but also as to possible plea negotiations and in the sentencing process." *Holloway v. Arkansas*, 435 U.S. 475, 490, 98 S.Ct. 1173, 1182, 55 L.Ed.2d 426 (1978); *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed 680 (1942). Therefore when an attorney labors under an actual conflict of interest, the defendant need not show prejudice in order to obtain reversal of his conviction. *Berger v. Kemp*, 483 U.S. 776, 783, 107 S.Ct. 3114, 3120, 97 L.Ed.2d 638 (1987). *Holloway v. Arkansas*, 435 U.S. 475, 490, 98 S.Ct. 1173, 1182, 55 L.Ed.2d 426 (1978); see *Glasser v. United States*, 315 U.S. at 75-65, 62 S.Ct. At 476,(the right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial).

## CONCLUSION

Petitioner concludes by stating that he has made the requisite showing under: *State ex rel. Bernard v. Criminal District Court*, 653 So.2d 1174 (La. 1995) to warrant this reviewing court to provide him with a complete copy of the "Jury Voire Dire transcript" so that he may file an

458

effectively make corrections to this post conviction application, or in this case supplement the petition with portions of the record in support of his claims. Petitioner has met his burden of proof and his convictions and sentence have been obtained in violation of the United States Constitution and Louisiana Constitution.

Wherefore, petitioner prays that this court vacate his convictions and sentence, and remand the matter to the trial court for a new trial. In the alternative, petitioner respectfully request that this Honorable Court order an Evidentiary Hearing, and appoint counsel to settle the allegations set forth above.

Petitioner further prays that this Honorable Court order the Clerk of Court or Court Reporter to provide petitioner with a complete copy of the trial transcripts hearing in this matter.

Respectfully Submitted By:

Rigoberto Funes
Rigoberto Funes # 591575
MAIN PRISON, Spruce-4
LA. STATE PENITENTIARY
ANGOLA, LOUISIANA 70712

## CERTIFICATE OF SERVICE

I, Rigoberto Funes, hereby certify that I have forwarded a copy of the above proceedings to the Clerk of Court and District Attorney's Office for the Parish of Jefferson on this 3rd day of June 2013.

Rigoberto Funes
Rigoberto Funes

## AFFIDAVIT

Wherefore after being duly question and making stipulations to the satisfaction on the undersigned, One, Rigoberto Funes, did appear before me and swear that to the best of his limited knowledge and understanding of the law, the facts and allegations contained herein are true to the best of his knowledge and belief. Therafter, this document was tendered to the hands of a Prison Official on the 3rd day of 2013.

John M. Joseph

Notary of Other Person duly Commissioned to
Accept a legal and Binding Oath

John B. Joseph, Jr. #25176
Ex-Officio Notary
La. Dept. Of Pub. Safety & Corr.

459

IN THE
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON
STATE OF LOUISIANA

STATE EX REL. Rigoberto Funes        DOCKET NO.  08-5641
              Petitioner

VERSUS                              FILED _____

BURL CAIN, WARDEN
LA. STATE PENITENTIARY            _____
            Respondent            Deputy Clerk

## MOTION FOR APPOINTMENT OF COUNSEL AND EVIDENTIARY HEARING

MAY IT PLEASE THE COURT:

      NOW INTO COURT comes, Rigoberto Funes, in proper person, who moves this Honorable

Court to appoint counsel to represent petitioner's meritorious post-conviction relief application and

grant an evidentiary hearing where he is entitled to relief requested.

      Currently, petitioner is presently incarcerated and unable to retain counsel and motions the

Court, out of the abundance of caution and in the interest of justice, to appoint counsel pursuant to

*La.C.Cr.P. art. 930.7(A)(B)(C).* and *Martinez v. Ryan*, supra.

      Petitioner submits that the court will not be able to resolve and determine the factual and legal

issues presented based solely on the answer by the State and the supporting documents of exhibits

submitted and should order an evidentiary hearing under the provisions of *La.C.Cr.P. arts. 928, 929*

and *930.*

                        SUBMITTED BY:

                        *Rigoberto Funes*
                        Rigoberto Funes # 571875
                        Main Prison, Spruce-4
                        LA. STATE PENITENTIARY
                        ANGOLA, LA 70712

*500*

IN THE
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON
STATE OF LOUISIANA

STATE EX REL. Rigoberto Funes        DOCKET NO. 08-5641
       Petitioner

VERSUS        FILED_____

BURL CAIN, WARDEN
LA. STATE PENITENTIARY        Deputy Clerk
       Respondent

## ORDER

CONSIDERING THE FOREGOING POST-CONVICTION RELIEF APPLICATION AND MOTION FOR APPOINTMENT OF COUNSEL AND EVIDENTIARY HEARING:

IT IS HEREBY ORDERED that attorney_____, enroll as

counsel of record to represent petitioner, Rigoberto Funes., before this Court pursuant to

Martinez v. Ryan and *La.C.Cr.P. art. 930.7(A)(B)(C)* at an evidentiary hearing to be held on

this ____ day of _____, 2013.

Thus done this ____ day of _____,2013.

_____
DISTRICT COURT JUDGE

Please Serve:

Rigoberto Funes # 57/875
Main Prison, Spruce-4
La. State Penitentiary
Angola, LA 70712

52

501

IN THE
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON
STATE OF LOUISIANA

STATE EX REL. Rigoberto Funes          DOCKET NO. 08-5641
   Petitioner

VERSUS                                 FILED _____

BURL CAIN, WARDEN
LA. STATE PENITENTIARY                 _____
   Respondent          Deputy Clerk

## MOTION TO COMPEL ANSWER

MAY IT PLEASE THE COURT:

  Petitioner, Rigoberto Funes, who respectfully submits that the allegations presented herein, if established, would entitle him to post-conviction relief, and respectfully moves this Honorable Court to require Paul Connick, District Attorney for the 24TH Judicial District Court, Parish of Jefferson, State of Louisiana, to file an answer and present any opposition to the application filed in this matter within the specified period pursuant to *Louisiana Code of Criminal Procedure, Article 927(A)*, at an evidentiary hearing to be held on _____ 2013.

      RESPECTFULLY SUBMITTED:

      *Rigoberto Funes*
      Rigoberto Funes # 571875
      Main Prison, Spruce-4
      LA. STATE PENITENTIARY
      ANGOLA, LA 70712

53

502

IN THE
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON
STATE OF LOUISIANA

STATE EX REL. Rigoberto Funes         DOCKET NO. 08-5641
           Petitioner

VERSUS                               FILED _____

BURL CAIN, WARDEN
LA. STATE PENITENTIARY             _____
          Respondent           Deputy Clerk

## ORDER

IT IS ORDERED that the Honorable _____, District Attorney for the 24TH

Judicial District Court, Parish of Jefferson, State of Louisiana, file an answer or present any

argument in opposition to the foregoing Application for Post-Conviction Relief before this

Court on the ____ day of _____, 2013, at the evidentiary hearing.

Thus said and done and signed this day of _____, 2013.


_____
DISTRICT COURT JUDGE


Please Serve:
Rigoberto Funes # 571875
Main Prison, Spruce-4
La. State Penitentiary
Angola, LA 70712

503

IN THE
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON
STATE OF LOUISIANA

STATE EX REL. Rigoberto Funes                 DOCKET NO.  08-5641
          Petitioner

VERSUS                                        FILED_____

BURL CAIN, WARDEN
LA. STATE PENITENTIARY                        _____
          Respondent                          Deputy Clerk

## PETITION AND ORDER FOR
## WRIT OF HABEAS CORPUS AD TESTIFICANDUM

MAY IT PLEASE THE COURT:

Petitioner, Rigoberto Funes, in proper person, respectfully request this Honorable Court to

order the Respondent Warden to produce petitioner for an Evidentiary Hearing, pursuant to Louisiana

Code of Criminal Procedure, *Article 930.4* for the following reasons to wit:

I.

That, said petitioner, Rigoberto Funes # 571875 , is incarcerated in the Louisiana State

Penitentiary, at Angola, Louisiana.

II.

That petitioner, therefore, desires that a Writ of Habeas Corpus Ad Testificandum be issued

and directed to Burl Cain, Warden at the Louisiana State Penitentiary, Angola, LA, to produce the

person of Rigoberto Funes, # 571875 , petitioner for an evidentiary hearing to be held at the 24TH

Judicial District Court, Parish of Jefferson, State of  Louisiana, on this _____day

of_____,2013, at ___o'clock___.m.

WHEREFORE, premises considered, petitioner prays that a Writ of Habeas Corpus Ad

Testificandum be issued herein as hereinafter set forth so that the petitioner, Rigoberto Funes

# 571875 , may be present to present witnesses and testify at the hearing set in the above entitled

cause.

RESPECTFULLY SUBMITTED:

*Rigoberto Funes*
Rigoberto Funes # 571875
Main Prison, Spruce-4
LA. STATE PENITENTIARY
ANGOLA, LA 70712

55

504

IN THE
24TH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON
STATE OF LOUISIANA

STATE EX REL, Rigoberto Funes                    DOCKET NO. 08-5641
                    Petitioner

VERSUS                                           FILED_____

BURL CAIN, WARDEN                                _____
LA. STATE PENITENTIARY                           Deputy Clerk
                    Respondent                   _____

## ORDER

IT IS ORDERED that a Writ of Habeas Corpus Ad Testificandum be issued on the foregoing

petition and be directed to Burl Cain, Warden, Louisiana State Penitentiary, Angola, Louisiana, to

produce the person, Rigoberto Funes # 571875 , for an Evidentiary Hearing to be held at the

24TH Judicial District Court, Parish of Jefferson, Gretna, La., State of Louisiana, on this_____day

of_____,2013, at the time of_____o'clock____.m.

Thus done and signed in the 24TH Judicial District Court, Parish of Jefferson, Gretna, La, on

this___day of_____, 2013.


                                        _____
                                        DISTRICT COURT JUDGE



Please Serve:

Rigoberto Funes # 571875
Main Prison, Spruce-4
La. State Penitentiary
Angola, LA 70712

515

# Appendix #20

Copy of Judgement denying Writ of Certiorari (Direct Appeal)

90 So.3d 408, 2012-0290 La. 5/25/12, State v. Funes, (La. 2012)                    **Page 1**

*29719 90 So.3d 408

2012-0290 La. 5/25/12

Supreme Court of Louisiana.

STATE of Louisiana
v.
**Rigoberto FUNES.**

No. 2012-KO-0290.

May 25, 2012.

Prior report: La.App., 88 So.3d 490.

In re Funes, Rigoberto;--Defendant; Applying For
Writ of Certiorari and/or Review, Parish of Jefferson,
24th Judicial District Court Div. E, No. 08-5641; to
the Court of Appeal, Fifth Circuit, No. 11-KA-120.

Denied.

GUIDRY, J., recused.

© 2014 Thomson Reuters. No claim to original U.S. Govt. works.

# Appendix #21

Certiorari (Direct Appeal) to the Louisiana Supreme Court filed
1/25/2012.

COURT RULES

APPENDIX C. SUPREME COURT OF LOUISIANA
WRIT APPLICATION FILING SHEET

No. _____

TO BE COMPLETED BY COUNSEL
or PRO SE LITIGANT FILING APPLICATION

TITLE

Applicant: Rigoberto Funes
Have there been any other filings in this
Court in this matter? [ ] Yes [X] No

State of Louisiana

VS.

Are you seeking a Stay Order? __No__
Priority Treatment? __No__
If so you MUST complete & attach a
Priority Form

Rigoberto Funes

LEAD COUNSEL, PRO SE LITIGANT INFORMATION

APPLICANT: Proper Person
Name: Rigoberto Funes
Address: TU Upper B
Angola, Louisiana 70712
Phone: N/A __ Bar Roll No. N/A

RESPONDENT: State of Louisiana
Name: Paul Connick, Jr., District Attorney
Address: Parish of Jefferson, 200 Derbigny St.
Gretna, LA 70053
Phone: _____ Bar Roll No. _____

Pleading being filed: [X] In Proper Person;  [X] In Forma Pauperis. Attach a list of additional
counsel/pro se litigants, their addresses, phone numbers and the parties they represent.

TYPE OF PLEADING
[ ] Civil, [X] Criminal, [ ] Bar, [ ] Civil Juvenile, [ ] Criminal Juvenile, [ ] Other

ADMINISTRATIVE OR MUNICIPAL COURT INFORMATION
Tribunal/Court: _____ Docket No. _____
Judge/Commissioner/Hearing Officer: _____ Ruling Date: _____

DISTRICT COURT INFORMATION
Parish and Judicial District Court: Jefferson, 24th Judicial District   Docket No. 08-5641"F"
Judge and Section: John J. Molaison                Date of Ruling/Judgment: August 5, 2010

APPELLATE COURT INFORMATION
Circuit: __Fifth__   Filing Date: __3-14-11__   Docket No. __11-KA-0120__
Applicant in Appellate Court: _____Rigoberto Funes_____              En Banc: [ ]
Ruling Date: __12-28-11__ Panel of Judges: Edwards, Chehardy, McManus

REHEARING INFORMATION
Applicant: _____   Filing Date: _____ Action on Rehearing: _____
Ruling Date: _____   Panel of Judges: _____              En Banc: [ ]

PRESENT STATUS
[ ] Pre-Trial, Hearing/Trial Schedule Date: _____, [ ] Trial in Progress, [X] Post Trial
Is there a stay now in effect? No.  Has this pleading been filed simultaneously in any other court?
No. __ If so, explain briefly _____

VERIFICATION

I certify that the above information and all of the information contained in this application is true
and correct to the best of my knowledge and that all relevant pleadings and rulings, as required by
Supreme Court Rule X, are attached to this filing. I further certify that a copy of this application
has been mailed or delivered to the appropriate court of appeal (if required), to the respondent
judge in the case of a remedial writ, and to all other counsel and unrepresented parties.

__January    2012__                                    Rigoberto Funes
DATE                                                   SIGNATURE

509

IN THE
SUPREME COURT
STATE OF LOUISIANA

DOCKET NO._____

STATE OF LOUISIANA

VERSUS

RIGOBERTO FUNES

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
APPLICATION FOR WRIT OF CERTIORARI TO THE
FIFTH CIRCUIT COURT OF APPEAL IN DOCKET NO. 11-KA-0120 FROM
THE AFFIRMATION OF DIRECT APPEAL FROM THE TWENTY-FOURTH
JUDICIAL DISTRICT COURT, PARISH OF JEFFERSON, NO. 08-5641, DIVISION "E",
THE HONORABLE JOHN J. MOLAISON, JR., JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PRO SE  BRIEF FILED ON BEHALF OF:
RIGOBERTO FUNES - APPELLANT/DEFENDANT

RESPECTFULLY SUBMITTED:

_Rigoberto Funes_
RIGOBERTO FUNES #571875
TU UPPER B
LA. STATE PENITENTIARY
ANGOLA, LA 70712

516

## TABLE OF CONTENTS

PAGE NO.

JURISDICTION ............................................................... 1

WRIT GRANT CONSIDERATION ............................................... 1

STATEMENT OF CASE ......................................................... 1

FACTS OF THE CASE ......................................................... 2

QUESTIONS OF LAW PRESENTED FOR REVIEW ............................... 6

LAW AND ARGUMENT PRESENTED ........................................... 6

CLAIM NO. 1 ............................................................... 6

CLAIM NO. 2 ............................................................... 12

CLAIM NO. 3 ............................................................... 13

CONCLUSION ............................................................... 16

CERTIFICATE OF SERVICE ................................................... 16

i

TABLE OF AUTHORITIES

PAGE NO.

CONSTITUTIONS

La.Const. Art. 1 § 20 (1974) ........................................................ 12

La.Const. Art. V § V (1974) ........................................................ 1

U.S.C.A. Const.Amend. 14 ........................................................ 14

U.S.C.A. Const.Amend. 5 ........................................................ 6

U.S.C.A. Const.Amend. 6 ........................................................ 6

U.S.C.A. Const.Amend. 8 ........................................................ 12

STATUTES

9th Cir. Model Crim. Jury Instruction 3.20 ........................................ 10

Court Interpreters Act, 28 U.S.C. §§ 1827-28. .................................... 10

La.C.Cr.P. art. 782(A) ............................................................ 15

LSA-R.S. 14:30.1 ................................................................ 1

FEDERAL CASES

Apodaca v. Oregon, 406 U.S. 404 (1972) .......................................... 14

Apprendi v. New Jersey, 530 U.S. 466, 47 (2000) .................................. 14

Blakely v. Washington, 542 U.S. 296, 301 (2004) .................................. 14

California v. Prysock, 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981) ...... 11

Duckworth v. Eagan, 492 U.S. 195, 203, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989) .... 11

Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) .............. 9

McDonald v. City of Chicago, 130 S.Ct. 3020, 3035 n.14 (2010) .................... 14

Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 1409, 89 L.Ed.2d 631 (1986)...... 11

Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ............ 6

Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) ........ 10

Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983) .... 11

Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) ......... 11

United States v. Boon San Chong, 829 F.2d 1572, 1574 (11th Cir. 1987) ............. 10

United States v. Heredia-Fernandez, 756 F.2d 1412, 1415 (9th Cir. 1985) ............ 10

United States v. Short, 790 F.2d 464, 469 (6th Cir. 1986) .......................... 10

STATE CASES

State v. Panes, 09-K-902 (11/19/2009) .............................................. 1

State v. Bertrand, 2008-2215 (La. 3/17/09), 6 So.3d 738 ............................ 15

ii

State v. Daigle, 96-782 (La.App. 5 Cir. 1/28/97), 688 So.2d 158, 159 *writ denied*, 97-0597 (La. 9/5/97), 700 So.2d 506 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

State v. Funes, No. 11-KA-120 (La.App. 5 Cir. 12/28/03) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

State v. Jones, 98-1055 (La.App. 5 Cir. 2/23/99), 792 So.2d 95, 97 . . . . . . . . . . . . . . . . . . . . . 12

State v. Lobato, 603 So.2d 739, 751 (La. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

State v. Munoz, 575 So.2d 848 (La.App. 5 Cir. 1991) *writ denied*, 577 So.2d 1009 (La.1991) 12

State v. Quebedeaux, 424 So.2d 1009 (La.1982), *aff'd on remand*, 446 So.2d 1210 (La.1984) 13

State v. Slang, 646 So.2d 1037 (La.App. 5 Cir. 1994) *writ denied*, 652 So.2d 1344 (La.1995) 13

State v. Sweeney, 443 So.2d 522, 531 (La.1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

State v. Telsee, 425 So.2d 1251 (La.1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

513

## JURISDICTION

Rigoberto Funes, defendant/appellant in this criminal matter invokes the jurisdiction of this Honorable Court by virtue of La.Const. Art. V § V (1974).

## WRIT GRANT CONSIDERATION

(a) The grant or denial of an application for writs rests within the sound judicial discretion of this court. The following, while neither controlling nor fully measuring the court's discretion, indicate the character of the reasons that will be considered, one or more of which must ordinarily be present in order for an application to be granted:

Rigoberto Funes seeks a writ of certiorari herein because the court of appeal has 1) erroneously interpreted or applied the constitution or law of this State or the United States Supreme Court in 1)*Miranda v. Arizona;* 2) the Eighth Amendment regarding excessive punishment and 3) the Sixth and Fourteenth Amendment in regards to a unanimous jury verdict in this case. See *McDonald v. City of Chicago,* and the decision rendered in this case by the Fifth Circuit Court of Appeal will cause material injustice to defendant. Rule X, 1(a) (4).

## STATEMENT OF CASE

On February 26, 2009, Rigoberto Funes, along with Jose Cornejo-Garcia, Renil D. Escobar-Rivera, Mario A. Funes, and Pedro A. Navarette-Duran, was indicted for four counts of second degree murder, violations of LSA-R.S. 14:30.1. (R.p.31). He was arraigned and pled not guilty on March 6, 2009. (R.p.6). The trial court heard and denied Motions to Suppress Identification and Statements on September 2, 2009. (R.pp.12, 470). The Fifth Circuit Court of Appeal denied writs on the issue, noting appellant retained a right of appeal. State v. Funes, 09-K-902 (11/19/2009).

On March 22, 2010, the trial court heard and denied appellant's Motion to Declare Article 782(A) Unconstitutional. (R.pp.85-93; 117; 618-625). The court did grant appellant's Motion to Quash Count 2 of the Bill of Indictment. (R.pp.17; 139-141; 631-649).

Trial before a jury of twelve as to appellant alone on the remaining counts 1, 3 and 4 was held on July 27 through 29, 2010, concluding with verdicts of guilty as charged by a margin of eleven to one on each count. (R.pp.23-30; 1200; 1201-1203).

On August 5, 2010, appellant was sentenced to three consecutive terms of imprisonment for life at hard labor without benefit of probation, parole, or suspension of sentence, with credit for time served. (R.pp.176; 1234-1235). The Court denied a Motion to Reconsider Sentence on September 9, 2010. (R.pp.178-179; 1239-1244).

514

On March 14, 2011, Bruce Whitaker of the La. Appellate Project filed a direct appeal on the defendant's behalf in the Fifth Circuit Court of Appeal in Docket No. 11-KA-120. On December 28, 2011, the Fifth Circuit affirmed defendant's convictions and sentences. State v. Pines, No. 11-KA-120 (La.App. 5 Cir. 12/28/03). From that adverse decision, defendant files this writ of certiorari in this Louisiana Supreme Court.

## FACTS OF THE CASE

Deputy Rhonda Goff of the JPSO testified that on October 30, 2008, at 2:00 p.m., she had occasion to drive down Fourth Street in Marrero, LA. (R.p.752). As she passed Gomez's Bar, she happened to observe two Hispanic males assisting a third as she left the establishment. (R.pp.752-753). All three appeared to be bloody. (R.p.753). She turned on her roof top lights and alerted the dispatcher as to her location and what she had observed. (R.p.753). Goff identified appellant in open court as one of the three men. (R.p.754). After notifying the dispatcher she exited her unit and asked the trio "What's wrong?" (R.p.754). The group stopped and showed to her that the middle subject had been shot. (R.p.755). Shortly thereafter some white males exited the bar and told her that the trio had just shot four people in the bar. (R.p.755). At that, Goff forced the two uninjured males onto the hood of her police unit and handcuffed them. (R.p.756). She patted them down for weapons and in doing so found the two to be carrying the wallets or property of several white males. (R.p.757). She then called for ambulances and backup. (R.p.758). As soon as backup arrived she entered the bar and found a scene "out of Hollywood" with "blood and money and bodies everywhere." (R.p.760).

Rodney Naumann of the crime lab testified that he documented the crime by collecting evidence from the bar, evidence discovered by the coroner's office, and even clothing worn by appellant at the time of his arrest. (R.pp.774-776). He also gathered numerous photographs and latent fingerprints. (R.pp.783-784).

Deputy David Chaplain stated that he was the first crime scene tech to arrive and in that role "handled everything inside the bar." (R.p.791). He photographed the scene, collected physical evidence, and took measurements. (R.p.792). Included in the physical evidence were handguns, cartridges, and casings. (R.pp.793-800).

Patrick Smith, 85 years old at the time of trial and a regular customer at Gomez's, testified that he went to the bar on the afternoon of October 30, 2008. (R.p.824). Smith said that as he and a friend entered it quickly became apparent that a robbery was underway. (R.p.825). Smith was knocked down by one of the robbers who tried, but failed, to take is money from him. (R.pp.825-

2

515

826; 835). Smith then accompanied one of the other patrons, Donald Lovas, to the kitchen. (R.p. 826). Once in the kitchen, Smith dialed 911 and reported the incident to the police. (R.pp.826-827). During the incident Smith heard "at least five or six shots . . . ." (R.p.828).

Donald Lovas stated that he too frequented Gomez's bar and walked in with Patrick Smith on the day of the shooting. (R.p.840-841). Soon after entering, someone said "Go to the back" whereupon Lovas felt someone's hand in his back pocket. (R.p.842) Realizing that it was a robbery, he glanced to his right and saw the glint of a pistol. (R.p.842). He let the robber remove his wallet and then corralled his friend Smith to accompany him to the kitchen. (R.p.842). While in the kitchen he heard multiple gunshots in the barroom. (R.p.842). His wallet, complete with its contents, was later returned to him by the JPSO. (R.p.843).

Keith Cummings told the jury that he rented an apartment above Gomez's bar. (R.p.835). He happened to be in the bar on the day of the incident. (R.p.856). As he sat at a table reading the paper, a group of men entered, ordered beers, and gathered by the pool table. (R.p.857) The next thing Cummings knew, the bar was being robbed with one of the men waving "a big ole pistol" and another guy with a gun too the back of one of the owners, Wallace Gomez. (R.p.858). Cummings emptied his pockets, showing the men that he had nothing on him, not letting them know that his possessions and cash were in a bag at his feet. (R.p.859). At some point gunfire broke out between Wallace Gomez and the robbers. (R.p.861). When the shooting was over, four men lay wounded and dead or dying on the barroom floor. (R.p. 862).

Earl Scioneaux testified that he was in the bar at the time of the incident. (R.p.883). As he sat at a video poker machine he heard Wallace Gomez exclaimed, "You've got to be kidding" and looked up to see a guy later identified as "Escobar" with a gun to Wallace Gomez's back. (R.p.887). The gunman then took Wallace toward the rear of the establishment. (R.p.887). The next thing he knew, Scioneaux heard a commotion, followed by a man approaching and telling him to put his hands up and turn around. (R.p.890). Scioneaux took his hands out of his pockets and dropped his money on the table. (R.p.891). The man then went through his pockets and took his cell phone, his wallet, and his change. (R.p.891). One person had gone behind the bar and broken open the cash register and was emptying it. (R.p.893). The other robbers then left leaving the robber at the register behind. (R.pp.893-894). Moments later Wallace Gomez came from the rear of the bar and was told that "They still got a guy behind there." (R.p. 95). Wallace stopped the guy and asked "Are you one of them?" whereupon the man picked up his pistol, prompting Wallace to fire his gun only to be shot in return. (R.p.897) Shortly thereafter the others returned firing.

(R.p.897). Scioneaux sought cover in a bathroom. (R.p.897). When the commotion died down he came out to view the bloody aftermath. (R.p. 897).

Stanley Gomez, 84 years old, testified that Wallace Gomez and Beuford Gomez were his brothers. (R.p.910-911). The original Gomez's bar was opened by their father in 1943 at 6109 Fourth Street in Marrero and remained in operation at that location at least through the date of trial. (R.p.911). Stanley stated that on the day of the incident, "five Mexicans come in" and "pulled out guns." (R.p.914). One of the gunmen walked his brother Wallace to the back. (R.p. 916). Later, when Wallace exited the back, Stanley saw him with a pistol in his hand, engage in a close range gun battle with one of the robbers. (R.p.917). Stanley said it appeared that the mortally wounded Wallace was firing his gun "automatically like, like he didn't know what he was doing". (R.p.918). He saw Wallace hit the floor and saw Beuford go down as well. (R.p.918). He later realized that Wayne Hebert and Jeffrey Canardelle had also been shot. (R.p.919). Stanley's wallet was taken from him in the incident, and later returned by the JPSO. (R.pp.921-922).

Maggie Pernia of the JPSO told the jury that she obtained a statement from appellant at the detective bureau on the evening of October 30, 2008. (R.p.983). Pernia advised that she is fluent in Spanish and so claimed she was able to converse with appellant in his native language. (R.pp. 981-982; 986-988). A tape recording of the statement was played in open court. (R.pp.991-992). Each juror was provided with a typed English language translation of the tape to read as the tape was being played.

[In the transcript, a copy of which accompanies the record on appeal, appellant apparently told the officer that the "rent was coming due" and "Renil said if I wanted to go with him there, so I could search the people and take the money." In the group that went to the bar "Pedro", Renil, and appellant's brother Mario had guns. Pedro had a .357, Mario had a .380, and Renil had a .22. Appellant and the fifth member of the crew were unarmed. Once inside the guns were pulled "to put the people with the hands up" after which appellant and the fifth member searched the people. When he heard the first shot appellant ran out of the bar. "We went outside, it was quick, but when we went outside, we didn't hear no more shots." Appellant then returned for his brother and the other shooting victims on the ground and took from his brother's hand a now empty gun and was assisting his brother out of the bar when the police first pulled up.]

Later, Pernia re-interviewed appellant and obtained a second statement which statement was likely presented at trial in the same manner as the first. (R.pp.994-996).

4

517

[In the second statement appellant allegedly added that when he returned to get his brother he took his weapon, a .380, and fired it "three or four" times to assist in making the getaway.]

Dr. Karen Ross testified as an expert in forensic pathologist and told the jury that she went to the crime scene and that the bodies of Wallace and Beuford Gomez had not yet been removed. (R.pp.1017-1023). Camardelle and Hebert had been transported to the hospital in an attempt to save their lives. (R.p.1023). She ultimately performed autopsies on all four. (R.p.1024). She found that Beuford Gomez died of a single gunshot wound to the back. (R.pp.1025-1027). Wallace Gomez died of a single gunshot wound to the chest. (R.p.1029). Jeffrey Camardelle suffered two gunshot wounds, a fatal shot to the left upper chest and one shallow entry wound beneath his navel. (R.p.1034). Wayne Hebert died of a single gunshot wound to the chest. (R.p.1040).

Colonel Timothy Scanlan of the JPSO Crime Lab testified as an expert in firearms and toolmarks examination and crime scene reconstruction. (R.pp.1057-1058). He and his lab examined a Smith & Wesson pistol, State's Exhibit 10, and a Llama semiautomatic pistol, State's Exhibit 17, as well as numerous casings and projectiles recovered at the scene, and projectiles removed during the course of the autopsies. (R.pp.1064-1069). He determined that Camardelle was killed by a projectile fired from the Llama semi-automatic. (R.pp.1070-1072). He further was able to determine that there was a third weapon used at the scene, a .22 caliber semi-automatic weapon, that was not recovered but which left four casings behind. (R.pp.1075-1076). Scanlan noted that Camardelle was also struck by a .22 caliber round in addition to the aforementioned .38 fired from the Llama (R.p.1081). His lab determined that both Camardelle and Hebert were shot by the .22. (R.p.1107).

Detective Keith Locascio testified that when he arrived at the shooting scene Camardelle was being rolled out on a stretcher. (R.p.1132). Paramedics were working on Hebert; the Gomez brothers lay on the floor dying. (R.p.1133). He noticed that three Hispanic males had been detained, one of whom, Mario Funes, had been shot and was soon to depart in an ambulance. (R.pp.1139-1140). The other two subjects in custody were Jose Garcia and appellant, Rigoberto Funes. (R.p.1141). Two other subjects, Pedro Navarrete-Duran and Ranil Escobar-Rivera were apprehended elsewhere. (R.p.1143).

The defense called to the stand Lt. Kelly Carrigan of the JPSO Crime Lab who stated that she attempted to lift fingerprints from the two firearms, the Smith & Wesson and the Llama, without success, and was not asked to swab either item for DNA testing purposes. (R.pp.1181-1185).

## QUESTIONS OF LAW PRESENTED FOR REVIEW

1. Whether the defendant was properly Mirandized prior to his statements of the police officers?

2. Whether three consecutive life sentences were excessive considering this particular defendant where evidence conflicts as to whether he actually killed any of the victims?

3. Whether the trial court erred in charging the jury that less than a unanimous verdict was sufficient to convict?

## LAW AND ARGUMENT PRESENTED

## CLAIM NO. 1

TRIAL COURT ERRED IN DENYING MOTION TO SUPPRESS STATEMENTS WHICH STATEMENTS WERE TAKEN IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FIFTH AND SIXTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES.

Rigoberto Funes contends that the trial court erred in denying his motion to suppress statements. Funes argues that his statements were taken in violation of his Fifth and Sixth Amendment rights to the United States Constitution. Specifically, he argues that the State failed to carry its burden of proving a knowing and intelligent waiver. In support of his argument, defendant asserts that the fact that the recorded waivers were deficient offers compelling evidence that the "off the record" advisory and waiver was likewise constitutionally inadequate. In addition, Funes asserts that where Officer Maggie Pernia represented that she was fluent in Spanish, the recorded statements demonstrate Pernia's inability to effectively communicate the Miranda warnings to him in Spanish.

### THE WAIVER LANGUAGE WAS DEFICIENT

According to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) prior to questioning, an individual in custody must be advised of 1) his right to remain silent; 2) that anything he says can be used against him in a court of law; 3) that he has the right to the presence of attorney; and 4) if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires.

At the hearing on Funes' Motion to Suppress, Maggie Pernia testified that she obtained two recorded statements from him. (R.p.323-324). Pernia told the judge that she considers herself to be bilingual. (R.p.324). She admitted, however, that her skill as an interpreter was based on her long ago birth in Cuba, and, it is presumed, her early childhood there - as it is, at the time of trial she had been with the Sheriff's Office for almost thirty years. (R.pp.322-328). In any event, self-confident in her ability, she personally advised Funes of his rights before taking any statement from him. (R.p.324).

6

519

In particular, Pernia claimed that she informed Funes in Spanish, in an unrecorded pre-interview, that "you have a right to remain silent; anything you say can and will be used against you in a court of law; you have the right to have an attorney present with you during questioning; if you can't afford an attorney, one will be appointed to you; if you decide to answer questions now, without an attorney present, you still have the right to stop answering questions at anytime until you speak to an attorney." (R.p.324). When she took a second taped statement, instead of advising him of his right anew, she simply "reminded him of the same rights . . . and told him they were still in effect." (R.p. 325) She agreed that the tape recorded statements contained "every question and answer that was put by her and given" by Funes. (R.p.327).

On cross, Pernia noted that the first statement began at 7:19 p.m., about five hours after the shooting. (R.p.330). She admitted that in the pre-interview with Funes and in the recorded interview she did not use a written waiver form. (R.p.332). She admitted that the recorded waiver of rights in the 7:19 statement was deficient because it did not include "each and every right under the Miranda decision" stating, "I did not read the rights like I read them at the beginning during the pre-interview, but I reminded him of his rights, of the important rights in that statement." (R.p.334).

In particular, in the recorded statement, Pernia merely told Funes, "Rigoberto, before we started to record this. I told you, you didn't had (sic) to speak to me, is this true?" Pernia also told Funes, "I told you, you could have an attorney and what you may tell me could be used against you in Court. Have I advised you of all of this?" and "Ok, Rigoberto, do you want to speak with me at this time?" Funes answered "yes" to each of these questions in the tape. See p. 1 of transcript of 7:19 statement in evidence.

It is extremely important to note that she did not advise Funes - a 20 year-old indigent - that if he could not afford an attorney, an attorney would be provided to him without cost before any questioning.

In this recorded waiver, in thus memorializing what she "just told him" Pernia makes the record plain that "before we started to record this" she recited for him a deficient listing of his Miranda rights. Clearly the tape displays an inadequate advisal of rights. If that is in fact what Pernia "just told" Funes - then she just proved that the statement must be suppressed and the trial court erred in failing to grant his motion, thus entitling him to a new trial. The tape thus shows that the unrecorded waiver was equally deficient.

520

Pernia also admitted that she did not obtain a written waiver for the second statement either, obtained at 12:24 a.m. on the morning of October 31, 2008. (R.p.336).

In the 12:24 statement, at pp. 1-2, Pernia simply declared, "Rigoberto, you have the right to remain silent and to have a lawyer present. Understand this." and "I have not forced you to talk with me, nor have I treated you badly, is this true?" to which statements Funes replied, "yes."

With regard to brief third statement, obtained at 2:50 a.m. on the morning of October 31, involving identification of his confederates in photographic lineups, Sgt. Kevin Decker testified. (R.pp.345-356). In that statement, Decker used a fellow officer, Deputy Jimmy Mendez, to translate. (R.p.352). Rather than go over his rights with him, Decker simply asked Funes "if he was still aware of his rights." (R,p.352). Mendez testified and admitted that he relied on the advisal of rights purportedly given to Funes earlier. (R.p.369). He admitted that he has no training or certification in translating and can neither read nor write in Spanish. (R.p. 373).

### LACK OF INTERPRETIVE SKILL NEGATES MEANINGFUL WAIVER

In the context of judging the deficiency of the waivers themselves, it is worth noting that the broken English in the recorded statements reveals how the self-professed bilingual Pernia clearly struggled in her attempts to communicate in Spanish. When her Spanish was translated to English, her lack of skill was made plain.

The following illustrative examples are taken from the 7:19 statement: p.1 - "Rigoberto, before we started to record this, I told you, you didn't had (sic) to speak to me, is this true?"; p.2 "I will ask. What happened uh-no let me start, the bar in the 4th street, it's called Gomez. Do you know this?"; p.3 "And went to play pool, and there weren't any problems that day?"; p.6 "Nothing, and so only, what were you all going to do?", "How you, how do you know Renil?", "I see that Renil is the brother, is your brother-in-law?"; p.7 "Then he is the boy-in-law, he is Melvin's brother-in-law?"; p.9 "You went on the door first."; p.12 "Wait a minute, let me see something? You come out with this boy Jose. You arrived at the car."; p.14 "How old are you?" - when Funes answered, "I am 20 years old. My birthday is September 13." Pernia inexplicably - and revealing - asked "Where? You didn't shoot?".

The 12:24 statement contains the following illustrative examples by Pernia: p.1 "This is your second declaration you done, truth, you have to say yes and no.", "But this is your second declaration - interview I done, truth?"; p.2 "That was the plan, you told at one time."; p.5 "Why Pedro and Jose come?"; p.6 "And you took anything out of pockets?", "Jose, was the one taking out of pocket?"; p.9 "How from your brother? How 'your brother'?"; p.10 "How you know?"

8.

This broken English is not highlighted for the purpose of ridiculing Pernia but to illustrate that she struggled to communicate with Funes regarding the comparatively simple mechanics of a barroom armed robbery. If she had such difficulty in communicating the simple "who what when where and how" of the crime, one can only imagine the even greater difficulty she encountered in advising the twenty year old indigent Funes of the essential constitutional rights he possessed. Her clear difficulty in understanding his responses in the recorded statement must call into question her claim that Funes understood his rights and thereafter waived them.

Accordingly, Funes submits, it would be the height of folly to assume that the unrecorded explanation of rights, and their attendant waiver, was done correctly when the recorded advisal is so clearly deficient, and where the "bilingual" Pernia is exposed to have struggled to communicate the much readily understood facts of the crime. It is only fair to presume that the unrecorded conversation revealed a similar difficulty with communication. Certainly, the evidence in the record does not show that the State carried its heavy burden of proving a knowing and intelligent waiver of Funes' constitutional rights.

## THE STATE FAILED TO CARRY ITS BURDEN

As established in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Fifth Amendment right to counsel is intended to protect a defendant from making self-incriminating statements during his arrest or interrogation that might be used against him in the course of subsequent legal proceedings. The burden of proving compliance with the procedures set forth therein is with the Government and that it is a heavy burden, quoting this language:

"If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel . . This Court had always set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and we re-assert those standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders." Miranda v. Arizona, 384 U.S. at 475.

Thus, according to Miranda, prior to questioning, the individual must be advised of 1) his right to remain silent; 2) that anything he says can be used against him in a court of law; 3) that he has the right to the presence of an attorney; and 4) if he cannot afford an attorney, one will be

522

appointed for him prior to any questioning if he so desires. Id. at 444. While the individual may knowingly and intelligently waive these rights, unless such warnings and waiver thereof are demonstrated, no evidence obtained as a result of the interrogation may be used against the individual. Id. In order for the waiver to be valid, the relinquishment of the right must have been voluntary in the sense that it was the product of a free individual choice rather than intimidation, coercion, or deception. Moran v. Burbina, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). It also must have been made with full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Id. "[L]anguage may in some instances impair an individual's ability to waive his rights in a knowing manner." United States v. Boon San Chong, 829 F.2d 1572, 1574 (11th Cir. 1987). See, United States v. Heredia-Fernandez, 756 F.2d 1412, 1415 (9th Cir. 1985) ("[L]anguage difficulties may impair the ability of a person in custody to waive [Miranda] rights in a free and aware manner."); United States v. Short, 790 F.2d 464, 469 (6th Cir. 1986) (holding defendant's language difficulties and lack of understanding regarding the United States criminal justice system rendered her waiver of Miranda rights invalid).

In federal courts, translations for criminal defendants and witnesses who are not fluent in English are normally provided by certified experts. Congress requires federal courts to certify interpreters for use in federal judicial proceedings. See, Court Interpreters Act, 28 U.S.C. §§ 1827-28. To be certified as a Spanish federal-court interpreter, an applicant must pass a rigorous written and oral examination, which requires native-level mastery of both English and Spanish. Many people claim "fluency" in a foreign language, but "there are few persons in the United States who can interpret with the degree of precision and accuracy required at the Federal court level." H.R. Rep. No. 100-889, at 58 (1988), reprinted in 1988 U.S.C.C.A.N. 5982, 6019. Indeed, jurors who consider their own translation skills superior to those of the certified interpreter are instructed to consider only the certified translation. See, 9th Cir. Model Crim. Jury Instruction 3.20.

While Pernia's representation that she is fluent in Spanish was well intended, her statement nonetheless lacks one crucial component: confirmation by someone familiar with the requisite standard that her fluency was commensurate with the level required for translating the sometimes difficult words and concepts used in a Miranda advisal of rights. If anything, the recorded statements show that she struggled haltingly throughout. Bilingual "fluency" is certainly not demonstrated. This lack of skill on the part of Pernia must be taken into account when judging whether she was able to communicate the Miranda warnings to Punes in an understandable manner.

10

523

While there is no rigid rule requiring that the warnings to an accused be a virtual incantation of the precise language set forth in the Miranda opinion, see California v. Prysock, 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981) (per curiam), and reviewing courts need not examine Miranda warnings as if construing a will or defining the terms of an easement. Duckworth v. Eagan, 492 U.S. 195, 203, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989), still the reviewing court must determine "whether the warnings reasonably 'convey to [a suspect] his rights as required by Miranda.'" Id. (quoting California v. Prysock, 453 U.S. at 361).

Additionally, there is a strong presumption against waiver, and in order to establish that statements taken by police during uncounseled custodial interrogation are admissible, the burden rests with the State to establish "that the [suspect] knowingly and intelligently waived his privileges against self-incrimination and his right to retained or appointed counsel." Miranda, 86 S.Ct. at 1628. Indeed, courts must "'indulge every reasonable presumption against waiver of fundamental constitutional rights.'" Michigan v. Jackson, 475 U.S. 625, 106 S.Ct. 1404, 1409, 89 L.Ed.2d 631 (1986)(quoting Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)).

The Supreme Court has explained the procedure for evaluating the validity of waivers as follows:

The inquiry has two distinct dimensions. First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than, intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived. Moran v. Burbine, 475 U.S. 412, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1985).

As part of this inquiry, courts must consider the unique facts of a particular case, "including the background, experience, and conduct of the accuse." Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983) (internal citations omitted). Again, although there is no requirement of adherence to talismanic language, courts "indulge every reasonable presumption," Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (internal quotation marks omitted), that a suspect has not waived his right to counsel under Miranda, see, e.g. Oregon v. Bradshaw, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (Powell, J., concurring) ("We

11

524

are unanimous in agreeing . . . that the [Miranda] right to counsel is a prime example of those rights requiring the special protection of the knowing and intelligent waiver standard") (internal quotation marks and brackets omitted).

In this case, the recorded "waiver" falls woefully short of the goal of reasonably conveying to Funes the right he possessed under Miranda. In the first recorded statement, Pernia declared simply: "Rigoberto, before we started to record this, I told you, you didn't had (sic) to speak to me, is this true?" . . . ."I told you, you could have an attorney and what you may tell me could be used against you in Court. Have I advised you of all of this?" As noted above, this advisal is clearly deficient on its face for failing to advise Funes that he would be provided counsel at no cost - and damning reflects what was just told "before we started to record this." At the time of the purported waiver, the 20 year old indigent alien had been held incommunicado in police custody for over five hours. The circumstances of this case fail to satisfy the knowing and intelligent waiver standard required by law.

The record before this Court demonstrates that the State failed to carry its heavy burden of proving a knowing and intelligent waiver. The evidence shows that the recorded waivers were deficient and are compelling evidence that the "off the record" advisal and waive was likewise constitutionally inadequate. Therefore, it was error for the trial court to deny the motion to suppress, thus resulting in Funes' constitutional rights under U.S.C.A. Const.Amends. 5 & 6 to be violated and requires that he be granted a new trial.

## CLAIM NO. 2

### THE TRIAL COURT IMPOSED AN EXCESSIVE SENTENCE IN VIOLATION OF THE EIGHTH AMENDMENT.

Funes contends that the trial court violated the Eighth Amendment when it imposed three consecutive life sentences without benefit of parole, probation or suspension of sentence. Such an extreme sentence imposed upon such a youthful first time offender where he did not specifically shoot any of the victims is constitutionally excessive.

The Eighth Amendment to the United States Constitution and Article 1, Section 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. U.S.C.A. Const.Amend. 8; La.Const. Art. 1 § 20 (1974). Even a sentence within the prescribed statutory limit may violate a defendant's constitutional right against excessive punishment. State v. Sweeney, 443 So.2d 522, 531 (La.1983); State v. Jones, 98-1055 (La.App. 5 Cir. 2/23/99), 792 So.2d 95, 97. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering. State v. Lobato, 603 So.2d 739, 751 (La. 1992); State v. Munoz,

12

575 So.2d 848, 851 (La.App. 5 Cir. 1991) *writ denied*, 577 So.2d 1009 (La.1991). In reviewing a sentence for excessiveness, the appellate court must considered the punishment in light of the harm to society and gauge whether the penalty is so disproportionate as to shock its sense of justice. State v. Daigle, 96-782 (La.App. 5 Cir. 1/28/97), 688 So.2d 158, 159 *writ denied*, 97-0597 (La. 9/5/97), 700 So.2d 506.

Generally, maximum sentences are reserved for cases involving the most serious violations of the offense charged and the worst type of offender. State v. Quebedeaux, 424 So.2d 1009, 1014 (La.1982), *aff'd on remand*, 446 So.2d 1210 (La.1984). However, the trial judge is afforded wide discretion in determining a sentence, and the court of appeal will not set aside a sentence for excessiveness if the record supports the sentence imposed. State v. Jones, 98-1055 (La.App. 5 Cir. 2/23/99), 729 So.2d 95, 97. The Court of Appeal should have considered several factors in reviewing the trial judge's sentencing discretion: 1) the nature of the crime was serious; 2) the participation of defendant as testified to by the witnesses was minimal as when the shooting started he fled outside, only to return while guns were being fired to retrieve the body of his brother; 3) the nature and background of the offender who had never been in serious trouble and was influenced by the older co-defendants; and 4) the sentence imposed for similar crimes for a non-shooter by the same court and other courts. State v. Telsee, 425 So.2d 1251 (La.1983); State v. Slang, 646 So.2d 1037, 1041 (La.App. 5 Cir. 1994) *writ denied*, 652 So.2d 1344 (La.1995).

Funes submits that he is not the worst offender for his crimes of conviction, as he was a youthful, mere follower of bad influences. He nonetheless receive the absolute maximum term of imprisonment available for a non-shooter. On the facts of this case, this Court should grant certiorari and find that he received a constitutionally excessive sentence which at the least consideration by the trial court, he should have been ordered serve concurrent sentences, thus requiring the sentence be set aside and the case remanded for resentencing.

CLAIM NO. 3

THE TRIAL COURT ERRED IN CHARGING THE JURY THAT A LESS THAN UNANIMOUS VERDICT WAS SUFFICIENT TO CONVICT DEFENDANT FOR AN OFFENSE NECESSARILY PUNISHABLE BY HARD LABOR.

In this case, trial counsel unsuccessfully challenged the constitutionality of Louisiana Code of Criminal Procedure Article 782(A). (R.pp. 85-93; 117; 618-625). In particular, trial counsel challenged the trial court's instruction on lack of a need for jury unanimity. As noted, the jury was polled on its verdict and it was found that each verdict was by a vote of only eleven to one. (R.pp. 1201-1203).

13

Funes submits that a non-unanimous verdict is a violation of federal due process, such that the verdict cannot stand. A non-unanimous verdict in a case such as the instant one violates U.S.C.A. Const.Amends. 6 & 14.

Louisiana is one of two states that allows a person to be convicted of a felony by a less than unanimous jury verdict. (Oregon is the other. See Or. Const. Art. I § 11; Or. Rev. State. § 136.450). This practice contravenes centuries of common law, as well as longstanding American precedent, requiring unanimity to convict in criminal cases. Nevertheless, in Apodaca v. Oregon, 406 U.S. 404 (1972), a bare majority of this Court - in a deeply fractured, internally contradictory decision - held that the Constitution does not forbid the states from securing convictions by non-unanimous verdicts.

In Apodaca, four justices concluded that the Sixth Amendment did not require unanimous juries and four justices concluded that the Sixth Amendment did require unanimity and that the Fourteenth Amendment applied the requirement to the states. The result in Apodaca turned on the conclusion of a single justice that, while the Sixth Amendment had a unanimity requirement, the Fourteenth Amendment did not apply that requirement to the states.

Subsequent developments in the Supreme Court's Sixth and Fourteenth Amendment jurisprudence call the five-vote judgment in Apodaca into serious question. In terms of the Sixth Amendment, the plurality opinion in Apodaca is squarely inconsistent with the Supreme Court's recent, repeated pronouncements in cases reviewing criminal convictions from state courts that the Sixth Amendment requires "that the 'truth of every accusation' against a defendant 'should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbors.'" Blakely v. Washington, 542 U.S. 296, 301 (2004) (quoting William Blackstone, Commentaries on the Laws of England 343 (1769)); accord Apprendi v. New Jersey, 530 U.S. 466, 47 (2000); see also McDonald v. City of Chicago, 130 S.Ct. 3020, 3035 n.14 (2010) ("[T]he Sixth Amendment right to a jury trial by jury requires a unanimous jury verdict.")

In terms of the Fourteenth Amendment, Justice Powell's concurring opinion cannot be squared with the Supreme Court's holding last term in McDonald, supra, that "[t]he relationship between the Bill of Rights' guarantees and the States must be governed by a single, neutral principle": "incorporated Bill of Rights protections are to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." 130 S.Ct. at 3035, 3048 (internal quotation and citation omitted).

14

527

In recognition of the apparently continued vitality of the *Apodaca* decision the Louisiana Supreme Court has rejected the argument that a non-unanimous verdict in a case such as the instant one, provided for by La.C.Cr.P. art. 782(A), violates the Fifth, Sixth or Fourteenth Amendments to the U.S. Constitution.

In *State v. Bertrand*, 2008-2215 (La 3/17/09), 6 So.3d 738, the trial court found that La.C.Cr.P. art. 782(A) violated the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, relative to the number of jurors needed to concur to render a verdict in cases in which punishment is necessarily confinement at hard labor, the same issue raised by Funes in the instant case. On direct appeal by the State, the Louisiana Supreme Court reversed, stating in its conclusion:

Due to this Court's prior determination that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court's still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts. *State v. Bertrand*, 6 So.3d 738, 743 (La 3/17/09).

The Supreme Court of the United States recently denied writs in a case from Louisiana challenging the constitutionality of Article 782. Funes nonetheless maintains that the day will come when this wrong, and the error of *Apodaca*, is rectified. Accordingly, Funes maintains that the non-unanimity instruction that resulted in his verdict and multiple life sentence was a denial of due process, contrary to the Sixth and Fourteenth Amendments to the U.S. Constitution.

This Court should grant certiorari and revisit this issue, finding that life sentences imposed must be vacated and the non-unanimous verdicts set aside and the case remanded for a new trial.

528

## CONCLUSION

Funes submits that in reviewing his direct appeal from the 24th Judicial District Court, the Fifth Circuit Court of Appeal erred in determining that his inculpatory statements made without an adequate *Miranda* warning were admissible and used at his trial, that his three consecutive life sentences were not excessive and that a unanimous verdict was not required under the Sixth and Fourteenth Amendments according to the circumstances of this case.

Wherefore, he pray that this Court would grant certiorari and remand this matter for further proceedings.

Respectfully Submitted:

*Rigoberto Funes*
RIGOBERTO FUNES #571875
TU UPPER B
LA. STATE PENITENTIARY
ANGOLA, LA 70712

## CERTIFICATE OF SERVICE

I, Rigoberto Funes, hereby certify that a copy of the foregoing Writ of Certiorari has been served upon the Clerk of Court for the Fifth Circuit Court of Appeal, Honorable John J. Molaison, Jr., Judge, 24th Judicial District Court and Paul Connick, Jr., District Attorney for the Parish of Jefferson, all properly addressed with sufficient postage affixed on this __25th__ day of January, 2012.

*Rigoberto Funes*
RIGOBERTO FUNES